UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────

DANIEL WILLIAMS,

                              Plaintiff,

            v.                                         9:16-cv-1157
                                                              (FJS/TWD)

N. KORINES, et al.,

                             Defendants.

───────────────────────────────────────

APPEARANCES:                                  OF COUNSEL:

DANIEL WILLIAMS
03-A-5915
Southport Correctional Facility
Pine City, NY 14871
Plaintiff, *pro se*

BARBARA D. UNDERWOOD                   LYNN M. KNAPP BLAKE, ESQ.
Acting Attorney General of the State of New York    ADRIENNE J. KERWIN, ESQ.
The Capitol
Albany, NY 12224
Counsel for Defendants

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

      This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983 by

Plaintiff Daniel Williams, an inmate in the custody of the New York Department of Corrections

and Community Supervision ("DOCCS"), has been referred for a report and recommendation by

the Hon. Fredrick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. §

636(b) and Northern District of New York Local Rule 72.3(c).

Plaintiff claims Defendants Korines, Smith, Kober, Pingotti, Liberty, Rodriguez, Uhler, and Annucci violated his constitutional rights when they punished him for possessing personal photographs depicting gang-related "hand gestures" in violation of DOCCS Disciplinary Rule 105.13. (Dkt. No. 16.) Plaintiff alleges Korines, Kober, and Pingotti conspired to confiscate his photographs and subject him to improper discipline in violation of his constitutional rights. *Id.* at 10.[1] Plaintiff seeks monetary damages, along with declaratory and injunctive relief. *Id.* at 21-22.

Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 45.) For the reasons discussed below, the Court recommends that Defendants' motion be granted.

## II.     FACTUAL AND PROCEDURAL SUMMARY

The majority of material facts are not in dispute. (*Compare* Dkt. No. 45-22 *with* Dkt. No. 50-2.) Rule 105.13 states:

> An inmate shall not engage in or encourage others to engage in gang activities, or meetings, or display, wear, possess, distribute or use gang insignia of materials including, but not limited to, printed or handwritten gang or gang related materials.
>
> Note:   For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion, or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

> possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

(Dkt. No. 16 at 27.)

### A.     Misbehavior Report

In September 2014, Plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk").  (Dkt. No. 45-22 at ¶ 2.)  On September 11, 2014, Plaintiff was issued a misbehavior report authored by Defendant Korines, a Corrections Officer ("C.O.") at the time, charging him with violating Rule 105.13 (Gangs):

> On [September 11, 2014, at 3:15 pm] I was asked to review the personnel [sic] property of inmate Williams, D. 03A5915.  While reviewing the personnel [sic] property I found 16 pictures with people showing hand signs.  [Offender Rehabilitation Coordinator ("ORC")] Kober was in the area at the time and I asked him to review the pictures.  He advised me that Williams, D. goes by the nickname "Cike Bike" and has previously been identified as a Crip.  Upon review of the pictures, by ORC Kober, he indicated that they appear to be pictures related to a gang known as the Crips, in violation of Rule 105.13.

(Dkt. No. 16 at 25; Dkt. No. 45-4 at 15.)  Plaintiff was served a copy of the misbehavior report on September 12, 2014, at 8:30 am.  (Dkt. No. 45-22 at ¶ 5.)

### B.     First Disciplinary Hearing

On September 18, 2014, Defendant Pingotti, Deputy Superintendent for Security at Shawangunk, began the Tier III disciplinary hearing regarding the September 11, 2014, misbehavior report (the "first disciplinary hearing").  *Id*. at ¶ 13.  Non-party Sergeant ("Sgt.") Lange served as Plaintiff's employee assistant.  (Dkt. No. 45-5 at 4.)

Pingotti read the misbehavior report into the record.  *Id*. at 10.  Plaintiff pleaded not guilty to Rule 105.13.  *Id*. at 12.  Plaintiff admitted that the sixteen photographs were his but

argued they had never been "depicted as Gangs or Contraband" at any other DOCCS facility. *Id*. at 15, 17.

At Plaintiff's request, non-party Captain Bertone testified that the search of Plaintiff's property on September 11, 2014, had been prompted by his altercation with another inmate. *Id*. at 22. Pingotti called Defendant Kober, ORC at Shawangunk, to testify. *Id*. at 27. Kober reviewed the photographs and indicated which photographs depicted gestures he believed to be gang-related. *Id*. at 29-43. Plaintiff was permitted to ask relevant questions and raise objections. *See id*. At the conclusion of his testimony, Kober testified he had received training in gangs generally, gang identification, gang lingo and jargon, and gang "tags" on a wall or in a picture. *Id*. at 45.

Plaintiff then requested two additional witnesses, ORC McCarthy of Five Points Correctional Facility and Sgt. Cochran of Attica Correctional Facility, who, according to Plaintiff had viewed his photographs in the past and would refute Kober's testimony. *Id*. at 46. Pingotti reserved his decision. *Id*. Plaintiff also requested to call Korines and Lange as witnesses. *Id*. at 47-48.

The hearing resumed on September 22, 2014. *Id*. at 49. Plaintiff was permitted to ask Lange questions relevant to the September 11, 2014, search and his role as Plaintiff's employee assistant. *Id*. at 49-59. Lange confirmed he provided Plaintiff with all of his requests except for a non-existent videotape of the September 11, 2014, search. *Id*. at 57-58.

Korines testified Captain Bertone authorized the September 11, 2014, search as part of an investigation. *Id*. at 62. Korines testified he found sixteen photographs of people showing hand signs. *Id*. at 60.

4

Korines attached the confiscated photographs to the misbehavior report and provided Plaintiff with a contraband receipt but not a personal property form. *Id*. at 59-65. Korines answered questions about photographs. *Id*. at 62-73. Pingotti provided Plaintiff with a copy of the contraband receipt he denied having previously received. *Id*. at 73.

The hearing resumed on September 23, 2014. *Id*. at 75. Pingotti denied Plaintiff's two requested witnesses, ORC McCarthy and Sgt. Conklin, as redundant. *Id*. Plaintiff objected and also raised issues about prior witness' testimony. *Id*. at 75-76. Plaintiff then asked Pingotti to review a series of images he had collected from newspapers and magazines showing various people, including well-known public figures or celebrities, using "hand gestures" that Plaintiff claimed were the same as some of the "hand gestures" in his photographs. *Id*. at 76-83. Plaintiff reiterated a number of objections raised earlier in the hearing, including the "chain of custody" of the photographs and having not received a contraband receipt the day of the search. *Id*. at 84-86. Plaintiff further stated Rule 105.13 is misleading and objected to his "tainted" hearing. *Id*. at 86-87.

On September 25, 2014, Pingotti found Plaintiff guilty. *Id*. at 88. Pingotti based his decision upon the misbehavior report and the credible testimony that some of the photographs depicted individuals using "hand signs" associated with the gang known as the Crips. *Id*. at 88-89. He imposed sanctions of 180 days in solitary confinement, a corresponding loss of packages, commissary, and telephone, and confiscation of the sixteen photographs.[2] *Id*. at ¶ 17; Dkt. No.

---

[2] On September 29, 2014, Plaintiff filed a grievance (SHG-29190-14), seeking the return of the sixteen confiscated photographs. (Dkt. No. 45-10 at 26.) Plaintiff's grievance was denied by Superintendent Smith, in relevant part, because the "photos were determined to be contraband and will not be returned." *Id*. at 27. Plaintiff did not pursue the grievance any further. (Dkt. No. 45-17 at ¶ 23.) Pingotti states, to the best of his knowledge, he returned the photographs, along with all documents connected with the first disciplinary hearing, to the file. (Dkt. No. 45-17 at ¶ 22.)

45-4 at 8-10.  Pingotti indicated that "[t]his penalty reflects a clear understanding that prior

dispositions for the same offense have not modified this inmate's behavior."  *Id*. at 89.

On September 26, 2014, Plaintiff sent a letter to Superintendent Smith requesting a

"discretionary review" of Pingotti's decision.  (Dkt. No. 45-4 at 3-6.)  By memorandum dated

October 8, 2014, Superintendent Smith replied:

> I have carefully reviewed your letter of 9/26/14 and have
> determined the following.  The hearing was conducted properly
> and the sanction was well within the guideline.  Your violating
> Rule 105.13 is clearly supported by the evidence.  As you well
> know your next step is to appeal to the Director of Special
> Housing.

*Id*. at 2.  Plaintiff filed an appeal, which was affirmed on December 5, 2014, by non-party

Venettozi, Acting Director of Special Housing/Inmate Disciplinary Program.  (Dkt. No. 45-6 at

11, 13, 19-28.)  Plaintiff's request for reconsideration was denied.  *Id*. at 13.

Plaintiff served six months in the segregated housing unit ("SHU") as a result of the

September 11, 2014, misbehavior report from September 25, 2014, to March 25, 2015.  (Dkt.

No. 45-7 at 25; Dkt. No. 45-22 at ¶ 24.)

Plaintiff filed an Article 78 proceeding in state court challenging his disciplinary

conviction.  (Dkt. No. 16 at 12.)  On March 3, 2016, the appellate division ruled in Plaintiff's

favor and annulled the September 25, 2014, determination, and remanded the matter for a

rehearing.  (Dkt. No. 45-6 at 6-7.)  In its decision, the court found the misbehavior report,

photographs, and testimony provided substantial evidence to support the determination of guilt,

but Pingotti should have permitted the testimony of Sgt. Cochran and ORC McCarthy to refute

Kober's testimony that the hand gestures in the photographs depicted gang signs.  *Id*. at 7.

On March 23, 2016, the September 25, 2014, guilty determination was administratively

reversed and a rehearing was scheduled.  *Id*. at 4.  Defendant Uhler, Superintendent of Upstate

Correctional Facility ("Upstate") was notified Plaintiff was to have a rehearing on the September 11, 2014, misbehavior report within fourteen days. *Id.* at 3.

### C.    Second Disciplinary Hearing

On March 26, 2016, Plaintiff was served a copy of the September 11, 2014, misbehavior report.  (Dkt. No. 45-7 at 2.)  On April 4, 2016, Defendant Liberty, a Commissioner's Hearing Officer ("CHO"), began the Tier III disciplinary hearing rehearing at Upstate (the "second disciplinary hearing"), where Plaintiff was housed at that time.  *Id.*

Liberty confirmed Plaintiff was served a copy of the September 11, 2014, misbehavior report.  *Id.* at 2.  Liberty also confirmed Plaintiff had met with his employee assistant and noted that assistance was not yet complete.  *Id.* at 3.  She read the misbehavior report into the record and stated the original sixteen photographs were unavailable for review.  *Id.* at 3-4.  She advised Plaintiff the rehearing record consisted of black and white photocopies of nine photographs.  *Id.* at 4.  Plaintiff asked Liberty why his original photographs were not a part of the rehearing.  *Id.* at 4-5.  Liberty noted Plaintiff's objection and stated she would request the originals from Shawangunk, if available.  *Id.* at 4-6.  Plaintiff pleaded not guilty.  *Id.* at 5.

When the hearing resumed on April 8, 2016, Liberty advised she was unable to locate the original photographs.  *Id.* at 6.  However, she obtained "color scans" of nine of the original photographs and advised Plaintiff she would be relying on the color scans as evidence.  *Id.* at 13. The record shows they reviewed the materials Plaintiff had previously requested.  *Id.* at 6-29. Plaintiff objected to Liberty relying on the color scans and the denial of some documents she deemed irrelevant.  *Id.*

Plaintiff raised an objection to the "chain of custody" of the color scans and identified "Teacher Lee" as a potential witness. *Id*. at 30-32.[3] Plaintiff also asked Liberty if she knew anyone at Upstate who had training in gang-related material. *Id*. at 32. She replied non-party C.O. Healy, who was present in the room as the escort officer, had relevant training. *Id*. Healy confirmed his training, and with Plaintiff's consent, agreed to testify. *Id*.

Healy reviewed the color scans and identified those he believed depicted gang gestures. *Id*. at 33-69. He also commented on Rule 105.13 and the September 11, 2014, misbehavior report and responded to questions posed by Plaintiff and Liberty. *Id*. Throughout Healy's testimony, Plaintiff raised a number of objections, emphasizing the poor quality of the color scans. *Id*.[4] Plaintiff and Liberty agreed to call Korines as a witness and the hearing was adjourned to schedule Korines' testimony. *Id*. at 72.

On April 18, 2016, Korines, who had been promoted to Sergeant, testified telephonically. *Id*. at 75. Generally, Korines testified about the events resulting in the September 11, 2014, misbehavior report. *Id*. at 76-77. Although he could no longer recall certain details of the search and the photographs, Korines affirmed the accuracy of September 11, 2014, misbehavior report. *Id*. at 76-84. Plaintiff had the opportunity to question Korines. *Id*. at 82-85. Plaintiff again objected to the missing photographs and requested to call the Attorney General as a witness, which Liberty denied as futile and irrelevant. *Id*. at 85-91.

The hearing resumed on April 19, 2016. *Id*. at 91. Plaintiff requested the testimony of Sgt. Lange and C.O. Bandell, who had searched his property at Shawangunk on September 9,

---

[3] It was later determined Teacher Isabella, not Teacher Lee, had training in gang-related materials. *Id*. at 14.

[4] Plaintiff also presented Liberty with a copy of a grievance concerning the confiscation of his photographs. *Id*. at 66. Liberty restated the original photographs could not be located and found Plaintiff's grievance otherwise irrelevant. *Id*. at 67-69.

2014, two days prior to the misbehavior report. *Id.* at 91-96. Liberty reserved her decision on

Bandell. *Id.* at 96.

Liberty stated she was calling Kober to testify and Plaintiff objected to Kober's testimony

as redundant. *Id.* Liberty noted Plaintiff's objection and, after a brief adjournment, Kober

testified telephonically. *Id.* at 96-97. Kober testified the scanned images he received from

Liberty were accurate depictions of the photographs he had reviewed in September of 2014. *Id.*

During Kober's testimony, Liberty reminded Plaintiff on multiple occasions not to interrupt and

make hand gestures while she was questioning a witness. *Id.* at 97, 100. She warned Plaintiff if

he continued to be disruptive, he would be excluded from the hearing:

> **CHO Liberty:** Okay, thank you. No Mr. Williams, I am asking
> questions. I will give you the opportunity. Please don't interrupt
> me again. I'm not going to warn me [sic] again. If you interrupt
> me, no you're interrupting me again even you're speaking lower,
> but you're still doing it. If you interrupt me again, I will consider
> it to be a disruption of the hearing process because now you've
> done it a couple times. Stop. If you continue to disrupt the hearing
> in this manner, you will be excluded from the hearing. The
> hearing will continue without you. There could be a penalty
> imposing the disposition if you're found guilty of any charges. Do
> you understand all of that?
>
> **Williams:** I understand that but can I state my objection to this
> person being a witness is not certified.
>
> **CHO Liberty:** After he answers the questions I have for him, you
> will be given the opportunity to place any objections on the record
> and ask any questions after I determine their appropriateness and
> relevance. Please stop interrupting. Thank you.

*Id.* at 100-101. Kober resumed testifying and Plaintiff interrupted:

> **CHO Liberty:** Okay, could you hold on one second?
>
> **ORC Kober:** Sure.
>
> **CHO Liberty:** Mr. Williams, you are flailing with your hands in
> the background it is very . . . stop. And now you're mouthing

> words to me, stop. It's very distracting when I am trying to hear the testimony and you're flailing, making hand motions to the escort officer. I would appreciate it if you would listen to the testimony. You will be given the opportunity . . . Mr. Williams. Stop.

*Id*. at 101 (alterations in original). Kober reviewed the images and identified the gang-related hand signs. *Id*. at 99-111. Plaintiff was permitted to ask Kober relevant questions, including whether DOCCS has a "list" of what is classified as gang-related material. *Id*. at 102-05. Kober responded he was not aware of any such list. *Id*. at 105-06. Kober admitted he did not personally know any of the individuals in the color scans, but could identify them as likely gang members by their actions and clothing. *Id*. at 106-08. Kober concluded his review of the color scans, identified the gang-related images, affirmed he had no information on the location of the original photographs, and confirmed that Plaintiff's nickname, as identified by DOCCS, was not itself "gang-related material." *Id*. at 107-111. After Kober's review of the images, Plaintiff asked to recall Healy, which Liberty denied as duplicative and redundant. *Id*. at 112-13.

Plaintiff argued Rule 105.13 was unconstitutionally vague because "there is not actual notice rectifying what hand gestures is prohibited . . . there is no notice of what is classified gang related material[.]" *Id*. at 113-14. Plaintiff argued the witnesses were speculating as to what was "gang related" and were biased. *Id*. at 114. Plaintiff raised numerous objections regarding the events surround the September 11, 2014, search. *Id*. at 114-121.

Liberty recalled Kober to testify regarding Plaintiff's exhibits, consisting primarily of magazine and newspaper images. *Id*. at 125. Plaintiff was permitted to ask relevant questions and raise objections. *Id*. at 126-29.

**Williams:** Are prisoners allowed to have pictures?

**CHO Liberty:** The question is are inmates allowed to have pictures, photos?

**Kober:** In accordance with directive 4911, yes they are allowed to have pictures.

**CHO Liberty:** Okay.

**Kober:** For their personal property.

**Williams:** Does rule 105.13 suggest the complications of an inmate personal property?

**CHO Liberty:** I'm not going to allow the question. It's up to me to determine if there's substantial evidence that you violated 105.13. Um, the question I will allow . . . no, Mr. Williams . . .

**Williams:** (inaudible)

**CHO Liberty:** You've got your hand up like you're ready to stop me . . .

**Williams:** I just didn't want to . . .

**CHO Liberty:** Don't talk over me . . .

**Williams:** (inaudible—talking at same time) trynna say.

**CHO Liberty:** Alright. Stop. I'm not going to allow the question because that's, the rule is what it is. The rule speaks for itself. I've read the rule, the rule is part of the record. It's up to me whether or not there's substantial evidence that you violated the rule. So, move on to your next question.

*Id.* at 128-30 (alternations in original). Plaintiff also asked Kober questions regarding Rule 105.13, such as whether DOCCS has photographs to use for comparison to determine if an image is gang-related and whether the Crips are listed as an unauthorized organization. *Id.* at 134. Kober responded no to each question and stated that he has "received training that indicates that the Crips are among a number of unauthorized gangs" within DOCCS. *Id.* Plaintiff was

permitted to ask Kober about the magazine and newspaper exhibits submitted by Plaintiff.  *Id.* at 135-42.

After Kober's testimony, Plaintiff raised an objection concerning Healy's prior testimony and an alleged conversation between them off the record.  *Id.* at 145.  He requested to review the videotape of this alleged exchange and repeated his objections as to the applicability of Rule 105.13 to photographs and overall vagueness.  *Id.* at 143-49.  Because Plaintiff also claimed Kober's testimony against him was the result of personal prejudice, Liberty adjourned the hearing to recall Kober for further testimony.  *Id.* at 149.

The proceeding resumed on April 26, 2016, during which time Kober affirmed that his testimony was truthful and accurate and not based on any personal prejudice against Plaintiff.  *Id.* at 150-51.  Thereafter, Liberty denied Plaintiff's request to recall Korines because Plaintiff did not specify any questions for Korines that had not already been answered.  *Id.* at 155-56.[5]

The hearing continued on April 28, 2014, with Lange testifying that he had no recollection of Plaintiff, the incident recorded in the misbehavior report, or serving as Plaintiff's employee assistant for the first disciplinary hearing.  *Id.* at 159-61.  Throughout his testimony, which consisted mostly of testimony regarding search procedures and the disposition of contraband generally, Plaintiff interrupted Liberty on multiple occasions.  *Id.* at 167-83.  After each interruption, Plaintiff was warned:

---

[5] On April 27, 2016, Plaintiff wrote a letter to Superintendent Uhler, arguing Rule 105.13 is "unconstitutionally vague" because there are "no documents giving adequate notice of what specific hand gestures are prohibited" and, therefore, was denied "advance and actual" notice of the prohibitive conduct at the second disciplinary hearing.  (Dkt. No. 50-4 at 43, emphasis in original.)  By memorandum dated April 27, 2016, non-party P. Woodruff, Acting Superintendent, responded: I received your correspondence dated 4/27/16.  Your objections need to made during the hearing in order for them to be placed on the record.  No further action will be taken by this office at this time."  *Id.* at 45.

> **CHO Liberty:**  No.  Mr. Williams do not tell me to hold on!  You are being so rude to me!  Mr. Williams I need you . . . .  No, I need you to not talk right now.  I'm asking the Sergeant and you tell me to hold on, hold on and then you bring up all of these other things.  I'm asking questions.  Let me do that.  Thank you.

*Id*. at 171.  After another interruption:

> **CHO Liberty:**  Mr. Williams, please stop.  I still wasn't done asking questions.  I know that's your objection, but again, you interrupted my questioning.  Now I appreciate your ability to bring objections but please let me ask the questions without interrupting me mid-questioning.  I will give you the opportunity to make your objections to ask questions, to tell me the relevance to each document presented.  Can I speak to the witness now?  I'm going to take your silence that you understand that I would like you to stop interrupting me.  Thank you.

*Id*. at 172.  Plaintiff interrupted again:

> **CHO Liberty:**  That's your last warning Mr. Williams.  Next time you interrupt me you're going to be removed from the hearing.  I'm going to complete the hearing without.  A penalty may be imposed in the disposition.  Do you understand that?
>
> **Williams:**  Yes.

*Id*. at 178-79.  Before adjourning for the day, Liberty granted Plaintiff's request to read and submit a three-page document titled "statement in support of defense" into the record.  *Id*. at 183-87.

The hearing resumed on May 2, 2016, with Korines testifying telephonically.  *Id*. at 193.  Korines confirmed that the copies of the color scans Liberty had sent to him were accurate reproductions of some of the photographs he had confiscated in 2014.  *Id*. at 193-94.  Korines further testified he had not interacted with Plaintiff before conducting the September 11, 2014, search and affirmed the misbehavior report was not the result of any personal prejudice or bias.  *Id*. at 194.

Liberty recalled Healy. *Id*. at 203. Healy confirmed he escorted Plaintiff to his cell on April 8, 2016, and affirmed that his earlier testimony had been accurate and truthful. *Id*. Plaintiff objected and claimed Healy told him the misbehavior report was "bullshit" and Shawangunk staff wanted Plaintiff transferred out of that facility. *Id*. At Plaintiff's request, a DVD of the escort at issue was reviewed, but the audio was not clear. *Id*. at 206-07. Healy had no recollection of the substance of their conversation. *Id*. at 207.

On May 9, 2016, Teacher Isabella, a DOCCS employee at Upstate also trained in identifying gang-related material, testified. *Id*. Isabella reviewed the nine images and, notwithstanding the poor qualify of the color scans, confirmed that some of the images depicted persons using gang-related hand gestures. *Id*. at 210-11. Plaintiff interrupted Liberty's questions; Liberty reminded Plaintiff not to interrupt and warned he would be removed for the remainder of the hearing. *Id*. at 212.

Plaintiff objected to the fact that the images shown Isabella had been previously marked with circles, which would influence his testimony and rendered him a biased witness. *Id*. at 212-15. During Isabella's testimony, Plaintiff interrupted several times and "wagged" his finger at Liberty. *Id*. at 215-16. After another contentious exchange, Liberty warned:

> **CHO Liberty:** I've had enough of the arguing with me. This is your last warning. That's it.
>
> **Williams:** You're warning me. I'm trying to speak and you're speaking over me.
>
> **CHO Liberty:** What is your next question Mr. Williams?
>
> **Williams:** That's what I'm askin. Can I speak and you're speaking over me. Every time I trynna say something you start . . .
>
> **CHO Liberty:** Alright that's it. I . . . seriously you're disrupt, you're disrupting the hearing process. I've asked you five times now what the next question is and you haven't identified it. Please

remove Mr. Williams from the hearing.

**Williams:**  Note my objection!

**CHO Liberty:**  You're [sic] objection is noted.

**Williams:**  You didn't give me back my documents either!

**CHO Liberty:**  You'll get them with your disposition after the hearing.

**Williams:**  Wooo!  (inaudible)

**CHO Liberty:**  Note for the record Mr. Williams just said "Woo got her!" as he left the room.

*Id.* at 216 (alterations and errors in original).  Liberty resumed questioning Isabella, who testified that regardless of the circled hand gestures, it was self-evident that some of the individuals in the images were using gang gestures and were wearing blue clothing associated with the Crips.  *Id.* at 217.  After showing Isabella Plaintiff's magazine and newspaper exhibits, Liberty asked if he found any difference between the gestures in the color scans and the gestures in Plaintiff's exhibits.  *Id.* at 218.  Teacher Isabella responded it was about "intent."  *Id.*

Liberty then explained her reasoning for removing Plaintiff from the hearing and denying Plaintiff's remaining witnesses.  *Id.* at 219-21.  She adjourned the hearing to review the evidence and render her decision.  *Id.* at 221.

Later that day, Liberty read her decision and statement of evidence relied upon into the record, and included the typed document, along with the completed hearing record sheet, in the hearing packet.  *Id.* at 221-28.  Liberty found Plaintiff guilty of violating Rule 105.13 and imposed a penalty of six months in the SHU, with a corresponding loss of packages, commissary, and telephones.  *Id.* at 222, 224-25.  She noted that a review of Plaintiff's disciplinary records showed this was his fourth violation of Rule 105.13.  *Id.* at 225.  Liberty

indicated the penalty had already been served from September 25, 2014, though March 25, 2015. (Dkt. No. 45-16 at ¶ 62.)

Plaintiff appealed.  (Dkt. No. 45-22 at ¶ 39; Dkt. No. 45-18 at ¶¶ 6, 7; *see also Dkt*. No. 50-4 at 46, 52-53.)  On July 14, 2016, Defendant Rodriguez, Acting Director of Special Housing/Inmate Disciplinary Program, affirmed Liberty's determination.  (Dkt. No. 45-18 at ¶ 10.)  On August 22, 2016, Plaintiff asked Rodriguez to reconsider his decision affirming Liberty's guilty determination.  (Dkt. No. 50-4 at 55.)  Plaintiff also wrote a letter to non-party Deputy Commissioner Bellnier, arguing he was found guilty of violating an unconstitutionally vague rule that "in no way" provided adequate notice of what is prohibited conduct.  *Id*. at 57-59.

Almost two years later, on August 1, 2018, Venettozi administratively reversed and expunged the guilty disposition rendered at the second disciplinary hearing.  (Dkt. No. 50-8.[6]) The August 1, 2018, determination states:

> ON BEHALF OF THE COMMISSIONER AND IN RESPONSE
> TO A LETTER OF RECONSIDERATION, PLEASE BE
> ADVISED THAT YOUR SUPERINTENDENT'S HEARING OF
> MAY 9, 2016, HAS BEEN REVIEWED AND
> ADMINISTRATIVELY REVERSED ON AUGUST 1, 2018.

(Dkt. No. 50-8.)  The Court notes the decision is stamped "EXPUNGED."  *Id*. at 2.

Based on the foregoing, Plaintiff alleges the confiscation of his personal photographs violated his First Amendment right to freedom of expression and that he was subjected to disciplinary proceedings in violation of his due process rights.  (*See generally* Dkt. No. 16.) Plaintiff alleges Annucci, Rodriguez, Smith, and Uhler were aware of the ongoing constitutional violations and failed to prevent them from continuing.  *Id*.  Plaintiff also claims Korines, Kober,

---

[6] On August 10, 2018, the Court granted Plaintiff's August 7, 2018, letter request seeking to attach the August 1, 2018, determination as an addendum to Plaintiff's opposition response. (Dkt. Nos. 55, 56.)

and Pingotti conspired to confiscate his photographs and subject him to improper discipline in violation of his constitutional rights.  *Id.*

Defendants now move for summary judgment.  (Dkt. No. 45.)  Plaintiff has opposed the motion and Defendants have filed a reply.  (Dkt. Nos. 50, 51.)  Plaintiff's sur-reply (Dkt. No. 52) was stricken from the record and, therefore, the Court will not consider it.  (Dkt. No. 53.)

## III.   APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005).  "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (citation and internal quotation marks omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id.* (citation and internal quotation marks omitted).  "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[7]  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  "[T]he trial court's task

---

[7]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at the point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    DISCUSSION

### A.    Fourteenth Amendment

In order to prove that procedural due process rights were violated, a plaintiff must show that he was deprived of a cognizable liberty or property interest without due process of law.  *McKithen v. Brown*, 626 F.3d 143, 151 (2d Cir. 2010).  An inmate has a liberty interest in remaining free from a confinement or restraint where the confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

### 1.    Liberty Interest

The Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined.  *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013).  Relevant to this action, "[a]

period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citation omitted); *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004).

For purposes of this motion, Defendants concede and the Court assumes, that the penalty imposed, six months in the SHU, implicated a liberty interest. (*See* Dkt. No. 45-23 at 7 n.4.)

### 2.    Due Process

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). The hearing officer's findings must be supported by "some" "reliable evidence." *Id*. (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

### 3.    Notice

"Due process requires prison officials to provide inmates with adequate notice of what conduct is prohibited." *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at *7 (N.D.N.Y. Mar. 31, 2014) (citations omitted), *aff'd* 590 F. App'x 82, 82-83 (2015) (summary order). "The underlying rationale . . . [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice . . . .").  *Williams v. Fischer*, No. 08-CV-413 (TJM/DRH), 2010 WL 3910129, at *10 (N.D.N.Y. Aug. 17, 2010).  As disused below, in *Booker v. Maly*, a case with striking similarities to the pending action, the District Court found

Rule 105.13 was not unconstitutionally vague.  2014 WL 1289579, at *1, 7, *aff'd* 590 F. App'x at 82-83.

### 4.    Analysis

Plaintiff alleges a host of due process violations during his first and second disciplinary hearings, including lack of advance notice, hearing officer bias, being denied witnesses and documentary evidence, and being capriciously removed from the second hearing.  (Dkt. No. 16 at 10-16.)

### a.    First Disciplinary Hearing is Moot

Plaintiff alleges he was denied due process at the first disciplinary hearing conducted by Pingotti.  (Dkt. No. 16 at 10-12.)  Defendants argue Plaintiff's claims related to the first disciplinary hearing are moot because the decision and order granting Plaintiff relief under Article 78 expunged Plaintiff's record of the September 28, 2014, guilty finding, and remanded the proceeding for a rehearing.  (Dkt. No. 45-23 at 7 n.5.)  The Court agrees with Defendants. *See Ramos v. Chappius*, No. 15-CV-6600-FPG, 2018 WL 488950, at *2 (W.D.N.Y. Jan. 1, 2018) ("Although Plaintiff asserts that Defendants violated his rights at the First Hearing, that hearing became null as a result of the Second Hearing.") (citing *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998) ("We need not discuss [the plaintiff's] contention that his rights were violated at the first hearing, because it became a nullity.  All findings and penalties imposed at the first hearing were vacated, and all the penalties [the plaintiff] suffered were imposed at the second hearing.")).

Here, because Plaintiff's SHU confinement resulting from the first disciplinary hearing was credited to the penalty imposed at the second disciplinary hearing, the evidence demonstrates Plaintiff's confinement "was entirely attributed to the ruling following the second

hearing" conducted by Liberty. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001).

"Accordingly, the result of the first hearing did not deprive [Plaintiff] of due process." *Id.*; *see also Cole v. New York State Dep't of Corrections and Community Supervision*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *20-21 (N.D.N.Y. Aug. 25, 2016) (finding it unnecessary to determine whether the plaintiff was afforded due process in connection with the first hearing, where the record established that plaintiff was confined in the SHU as a result of a penalty imposed which was ultimately reversed and where the plaintiff was again found guilty at the second disciplinary hearing), *report and recommendation adopted by* 2016 WL 5374125, at *1 (N.D.N.Y. Sept. 25, 2016).

Therefore, the Court recommends dismissing Plaintiff's due process claim based on the first disciplinary hearing. Even assuming, *arguendo*, Plaintiff's first disciplinary hearing was not rendered a nullity, as set forth below, the Court finds Plaintiff was afforded the minimum requirements of due process.

### b.    Advance Notice of Charges

An accused prisoner has the right to be provided with advanced written notice of the charges brought against him. *Sira*, 380 F.3d at 69.

Here, it is undisputed that Plaintiff received a copy of the September 11, 2014, misbehavior report on September 12, 2014, and again on March 26, 2016. (Dkt. No. 45-7 at 2.) Contrary to Plaintiff's contention, the misbehavior report was not "barren of any particulars." (*See* Dkt. No. 16 at 8.) The misbehavior report specifies Plaintiff violated Rule "105.13-Gangs." *Id.* at 25. The explanation states Korines was asked to search Plaintiff's personal property on September 11, 2014, and that during the course of that search, sixteen photographs were found "with people showing hand sings." *Id.* The report further indicates Korines was advised

Plaintiff goes by the name "Cike Bike" and has previously been identified as a member of the Crips. *Id.* Upon review, the sixteen photographs were found to be pictures "related to a gang known as the Crips, in violation of rule 105.13." *Id.*

Thus, the Court finds Plaintiff had "advance notice of the charges" as "*required for procedural due process.*" *Booker*, 2014 WL 1289579, at *8 (emphasis in original) (finding advance notice for procedural due process where the misbehavior report charged the inmate with violating Rule 105.13 after a search of the inmate's property revealed five photographs that were said be "gang-related material").

### c.    Witness/Documentary Evidence

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69.

Plaintiff claims Pingotti denied two witness, ORC McCarthy and Sgt. Cochran, in violation of his due process rights. Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative").

Here, Pingotti determined the testimony of ORC McCarthy and Sgt. Cochran would be redundant in light of Kober's testimony, who had training in identifying gang-related materials and had already viewed and commented on the photographs.  (Dkt. No. 45-7 at 75.)  Pingotti's decision was well within the discretion of a hearing officer and comports with procedural due process.  *See Kalwasinksi v. Morse*, 201 F.3d 103, 108-09 (2d Cir. 19990 (holding "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony").  Plaintiff does not allege, and the record does not support, that he was denied any witnesses in violation of his due process rights during the second disciplinary hearing.

Turing to the documentary evidence, the record demonstrates Plaintiff presented a wide range of documentary evidence at both disciplinary hearings, including SHU log book entries, magazine and newspaper images, excerpts of DOCCS Correction Laws and Directives, a three page written statement, contraband receipts and inventory notices, copies of grievance documents, a 2008 DOCCS memorandum addressing Rule 105.13, and a signed receipt for Rule 105.13.  (Dkt. Nos. 45-4 at 9; 45-7 at 4-5.)

As to Plaintiff's claim he was denied the right to present "untainted" documentary evidence at the second disciplinary hearing, the record demonstrates only color scans of the original confiscated photographs were available for review.  (Dkt. No. at 45-16 at ¶¶ 7, 9, 10.)  Further, while Plaintiff objected to the quality of the color scans, he nonetheless admitted they were accurate reproductions of his photographs.  (Dkt. No. 45-8 at 149-51.)  Korines also testified the color scans were accurate reproductions of nine of the sixteen confiscated photographs.  *Id*. at 193-94.  Furthermore, Kober, Healy, and Isabella, all of whom testified regarding their training in identifying gang-related materials, were able to identify the hand gestures at issues as gang-related in some of the color scans.  (Dkt. No. 45-8 at 149-51.)

24

Regarding Plaintiff's objection that the color scans had been marked up prior to Isabella's testimony, the Court agrees with Defendants that the circling of certain gestures was not prejudicial as Isabella testified it was "self evident" that some of the individuals in the color scans were using gang-related gestures and were wearing blue clothing associated with the Crips. (Dkt. No. 45-16 at ¶ 65.) *See, e.g.*, *Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

As to Plaintiff's claim he was denied copies grievances filed in 2014 at Shawangunk, "due process does not require that a prisoner be provided with all the documentary evidence he has requested." *Lebron v. Artus*, No. 06-CV-0532 (VEB), 2008 WL 111194, at *9 (W.D.N.Y. Jan. 9, 2008). Liberty explained her reasons for finding the requested material irrelevant to the charge at issue. (Dkt. No. 45-8 at 66-68.) Moreover, Liberty recalled several witnesses in response to Plaintiff's allegation of bias. *Id*. at 149-51.

In light of the foregoing, the Court finds no triable issue of fact exists as to whether Plaintiff had a reasonable opportunity to call witnesses and present documentary evidence.

### d.     Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d at 253, 259 (2d Cir. 1996); *Sira*, 380 F.3d at 69. An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess the evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be

improper for prison officials to decide the disposition of a case before it was heard")' *see also Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) ("The degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally.").

Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent*, 472 U.S. at 455. "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004).

Here, the record evidence demonstrates there was "some evidence" that Plaintiff violated Rule 105.13. In their written determinations, the hearing officers set forth the evidence upon which their guilty determinations were based, including the September 11, 2014, misbehavior report and the testimony of Korines and Kober. *See Hinton v. Prack*, No. 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *15 (N.D.N.Y. Sept.11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *see also Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same). Further, Liberty also relied on the testimony of Healy and Isabella, both of whom testified as to their training in identifying gang-related materials, and whose testimony was generally consistent with Kober. (Dkt. No. 45-8 at 223.)

26

Moreover, prison officials "enjoy a rebuttable presumption that they are unbiased." *Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 WL 1086001, at *11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis*, 891 F.2d at 46). A plaintiff's disagreement with a hearing officer's ruling alone does not give rise to a finding of bias. *See Johnson*, No. 9:05-CV-376 (TJM/RFT), 2007 WL 3046701, at *10 (N.D.N.Y. Oct. 17, 2007) (finding hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections).

Here, there is no record evidence from which a reasonable factfinder could conclude that Pingotti or Liberty were biased against Plaintiff or that they predetermined the outcome of the disciplinary hearings. As set forth above, Plaintiff was afforded the opportunity to testify, question witnesses, and raise objections. (*See* Dkt. Nos. 45-5; 45-8.) Indeed, the hearing officers heard extensive testimony from several witnesses, including several trained in identifying gang-related material, over the course of several days. While Pingotti and Liberty limited questions, witnesses, and documentary evidence, there is no record evidence to suggest that either did so out of bias towards Plaintiff.

In short, Plaintiff's bare conclusory and assertions with respect to the hearing officers' bias are unsupported and belied by the record. *See Francis*, 891 F.2d at 47 ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"). Although their decisions were ultimately administratively reversed and expunged, upon review of the record evidence, the

Court finds "some evidence" to support Pingotti's and Liberty's guilty determinations.  *See Sira*, 380 F.3d at 76 n. 9 (noting the director's reversal of the disciplinary ruling does not automatically establish a federal claim") (quoting *Foster v. Coughlin*, 76 N.Y.2d 964, 966 (1990)); *Alicea*, 387 F. Supp. 2d at 232-33 (same); *Moore v. Griffin*, No. 9:13-CV-616 (FJS/TWD), 2015 WL 5330366, at *12 (N.D.N.Y. Sept. 11, 2015) ("While the guilty determination was later reversed, there was "some evidence" to support [the hearing officer's] decision that [the plaintiff] was guilty of the charges set forth in the misbehavior report."); *see also Shabazz v. Bezio*, No. 9:10-CV-1212 (NAM/DEP), 2014 WL 4794432, at *2 (N.D.N.Y. Sept. 25, 2014) (finding "some evidence" to support the hearing officer's guilty determination that was later reversed on appeal).

### e.    Removal from Hearing

Plaintiff claims Liberty "capriciously" removed him from the hearing in violation of his right to due process.  (Dkt. No. 16 at 18.)  Defendants argue Plaintiff was given repeated warnings to stop being disruptive and interrupting the hearing and was removed for failing to abide by those warnings.  (Dkt. No. 45-23 at 10-11.)

"The Second Circuit had not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue."  *Cole v. DOCCS*, 2016 WL 5394752, at *22.  However, even those courts that recognized a right to be physically present at the hearing have limited that right to allow an inmate to be removed if he engages in disruptive behavior.  *See*, e.g., *Sheils v. Minogue*, No. 9:06-CV-482 (GLS/RFT), 2010 WL 5625919, at *6 (N.D.N.Y. Nov. 1, 2010) ("There is no due process violation when a hearing officer is forced to remove an obstreperous inmate from disciplinary proceedings."); *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL

2973687, at *1 (W.D.N.Y. 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland*, No. 07 Civ. 1926 (DCL), 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (holding the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive behavior).

Here, the record demonstrates Liberty removed Plaintiff from the second disciplinary hearing only after he repeatedly disregarded her instructions and warnings. (Dkt. No. 45-8 at 100-03, 178, 212-16.) In light of the foregoing, the Court finds no reasonable juror could find Liberty capriciously removed Plaintiff from the second disciplinary hearing.

Additionally, because neither the Supreme Court nor the Second Circuit has clearly established the right of prisoners to be present at a disciplinary hearing, the Court also recommends finding Liberty is entitled to qualified immunity. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence.").

Here, as was the case in *Cole v. DOCCS*, the Court finds a person in Liberty's position could have reasonably concluded that excluding Plaintiff from the hearing would not violate any clearly established constitutional right. Therefore, even assuming Plaintiff is able to establish a constitutional violation based on his removal from the hearing, the Court also recommends finding Liberty entitled to qualified immunity.

###### f.    Vagueness

Plaintiff also claims that his Fourteenth Amendment due process rights were violated because Rule 105.13 is "unconstitutionally vague as applied to him, and it fails to give adequate notice of what conduct is prohibited . . . ."  (Dkt. No. 16 at 6-10.)

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockland*, 408 U.S. 104, 108 (1972).  Due process vagueness challenges to prison disciplinary rules and directives have been recognized in the Second Circuit.  *Chatin v. Coombe*, 186 F.3d 82, 88-89 (2d Cir. 1999); *Leitzsey v. Coombe*, 998 F. Supp. 282, 289 (W.D.N.Y. 1998) ("inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice of the actions that could subject them to discipline").

"A disciplinary rule 'is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule.'"  *Booker*, 2014 WL 1289579, at *7 (quoting *Williams v. Fischer*, 2010 WL 3910129, at *10 (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995))).  Indeed, upon review of Rule 105.13 in a factually similar challenge, the court in *Booker* found "that the prohibited conduct is clear to a person of average intelligence."  *Id*. at *12.

In *Booker*, the plaintiff was charged with possession of five photographs said to be "gang-related material" in violation of Rule 105.13.  2014 WL 1289579, at *8.  During his disciplinary hearing, Booker, like Plaintiff in this action, spent a great deal of time arguing that there was no specific criteria to establish whether an inmate's property contained "gang-related"

material or depicted gang signs.  *Id.*  Booker challenged the constitutionality of Rule 105.13,

arguing it did not "set forth specific criteria for determining whether a gesture is a gang sign or

whether it simply was 'cultural expression.'"  *Id.* at *12.  The court disagreed:

> It is quite clear, according to the rule, that a gang sign is something
> that another inmate would recognize as creating an inference of a
> particular gang affiliation.  More specificity in the prison context
> would be impossible because . . . individuals could change the
> signs to avoid detection, interfering with the security of the facility.

*Id.*  After an in-depth discussion of an inmate's challenge to a similar Connecticut rule, the court

found Rule 105.13 was not unconstitutionally vague because it "gives inmates the definition of

gangs and of gang-related materials" and noted "more specificity is not required, and would be

very difficult, given the number of gangs and the different methods of symbolic communication

that exist."  *Id.* at *13 (internal footnote omitted).  The court further noted "[t]he fact that

plaintiff may have been able to possess those pictures at other facilities does not undermine the

defendants' desire to regulate gang-related material at their facility."  *Id.*

Upon review and for the reasons discussed above, this Court agrees with the reasoning in

*Booker*, and finds Rule 105.13 is not unconstitutionally vague.

Based on the foregoing, the Court finds Plaintiff was afforded the minimum requirements

for procedural and substantive due process under the Fourteenth Amendment.  Therefore, the

Court recommends that Defendants' motion for summary judgment on Plaintiff's Fourteenth

Amendment claims be granted.

## B.    First Amendment

Plaintiff claims that the confiscation of his personal photographs also violated his First

Amendment right to freedom of expression.  (Dkt. No. 16 at 10-12.)  Liberally construed,

Plaintiff claims Rule 105.13 is unconstitutional; in the alternative, Plaintiff claims Rule 105.13

affords no basis for the characterization of his photographs as gang-related material; and, accordingly, the confiscation of his photographs was not authorized by legitimate penological interests.  (Dkt. Nos. 10 at 9, 15 at 3.)  Defendants argue Rule 105.13 does not violate the First Amendment as it is reasonably related to the legitimate penological interest of maintaining security and order in facilities.  (Dkt. No. 45-12 at 12-15.)  The Court agrees with Defendants.

Although "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests," *Hudson v. Palmer*, 468 U.S. 517, 528 n.8 (1984), an inmate retains "those First Amendment rights that are not inconsistent with his status as a prisoner" or the state's legitimate penological interests.  *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995) (citation omitted).  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) (stating that "[t]he governing standard is one of reasonableness . . . .").

The reasonableness of a prison regulation is measured using the three-step analysis outlined in *Turner*.  *See Shakur v. Selsky*, 391 F.3d 106, 113-14 (2d Cir. 2004).  First, the court must ask "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] regulations are rationally related to that objective."  *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989).  Second, the court looks to see "whether there are alternative means of exercising the right that remain open to prison inmates."  *Id.* at 417 (citation omitted).  Third, the court examines "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison."  *Id.* at 418 (citation omitted).  "The prisoner-plaintiff bears the burden of proving that [a] disputed regulation is unreasonable."  *Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995) (citations omitted).

The Supreme Court has advised that prison administrators must be given deference and latitude to determine the probable consequences of allowing certain speech and to take reasonable steps to prevent breaches of security and prisoner violence. *See Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974); *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Thus, the Court has upheld regulations that prohibit inmates from engaging in activities that would be permissible and protected outside of prison. *See Thornburgh*, 490 U.S. at 419 (upholding regulation that limits prisoners' receipt of publications that threaten prison security); *Turner*, 482 U.S. at 78 (upholding regulations that restrict correspondence between inmates of different correctional facilities). Additionally, the Second Circuit has upheld a content-based limitation, the sole purpose of which was to maintain security and deter violence among inmates. *See Giano*, 54 F.3d at 1054-55 (upholding regulation that prohibited inmates from possessing nude or semi-nude photographs of spouses or girlfriends).

Here, the Court finds the confiscation of the photographs at issue did not violate Plaintiff's First Amendment right. While they are of a different character than the photographs at issue in *Giano*, the photographs seized from Plaintiff present their own challenges to prison order and security. *See Self-Allah v. Annucci*, No. 97-CV-607(H), 1998 WL 912008, at *3 (W.D.N.Y. Oct. 14, 1998) ("Efforts to end gang-related activity in penal institutions and fostering institutional security are legitimate penological interest."); *see also Michel v. Manna*, No. 9:15-CV-1187 (DNH/ATB), 2017 WL 1381859, at *5 (N.D.N.Y. Jan. 17, 2017) (finding grooming policy rationally related to legitimate interest in preventing displaying of gang signs or symbols), *report and recommendation adopted by* 2017 WL 1380583, at *1 (N.D.N.Y. Apr. 17, 2017); *Alameen v. Coughlin*, 892 F. Supp. 440, 451 (E.D.N.Y. 1995) (upholding regulation prohibiting the display of black beads, which were related to gang affiliation); *see also Escalara*

*v. Charwand*, No. 9:04-CV-0983(FJS/DEP), 2008 WL 699273, at *6 (N.D.N.Y. Mar. 12, 2008) ("The right of officials to control inmate speech and other behavior through the imposition of measures reasonably calculated to preserve the safety and security of a prison facility, its employees and inmates, is well established, even though such measures may impinge upon an inmate's ability to speak freely or to associate with others.") (citing *Auleta v. LaFrance*, 233 F. Supp. 2d 396, 399 (N.D.N.Y. 2002) (noting that restrictions on inmate communication are constitutional if reasonably related to legitimate penological interests)); *Leitzsey*, 998 F. Supp. at 287 (finding the rule prohibiting prisoners from engaging in organizational activities or possessing organizational materials that were not authorized was reasonably related to legitimate penological interest of maintaining order within correctional facilities and, thus, the inmate's free speech rights were not violated by punishment imposed upon him for possessing material pertaining to unauthorized group).  Thus, the first *Turner* factor is clearly met.

As to second factor, the Court finds the regulation provides for an alternative means of exercising First Amendment rights.  Specifically, Rule 105.13 presumably allows inmates to possess published gang-related materials that are available through the library or approved through the Media Review process.[8]  Regulations which limit, but do not eliminate, the availability of alternatives means of exercising a constitutional right may be permissible.  *Beard v. Banks*, 548 U.S. 521, 532 (2006); *see also* Thomas v. Scully, No. 89 CIV. 4715 (DNE), 1990 WL 608764, at *4 (S.D.N.Y. June 28, 1990) ("[S]o long as the regulations foreclose only one of several ways in which inmates may exercise a specific first amendment right, the fact that the

---

[8]  As set forth above, the language of Rule 105.13 "excludes possession of published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process."  (Dkt. No. 16 at 27.)

prohibited activity may be a more desirable means of expression does not diminish the import of the remaining alternative.").

Further, the record demonstrates "distinctions are drawn" between permissible and impermissible photographs "on the basis of their potential implications for prison security." *See Thomas*, 1990 WL 608764, at *4. Indeed, only sixteen out of approximately one thousand photographs in Plaintiff's possession were initially identified as violating Rule 105.13. (Dkt. No. 45-3 at 66-67.) Since Plaintiff continued to possess almost all of his photographs, he cannot seriously claim he was provided no means of expression. Thus, the Court finds the second factor is met. *See Turner*, 482 U.S. at 78 (a regulation which prohibits communication between inmates at different penal institutions does not deprive inmates of all means of communication).

The third *Turner* factor evaluates the magnitude and nature of accommodating the asserted constitutional right. According to Acting Commission Annucci, who is responsible for the confinement and rehabilitation of approximately 51,000 individuals in custody at 54 state facilities, gang-related materials pose "a clear danger to the safety and security of a correctional facility." (Dkt. No. 45-14 at ¶¶ 5, 20.) Indeed, "allowing inmates to possess gang-related materials would likely cause a 'ripple effect' on other inmates and prison staff; in such circumstances, 'courts should be particularly deferential to the formulated discretion of corrections officials.'" *Ortiz v. Russo*, No. 13 Civ. 5317 (ER), 2015 WL 1427247, at *9 (N.D.N.Y. Mar. 27, 2015) (finding that given the threat of gang activity within prisons, accommodating the purported right to possess gang-related materials would likely produce a negative result). Thus, this factor is also is met.

Lastly, the court considers the reasonableness of the regulation. "[T]he existence of obvious, easy alterations may be evidence that the regulation is not reasonable." *Turner*, 482

U.S. at 90. Liberally construed, Plaintiff has suggested lists, examples, and images could clarify exactly what prohibited under the Rule. The *Booker* court rejected a similar argument, finding "more specificity in the prison context would be impossible, because . . . individuals could change the signs to avoid detection, interfering with the security and order of the facility." 2014 WL 1289579, at *12.

After applying the *Turner* factors in conjunction with the substantial deference owed to prison officials in matters affecting discipline and safety, the Court finds Rule 105.13 does not unreasonably restrict Plaintiff's First Amendment rights. Therefore, the Court recommends that Defendants' motion for summary judgment on Plaintiff's First Amendment claim be granted.

### C.    Personal Involvement/Supervisory Liability

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under § 1983. *Aschcroft v. Iqbal*, 556 U.S. 662, 676 (2009). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

It is well established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under § 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability . . . cannot rest on respondeat superior."); *see also Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) ("Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement.") (citing

*McKinnon*, 568 F.2d at 934). To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual: (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[9]

Here, Plaintiff asserts claims against Annucci, Rodriguez, Smith and Uhler based upon their apparent supervisory positions, awareness of ongoing constitutional violations and their failure to prevent them from continuing. (Dkt. No. 16 at ¶¶ 32-33, 80-84.) The record demonstrates, however, that Annucci, Rodriguez, Uhler, and Smith were not personally involved in any alleged violation of Plaintiff's constitutional rights. For example, Annucci declares he had no involvement in Plaintiff's disciplinary hearings or appeals. (Dkt. No. 45-14 at ¶¶8-15.) Rodriguez received correspondence related to Plaintiff's first disciplinary hearing, which he passed on to the appropriate staff and affirmed the second disciplinary hearing. (Dkt. No. 45-18 at ¶¶6-7, 9-10.) Uhler simply forwarded a piece of correspondence from Plaintiff to the appropriate staff at DOCCS Central Office. (Dkt. No. 45-20 at ¶¶9-11.) Finally, Smith delegated Plaintiff's first disciplinary hearing and grievance investigations to his subordinates at Shawangunk and conducted a discretionary review of Plaintiff's first disciplinary hearing. (Dkt. No. 45-19 at ¶¶ 10-12, 14-22.)

---

[9] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Initially, it is well settled "that receipt of letters or grievances, by itself, does not amount to personal involvement." *Guillory v. Ellis*, No. 11-CV-600 (MAD/ATB), 2012 WL 2754859, at *10 (N.D.N.Y. July 9, 2012) (citing *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009)); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.")  Further, to the extent Plaintiff brings claims against Annucci, Rodriguez, Uhler and Smith because they were involved in some way with the disciplinary appeals process, for the reasons set forth above, Plaintiff was afforded the minimum requirements of due process.  As such, Plaintiff's supervisory liability claims necessarily fail. *See, e.g.*, *Cole v. DOCCS*, 2016 WL 5394752, at *28 (granting summary judgment to supervisor who affirmed a disciplinary hearing that was rendered a nullity and granting summary judgment to a supervisor who affirmed a disciplinary hearing that comported with due process); *Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against supervisor "[b]ecuase his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court . . . found comported with due process"); *Cole v. DOCCS*, 2016 WL 5394752, at *28 (same).

In light of the foregoing, the Court recommends that Defendants' motion for summary judgment on Plaintiff's supervisory liability claims be granted.

### D.    Conspiracy

Plaintiff alleges Korines, Pingotti, and Kober conspired to confiscate his photographs and subject him to improper discipline in violation of his constitutional rights.  (Dkt. No. 16 at 10-12.)  However, Defendants do not address this claim in their memorandum of law.

Inasmuch as the Court is recommending granting summary judgment to Defendants on the underlying § 1983 causes of action, the Court recommends *sua sponte* dismissing Plaintiff's conspiracy claim. *See Bristol v. Nassau Cty.*, No. 08 Civ. 3480 (AMD)(SIL), 2016 WL 2760339, at *7 (E.D.N.Y. May 12, 2016) ("Because, the plaintiff's claim that the individuals defendants violated his constitutional rights is dismissed as a matter of law, his section 1983 conspiracy claim also fails as matter of law.") (citing *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.")).

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 45) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's § 1983 conspiracy claim be *sua sponte* **DISMISSED** for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that Plaintiff's second amended complaint (Dkt. No. 16) be **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the

---

[10] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: August 31, 2018
     Syracuse, NY

Therèse Wiley Dancks
United States Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that

1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]   Given my duty to liberally construe a *pro se*
plaintiff's civil rights complaint, I construe Plaintiff's
Amended Complaint as including a claim that
various Defendants violated Plaintiff's rights under
the Fourth Amendment to be free from unreasonable
searches and seizures. See *Phillips v. Girdich,* 408
F.3d 124, 130 (2d Cir.2005) ("We leave it for the
district court to determine what other claims, if any,
[the plaintiff] has raised. In so doing, the court's
imagination should be limited only by [the plaintiff's]
factual allegations, not by the legal claims set out
in his pleadings.") [citations omitted]. *(See also*
Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
Defendants Woods and Holt "violat[ed] plaintiff's
4th ... Amendment[ ] rights"], ¶ 15 [alleging that

2006 WL 1133247

Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) *("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").*

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

2006 WL 1133247

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

6   *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P. 56(c)* ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7   *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8   *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under *Rule 56* to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9   *See Fed.R.Civ.P. 56(e)* (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of *Rule 56[e]* is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of *Rule 56[e]* ), *cert. denied,* 474 U.S. 829 (1985);

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

*Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11 *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

*4 Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." 12 However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. 13

12 (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13 *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff *"stuck with them* as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]     (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]     (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]     (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]     (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]     (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]     (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]     (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

2006 WL 1133247

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21     (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. 22

22     (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. 23 In pertinent part, the letter stated,

23     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already tied both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. 24

24     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. 25

25     (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. 26 In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." 27 In addition, the last page of the letter states:

26     (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

2006 WL 1133247

[27]

(Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

[28]

(Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]

(Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

[30]

(Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]

(Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

[32]

(Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]

(Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

[34]

(Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

[35]

(Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36] (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37] (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38] (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39] (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40] (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41] (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42] (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43] (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44] (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45]  (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]  (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

**Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal**

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47]  (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]  (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

[49]    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14][v].

[51]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (*Id.*)

59    (*Id.*)

### Meetings Between Defendants Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]   (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]   (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]   (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9**  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antonelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See *Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. See *Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of

2006 WL 1133247

the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]   *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks

before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]   (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]   (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]   (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without

2006 WL 1133247

providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73   (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74   *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75   (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense

counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).)

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in *Paragraph 15* of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." 78

76   *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77   (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites

the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

[78]    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11**  The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79]  Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80]  Indeed, Plaintiff appears to recognize this point of law. [81]

[79]    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

[80]    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and

seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82]  Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83]  I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

[82]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[83]    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

[84]    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU

2006 WL 1133247

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation
Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

| 85 | "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ). |

| 86 | (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].) |

| 87 | *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989). |

| 88 | (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].) |

| 89 | (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].) |

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he

2006 WL 1133247

suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

[90]     (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]     (See, supra, Statement of Fact No. 29.)

*13 More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

[92]     (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]     (Compare Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02**, after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02**, and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02**, or three days after his admission to SHU].)

[94]     (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]     *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

2006 WL 1133247

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]    (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]    (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely

moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

#### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose

decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

#### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

2006 WL 1133247

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds, bed] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

*16 Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any

prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104]    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]   (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]   (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]   (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

   E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17**   In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S.

477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109]   *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]   *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]   *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect

2006 WL 1133247

Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

 **\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result,

I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995)

(citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]    *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]    *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter"

2006 WL 1133247

regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20**  As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt.

No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

End of Document          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent inmates posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]   In light of this finding, there is no need to consider the defendant's qualified immunity argument.

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1289579
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Amin B. BOOKER, Plaintiff,
v.
J. MALY, Deputy Superintendent of
Security, Shawangunk Correctional
Facility, et al., Defendants.

No. 9:12–CV–246 (NAM/ATB).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Amin B. Booker, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Douglas J. Goglia, Esq., Assistant New York State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

 **\*1** Upon referral pursuant to 28 U.S.C. § 636(b)(1) (B) and Local Rule 72.3(c), United States Magistrate Judge Andrew T. Baxter issued an excellent and thorough Report–Recommendation and Order (Dkt. No. 113) addressing a number of motions in this *pro se* inmate civil rights case. Magistrate Judge Baxter recommended the following: that plaintiff's motion for summary judgment (Dkt. No. 69) be denied; that defendants' motion for summary judgment (Dkt. No. 103) be granted and the complaint dismissed in its entirety as against all defendants; that plaintiff's motion for sanctions (Dkt. No. 107) be denied; and that defendants' cross-motion for sanctions (Dkt. No. 108) be denied. Magistrate Judge Baxter further denied plaintiff's motion for appointment of counsel (Dkt. No. 109).

Plaintiff has submitted an objection (Dkt. No. 114) to the Report–Recommendation and Order. Pursuant to 28 U.S.C. § 636(b)(1) (C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. In view of the comprehensive nature of plaintiff's objections, the Court considers all issues *de novo*. The Court has reviewed the record in its entirety, including plaintiff's deposition testimony. Upon *de novo* review, the Court adopts Magistrate Judge Baxter's Report–Recommendation and Order in all respects. Reading plaintiff's papers liberally and interpreting them to raise the strongest arguments that they suggest, *see McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999), the Court grants summary judgment to defendants and dismisses the case.

Plaintiff also moves (Dkt. No. 115) for permission to submit late exhibits. He states that he is awaiting the arrival of weather reports, which he says are relevant to his Eighth Amendment claim of cruel and unusual punishment and his claim that his confinement in the special housing unit at Upstate Correctional Facility imposed an atypical and significant hardship because the cell was cold. David A. Rock, Superintendent of Upstate Correctional Facility, submitted a declaration regarding conditions at the facility, and stated that the cells were maintained at temperatures between 70 and 74 degrees. Weather reports establishing cold outdoor temperatures would not aid plaintiff in resisting summary judgment on this issue. The Court assumes that the early winter of 2010 was cold in Malone, New York; nevertheless, summary judgment dismissing plaintiff's claim based on allegedly cold temperatures in his cell is warranted based on a number of factors. These include the undisputed evidence that plaintiff had been issued warm clothing including a sweatshirt, a winter coat, and a hat; the fact that plaintiff alleges only mild negative effects which are insufficient to support an inference that the cell was unreasonably cold; and plaintiff's testimony that there was a heating system and that some days he could feel the heat coming in.[1] Leave to submit late exhibits is denied.

[1]    Plaintiff testified:
        Some days it would be you would feel the heat, actually you could feel the heat coming in there sometime and it was just so cold you could feel the cold as well, and they did have a heating system in there, but because it was more cold than hot, it didn't balance out.

 **\*2** It is therefore

ORDERED that plaintiff's motion (Dkt. No. 115) for leave to submit late exhibits is denied; and it is further

ORDERED that the Report and Recommendation (Dkt. No. 113) of United States Magistrate Judge Andrew T. Baxter is adopted and accepted; and it is further

ORDERED that defendants' cross-motion for sanctions (Dkt. No. 108) is denied; and it is further

ORDERED that plaintiff's motion for sanctions (Dkt. No. 107) is denied; and it is further ORDERED that defendants' motion for summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 69) is denied; and it is further

ORDERED that the action is dismissed with prejudice; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his amended civil rights complaint plaintiff alleges that his due process rights were denied in conjunction with a misbehavior report and disciplinary hearing, after which he was sentenced to a term in the Special Housing Unit ("SHU"). (Amended Complaint "AC") (Dkt. No. 73). Plaintiff also alleges that while he was in SHU, he was housed under conditions which violated his constitutional right to be free from cruel and unusual punishment, his right to privacy, and his right to practice his religion. Plaintiff seeks declaratory and injunctive relief in addition to a substantial amount of compensatory and punitive damages. (AC at 51–53, ¶¶ A–C). [1]

[1]     The court will cite to the pages of the amended complaint as were assigned by the court's electronic

filing system (CM/ECF) in addition to the paragraph number or letter assigned by plaintiff, if one exists.

Several motions are presently pending before this court. Prior to filing his amended complaint, plaintiff filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 69). In his amended complaint, plaintiff has included a motion for class certification. (See Dkt. No. 73, ¶¶ 1–41). After plaintiff filed his amended complaint, the defendants responded in opposition to plaintiff's motion for summary judgment and made a cross-motion for summary judgment. (Dkt. No. 103). Plaintiff responded in opposition to the defendants' cross-motion. (Dkt. No. 106). Plaintiff also moved for "sanctions" because he was not satisfied with defendants' response to his summary judgment motion. (Dkt. No. 107). Defendants have responded in opposition to plaintiff's motion for sanctions. (Dkt. No. 108). Plaintiff has filed a reply to the defendants' "sanctions" response, and plaintiff has also moved for appointment of counsel. [2] (Dkt.Nos.109, 110).

[2]     The court notes plaintiff originally moved for appointment of counsel and class certification, together with his original complaint. (Dkt. No. 1). Defendants argue that Judge Mordue has already denied the motion for class certification, and that only the plaintiff's individual claims have been allowed to proceed. (Def.s' Mem. of Law at 5) (Dkt. No. 103–4). However, on May 22, 2012, the court denied plaintiff's motions for appointment of counsel and for class certification without prejudice. (Dkt. No. 7 at 4–7). Thus, the court will address both of these motions.

For the following reasons, this court agrees with the defendants and will recommend denying plaintiff's motions for class certification and summary judgment and will recommend granting defendants cross-motion for summary judgment. The court will order the denial of plaintiff's motion for sanctions and his motion for appointment of counsel.

### I.  Complaint

 *3  The court will briefly review the facts as stated in the amended complaint [3] and as outlined in Judge Mordue's May 22, 2012 Order as a basis for further discussion of the additional evidence presented by the defendants.

[3]     The amended complaint did not change plaintiff's claims or his recitation of the facts. Plaintiff amended his complaint to name Corrections Officers Lance

Taylor and Daniel Dumas, two individuals who he originally named as "John Does." (AC at ¶¶ 155–61).

Plaintiff alleges that on March 24, 2010, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow"), he was approved for a "satisfactory behavior preference transfer" to Shawangunk Correctional Facility. ("Shawangunk") (AC ¶¶ 42–43). Plaintiff states that prior to his transfer our of Great Meadow on March 26, 2010, his "draft bags" were searched by Great Meadow staff and approved for transfer with him. (AC ¶ 42). Plaintiff claims that a corrections officer viewed all of plaintiff's photos for "security clearance," and determined that none of plaintiff's property was contraband. (*Id.*)

Notwithstanding this alleged approval, upon plaintiff's arrival at Shawangunk, his property was searched outside of his presence by defendant Kavanaugh in violation of Department of Corrections and Community Supervision ("DOCCS") policy. (AC ¶ 45). Although defendant Kavanaugh was not "trained or certified" by DOCCS in identifying gang insignia, he selected five (5) of plaintiff's personal photographs, and he concluded that they contained "Blood Gang hand signs," in violation of an "unpublished departmental rule # 105.13 Gangs." (*Id.*) Based upon these photographs, on March 27, 2010, defendant Kavanaugh issued plaintiff a misbehavior report for violating the "unconstitutionally vague prison gang rule ." (AC ¶¶ 22, 45–48). [4]

[4]    The court notes that plaintiff has omitted a paragraph # 46.

Plaintiff claims that, in furtherance of a conspiracy to violate plaintiff's civil rights, defendant Smith [5] assigned defendant Maly [6] as the hearing officer for plaintiff's disciplinary hearing. (AC ¶ 51). Plaintiff claims that he possessed all of the photographs in question for many years, and the pictures had been viewed by countless officers, during searches at various facilities. (AC ¶¶ 88–93) (description of the photographs). Plaintiff claims that some of the pictures were taken inside DOCCS facilities as part of the "inmate photo program," which is conducted and monitored by corrections officers, and thus the pictures should not have been found to be "gang" materials. (AC ¶ 88). Plaintiff alleges that defendant Maly denied plaintiff due process at the hearing by denying him witnesses, being biased, and finding plaintiff guilty on insufficient evidence. (AC ¶¶ 52–87).

[5]    Defendant Joseph Smith was the Superintendent of Shawangunk at the time of the incidents in question.

[6]    Defendant J. Maly was the Deputy Superintendent of Security at Shawangunk.

Plaintiff alleges that defendant Kober, a Counselor at Shawangunk and a witness, called by hearing officer Maly, testified that the people in the photographs were making "gang signs." Plaintiff claims that, after the hearing, defendant Kober admitted to plaintiff that he lied at the hearing and "confirm [ed the] conspiracy." (AC ¶¶ 94–100). Kober allegedly implied to plaintiff that he lied because there was a "recession," and officers were getting laid off, so the "higher ups" needed SHU cells filled. He told plaintiff not to worry because he could try to get his disciplinary sentence reduced for good behavior. (AC ¶¶ 95, 97). Plaintiff claims that while he was housed in the SHU at Shawangunk, he witnessed three other African–American inmates "get falsely charged with this same prison gang rule." (AC ¶ 100). Although plaintiff wrote to Superintendent Smith complaining of the denial of due process and of defendant Kober's "confession," plaintiff's administrative appeals were denied at both the facility and the Commissioner's level. (AC ¶ 101–103).

 **\*4** On April 23, 2010, plaintiff was transferred to Upstate Correctional Facility ("Upstate") to serve his SHU sentence. The amended complaint states that plaintiff was taken to Downstate Correctional Facility prior to his transfer to Upstate. (AC ¶ 105). Plaintiff complains that the bus ride from Downstate to Upstate was unreasonably slow and that the inmates' meals were unsatisfactory. (AC ¶ 106). He complains about the guards stopping at too many rest areas. Although plaintiff does not make any claims regarding the trip itself, it appears that this transportation issue is part of plaintiff's claim that defendants are conspiring to find inmates guilty of misbehavior to keep the SHU facilities open, and the guards are getting overtime pay for the transportation. (AC ¶ 39). The longer it takes to bring the inmates to the SHU facility, the more money spent in overtime.

As part of the class action argument, plaintiff also alleges that the defendants are trying to keep their Aggression Replacement Therapy ("ART") program funded by increasing the number of inmates who are assigned to the program. The increase in inmate participants is allegedly accomplished by falsely charging inmates

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 73 of 314
Booker v. Maly, Not Reported in F.Supp.3d (2014)
2014 WL 1289579

with misbehavior that is associated with violence, such as gang activity and then forcing those inmates to participate in ART at the risk of having "a negative effect on his conditional release date, his good time credits, his family reunion participation, and other department privileges and work options." (AC ¶¶ 33–35). Plaintiff adds defendant Cook to the list of defendants who are responsible for forcing inmates to participate in ART. (AC Twelfth Cause of Action ¶ 1(a), (2)(f)).

While at Upstate, plaintiff alleges that he was subjected to "atypical and significant" as well as cruel and unusual conditions of confinement. Plaintiff claims that he was forced to share a small cell with another inmate, and that his right to privacy was denied while showering, using the toilet, and dressing. (AC ¶¶ 120–24). Plaintiff also alleges that the lights were left on continuously, making it very difficult for him to sleep (AC ¶¶ 114–19); the showers were dirty and he was given insufficient cleaning materials (AC ¶¶ 125–30); he was denied proper winter garments (AC ¶¶ 131–36); he was handcuffed when outside of his cell; was only allowed one visit per week in unsatisfactory conditions; had to request his "necessities;" had no contact with other human beings outside of his cell mate; was served extremely small portions of food; was deprived of 97% of his personal property; and was denied the opportunity to work. (AC ¶ 137(a)-(f)). Plaintiff outlined various other restrictions to which he was subjected in SHU. (AC ¶¶ 138(a)-(f)).

Plaintiff states that while he was confined in SHU, his First Amendment right to practice his religion was violated. Plaintiff is Muslim, and he was not allowed to attend any congregate religious services (for which there is no substitute); he was not allowed to perform fithra (hair removal); he was not afforded access to an Imam; and was "daily" subjected to viewing another individual's nudity, as well as others viewing his nudity, in direct violation of the tenets of Islam. (AC ¶¶ 139–47). Plaintiff claims that defendants Rock and Fischer condoned and controlled a policy which forced plaintiff to share a cell with another individual without providing a partition to shield the inmates from "indecent exposure ." (AC ¶ 148).

*5  Plaintiff claims that defendants Maly, Smith, Kavanaugh, Kober, Fischer,[7] Prack,[8] Rock,[9] and Cook[10] entered into a civil conspiracy to violate plaintiff's (and other inmates') First, Fourth, Eighth, and Fourteenth Amendment rights. Plaintiff claims that these

defendants have conspired to charge African–American and LatinoAmerican inmates with gang activity under an unconstitutionally vague rule, find them guilty,[11] and sentence them to serve time in SHU and requiring their participation in the federally funded Aggression Replacement Training program ("ART").

[7]    Defendant Brian Fischer is the Commissioner of DOCCS.

[8]    Defendant Albert Prack is the Director of Special Housing, who is, among other things, responsible for deciding appeals from facility disciplinary determinations.

[9]    Defendant Rock was the Superintendent of Upstate. He retired on October 30, 2013. (Rock Decl. ¶ 1) (Dkt. No. 103–19).

[10]   Defendant Cook is a Corrections Counselor at Upstate, who put plaintiff on a list for the ART program, notwithstanding that plaintiff told her that she already completed the program and did not need to take it again. (AC ¶¶ 108–112).

[11]   Plaintiff states that the defendants are "in agreement" to have staff members who are not "certified or trained in gang identification" write misbehavior reports, falsely accusing AfricanAmerican and Latino inmates, based on their innocuous cultural expressions, use of slang or ebonics, poetry, writing, skipping holes in lacing their shoes, and wearing their hair in particular braids. (AC ¶ 23).

Plaintiff alleges that defendants have intentionally failed to publish the rule in the DOCCS rule book, "although they received the funding to print the rule inside the rule book...." (AC ¶ 24). Plaintiff claims that the defendants have conspired to withhold adequate notice of the prohibited conduct so that they may continue to write false misbehavior reports. (AC ¶ 25). Plaintiff alleges that the hearings are conducted in isolated locations so that inmates may be intimidated into pleading guilty. (AC ¶ 29). Plaintiff alleges that there are no criteria used to distinguish between gang materials and non-gang materials. (AC ¶ 27).

Plaintiff states that as a result of this conspiracy, (1) DOCCS receives additional money from the government because the defendants have inflated the number of inmates who "need" the ART program; (2) the need for SHU facilities has been manipulated by increasing the

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 74 of 314

capacity/occupancy of SHU cells unnecessarily through the "prison gang rule scam," and (3) more overtime, and consequently more money, is generated for DOCCS staff who must transport the inmates to SHU facilities. (AC ¶¶ 22–41).

Plaintiff has again asked for class action status. (AC ¶¶ 1–7). In this request, plaintiff alleges that he wishes to bring this action "on behalf of himself and other identified and unidentified inmates incarcerated in the New York State [DOCCS]." (AC ¶ 1). Plaintiff alleges that his claims are typical of the "class," and that he will fairly represent the members of the class because he is a "direct victim," but he also asks the court to appoint a class counsel. (AC ¶¶ 3–6).

Plaintiff alleges that for years, plaintiff and other inmates have complained about the lack of procedural safeguards at disciplinary hearings wherein violations of the "vague" prison gang rule are charged. (AC ¶ 7). Plaintiff alleges that the rule unfairly characterizes their "cultural expressions" as amounting to "gang activity." (*Id.*) Plaintiff alleges that the injunctive relief that he has requested will affect all the class members, and therefore, class certification should be granted.

The amended complaint contains twelve causes of action. As Judge Mordue found, construed liberally, in addition to the civil conspiracy noted above by defendants Maly, Smith, Kavanaugh Kober, Fischer, Prack, Rock, and Cook (Twelfth Cause of Action), plaintiff also alleges that (1) defendants Maly, Smith, Prack, and Fischer denied plaintiff due process in violation of the Fourteenth Amendment (First and Second Causes of Action); (2) defendants Maly, Smith, Prack, Fischer, and Rock subjected plaintiff to cruel and unusual conditions of confinement in violation of his rights under the Eighth Amendment (Third, Fourth, Fifth and Sixth Causes of Action); (3) defendant Rock caused a violation of plaintiff's right to privacy in violation of the Fourth Amendment (Seventh Cause of Action); and (4) defendants Maly, Smith, Prack, Fischer, Rock, Rokace, Taylor and Dumas interfered with plaintiff's ability to freely practice his religion in violation of his First Amendment rights and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Eighth, Ninth, Tenth, and Eleventh Causes of Action).

## II. *Class Action*

**\*6** Plaintiff has simply repeated the paragraphs of his original complaint that request the court to grant class actions status under Fed.R.Civ.P. 23. (*Compare* Compl. ¶¶ 1–7, 18–41 *with* AC ¶¶ 1–7, 18–41). Judge Mordue has already denied plaintiff's motion for class certification based upon the same facts. Although Judge Mordue denied plaintiff's motion "without prejudice," plaintiff has cited nothing that would change Judge Mordue's analysis. Thus, to the extent that plaintiff is again requesting class certification, this court recommends that it be denied, and will proceed based upon plaintiff's individual claims. [12]

[12]    The court does note that if plaintiff were to succeed individually on his claim that the challenged rule was unconstitutionally vague, to the extent that plaintiff seeks injunctive relief, the ruling would affect all inmates, including those that plaintiff alleges form his "class." *See Forts v. Ward,* 621 F.2d 1210, 1217–18 (2d Cir.1980) (in certain circumstances when order benefits all members of the alleged class, class certification would be a mere formality); *Galvan v. Levine,* 490 F.2d 1255, 161 (2d Cir.1973) (certification of class unnecessary when prospective relief would benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment); *Daniels v. City of New York,* 198 F.R.D. 409, 421–21 (S.D.N.Y.2001) (citing cases). Thus, class certification is unnecessary to obtain the prospective relief that plaintiff seeks.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### IV. *Due Process ( First and Second Causes of Action)*

#### A. Legal Standards

**1. Procedural Due Process**
To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

 *7 The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary

incidents of prison life to require procedural due process protections under *Sandin." Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

**2. Notice/Vagueness**
"Due process requires prison officials to provide inmates with adequate notice of what conduct is prohibited." *Collins v. Goord,* 581 F.Supp.2d 563, 578 (S.D.N.Y.2008) (citing, *inter alia, Chatin v. Coombe,* 186 F.3d 82, 87 (2d Cir.1999). " 'Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct. The underlying rationale ... [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice....' " *Williams v. Fischer,* 08–CV–413 (TJM/DRH), 2010 WL 3910129, at *10 (N.D.N.Y. Aug. 17, 2010) (quoting *Leitzsey v. Coombe,* 998 F.Supp. 282, 289 (W.D.N.Y.1998)). A disciplinary rule "is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule." *Id.* (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)).

#### B. Application

**1. Liberty Interest**
In this case, plaintiff was found guilty of the possession of gang-related material, but was found not guilty of

2014 WL 1289579

possessing another inmate's work. (Goglia Decl. Ex. B at 4). He was sentenced to one year in SHU for the possession of gang-related photographs. Even though plaintiff only served 264 days of his one year sentence in SHU, defendants do not contest, and this court will assume for purposes of this recommendation, that plaintiff had a protected liberty interest. Thus, the court need not engage in a lengthy analysis of whether plaintiff suffered an atypical and significant hardship,[13] and instead, may proceed to an analysis of whether plaintiff was afforded the requisite procedural safeguards.

[13]    The court notes that plaintiff spends a great deal of time arguing that the restrictions imposed on him in SHU were "atypical and significant." He seems to confuse this standard for finding a liberty interest with the standard for cruel and unusual punishment which is different and which the court will discuss below.

### 2. Advance Notice of Charges

**\*8** Plaintiff was served with his misbehavior report on March 27, 2010. (Kober Aff. Ex. B at 1) (Hearing Transcript ("HT")) (Dkt. No. 103–15); (Goglia Decl. Ex. B at 4, 5) (indicating delivery date and time). His hearing commenced on April 1, 2010. (*Id.*) The misbehavior report specified the rules that plaintiff was alleged to have violated. (Goglia Decl. Ex. A). The explanation in the misbehavior report was quite clear that Officer Kavanaugh had been assigned to search plaintiff's personal property, and that during the course of that search, found the five photographs that were said to be "gang-related material," in violation of Rule 105.13. (*Id.*) Officer Kavanaugh also stated that he found legal material belonging to another inmate in violation of Rule 113.27. (*Id.*) Thus, plaintiff had "advance notice of the charges" as required for *procedural due process.*

### 3. Witnesses/Documentary Evidence

Plaintiff was given a choice of employee assistants for the hearing, and he chose Sergeant Checcia, who met with plaintiff on March 27, 2010. (HT at 1); (Goglia Decl. Ex. B at 5) (Dkt. No. 103–9). Sergeant Checcia determined that plaintiff wished to call Inmate Perez as a witness, and during the hearing, defendant Maly confirmed plaintiff's request. (*Id.* at 1–2). Inmate Perez, the law library clerk at Great Meadow, was called to testify telephonically on plaintiff's behalf relative to the unauthorized possession of another inmate's legal work. (*Id.* at 12–16). Inmate Perez

was the only witness who plaintiff requested prior to the hearing.[14] (Goglia Decl. Ex. B at 5) (Hearing Record Sheet).

[14]    Defendant Maly called Inmate Perez as a witness for plaintiff. Perez testified that he was an inmate law clerk and made a mistake in sending plaintiff another inmate's papers. (Kober Aff. Ex. B at 15–16) (Dkt. No. 103–15). As a result of Inmate Perez's testimony, plaintiff was found not guilty of possession of another inmate's legal work. (*Id.* at 33).

Plaintiff spent a great deal of time at the hearing, arguing that he never received the memorandum amending Rule 105.13, that the rule was not in the rule book, and that there were no specific criteria to establish whether an inmate's property contained "gang-related" material or depicted gang signs. Plaintiff was given the opportunity to argue that he did not receive the memorandum. (HT at 24–28). When plaintiff told defendant Maly that he had not received the memorandum updating Rule 105.13, defendant Maly adjourned the hearing in order to obtain evidence regarding the plaintiff's receipt of this document. (HT at 8–10). When defendant Maly recommenced the hearing, plaintiff was provided with copies of pages of the "Locator System," a two page copy of the memorandum updating Rule 105.15 that was issued in 2008; and a copy of the redacted Green Haven Log Book for A–Block on May 17, 2008,[15] the time when the memorandum was distributed to all inmates. (*Id.*)

[15]    Plaintiff was housed in A–Block at Green Haven at the time that the Rule 105.13 amendment was distributed.

However, when plaintiff requested to call the individual who actually "gave" him the memorandum 2008, the hearing officer denied that "unknown" witness. The hearing officer explained the reason for the denial. (HT at 28–30). There was no indication that anyone in particular gave plaintiff the amended rule. (HT at 29). The document produced by defendant Maly stated that the amendments were "passed out at twenty-two hundred." (*Id.*) Defendant Maly assumed that the floor officers were responsible for passing out the rules. (*Id.*) Thus, defendant Maly's denial of plaintiff's unknown witness, who gave plaintiff the amendment to Rule 105.13 two years prior to the hearing in this case was reasonable, given the documentary evidence supporting the finding that plaintiff received the memorandum when it was distributed to all inmates on

the unit. The denial was not a violation of plaintiff's right to present witnesses.

**\*9** What plaintiff does not state in his complaint, or anywhere in his papers, is that he was well aware of the rule and the 2008 memorandum because he brought a lawsuit, making identical claims in 2010, after a prior misbehavior report, charging him with similar behavior. *Booker v. Tokarz,* No. 10–CV–4796, 2012 WL 5431008 (E.D.N.Y. Nov.7, 2012). Defendants have filed a copy of plaintiff's amended complaint in *Tokarz* as Exhibit D to the Goglia Declaration. In *Tokarz,* plaintiff even made similar claims about the conditions in SHU. (*Id.*)

In *Tokarz,* the plaintiff was charged with the possession of photographs that were considered gang-related material. The hearing officer produced the same documentary evidence as defendant Maly, showing that plaintiff was given the rule amendment in May of 2008. In *Tokarz,* plaintiff made the same argument that he never personally signed for the rule amendment, and he was given a copy of the memorandum by the hearing officer. (*See Tokarz,* No. 10–CV–4796, Dkt. No. 54–12, Def.s' Ex. I, Pt. 1 at 11–12, 23–24). [16] Clearly, plaintiff is, and was, well-aware of the rule amendment. Even if plaintiff had not received a copy when the rule was distributed to all inmates in 2008, he received a copy of the rule during his disciplinary hearing in *Tokarz.* Plaintiff's argument in this case that he did not receive the memorandum regarding the rule amendment is disingenuous at best. [17]

[16]   This court has examined the documents filed in *Tokarz.* However, the review of those documents was not necessary to determine that plaintiff knew about the rule since he brought the same claim as he brings in this case, and defendants have filed plaintiff's own amended complaint in *Tokarz* as an exhibit in this case. The review of the disciplinary hearing transcript in *Tokarz* merely confirms that plaintiff received the memorandum at that hearing.

[17]   The court notes that even if it were not so obvious that plaintiff received a copy of the rule at the hearing in *Tokarz,* the evidence that he was housed in A–Block, and the log book entry, indicating that "all" inmates on A–Block received copies of the memorandum, would have been sufficient evidence *at a prison disciplinary hearing* to show that he received the memorandum. Defendant Maly's denial of unknown witnesses from a different facility, whose

conduct occurred two years prior to the disciplinary hearing was quite reasonable and justified as lacking necessity. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (hearing officer may refuse to call a witness due to lack of necessity or irrelevance).

Plaintiff's request to call the officer who packed his property at Great Meadow was also denied. (HT at 31– 32). Defendant Maly denied that witness because plaintiff did not dispute his ownership of the photographs. (HT at 32). Plaintiff did not deny that he owned the photographs, he was trying to show that the unknown officer who packed the photographs did not find that they were gang related. The fact that an officer packed plaintiff's property without noticing or finding that the photographs were gang-related material would not change the fact that defendant Kober found them to be so. Thus, the denial of the "unknown" witness who packed plaintiff's belongings at Great Meadow was not a violation of plaintiff's right to present evidence.

Finally, defendant Maly refused to call defendant Kavanaugh, the author of the misbehavior report to explain why he determined the photos to be gang-related. The court finds that the refusal to call defendant Kavanaugh was reasonable, given that defendant Kober was called to testify about the photographs. The misbehavior report is only a charge that plaintiff has violated a facility rule, and defendant Kavanaugh simply wrote the misbehavior report. The determination of whether plaintiff was guilty of that misbehavior is based upon the evidence presented at the hearing.

### 4. Sufficiency of Evidence

Defendant Maly called Corrections Counselor Kober to testify about gangrelated material. (HT at 17–23). Plaintiff alleges that the evidence was insufficient to find him guilty of the misbehavior because Kober was not qualified to testify about gang signs and was not specific about his reasoning at the hearing. Plaintiff also claims that defendant Maly and defendant Kober "discussed" what Kober was going to say, also showing that defendant Maly was biased.

**\*10** As stated above, the quantum of evidence required for a guilty finding in a prison disciplinary hearing is "some," "reliable" evidence, nowhere near the amount of evidence required for conviction in a criminal case. *Sira v. Morton, supra.* First, in this case, there is absolutely no basis for plaintiff's conclusory statement that defendant

Maly prejudged plaintiff's guilt or conspired to have defendant Kober give false testimony at the hearing, even if Maly did ask defendant Kober to testify. [18] Defendant Kober has submitted an affidavit explaining his testimony and why additional specificity is contrary to security concerns. (Kober Aff.) (Dkt. No. 103–13).

> [18]     Defendant Kober states that he was called as a witness by defendant Maly and was asked at the hearing to look at the five photographs to determine whether they contained gang-related material. (Kober Aff. ¶¶ 14, 18).

In his affidavit, defendant Kober states that his job as Corrections Counselor includes reviewing the records of "each inmate [who] is transferred into Shawangunk...." (Kober Aff. ¶ 4). Defendant Kober states that he reviewed plaintiff's records prior to meeting him when he was transferred to Shawangunk and noticed that plaintiff had identified himself to corrections officials as a member of the "Bloods." Defendant Kober also noticed that plaintiff was previously charged in misbehavior reports involving gangs or gang-related materials. (*Id.* ¶ 5). Defendant Kober has included plaintiff's disciplinary record as Exhibit A to his affidavit. (Dkt. No. 103–14). The disciplinary record shows that plaintiff has been charged with, and found guilty of, various misbehavior related to gangs and possession of gang-related material. In addition to the misbehavior adjudicated in this case, he was found guilty of behavior dealing with "unauthorized organizations" on June 6, 2002 (Kober Ex. A at 2); on July 26, 2000 (*Id.* at 3); on November 15, 1999. (*Id.* at 4); and on July 7, 1999 (*Id.* at 5).

In addition to defendant Kober's job as a Corrections Counselor, he has been designated to receive training relative to gangs and their activities in the correctional system. (Kober Aff. ¶¶ 6–7). This designation involved initial training as well as continuing education of four hours per month. (*Id.* ¶ 7). However, there are no textbooks for this training, and it is not a course of study that leads to a "certification" as a "gang expert ." [19] Instead, defendant Kober states that the training involves dissemination and discussion of intelligence material about gangs which is obtained from a number of different confidential sources. (*Id.* ¶ 8).

> [19]     At his disciplinary hearing, plaintiff was attempting to determine whether Kober had

a "certification." (Kober Aff. Ex. B, Hearing Transcript ("HT") at 22–23).

One of the important parts of defendant Kober's training is to learn the means by which gangs identify themselves because a significant number of inmates come into the correctional system with gang affiliations and retain these affiliations while incarcerated. (*Id.* ¶ 9). These methods of identification serve to enable gang members to identify each other for protection as well as warning to members of rival gangs. (*Id.* ¶ 10). Gang presence and activity within the correctional system presents "a real potential for danger because of their ability to bring about and coordinate organized violence at any time." (*Id.* ¶ 11). The correctional staff must be able to identify the gangs and their members in order to prevent any problems. (*Id.* ¶ 12). Defendant Kober states that it is also important for security to keep confidential the information that he receives as well as the sources from which that information is received in order for the staff to be effective in preventing the problems that can arise because of the gangs. (*Id.* ¶ 13). Once the inmates who belong to the gangs are aware that the staff knows their means of identification, they develop new ways to identify themselves. (*Id.*) This is why defendant Kober does not go into much detail when he is called to serve as a witness at an inmate's disciplinary hearing. (*Id.* ¶ 13).

**\*11** Defendant Kober explains his rationale for determining that the photographs in question depicted gang signs. (Kober Aff. ¶¶ 19–22). Defendant Kober explains that the hand signs in at least four of the five photographs are associated with the Bloods. (*Id.*) Defendant Kober also states that, although he was not asked at the hearing, the Bloods also use the color red as a "common identifying sign," and that in addition to the hand signs, both inmates in one of the photographs are dressed in red from head to toe. (*Id.* ¶ 22). Defendant Kober's testimony was sufficient to constitute "some" evidence at the disciplinary hearing, supporting the hearing officer's determination of guilt.

### 5. Hearing Officer Bias

Plaintiff argues that defendant Maly was not impartial. "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has

not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

Plaintiff believes defendant Maly was "biased" because he did not allow plaintiff to "test" the reliability of the evidence showing that plaintiff received the memorandum regarding rule 105.13. As stated above, plaintiff's entire challenge regarding his "knowledge" of the rule is specious because he brought a law suit in 2010, making the same claim about not getting the memorandum. Defendant Maly's refusal to call witnesses to "test" the evidence was reasonable and did not show that he was biased against plaintiff.

There is nothing in the record to which plaintiff refers that would show bias by defendant Maly sufficient to rise to the level of a constitutional violation. Plaintiff believes defendant Maly was biased because he did not allow plaintiff to call defendant Kavanaugh to testify and instead called defendant Kober to testify about the gang signs depicted in the photographs and appears to claim that Maly and Kober "discussed" the case prior to his testimony. There is absolutely no evidence that any discussion that occurred between Maly and Kober was more than a request that Kober review the photographs for gang-related material and testify to his opinion at the hearing. This does not indicate that defendant Maly "prejudged" the evidence. The fact that Maly called a "trained" officer to testify shows that he was wanted to make sure of the facts, not that he prejudged them.

**\*12** Plaintiff was given a written copy of the disposition and the reasons for the guilty finding. (*Id.* at 6). At the hearing, defendant Maly read, to the plaintiff, the statement of the evidence upon which he relied. (HT at 33). Plaintiff's appeal rights were explained to him, and

he was given an appeal form. (HT at 34). Thus, plaintiff's procedural due process rights were not violated in his disciplinary hearing.

**5. Vagueness**

The question remains whether Rule 105.13 itself is vague. The memorandum circulated by DOCCS in 2008 was an amendment to the "Standards of Inmate Behavior." The amendment was meant to clarify the existing rules with respect to gang related materials. (Goglia Decl. Ex. B at 25; Copy of Amendment Memorandum) (Dkt. No. 103–9). The memorandum contained amendments to both Rules 105.13 and 105.14. The amendment to Rule 105.13 read as follows:

> 105.13—An inmate shall not engage in or encourage others to engage in gang activities or display, wear, possess, distribute or use gang insignia or materials, including, but not limited to, printed or handwritten gang or gang-related material. I, II, III

> Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

(*Id.*) Contrary to plaintiff's allegation, the amendment has been published in the Rule Book. *See* 7 N.Y.C.R.R. § 270.2, Rule 105.13 (2012). A review of the amendment shows that the prohibited conduct is clear to a person of average intelligence.

Plaintiff challenges the rule because he claims that it does not set forth specific criteria for determining whether a gesture is a gang sign or whether it is simply "cultural expression." This court disagrees. It is quite clear,

according to the rule, that a gang sign is something that another inmate would recognize as creating an inference of a particular gang affiliation. More specificity in the prison context would be impossible because, as stated by defendant Kober, individuals could change the signs to avoid detection, interfering with the security and order of the facility.

In *Klimas v. Lantz,* [20] the inmate challenged a similar Connecticut rule on both First Amendment and Substantive Due Process grounds. Prior to his incarceration, Klimas was a Sergeant–at–Arms of the Hell's Angels Motorcycle Club ("HAMC"). [21] 2012 WL 3611018, at *1. The Connecticut Department of Corrections had a "zero tolerance" policy toward gangs and gang-related materials, and viewed the HAMC connection and alignment with "white supremacy groups" as a threat to the safety and security of the inmates and staff. *Id.* at *2. The Directive at issue in *Klimas* provided for the rejection of correspondence that included "letters written in code" or information that would create a clear and present danger of violence and physical harm, or threats to safety and security. *Id.*

[20]     *Klimas v. Lantz,* No. 3:08–CV–694, 2012 WL 3611018 (D.Conn. Aug.21, 2012), *aff'd,* 531 F. App'x 6 (2d Cir.2013).

[21]     The court would point out that this plaintiff makes much of the fact that the gang rules target African American and Latino inmates; however, HAMC members were required to be Caucasian. 2012 WL 3611018 at * 1. Thus, gang-related material can apply to any unauthorized organization, and there is no indication in the New York rule cited above that it would target any particular race. It is plaintiff who assumes that gangs are either African American or Latino.

**\*13** Another directive defined a "Security Risk Group" as a group of inmates designated by the Commissioner as possessing common characteristics, which serve to distinguish them from other inmates and "which as a discrete entity, jeopardizes the safety of the public, staff, or other inmate(s) and/or the security and order of the facility." *Id.* The rule contained also defined a "Disruptive Group," with general factors for the determination of each type of group. HAMC was designated as a Disruptive Group. *Id.*

The Connecticut Department of Corrections rejected Klimas's correspondence because the materials contained references to HAMC; HAMC-related symbols; and words which contained coded meanings. *Id.* at *3. Klimas was informed that any of his correspondence that contained HAMC logos or insignia would continue to be rejected based upon security concerns. *Id.*

The court in *Klimas v. Lantz* held that "the challenged practice is reasonably related to legitimate penological interests and is not an exaggerated response to prison concerns." *Id.* at *6. With respect to a vagueness challenge, the court held that the vagueness doctrine does not require perfect precision in the drafting of laws. *Id.* at *7 (citing *Rose v. Locke,* 423 U.S. 48, 49, 96 S.Ct. 243, 46 L.Ed.2d 185 (1972). The degree of vagueness that is tolerated depends upon the nature of the enactment, and in reviewing challenged regulations, the court should look to the words of the regulation, the interpretation given to analogous regulations, and the interpretation of the statute given by those who are charged with enforcing it. *Id.* (citing *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). The court held that although the Connecticut Directive implicated an inmate's First Amendment rights, it "gave reasonable notice of the proscribed speech by enumerating the specific circumstances where correspondence would be disapproved." *Id.* The court also stated that the fact that plaintiff may have received or sent correspondence in the past bearing the HAMC indicia "does not undermine the legitimacy of the defendants' rationale for rejecting his mail." *Id.* at *5 n. 4.

The reasoning of *Klimas v. Lantz* supports the defendants' position that the disciplinary rule in this case is not unconstitutionally vague. Rule 105.13 gives inmates the definition of gangs and of gang-related materials. As stated above, more specificity is not required, and would be very difficult, given the number of gangs [22] and the different methods of symbolic communication that exist. The fact that plaintiff may have been able to possess those pictures at other facilities does not undermine the defendants' desire to regulate gang-related material at their facility. *Klimas v. Lantz,* at *5 n. 4.

[22]     Exhibit E to defendant Kober's affidavit is an extract from an FBI document, entitled: "2011 National Gang Threat Assessment—Emerging Trends." (Kober Aff. Ex. E) (Dkt. No. 103–18). This

2014 WL 1289579

document discusses the development of the "National Gang Intelligence Center" ("NGIC"), lists definitions of different types of gangs, and lists the names of many of the gangs that currently exist, including the Bloods, together with the trend in their criminal behavior. (*Id.* at 3–4). In New York State alone, there are *29* different gangs listed. (*Id.* at 4).

The court would also point out that plaintiff is not as naive as he implies. Contrary to his allegations, he has had other issues with gang-related items, including photographs. The court notes that in the 2010 case, he made some of the same challenges to the disciplinary hearing as he makes in this case. The disciplinary hearing was reversed, but the court stated that the reversal was for " 'failure to maintain evidence for review.' " *Booker v. Tokarz,* 2012 WL 5431008 at *2. Plaintiff has identified himself to DOCCS officials as a member of the Bloods, holding the rank of Enforcer. (*See* Dechick Aff. ¶¶ 8–9 & Ex. A) (plaintiff's records show that his gang membership and rank were "self-reported"). Thus, plaintiff is well aware that gangs may communicate through signs and symbols. Even if such communication could also be considered "cultural expression," it is the type of "cultural expression" that may be reasonably regulated. *See Turner v. Safely,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (same).

**\*14** In his response to defendants' motion for summary judgment, plaintiff has attached a photograph of Haile Selassie I, purportedly making the same hand sign that was found to be a gang sign in plaintiff's disciplinary hearing. (Dkt. No. 106–3 at CM/ECF p. 8). Under the photograph is an explanation that the sign is the "Sign of the Holy Trinity," and the "triangle pointing downwards is an esoteric symbol representing the material phase of the Seal of Solomon...." (*Id.*)

Plaintiff has also attached a memorandum, dated February 26, 2001 from Lucien J. Leclaire, Jr., Deputy Commissioner. (*Id.* at 9). The memorandum is addressed to Father James C. Hayes, Chief of Chaplains and is in response to a memorandum sent by Father Hayes. The memorandum states that Deputy Commissioner Leclaire met with Don Selsky, who was then the Director of Special Housing and Inmate Discipline, and with

Dale Artus, who was then the Director of the Crisis Intervention Unit. (*Id.*) These individuals met to discuss that it was "inappropriate for an inmate to be disciplined for *possession of a picture of this nature."* (*Id.*) Deputy Commissioner Leclaire also stated that "Rule 105.12 of the Standards of Inmate Behavior, in no way, addresses hand signals," and that "[a]ny misbehavior report dealing solely with the displaying of hand signals [was] being dismissed by Mr. Selsky's office." The memorandum also states that "the issuance of this type of misbehavior report appears to be at a minimum." (*Id.*)

Plaintiff points out that the hand signal in his photographs was the same as that in the Haile Selassie photo. However, the court would note that the misbehavior report to which the memorandum refers was issued for "a picture of this nature,"-a picture of a well-known individual, published in what appears to be a book, where it is specifically stated that the hand symbol has historical or religious meaning. The court also notes that the disciplinary rule cited in Deputy Commissioner Leclaire's memorandum is not the rule that plaintiff was charged with violating, and the amendment to the Standards of Behavior was issued in 2008, seven years after the Leclaire memorandum. The Haile Selassie photo is, in no significant way, comparable to the pictures possessed by the plaintiff in this case.

In fact, the photo in plaintiff's exhibit would probably be acceptable under the 2008 amendment because the amendment excludes "published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process." Rule 105.13. In addition, the fact that a gang may have adopted a symbol that is also a religious or historical symbol as a method of identification does not make that symbol any less gang-related. The regulation is not unconstitutionally vague. Thus, plaintiff's due process claims, both procedural and substantive may be dismissed as against defendants Kavanaugh, Maly, Kober, Smith, Prack, and Fischer.[23]

[23]     In his first "cause of action," plaintiff names defendant Maly as responsible for the procedural due process violations, and in plaintiff's second cause of action, he states that defendants "Smith, Prack, and Fischer" "condoned and ratified" defendant Maly's violations by refusing to overturn the disciplinary findings. The court notes that in the body of his amended complaint, plaintiff has also

named defendants Kavanaugh and Kober as being responsible for the due process violations. Other than writing the misbehavior report, defendant Kavanaugh is not alleged to have participated in the disciplinary hearing. Plaintiff alleges only that defendant Kavanaugh was not qualified to make the gang-related determination and that defendant Maly refused to call him as a witness. Plaintiff claims that defendant Kober "withheld" evidence because he withheld the criteria that he used for determining whether plaintiff's photographs were gang-related materials, making the evidence "insufficient" to find plaintiff guilty. The court has discussed defendant Kober's involvement above. Because plaintiff's procedural and substantive due process claims may be dismissed, they may be dismissed as against all defendants that plaintiff associated with the due process violations.

## V. *SHU Conditions ( Third, Fourth, Fifth, and Sixth Causes of Action)*

### A. Legal Standards

**\*15** The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.' " *Farmer v. Brennan,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett,* 379 F.3d 462, 464 (7th Cir.2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835.

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Carlson v. Parry,* No. 06–CV–6621, 2012 U.S. Dist. LEXIS 44292, at \*20–21, 2012 WL 1067866 (W.D.N.Y. Mar.29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[ ] sufficient to satisfy the subjective component of the deliberate indifference standard. *Id.* (citing *Farmer,* 511 U.S. at 842; *Proffitt v. Ridgeway,* 279 F.3d 503, 506 (7th Cir.2002); *Bagola v. Kindt,* 131 F.3d 632, 646 (7th Cir.1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett,* 379 F.3d at 465 (citing *Fruit v. Norris,* 905 F.2d 1147, 1150–51 (8th Cir.1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

### B. Application

#### 1. General Conditions in SHU

**\*16** The court would first point out that plaintiff's Third Cause of Action names only defendant Maly

as "responsible" for the unconstitutional conditions of confinement because he found plaintiff guilty and sentenced him to SHU. (AC at CM/ECF p. 45). Plaintiff's Fourth Cause of Action names defendants Smith and Prack as being responsible for the unconstitutional conditions in SHU because they affirmed defendant Maly's disciplinary finding. However, plaintiff made the same claim about the hearing officer in *Tokarz,* and the court held that at most, the hearing officer intended that plaintiff be confined in SHU. There was no intention or awareness that plaintiff would be exposed to unconstitutional conditions while in SHU. Thus, the Eighth Amendment claims were dismissed as against the individuals responsible for the disciplinary determination. 2012 WL 5431008, at *7.

This court agrees. Restrictive SHU conditions on their own do not *per se* rise to the level of cruel and unusual punishment. *Inesti v. Hogan,* No. 11 Civ. 2596, at *24 (S.D.N.Y. Mar. 5, 2013) (normal conditions of SHU confinement are not violations of the Eighth Amendment); *Dixon v. Goord,* 224 F.Supp.2d 739, 752 (S.D.N.Y.2002). In addition, defendants are not responsible for conditions in SHU because of any alleged improprieties in the disciplinary hearing that caused the sentence to be imposed. *Id.* Thus, to the extent that plaintiff blames defendants Maly, Smith, Prack, and Fischer [24] for the SHU conditions only to the extent that they were involved in the disciplinary hearing at or its review, [25] any Eighth Amendment claim regarding the subsequent SHU conditions may be dismissed because there is no allegation that any of the three defendants were personally involved in maintaining the conditions in SHU or expected plaintiff to be subjected to anything more than the "normal" conditions in SHU. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (personal involvement in the violation required to establish liability under section 1983); *Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

[24]    Defendant Fischer, the Commissioner of DOCCS, is named in the Fifth Cause of Action as responsible for the conditions in SHU in relation to his handling of plaintiff's disciplinary appeal. Plaintiff claims that defendant Fischer violated the Eighth Amendment by continuing the authorization of "cruel and unusual punishment after learning of the due process violations and conditions of confinement under atypical and significant hardship." (AC at 46). Plaintiff also complained that Fischer delegated his decision making to defendant Prack, who was the Director of Special Housing. Passing the decision making on to a subordinate does not rise to the level of personal involvement required to establish liability under section 1983. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

[25]    In addition, defendants Maly and Smith work at Shawangunk. They would certainly not be responsible for any unconstitutional SHU conditions at Upstate.

Plaintiff's sixth cause of action states that defendant Rock, the former Superintendent of Upstate is also responsible for the unconstitutional conditions of the SHU at Upstate. Plaintiff claims that the cells and the showers were dirty and the cleaning supplies were unsatisfactory. He states that he was forced to inhale "sour odors." (AC ¶¶ 125–29). Plaintiff claims that his cell was "uninsulated," and he was denied thermal clothing, boots, a scarf, and gloves for the winter. (AC ¶ 131). Plaintiff also alleges that he was tormented by the illumination in his cell during the night, resulting in burning, watery eyes and fatigue due to lack of proper sleep. (AC ¶ 114–19). Plaintiff alleges that he was assigned to a double cell, and that there were no curtains to shield inmates from each other while they performed their daily hygiene such as showering or using the toilet. (AC ¶¶ 120–24).

*17  Plaintiff also claims that he was frisked when leaving his cell and that restraints were always applied, even when he had a medical appointment. (AC ¶ 137). He lost doctor-patient confidentiality because there were always guards present, he had to be locked in his cell 24–hours per day, seven days per week, with only one hour of daily recreation in a small caged area with no exercise equipment and no sunlight. He was only allowed to receive one visit per week behind a waist-high partition, with no ability to hug, kiss, or embrace his visitors. Plaintiff claims that his wife left him because of the "SHU hardship [and] lengthy sentence." (AC ¶ 137(a)). Plaintiff claims that he had to wake up at odd hours to mail his letters and to request necessities from officers who were making rounds. (AC ¶ 137(b)). Plaintiff claims that he had no contact with other human beings outside of his cell-mate; had to receive meals from corrections officers; his food rations

were unreasonably small; he was deprived of 97% of his personal property; there was no opportunity for him to work, to study, or to attend programs. (AC ¶ 137(c)-(f)).

Most of the restrictions and limitations that plaintiff states he suffered in the Upstate SHU are normal restrictive, and perhaps, harsh, conditions of SHU. Plaintiff refers to these conditions as atypical and significant. However, as stated above, atypical and significant conditions, compared to the ordinary incidents of prison life, may be sufficient to create a liberty interest, but do not establish an Eighth Amendment violation. The fact that plaintiff had to be shackled when leaving his cell, was confined 23 hours per day; had to receive meals from corrections officers, had to wake up at "odd" hours to mail letters or request "necessities," had limited contact with other inmates, was limited in his visitation rights, or did not have an opportunity to attend programs do not rise to the level of a serious deprivation of basic human needs. *See Beckford v. New York State Office of Mental Health,* No. 06–CV–561, 2010 WL 1816689, at *12 (W.D.N.Y. May 3, 2010) (citing, *inter alia, McNatt v. Unit Manager Parker,* No. 3:99CV1397, 2000 WL 307000, at *4 (D.Conn. Jan.18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to the level of Eighth Amendment violation); *Shannon v. Selsky,* No. 04 Civ.1939, 2005 WL 578943, at *6 (S.D.N.Y. Mar. 10, 2005) ("normal" SHU conditions do not violate the Eighth Amendment) (citing *Graham v. Perez,* 121 F.Supp.2d 317, 322–23 (S.D.N.Y.2000) (finding no serious deprivation resulting from limiting out-ofcell exercise; deprivation of job opportunity; limiting location and content of meals; denying in-cell hot water and electrical outlets; providing inadequate lighting; limiting recreation; limited "stamp buying opportunities;" limiting access to newspapers; personal telephone calls; and requiring them to wear prison-issue clothing)). Thus, plaintiff's general claims that the conditions in SHU violated the Eighth Amendment may be dismissed.

## 2. Nighttime Cell Illumination

**\*18** There are some conditions of which plaintiff complains that require further analysis. Plaintiff alleges that the lights in SHU were kept on from 7:00 or 8:00

p.m. until 8:00 a.m. the next morning, causing him to suffer from fatigue and causing his eyes to burn and water. (AC ¶ 114). In *Holmes v. Grant,* No. 03 Civ. 3426, 2006 WL 851753, at *3, 11 (S.D.N.Y. Mar. 31, 2006), the court denied a motion to dismiss on a similar cell illumination issue, [26] brought by defendants pursuant to Fed.R.Civ.P. 12(b) (6), before transferring the case to the Northern District of New York. Plaintiffs in *Holmes* alleged that defendants' 24–hour per day illumination of their cells at Eastern Correctional Facility, caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems. *Id.* The court simply stated that if these allegations were true, the claim would sustain both the objective and the subjective prongs of an Eighth Amendment analysis. After the case was transferred to the Northern District of New York, the parties voluntarily dismissed the action after coming to a settlement agreement. *Holmes v. Corrections Officers,* No. 9:06–CV–462 (LEK/DRH) (Dkt.Nos.76, 77).

[26]  There were many other issues in *Holmes* that are not relevant herein. Many of the plaintiff's claims were dismissed prior to transfer.

Other cases have upheld the defendants' maintenance of 24–hour security lighting in prison cells, based upon the facts presented to the court. In a Vermont class action, the district court held that the low wattage security lighting used in Vermont facilities was "of an intensity ... that courts have generally found permissible under the constitution." *McGee v. Gold,* No. 1:04–CV–335, 2010 WL 5300805, at *5 (D.Vt. August 3, 2010) [27], *Report–Recommendation adopted,* 2010 WL 5389996 (D.Vt. Dec.20, 2010), *vacated and remanded on other grounds sub nom. Kimber v. Tallon,* No. 11–1430, 2014 WL 715661 (2d Cir. Feb.26, 2014). Although the district court approved the report-recommendation, the Second Circuit has recently vacated the opinion and remanded the case for further proceedings because the court found that class counsel was inadequate. *Id.* The court made no comment upon the merits of the plaintiffs' claims.

[27]  The court in *McGee* cited *Vasquez v. Frank,* 290 F. App'x 927, 929 (7th Cir.2008) (24–hour lighting with a single 9–watt fluorescent bulb does not objectively constitute an "extreme deprivation"); *McBride v. Frank,* No. 05–C–1058, 2009 WL 2591618, at *5 (E.D.Wis.Aug.21, 2009) (constant illumination from a 9–watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities");

*Wills v. Terhune,* 404 F.Supp.2d 1226, 1230–31 (E.D.Cal.2005) (holding that 24–hour illumination by 13–watt bulb was not objectively unconstitutional); *Pawelski v. Cooke,* No. 90–C–949–C, 1991 WL 403181, at *4 (W.D.Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd,* 972 F.2d 352 (7th Cir.1992) (table); *compare Keenan v. Hall,* 83 F.3d 1083, 1090–91 (9th Cir.1996) (lighting from "large fluorescent lights" was unconstitutional where plaintiff alleged that he "had no way of telling night or day"); *Shepherd v. Ault,,* 982 F.Supp. 643, 646–50 (N.D.Iowa) (summary judgment denied where inmates claimed harm from 60–watt bulbs).

In the cases cited by the Magistrate Judge in *McGee* the court noted that the analysis of this issue was "fact-driven," based upon the degree of illumination, the discomfort that it caused, and the penological concern for the lighting. *See e.g. Vasquez,* 290 F. App'x at 929 (refusal to turn off the light had a valid penological concern); *Shepherd,* 982 F.Supp. at 645 (finding that constant illumination of a jail cell with bright light, which deprived the inmate of normal sleep, violated the inmate's basic rights) (citing *Zatko v. Rowland,* 835 F.Supp. 1174, 1181 (N.D.Cal.1993)); *Wills,* 404 F. Supp 2d at 1230–31 (plaintiff admitted that the security light was not even bright enough for him to read or write without straining his eyes).

In this case, defendant Rock states in his declaration that each cell in SHU is equipped with an overhead lighting fixture that houses a day-time overhead light and "a separate 3 watt LED night light." (Rock Decl. ¶ 9). The day-time light may be turned on and off by the inmates in the cell, while the night light is controlled by security staff. (*Id.*) The night lights are kept on between 11:00 p.m. and 6:00 a.m. (*Id.*) Defendant Rock states that the night lights are unobtrusive, but do allow the security staff to see into the cells in order to protect the security of the facility by making sure that inmates are not causing harm to themselves or to their cell mates. (*Id.*) This court notes that a 3–watt LED bulb is much less bright than the 9 or 13–watt illumination that was found acceptable in *Vasquez, McBride,* and *Wills* cited above. Three watts is far from the blinding bright light that plaintiff claims to have endured, causing his burning and watery eyes, and rashes.

*19 Defendant Rock has also submitted photographs of an SHU cell, depicting a solid door with a very small window. The low wattage night light helps the officers see into the cell *without* disturbing the inmates. The ability to maintain the safety of the inmates and the officers is a legitimate penological interest. Based upon the very low wattage of the light and the fact that the cell would normally be very dark because of the small window in the door, this court finds that plaintiff cannot meet either prong of the Eighth Amendment analysis. [28] Plaintiff's claim that the lighting in his cell amounted to cruel and unusual punishment may be dismissed.

[28]     In any event, even if the court were to find a constitutional violation, defendants would be entitled to qualified immunity from damages on this issue. Plaintiff has finished his sentence in the Upstate SHU, and other than in his "class" claims, he cannot ask for injunctive relief. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)). Based upon the cases cited above, it is apparent that the low wattage lighting violates no "clearly established" constitutional right of which a reasonable person would have known. The cases are fact-specific, there are many cases finding that all-night lighting does not violate an inmate's Eighth Amendment rights, and the lower and less obtrusive the lighting, the more likely that it will pass constitutional muster. Thus, even if this court were

2014 WL 1289579

to find a violation, defendants would be entitled to qualified immunity for this claim.

### 3. Clothing and Temperature

Plaintiff alleges that he was not issued "thermols [sic] upon request for the winter season," and that he was also denied boots, a scarf, and gloves. (AC ¶ 131). He also claims that his cell was "uninsulated." (*Id.*) Plaintiff claims that there is a window and a recreation yard door in each cell, but that neither is insulated, and the cold air comes through, keeping the cell "irregularly cold or freezing." (*Id.* ¶ 132). Plaintiff claims that as a result, he suffered from "common colds" and "unreasonable discomfort." (*Id.* ¶ 133). Plaintiff states that he could not take advantage of his recreation time because he was "underdressed," causing an old injury to become stiff, impairing his mobility and causing pain.

Defendant Rock states that every inmate who is admitted to Upstate is issued three shirts; four pairs of pants; three pairs of undershorts/undershirts; three pairs of socks; a pair of sneakers; and a winter coat for outdoor exercise.[29] (Rock Decl. ¶ 13) (citing Rock Decl. Ex. C, SHU Manual at 5) (Dkt. No. 103–23). The manual also states that each cell will be "heated adequately for comfort, as well as lighted adequately to permit reading." (*Id.* ¶ G). Defendant Rock has submitted photographs of the cells, the exercise areas outside of each cell and the visiting areas. (Rock Decl. Exs. A(1), A(2), D(1), D(2)).

[29]    The SHU manual also states that inmates will be issued one sweatshirt in addition to the items mentioned by defendant Rock. (Rock Decl. Ex. C at 5, ¶ D).

The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) (citing *inter alia Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann,* 387 F.2d 519, 527 (2d Cir.1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis–Charles v. Courtwright,* No. 9:11–CV–147, 2014 WL 457951, at *7–8 (N.D.N.Y. Feb.4, 2014) (adopting Rep't–Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell*

*v. Keane,* 338 F.3d 155, 159, 165 (2d Cir.2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

**\*20**   The court would point out that plaintiff arrived at Upstate on April 26, 2010 and left upstate on January 20, 2011. (Rock Decl. ¶ 6). Chances are that plaintiff would not have been subjected to the extremely cold temperatures of which he complains during most of that time period. Plaintiff does not contest that he was issued a winter coat and other clothing that he could use to mitigate the effects of any cold temperatures, even if he was denied some of the winter clothing he requested.[30] *See, e.g., Thompson v. Carlsen,* 9:08–CV–965 (FJS/ATB), 2010 WL 3584409, at *10 (N.D.N.Y. Aug. 16, 2010) (Rep't–Rec.), *adopted,* 2010 WL 3584396 (N.D.N.Y. Sept.7, 2010) ("Even assuming plaintiff's allegations are not exaggerated, he was not subjected to freezing temperatures for prolonged periods, and he was permitted to wear heavy winter clothes to maintain warmth."); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (confining INS detainee in a cold room for a prolonged time period did not meet the objective criteria for an Eighth Amendment violation because he apparently had clothing and was able to get some warmth with blankets, and provide himself with livable conditions). Plaintiff's statement that he caught "common colds" and was uncomfortable "regularly" is not sufficient to rise to the level of an Eighth Amendment claim. His allegation that an old injury stiffened up because he was cold also does not rise to the level of an Eighth Amendment violation, given the short period of time that he was actually in cold weather at Upstate.

[30]    During plaintiff's deposition, he testified that he was issued a hat. (Goglia Aff. Ex. E ("DT") at 88. He testified that he suffered dry, cracked lips and an occasional blister on his face. (DT at 91–92). However, he also testified that "some days" you "would feel the heat, actually you could feel the heat coming in and it was "just so cold you could feel the cold as well, ... it didn't balance out." (DT at 92). The fact that the temperatures "didn't balance out" does not rise to the level of cruel and unusual punishment.

Moreover, plaintiff's conclusory claims that one or more of the defendants were acting with deliberate indifference to the inmates' need for warmth is not supported by

2014 WL 1289579

the record. The DOCCS staff who worked in the SHU presumably experienced the same temperatures as the inmates. As noted above, former Upstate Superintendent Rock understood that SHU cells were adequately heated and that inmates were provided with sufficient clothing, including a winter coat, to mitigate the effects of any cold temperatures. *See Thompson v. Carlsen,* 2010 WL 3584409, at *11.

## VI. *Privacy (Seventh Cause of Action)*

Shielding one's unclothed figure from the view of strangers is "impelled by elementary self-respect an personal dignity." *Jean Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar.19, 2013) (citing *Michenfeler v. Sumner,* 860 F.2d 328, 333–34 (9th Cir.1988)). However, while an inmate's right to privacy does not vanish altogether when he is imprisoned, that right must yield to a penal institution's need to maintain security. *Id.* (citing *Cumbey v. Meachum,* 684 F.2d 712, 714 (10th Cir.1982). In *Jean–Laurent,* the court noted that " 'recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex'—which would include possible glimpses on the way to the shower—'may be permissible.' " *Id.* (citing *Correction Officers Benev. Ass'n of Rockland Cnty. v. Kralk,* No. 04 Civ. 2199(PG), 2011 WL 1236135, at *11 (S.D.N.Y. Mar.30, 2011) (citations omitted); *Israel v. City of New York,* No. 11 Civ. 7726(JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct.5, 2012) (finding intake strip searches permissible, notwithstanding the presence of other inmates and officers, males and females); *Baker v. Welch,* No. 03 Civ. 2267(JSR)(AJP), 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) (stating that a balance should be struck, which would allow occasional viewing but that would prohibit regular viewing); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) (explaining that cases finding a violation of privacy rights have looked to the frequency or regularity of such viewing, and finding violations only in those cases in which the guards "regularly" watch inmates undressing, using toilet facilities, or showering).

**\*21** Plaintiff alleges that he was forced to conduct his private functions daily "in clear view" of his cell mate (who was of the same sex) and of male and female personnel who might be walking by the cell. (AC ¶¶ 120–24). Defendants have submitted photographs of the cells in SHU. (Rock Decl. Exs. A(1) & A(2)). The pictures

show that the cell door is solid with a very small window opening that is on the top half of the door,[31] with the toilet toward the front, left side of the cell. (*Id.* Ex. A(1)). Even with the door open, an individual looking straight through the cell cannot see the toilet. With the door closed, it would be almost impossible to see someone using the toilet unless the guard actually walked up to the door to look inside the cell, and even then, the guard would have to specifically look down to see the toilet. (*Id.*) While it is true that the shower does not have a door or a curtain, defendant Rock states that Muslim inmates are allowed to wear boxer shorts in the shower if they wish to avoid being completely nude. (Rock Decl. ¶ 33).

[31]    Defendant Rock states that the window measures 12# by 12#. (Rock Decl. ¶ 30).

Plaintiff states in his response to the defendants' summary judgment motion, that any attempt to "shield himself" while housed in Upstate was met with the threat of a misbehavior report, and he cites the defendants' memorandum of law at pp. 27–28. However, that section of the defendants' memorandum of law says just the opposite—that "while inmates generally may not obstruct the view into their cells for security reasons, they are permitted to hang a sheet across their cells to obtain privacy while actually showering or using the toilet." (Dkt. No. 103–4 at 28 & Rock Decl. ¶ 31). Additionally, defendants state that the water to the cell showers is only turned on during recreation time, and "any inmate wishing to shower in private may ask his cellmate to go into the adjoining outdoor recreation area." (Rock Decl. ¶ 32). Thus, plaintiff had ready alternatives to protect his right to privacy, and any occasional viewing by members of the same or opposite sex did not rise to the level of a constitutional violation.

## VI. *Religious Rights (Eighth, Ninth, Tenth, and Eleventh Causes of Action)*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). The right is not extinguished

simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007).

**\*22** To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274– 75 (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909, at *8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. [32] *See* 42 U.S.C. § 2000cc–l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d at 504–05; *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr.22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

[32] However, RLUIPA does not provide for damages against defendants in their official capacities, and although the Second Circuit has not spoken on the issue, numerous district courts have held that RLUIPA does not provide for damages in the defendant's individual capacity. *See Jean Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *7 n. 9 (S.D.N.Y. Mar.19, 2013) (citing cases).

**B. Application**

Plaintiff alleges that his First Amendment right to practice his religion was violated because he was not able to attend religious services, study groups, or engage in fithea (hair removal). (AC ¶ 139). Plaintiff claims that there is no substitute for his weekly Juma services, he was not afforded any access to the Imam, and he was forced to view his cell-mate's nudity, as well as appear nude before his cell-mate, both of which are forbidden by plaintiff's religion. (AC ¶¶ 142–47). Plaintiff claims that his celebration of Ramadan was disrupted because he was denied access to the appropriate food, and defendants Taylor, Rakoce, and Dumas denied plaintiff his entire Eid ul Fitr meal on September 18, 2010. (AC ¶¶ 153–55). On September 17, 2010, defendant Taylor and Dumas did not give plaintiff the proper food because they were not responsible for "NOI" [33] food. (AC ¶¶ 157–58).

[33] "NOI" stands for Nation of Islam, a Muslim sect that is different from Shia or Sunni Muslims.

With respect to the issue of nudity, the court has discussed the constitutional "privacy" issue in the section above. With respect to the religious implications, the court assumes that the practice burdens the inmate's religious beliefs, however, there are valid penological objectives for prohibiting complete shielding of inmates at all times or for allowing the occasional viewing of male inmates in various states of undress by female officers. Defendants' accommodation involves allowing Muslim inmates to wear boxer shorts or a towel around their waists in the shower, allowing a brief shielding of the cell during the time that the water is turned on for showers, or allowing inmates to ask their cell mates to step out into the recreation pen while the inmate showers or uses the toilet. [34] The court finds that these alternatives are reasonable and finds that the defendants' policy serves a legitimate penological objective. Even if the court were considering the RLUIPA standard, the defendants' alternatives are the least restrictive measure, given the increased security issues in SHU.

[34] Defendant Rock states that each cell at Upstate has a door accessing its own exercise area, and that the inmates are given more than the one hour minimum required exercise time per day. In fact the outdoor exercise areas are unlocked "for at least two hours per day pursuant to the SITU manual, and at least half an hour additional time is afforded to

inmates who have displayed good behavior and have advanced to "PMS Level III status." (Rock Decl. ¶ 25). PIMS stands for Progressive Inmate Movement System. (*Id.*) There are three different levels of PIMS status for inmates who maintain good behavior while incarcerated at Upstate. Level III affords the most desirable conditions and extent of privileges. (*Id.* & n. 1).

**\*23** Inmates in SHU are not allowed to attend congregate services pursuant to Directive 4933; 7 N.Y.C.R.R. § 304.9(d); and SHU Manual at 45. (Rock Decl. ¶ 35). However, these inmates may obtain religious counseling by making a written request to the facility's ministerial staff. (*Id.*) Each SHU inmate is also allowed to have a Qu'ran, a prayer rug, and similar "devotional articles" in his SHU cell. DOCCS Directive No. 4933; 7 N.Y.C.R.R. § 302.3(e) (2); and SHU Manual at 7. Defendant Rock states that an Imam visits Upstate monthly, or whenever an Islamic inmate requests a visit or religious counseling. (Rock Decl. ¶ 36).

In *Walker v. Artus,* the court held that notwithstanding the regulations prohibiting SHU inmates from attending congregate services, DOCCS provides "several accommodations" to Muslim inmates in SHU so that they may practice their religion. *Walker v. Artus,* No. 9:10–CV–1431, 2014 WL 675815, at \*18 (N.D.N.Y. Sept.27, 2013) (Rep't–Rec.), *adopted,* 2014 WL 675815, at \*6–10 (N.D.N.Y. Feb.21, 2014).[35] The accommodations cited in *Walker* are the same as cited by defendants in this action. Plaintiff in *Walker* had requested that, in addition to the other accommodations, he be allowed to watch the congregate services by video or to listen to a tape recording. The court denied plaintiff's claim, and based its decision both on the First Amendment and RLUIPA, finding that neither was violated.

[35]   The court notes that the Westlaw citation for this decision does not differentiate between the date of the report-recommendation and the date of the district court's adoption. Both decisions are printed together on Westlaw. In this citation, I have indicated the date of the report-recommendation from this court's docket sheet.

Defendant Rock states that SHU inmates are not allowed to attend congregate services based upon the risk they pose to institutional security. (Rock Decl. ¶ 37). Defendant Rock states that because of plaintiff's known gang affiliation and his disciplinary history, he is viewed as an increased security risk in addition to being in SHU, and states that releasing plaintiff from confinement to attend congregate services "clearly would have posed a threat to the safety of other prisoners and to the security of Upstate CF." (*Id.*)

Plaintiff alleges that an Imam did not visit the SHU while he was there. (AC ¶ 143). However, defendant Rock notes that, even if an Imam had not been available at Upstate, DOCCS Directive 4202 expressly provides that an inmate may encourage outside clergy to contact the coordinating chaplain and apply to become a "registered religious volunteer." (Rock Decl. ¶ 38 & Ex. E (copy of Directive 4202)). The plaintiff in *Walker* also alleged that the Imam did not visit the SHU regularly. In adopting Magistrate Judge Peebles's recommendation, District Judge D'Agostino found that even assuming that the religious leader did not visit as often as required, "that would not change the fact that Plaintiff received numerous other accommodations to practice his religion...." 2014 WL 675815, at \*8.

Plaintiff alleges that he was unable to perform his religious hair removal. (AC ¶ 139). There is no indication that plaintiff was not allowed to shave while he was in SHU. Defendant Rock states in his declaration that SHU inmates may obtain shaving cream and razors daily before each scheduled exercise period. (Rock Decl. ¶ 43). Plaintiff has not indicated why he may not use the issued razors for shaving purposes, and defendant Rock states that other Muslim prisoners "routinely do this." (*Id.*)

**\*24** Finally, plaintiff alleges that defendants Rakoce, Taylor, and Dumas denied plaintiff his Suhoor Bag[36] during Ramadan on September 17, 2010 and his Eid ul Fitr meal on September 18, 2010. (AC ¶¶ 155–57). Plaintiff alleges that defendant Taylor was giving out the Suhoor bags, but told plaintiff that Taylor only served Shia Muslims, but no "second" officer came by with plaintiff's Suhoor bag. (AC ¶ 157). Plaintiff went without breakfast that day, and he states that when defendant Dumas came by to serve the evening feast, he told plaintiff that he did not have plaintiff's meal because Dumas was "doing only orthodox sunni meals ." (*Id.*) Once again, he went without a meal, and the area Sergeant never came along to "rectify the matter."

36      The Suhoor bag contains an early morning religious meal, eaten during Ramadan before fasting.

These are the only claims that plaintiff makes against defendants Rakoce, Taylor, and Dumas. Plaintiff does not allege that these individuals intentionally denied him his religious meals. Even according to plaintiff's version of the events, it appears as though these defendants delivered the religious meals for other Muslims, but somehow plaintiff was left out. Defendant Rock states that plaintiff was on the list of Muslim inmates who were participating in the 2010 Ramadan fast, and states that to defendant Rock's knowledge, plaintiff was always given his appropriate meals. (Rock Decl. ¶¶ 39–40). Exhibit F to defendant Rock's declaration shows that plaintiff was on the list of inmates participating in the Ramadan fast. (Rock Aff. Ex. F at 2) (Dkt. No. 103–28). Exhibit F also contains a memorandum from Sergeant Rakoce to FSA D. Haug, stating that defendant Rakoce was the Block Sergeant on September 18, 2010, and that plaintiff never complained to him or advise him that he did not receive his lunch meal.[37] (Rock Aff. Ex. F at 2).

37      This memorandum is apparently the investigation of plaintiff's internal grievance, complaining that he did not receive his lunch on September 18, 2010. (Rock Decl. ¶ 42). The court also notes that defendant Rock indicates that there is an Exhibit G, which is the Ramadan Menu for 2010. (Rock Decl. ¶ 40). There is no Exhibit G filed, however, the court does not doubt that there was a Ramadan Menu since plaintiff alleges that other inmates got their food. Thus, the absence of that exhibit is not relevant to the court's findings.

At worst, the amended complaint indicates that defendants Taylor and Dumas made a mistake, thinking that they were serving meals only for other Muslim sects or that someone who was supposed to serve plaintiff's meal did not come afterward. Mistakes, even those amounting to negligence, are not actionable under the First Amendment. *Daniels v. Williams*, 474 U.S. 327, 331–33 (1986) (injuries inflicted by governmental negligence are not addressed by the U.S. Constitution); *Scott v. Shansiddeen*, No. 9:12–CV–84, 2013 WL 3187071, at *4 (N.D.N.Y. May 28, 2013) (Rep't–Rec), *adopted,* 2013 WL 3187071, at *1 (N.D.N.Y. June 20, 2013) (citing *Tafari v. Brown,* No. 9:10–CV–1065, 2012 WL 1098447, at *6 (N.D.N.Y. Mar.30, 2012); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 498 (N.D.N.Y.2009)). In *Shansiddeen,* the court dismissed a First Amendment claim by a plaintiff who missed only two religious meals, in part

because plaintiff's claims sounded in negligence, alleging that the defendant failed to catch a mistake made by a clerk regarding the plaintiff's location for delivery of the religious meals, and in part because missing two meals did not "substantially burden" plaintiff's ability to freely exercise his religion.

**\*25** The same is true in this case. Any mistakes made by defendants did not violate plaintiff's constitutional rights, and as defendant Rock states, as the Superintendent, he is not responsible for serving food to inmates. Defendant Rakoce's memorandum shows that plaintiff was on the list and should have been served his religious meals. If a mistake were made, and plaintiff missed his meals, defendant Rock would have no way of "rectifying" the situation.

Thus, this court finds that plaintiff's religious claims may be dismissed.

## VII. *Conspiracy*

### A. Legal Standards
In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d at 468. An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient. See *Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

### B. Application
In this case, because the court has found no constitutional violations, any claim that plaintiff has based upon a "conspiracy" by defendants must fail. First, plaintiff's conspiracy claims all appear to be related to his "class

action." To the extent that he claims that anyone conspired to violate his individual constitutional rights, plaintiff has not set forth anything but conclusory allegations that the defendants participated in such a conspiracy. [38] The disciplinary hearing that placed plaintiff into SHU was at one facility, while the "conditions of confinement" that plaintiff claims were unconstitutional were at another facility. There is no indication that the defendants somehow "agreed" on any constitutional or other violations. Even if plaintiff had made a proper vagueness challenge, none of the individuals at Shawangunk would have participated in any conspiracy since they had nothing to do with the charges or the hearing that placed plaintiff in SHU.

[38]    The court notes that with respect to defendant Counselor Cook, it is the only claim in which he has been named.

Plaintiff sets forth various conclusory statements about a conspiracy to charge African–American and Latino inmates with gang-related violations in order to force them to participate in the ART program. Plaintiff claims that this is a violation of his First and Fourteenth Amendment rights. He claims that in the ART program inmates are "forced" to admit that their "ethnical [sic]" culture is "unauthorized gang, violent, [and] un-american [sic]." (AC ¶ 36). Plaintiff has absolutely no basis for this statement, and as the court has found above, ethnicity is not relevant to the rule prohibiting gangs and gang-related materials. Plaintiff does not claim any other due process violations regarding his placement in the ART program. [39] Thus, any conspiracy claim would have to have been dismissed.

[39]    The court has already rejected plaintiff's claims that inmates' placement in ART is somehow related to an effort by DOCCS to obtain federal funding and to keep SHU facilities open by falsely charging inmates

with misbehavior. In fact, during plaintiff's deposition in this case on January 8, 2013, he testified that he still had not re-taken the ART program because Upstate did not offer the program. (DT at 61).

*26  **WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 103) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 69) be **DENIED,** and it is

**RECOMMENDED,** that plaintiff's motion for sanctions (Dkt. No. 107) be **DENIED,** and it is

**RECOMMENDED,** that defendants' cross-motion for sanctions (Dkt. No. 108) be **DENIED,** and it is

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 109) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed March 6, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1289579

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3910129
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rameses WILLIAMS, Plaintiff,

v.

B. FISCHER, Commissioner, NYS Docs; J.
Taylor, Superintendent, Gouverneur Correctional
Facility; R. Pirie, Deputy Superintendent of
Programs, Gouverneur Correctional Facility;
and J. Nocera, Investigator/New York State
Inspector General, NYS Docs, Defendants.

No. 08–CV–413 (TJM/DRH).
|
Aug. 17, 2010.

**Attorneys and Law Firms**

Rameses Williams, East Elmhurst, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Michael G. McCartin, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

## REPORT–RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1**  Plaintiff pro se Rameses Williams ("Williams"),
formerly an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, the DOCS Commissioner and three
DOCS employees, violated his constitutional rights under
the First, Fifth, Eighth, and Fourteenth Amendments.
Compl. (Dkt. No. 1). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Dkt. No. 47. Williams' opposes the motion. Dkt. No.
53. For the following reasons, it is recommended that
defendants' motion be granted.

### I. Background

The facts are related herein in the light most favorable
to Williams as the non-moving party. *See* subsection
II(A) *infra.* The events in question occurred during
Wiliams' incarceration at Gouverneur Correctional
Facility ("GCF").

In early 2008, defendant Taylor, the GCF Superintendent,
was informed that the GCF mail room was "receiv[ing] an
unusual amount of inmate mail addressed to the Internal
Revenue Service [ (IRS) ]." Taylor Decl. (Dkt. No. 47–
14) ¶ 5. Taylor was also informed that "a publication
was circulating in the prison, entitled *The American's
Bulletin* [2] , ... which advocated the filing of fraudulent tax
returns as a form of protest against what the authors'
believe [d] a 'criminal judicial system.' " *Id.* ¶ 5; *see also*
Dkt. Nos. 47–5; 47–15. Taylor was also aware of a similar
situation where inmates at a facility had attempted to file
fraudulent tax returns. Taylor Decl. ¶ 6. Taylor contacted
the Inspector General's office for advice. Taylor Decl. ¶ 8.
An inspector spoke with Taylor, providing him with

[2]     *The American's Bulletin,* written by Jim Rivers and
Obie One Kanobi, explains how "[t]he 'system' in
today's world, ... is now completely dominated/
controlled by the forces of darkness, i.e. Satan/
Lucifer/Devil," (Dkt. No. 47–5 at 2), that the United
States is a private foreign corporation based in
England (*Id.* at 3), that courts and judges have no
lawful authority and are merely agents of the foreign
corporation (*Id.*), that states are making thousands of
dollars per inmate per day and that appearance bonds
are a source of unlimited 'commercial energy' (*Id.* at
5–6), and that "[i]ndividual income tax is voluntary ...
[and t]hat the IRS has absolutely no legal authority
to assess the tax even though they will try to bluff
you." (*Id.* at 7). The publication goes on to provide
inmates with the templates for letters and forms to
send to the District Attorney, court, and IRS so that
the inmate may "lay[ ] claim to what is rightfully
[theirs by successfully] operating ... in complete
conformance to the letter and intent of the law." Dkt.
No. 47–5 at 7–19. The reader is first told that, due
to the brevity of the publication, it "will make no
attempt to prove anything stated herein ... [and] will of
necessity be simply asserted as fact, firmly established
as irrefutable...." *Id.* at 2.

details of the scheme which included [filing] IRS forms ... and letters to the District Attorneys requesting an IRS filing based on the [inmate's] indictment number and social security number. The scheme [wa]s based on false withholding credits attributed to 'appearance bonds,' [and] involve[d] the filing of frivolous returns and claims using Tax Form 1099–OID, Original Issue Discount forms. The forms and letters [we]re nearly identical to those provided as examples in *The American's Bulletin* publication which was circulating GCF at the time.

*Id.* ¶ 8.

After speaking with the investigator, Taylor "was concerned that there was an inmate conspiracy developing at GCF ... which aspired to defraud the Internal Revenue Service of funds by filing false or misleading tax returns ... as advocated in *The American's Bulletin*," so he decided to personally open and review outgoing inmate mail addressed to the IRS to determine whether a scam was actually occurring at GCF. Taylor Decl. ¶ 9. Prior to initiating any action, Taylor spoke with DOCS counsel, who advised Taylor that based on the information presented, he "had sufficient reason to open and review the contents of the envelopes addressed to the IRS." *Id.* ¶ 14. Accordingly, pursuant to DOCS Directive No. 4421 [3], Taylor authorized and began inspecting the outgoing mail. *Id.* ¶ 14.

[3]  The DOCS directive provides that:

> the Superintendent shall not authorize the reading of ... outgoing privileged correspondence unless there is a reason to believe that the provisions of this or any directive or rule or regulation have been violat [ed], that any applicable state or federal law has been violated, or that the content of such correspondence threatens the safety, security, or good order of a facility or the safety or well being of any person.

Taylor Decl. ¶ 11. Furthermore, if a violation of any of the above is noted after reading the correspondence, it "may be confiscated, and the inmate provided with written notice of the confiscation, unless doing so would be inconsistent with the need to safeguard an investigation." *Id.* ¶ 12.

**\*2** Taylor's investigation revealed multiple envelopes addressed to the IRS which contained the forms previously identified by the Inspector General's investigator, letters to District Attorneys seeking filings based upon the inmate's indictment and social security numbers, and requests for IRS refunds in excess of several hundred thousand dollars. Taylor Decl. ¶ 14. Taylor notified the DOCS Inspector General's office in Albany which initiated a case and investigation. *Id.* ¶ 15; *see also* Nocera Decl. (Dkt. No. 47–24) ¶¶ 8–9. On January 30, 2008, the Inmate Liaison Committee was also informed of the pending "investigation into a possible inmate IRS tax scam." Taylor Decl. ¶ 16.

Between January 2008 and June 2009, defendant Nocera, an investigator for the Inspector General's Office, worked with the GCF staff and the IRS's Criminal Investigation Division to investigate Taylor's concerns of tax fraud. Nocera Decl. ¶ 11. During the investigation, Nocera reviewed fourteen different inmate's outgoing mail which all "included documents consistent with the tax scam advocated in *The American's Bulletin* ....[and] sought an IRS refund in excess of several hundreds of thousands of dollars, and in some cases, ... millions of dollars." *Id.* ¶¶ 11–12. As a result of the investigation, Nocera issued misbehavior reports for false and misleading statements and soliciting, of which "[a]ll [fourteen] inmates were found guilty and were given various sanctions, including time in SHU." *Id.* ¶¶ 18–19; *see also* Taylor Decl. ¶ 17. Nocera based these misbehavior reports upon "conversations with IRS Special Agent Kelly Ewald" and the "hallmarks of a fraudulent tax return ...." which included:

> (1) the excessive amount of the tax refund demanded; (2) the lack of supporting documentation to substantiate a tax refund demand of that amount; (3) the fact that [inmates] had listed a private address instead of [the] then current address as an inmate, which [Nocera] believed was an attempt to conceal from the IRS the fact that the filer was an inmate and therefore unlikely to have income or assets sufficient to justify a tax refund of the amount demanded; [and] (4) the use of Forms 1099–OID and 1096 to claim large withholding credits attributed to appearance bonds posted as a result of inmate incarceration.

Nocera Decl. ¶¶ 12–13.

2010 WL 3910129

On January 18, 2008, Williams placed an envelope, containing tax return documents, into the mail at GCF addressed to the IRS. Williams Decl. (Dkt. No. 53–3) ¶ 14. Taylor discovered these documents in which Williams had attempted to send the IRS a "tax return claiming that, in 2007, he had $12,500,000 in '[o]ther income,' which he labeled as [an] 'Appearance Bond.' " Taylor Decl. ¶ 19; Nocera Decl. ¶ 14; Dkt. Nos. 47–4 at 14, 47–11 at 16. Additionally, Williams' documents included a Form 1099–OID asserting "that District Attorney Robert M. Morgenthau withheld a total of $12,500,000 in federal income tax as 'holder in due course'...." Taylor Decl. ¶ 19; Nocera Decl. ¶ 14; Dkt. Nos. 47–4 at 15, 47–11 at 17;Dkt Nos. 53 at 5–14, 53–3 a t 4–11. Lastly, Williams listed his address on the correspondence as his sister's residence and not his current address at GCF, in a potential "attempt ... to conceal from the IRS the fact that he was incarcerated and therefore very unlikely to have a source of income or assets sufficient to generate a tax refund of the magnitude he claimed." Taylor Decl. ¶ 20; Nocera Decl. ¶ 15. Williams contends that he utilized his sister's address on the tax forms because he "believed that it would be a more secure address ... to receive funds ... [and] that the Department of Corrections would not intercept what [Williams] believe[d he] was entitled to receive." Williams Dep. (Dkt. No. 47–3) at 18–20, 29–31. On January 25, 2008, when questioned by Nocera, Williams indicated that he filed the return to "try it, because if it worked [he] would get the money." Nocera Decl. ¶ 14; *but see* Williams Dep. (Dkt. No. 47–3) at 31–31 (stating that Nocera paraphrased Williams' responses).

**\*3** On January 24, 2008, Williams filed a grievance complaining that his mail to the IRS was opened, read, and confiscated. Dkt. No. 47–9 at 3, 6. On January 30, 2008, Williams received a letter informing him that his tax returns had been confiscated pursuant to directive 4421, "as the subject of a joint investigation between [DOCS] ... and the [IRS] relating to a possible violation of Federal Law." Taylor Decl. ¶ 21; Dkt. No. 47–11 at 13. Also on January 30, the Inmate Liaison Committee was advised by defendant Pirie, a GCF Deputy Superintendent, and Taylor were in attendance and Taylor informed the committee "of the wide-spread investigation being conducted by the I[nspector] G[eneral]'s Office into the IRS scam." Dkt. Nos. 53 at 16, 53–3 at 17.

On February 1, 2008, Williams was issued a misbehavior report charging him with false and misleading statements and soliciting. Taylor Decl. ¶ 22; Nocera Decl. ¶ 17; Dkt. Nos. 47–4 at 9; 47–11 at 11; 47–26 at 1. Williams' grievance was denied on February 5, 2008 by the IGRC, [4] referring to the letter written on January 30th for its reasoning. Dkt. No. 47–9 at 3, 7. The IGRC's finding was affirmed by the Superintendent on February 12, stating that the "mail was confiscated as part of a joint investigation ... relating to a violation of Federal Law." Dkt. No. 47–9 at 3, 4; *see also* Dkt. No. 47–9 at 8. Williams again appealed the disposition, which was again denied by CORC. Dkt. No. 47–9 at 1, 3.

[4]  "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

On February 11 and 14, 2008, Williams attended a Tier III hearing on the charges. [5] Taylor Decl. ¶ 23; Nocera Decl. ¶ 18; *see also* Dkt. Nos. 47–4 at 6–17, 47–11 at 8–19; 47–22 at 14 (identical copies of hearing packets, or portions thereof); Dkt. Nos. 47–6, 47–21 (transcript of the hearing). Pirie presided over the hearing and received testimony from Nocera. Taylor Decl. ¶ 23; Pirie Decl. (Dkt.o.47–27) ¶ 4. During the hearing, Pirie (1) reviewed the documents Williams submitted to the IRS claiming $12,500,000 in other income from the appearance bond and letters submitted to the District Attorney contending he was a holder in due course for the twelve million dollars; (2) heard testimony from Nocera about the joint investigation and information gathered from the IRS that "filing of tax refunds based on appearance bonds, of the same type that [Williams] attempted to file ..., was a common tax scam that the IRS was aware of and investigating;" and (3) heard testimony from Williams about his "belie[f] that he had received legitimate advi[c]e [from] *The American's Bulletin* which allowed him to seek perhaps millions or tens of thousands of dollars in a tax refund from the IRS." Pirie Decl. ¶¶ 5–6; *see also* Williams Dep. at 23–31, 35 (explaining that Williams believed tax advice from author Obie One Kanobi because (1) his article was not banned in the prison and (2) people use

2010 WL 3910129

different names in life; therefore, since the publication was not banned and stated it was based in law, Williams believed that he was entitled to some money, though he was unsure as to exactly how much).[6]

5    DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a).

6    However, during later testimony, Williams indicated that he was aware that another inmate's tax return, filed in the same manner as those submitted by Williams, resulted in the check being confiscated by DOCS, sent back to the IRS, and the inmate suffering disciplinary sanctions. Williams Dep. at 43–46.

**\*4** Pirie found Williams guilty, relying upon the tax forms, information from the IRS, Wiliams' concealment of his address at GCF, and the "entirely preposterous [idea] that the plaintiff would be entitled to the magnitude of the tax refund that he sought from the IRS," and sentenced to eight months in the Special Housing Unit ("SHU")[7] and eight months loss of good time. Pirie Decl. ¶¶ 7–8; *see also* Taylor Decl. ¶ 23; Nocera Decl. ¶ 18. At the conclusion of the hearing, Williams failed to object to the way Pirie had presided over it, instead remarking that he "th[ought Pirie] did an excellent job [in] conducting th[e] hearing." Pirie Decl. ¶ 9; *see also* Williams Dep. at 63–68 (explaining that Pirie did not demonstrate unfairness or bias during the actual hearing, did not abuse his authority, and genuinely conducted a good hearing); Dkt. No. 47–6 at 16 (hearing transcript whereupon Williams stated that he thought Pirie "did an excellent job conducting this hearing...."). Williams appealed the hearing and had the disciplinary dispositions administratively reduced to four months in SHU and two months loss of good time credits, but the findings of guilt were both administratively upheld. Pirie Decl. ¶ 8; *see also* Dkt. Nos. 47–4 at 2–3; 47–28 at 1–2.

7    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct

charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Following the hearings, on February 21, 2008, Williams wrote to the DOCS Commissioner regarding the disciplinary disposition for which he contends he was falsely convicted. Dkt. No. 53 at 24. On March 15, 2008, Williams submitted another grievance seeking to discover what piece of mail was confiscated. Dkt. No. 47–10 at 3, 5. Wiliams' grievance was denied, directing him to the memorandum and receipt that he had previously received stating that his IRS forms had been withheld. Dkt. No. 47–10 at 3, 4, 6. Williams again appealed the disposition, but the denial was upheld by CORC on May 21, 2008, for those reasons previously stated. Dkt. No. 47–10 at 1, 3.

In 2009 after being released from prison, Williams again attempted to receive a tax return based upon his appearance bond and *The American's Bulletin.* Williams Dep. at 76. In response, the IRS indicated that the tax forms which Williams submitted in 2008 were incorrect and that any further filings would result in a $5,000 fine from the IRS. *Id.* at 77; Dkt. Nos. 53 at 18–19, 53–3 at 19–20 (letter dated June 5, 2009).[8] Despite the letter, Williams still asserted an entitlement to a return from the IRS during his deposition but believed the return now only totaled a few hundred thousand dollars, instead of a multimillion dollar return, and expressed a need to consult with a tax attorney prior to making additional filings. Williams Dep. at 78, 81, 89–90. Williams submitted additional tax forms, and letters to the District Attorney, for the year 2008 for a $500,000 appearance bond. Dkt. No. 59 at 5–10. Williams again received a letter from the IRS, similar to the one he previously received on June 5, 2009, indicating that the documents did not qualify as legitimate claims, "ha[d] no basis in law and represent[ed] a frivolous position." Dkt. No. 59 (letter dated January 25, 2010). The correspondence again threatened a $5,000 fine for any additional fraudulent claims which were filed. Later submissions to the court indicate that Williams ceased pursuing these filings shortly thereafter, requesting that the IRS to "rescind and ... withdraw the filing[s of his tax forms]...." *Id.* at 2.

8    In Williams' submissions, there was an additional letter from the IRS dated April 1, 2008 which specifically and unequivocally stated that any appearance bond taken out in his name "has **no value** to [Williams.]" Dkt. No. 53–3 at 39.

## II. Discussion

**\*5** Williams contends that his First Amendment rights were violated when defendants opened and confiscated his outgoing mail and that he was retaliated against for filing grievances. Williams asserts that his Fifth Amendment rights were violated during his disciplinary hearing. [9] Additionally, Williams alleges that the time which he spent in SHU was harsh and excessive in violation of his Eighth Amendment rights. Last, Williams states that his Fourteenth Amendment rights were violated because (1) he was subjected to a biased hearing officer, (2) the disciplinary disposition removed him from a program which would have made him eligible for an earlier parole date, and (3) the prison regulations under which he was disciplined were vague. Defendants assert that Williams has failed to state a constitutional claim, his claims are without merit, Fischer must be dismissed for a lack of personal involvement, and defendants are entitled to qualified immunity.

[9]   Williams also alleges violations occurring under the Fifth Amendment, but the Fifth Amendment is inapplicable. The Fifth Amendment pertains to criminal charges and prohibits the federal government from violating a person's due process rights. *See Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461 (1952); *Am. Bankers Mortgage v. Fed. Home Loan Mortgage,* 75 F.3d 1401, 1406 (9th Cir.1996); *Birdsall v. City of Hartford,* 249 F.Supp.2d 163, 170 (D.Conn.2003). As this case is civil and not criminal in nature and asserts no conduct by any federal employee, official, or entity, the Fifth Amendment does not apply.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P.* 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All

ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," that a pro se litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by pro se litigants" and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

**\*6** *Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' (citations omitted)).

### B. Personal Involvement

Defendants seeks dismissal of defendant Fischer based on a lack of personal involvement. Personal involvement is an essential prerequisite for section 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983

defendant, however, cannot be liable "merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered " personally involved" if:

1) the defendant participated directly in the alleged constitutional violation;

2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

Williams contends nonetheless that because of Fischer's authority within DOCS and the fact that he had given Fischer notice of his claims, he is liable. Fischer cannot be held liable simply because he is a supervisor. *Black,* 76 F.3d at 74. Williams does not contend that Fischer directly participated in any of his alleged constitutional violations. However, he does contend that because he sent him a letter, Fischer was personally involved. Dkt. No. 53 at 24. Such contentions are meritless. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y .2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted). Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). Moreover, the complaint fails to allege facts sufficient to

presume that Fischer failed to train any of the defendants or that he was grossly negligent.

**\*7** Therefore, because Williams failed to show that Fischer had any personal involvement in the matters alleged in the complaint, the motion to dismiss should be granted on this ground as to Fischer.

### C. First Amendment [10]

[10]    Williams' initial actions in attempting to file a false tax form and collect money which was not rightfully his were neither constitutional nor protected. *See e.g., United States v. Rowlee,* 899 F.2d 1275, 1279 (2d Cir.1990) ("The consensus of this and every other circuit is that liability for a false or fraudulent tax return cannot be avoided by evoking the First Amendment.") (citing cases). Even construing the facts in the light most favorable to Williams, his purported defense of ignorance is belied by the fact that he had notice that these actions were punishable by DOCS, he attempted to deceive the IRS by failing to disclose that he was in prison, he stated to Nocera that he was intending to see what was available to him yet recognized that he had never acquired anywhere near twelve million dollars in income, and he received information from the IRS that the attempted filings were fraudulent and he still continued to submit claims. Therefore, Williams' actions and attempt at further perpetuating the lawlessness advocated by *The American's Bulletin* are not actionable under § 1983. *See United State v. Shugarman,* 596 F.Supp. 186, 190 (D.C.Va 1984) ("It is settled ... that the first amendment protects an individual's right to disagree with the law ... [but t]here is no protection ... for speech or advocacy that is directed toward producing imminent lawless action.") (citing *Brandenburg v. Ohio,* 395 U.S. 444 (1969)).

### 1. Retaliation

Liberally construing Williams' complaint, he also alleges that he was issued his misbehavior report in retaliation for filing a grievance seeking the return of his confiscated documents. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d

75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Williams has failed to allege facts sufficient to support a retaliation claim. While filing grievances and lawsuits are actions protected by the First Amendment, Williams has failed to establish that his misbehavior report was false or filed as a result of his grievance. First, Williams admits to filing the forms and letters to the IRS, forms and letters which he has been told by the IRS were fraudulent and form the basis of disciplinary action. Williams Dep. at 76–90; Dkt. No. 53 at 18–19; Dkt. No. 53–3 at 19–20, 39; Dkt. No. 59 at 2, 5–10 Thus, based upon his own admission and subsequent information from the IRS, the misbehavior reports lodged against Williams were not false as he was attempting unlawfully to solicit money from the IRS based upon false information. Second, Williams' claims are conclusory and unsupported. Accordingly, they must be dismissed. *Jackson,* 713 at 214.

Accordingly, defendants' motion should be granted as to these claims.

### 2. Mail Tampering [11]

[11]    To the extent that, liberally reading Williams' complaint, the confiscation of Williams' IRS forms pursuant to the mail watch could be deemed a Fourth Amendment violation, such contentions are also without merit. *See United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998) ( "[T]he interception of a defendant's prison correspondence does not violate that individuals First or Fourth Amendment rights if prison officials had a good or reasonable cause to inspect the mail.") (internal quotation marks and citations omitted). For the same reasons cited *infra,* the defendants' motion is granted on this ground.

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord,* 320 F.Supp.2d 346, 351 (2d Cir.2003) (citations omitted). "A prisoner's right to receive and send mail, however, may be regulated." *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (citations omitted). While legal mail is afforded the greatest protection, "greater protection [is afforded] to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted).

The Second Circuit has determined two different tests by which to evaluate whether infringements on inmate correspondence were constitutionally justified. *Compare Davis,* 320 F.3d at 351 ("Restrictions ... are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved.") *with Johnson,* 445 F.3d at 534–35 (applying the *Turner* test to prisoner's challenge on regulating mail which asks whether (1) there is "a valid, rational connection between the prison regulation and the legitimate government interest ... [ (2) ] whether there are alternate means of exercising the right [for inmates; (3) ] ... the impact accommodation of the right ... will have on [DOCS; and (4) ] ... proposed alternatives.") (internal quotation marks and citations omitted).

**\*8** Regardless of which test is applied, defendants' conduct satisfies either standard. With regard to the *Davis* standard, defendants actions in confiscating and inspecting the envelopes addressed to the IRS furthered a substantial government interest because defendants determined, based upon a lengthy investigation and previous experience with inmate tax schemes, that *The American's Bulletin* was inciting similar conduct at GCF. Such actions are contrary to governmental aims of security, order, and rehabilitation because allowing the continuance of a tax scam would incite the inmates against the government, potentially cheat the government out of millions of dollars, and continue to encourage and support illegal actions. The mail watch was instituted only for a specific segment of outgoing mail which was reasonably believed to be perpetuating the fraud and, therefore, the restriction was not greater than necessary to conduct a thorough investigation.

Moreover, under to the *Turner* standard, the Second Circuit has already determined that facility instituted mail

watches are constitutional as a reasonable measure "to ensure the good order of the prison and the rehabilitation of prisoners by preventing a prisoner from engaging in illegal activities while incarcerated." *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (internal quotation marks and citations omitted). Such inspection of the outgoing mail was undertaken to prevent illegal activity. Thus, the mail watch was consistent with legitimate penological goals and satisfied the *Turner* standard.

Accordingly, defendants' motion should be granted on this ground.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly,* 76 F.3d at 480 (citations omitted).

Williams contends that his placement in SHU was, in itself, cruel and unusual punishment. However, this claim is without merit. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) ("The conditions of special housing units do not per se constitute cruel and unusual punishment in violation of the Eighth Amendment.") (citations omitted). Williams failed to proffer any evidence that his confinement in SHU was abnormal. Williams testified that he received all his meals, his recreation time, access to showers, and delivery of his mail. Williams Dep. at 70–74. Therefore, Williams has failed to establish a basis for Eighth Amendment relief.

Accordingly, defendants' motion should be granted on this ground.

### E. Fourteenth Amendment

**\*9** Williams claims that his Fourteenth Amendment rights have been violated because his hearing officer was biased, his confinement interfered with a program which may have resulted in earlier parole, and he was convicted based upon vague prison regulations.

### 1. Due Process[12]

[12] While not argued by defendants, it is important to note that Williams' due process claims are also precluded from review. Williams alleges due process violations in connection with his disciplinary proceeding. However, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487–87 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures used in prison disciplinary proceedings. *Edwards v. Balisok,* 520 U.S. 641 (1997). There is no evidence that Williams' disciplinary determinations were ever vacated. While Williams' sentence was modified, it was never overturned or expunged. Thus, the *Heck* rule still applies and any procedural challenges are barred. Therefore, because Williams' recovery of damages here for a false misbehavior report and his requested relief to amend his disciplinary history would necessarily imply the invalidity of his disciplinary conviction, the requested relief based on that hearing is barred.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The

Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

As Williams spent more than thirty days in keeplock, questions of fact exist as to the liberty interest asserted by him. Accordingly, defendants' motion on this ground should be denied.

### 2. Fair and Impartial Hearing

While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted). The only aspect of Williams' hearing for which he proffered a complaint was about the actions of defendant Pirie as his hearing officer.

Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

**\*10** In this case, it is clear that Williams' disposition was based on ample evidence and that, even viewing the evidence in the light most favorable to him, Pirie was not biased. First, Williams' claims of impartiality are belied by his testimony both during the disciplinary hearing and at his deposition that Pirie did a very good job conducting the hearing and he took no issue with

the procedures that had been undertaken. Williams Dep. at 63–68; Dkt. No. 47–6 at 16. Second, there is nothing in the record to indicate that Pirie had predetermined Williams' disposition as the tax scheme that was discussed at the prior ILC meeting was only addressed as a potential scheme. Dkt. Nos. 53 at 16, 53–3 at 17. The meeting's minutes only expressed the fact that the potential scheme was being investigated; however, that was a not an affirmative representation that the scheme was actually a scheme or that Williams had participated in it. Accordingly, Pirie's attendance at the meeting did not render him jaded.

Finally, Pirie stated an abundance of information upon which it is reasonable to believe that Williams was guilty of both soliciting and making false statements. It is undisputed that the "tax advice" proffered in *The American's Bulletin* came from a fanciful character, Williams used an address other than his current one when filling out the tax forms, the forms used and the manner in which they were filled out corresponded to previous tax fraud schemes, and Williams was unsure of the financial information he had included in the forms. All of this is sufficient to establish reliable evidence supporting both charges.

Accordingly, defendants' motion should be granted on this ground.

### 3. Vague Prison Regulations

"Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct. The underlying rationale ... [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice...." *Leitzsey v. Coombe,* 998 F.Supp. 282, 289 (W.D.N.Y.1998).

> A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the

part of the officials charged with enforcing the rule.

*Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (internal quotation marks and citations omitted).

In this case, the prison regulations prohibiting solicitation and filing false statements are neither vague nor open to multiple interpretations. With regard to Williams' correspondence, the regulations need not have addressed the specifics of filing taxes. All that is required is for inmates to be truthful in their daily living, whether through actions, oral representations, or written filings. Using false information and financial figures which were not reasonably believable or verifiable are both obvious transgressions of the previously mentioned facility rules. Moreover, giving credence to testimony that an individual, heeding tax advice from Obi One Kanobi, who makes multiple declarations on the invalidity of the government and the lack of jurisdiction of the courts, "is so replete with ... improbabilities that a reasonable jury could not find that [a constitutional violation occurred]...." *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 475 (S.D.N.Y.2003) (dismissing excessive force claim because the inmate's story was full of "inconsistencies and improbabilities" ....").

*11 Furthermore, even if it could be said that such regulations were vague, Williams testified that he was fully aware that filing such forms and acting in such a manner had previously resulted in inmate discipline. Williams Dep. 43–46. Therefore, it was clear to him that engaging in such activity was prohibited conduct which would result in disciplinary actions. Thus, the underlying reasoning for such constitutional challenges has also not been offended.

Accordingly, defendants' motion should be granted on this ground.

### E. Parole Eligibility

Williams contends that his time in SHU precluded him from an earlier parole date because it prohibited his participation in a necessary class. It is undisputed that inmates have no constitutionally protected interest in parole, or other conditional release from prison, prior to the expiration of a valid sentence. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1, 7 (1979).

The Second Circuit has also held that inmates have no constitutionally protected liberty interest in internal classifications or eligibility for rehabilitative programs. *See Pugliese v. Nelson,* 617 F.2d 916, 923 (2d Cir.1980).

Additionally, the Second Circuit has concluded that inmates have "no constitutional right to discretionary good time release, or to participation in prison programs which expedite release. *Fifield v. Eaton,* 669 F.Supp.2d 294, 297 (W.D.N.Y.2009) (citations omitted); *see also Abed v. Armstrong,* 209 F.3d 63, 66–67 (2d Cir.2000) ("Although inmates have a liberty interest in good time credits they have already earned, no such interest has been recognized in the opportunity to earn good time credit where, as here prison officials have discretion to determine whether an inmate ... is eligible to earn good time credit."); N.Y. Correct. Law § 803(a) (explaining that inmates may receive credit to reduce their sentence for "good behavior and efficient and willing performance ... in an assigned treatment program [but] may [also have such credits] be withheld, forfeited or canceled in whole or in part for ... failure to perform properly in the ... program assigned."). Thus, to the extent the complaint seeks compensation for Williams' presumed inability to accumulate good time credits after his removal from programming due to his disciplinary disposition, such allegations are insufficient to survive summary judgment. *Fifield,* 669 F.Supp.2d at 297 ("Accordingly, plaintiff's due process claim relating to lost opportunities to earn good time credits must be dismissed.").

Therefore, defendants' motion should be granted on this ground.

### F. Qualified Immunity

Defendants claim that even if Williams' constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y .2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions

might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

**\*12** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* it has not been shown that defendants violated Williams' constitutional rights. Accordingly, defendants' motion should be granted in the alternative on this ground.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED** and that judgment be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3910129

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 488950
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Luis A. RAMOS, Plaintiff,
v.
Paul CHAPPIUS, Jr., et al., Defendants.

15-CV-6600-FPG
|
Signed 01/19/2018

**Attorneys and Law Firms**

Luis A. Ramos, Buffalo, NY, pro se.

Heather Lynn McKay, New York State Attorney General's Office Department of Law, Rochester, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

**\*1**  *Pro se* Plaintiff Luis A. Ramos, a former a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), filed this Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants violated his civil rights. ECF No. 1. Plaintiff alleges that Defendant Taylor violated his due process rights at a disciplinary hearing ("First Hearing"), which Defendant Chappius approved but later reviewed and reversed. Plaintiff also alleges that Defendant Tanea violated his due process rights at a later disciplinary hearing ("Second Hearing"), which Defendant Wenderlich reviewed and then reduced Plaintiff's sentence of one year in the Special Housing Unit ("SHU") to nine months. *Id.* at 8-17.

Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. ECF No. 14. Plaintiff did not respond. [1] For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

[1]  By Order of this Court, Plaintiff had until November 6, 2017 to file papers in opposition to the motion and was advised that if he "fails to respond, the Court will decide the motion based on the Complaint and the Motion to Dismiss." ECF No. 16.

**DISCUSSION**

**I. Legal Standard**

A defendant may move to dismiss a complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court deciding a Rule 12(b)(6) motion "must accept as true all of the allegations contained in a complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The determination regarding "whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Under this plausibility standard, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "[W]ell-pleaded factual allegations" permit a court to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Although the court assumes that the plaintiff's factual allegations are true, this tenet is "inapplicable to legal conclusions." *Id.* at 678. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Bell Atl. Corp.*, 550 U.S. at 570.

The Second Circuit has recognized that "this plausibility standard governs claims brought even by *pro se* litigants." *Robles v. Bleau*, No. 9:07-CV-0464, 2008 WL 4693153, at \*5 (N.D.N.Y. Oct. 22, 2008) (citing *e.g.*, *Jacobs v. Mostow*, 271 Fed.Appx. 85, 87 (2d Cir. 2008) and *Boykin v. KeyCorp*, 521 F.3d 202, 215-16 (2d Cir. 2008)). However, the Court remains mindful that a "document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."

*Boykin*, 521 F.3d at 214. Nonetheless, all pleadings—*pro se* or otherwise—must contain enough factual allegations to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89 (2007)) (internal quotation marks omitted); *see also Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 414 (W.D.N.Y. 2010).

## II. Official Capacity Claims

**\*2** Defendants move to dismiss the entire Complaint or alternatively to dismiss all claims against Defendants Taylor, Chappius, and Wenderlich, and the official capacity claims against Defendant Tanea. ECF No. 14 at 1.[2]

[2]    Defendants also move to dismiss for Plaintiff's failure to comply with Local Rule 5.2(d), which requires that he provide the Court with a current address. ECF No. 14-1 at 4. However, Plaintiff filed a Notice of Change of Address shortly after Defendants filed their motion, and thus he complied with this requirement. ECF No. 15.

The Eleventh Amendment bars Plaintiff's claims against all Defendants in their official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Hafer v. Melo*, 502 U.S. 21, 27 (1991) (noting that state officers acting in their official capacities are not "persons" under Section 1983 because they assume the identity of the government that employs them). Thus, Plaintiff may sue Defendants in their official capacities only if they consent to be sued. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 140-141 (1984). Since none have consented, the Eleventh Amendment bars Plaintiff's suit against Defendants in their official capacities, and all official capacity claims are hereby DISMISSED.

## III. Defendants Taylor and Chappius

Defendants move to dismiss all claims against Taylor and Chappius arising from the First Hearing. They argue that the administrative reversal nullified that hearing and made it irrelevant to the harms Plaintiff allegedly suffered. ECF No. 14-1 at 6.

Taylor conducted the First Hearing, and Plaintiff asserts that Chappius knew of and failed to correct the wrongs allegedly committed at this proceeding. ECF No. 1 at 5. This hearing was reversed and the Second Hearing was

held on the same allegations. Defendant Tanea conducted the Second Hearing, which resulted in a one-year SHU confinement that was later reduced to nine months. ECF No. 1-1 at 67. Taylor and Chappius argue that the Second Hearing nullified the First Hearing and therefore the claims against them must be dismissed. The Court agrees.

Although Plaintiff asserts that Defendants violated his rights at the First Hearing, that hearing became null as a result of the Second Hearing. *See Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998) ("We need not discuss [the plaintiff]'s contention that his rights were violated at the first hearing, because it became a nullity. All findings and penalties imposed at the first hearing were vacated, and all the penalties [the plaintiff] suffered were imposed at the second hearing."). Because Plaintiff's SHU confinement was credited to the penalty imposed at the Second Hearing, his confinement "was entirely attributable to the ruling following the second hearing." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). "Accordingly, the result of the first hearing did not deprive [plaintiff] of due process." *Id.* at 164. Therefore, Defendants' motion to dismiss as to Taylor and Chappius is GRANTED.

## IV. Defendant Wenderlich

Wenderlich moves to dismiss all claims against him. ECF No. 14-1 at 7. Although Plaintiff's appeal to Wenderlich included his due process claims (*see* ECF 1-1 at 53-62), Wenderlich argues that Plaintiff failed to show his personal involvement in the alleged wrong or alternatively argues that he is entitled to qualified immunity. ECF No. 14-1 at 7.

**\*3** Defendants also argue that *Ashcroft v. Iqbal* (556 U.S. 662 (2009)) nullified all but the first and third *Colon* categories. *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). However,

the Second Circuit recently reaffirmed that "[a] plaintiff may establish such personal involvement by making any one of five showings (the 'Colon factors')," including by showing that "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) [*cert denied sub nom. Brooks v Pataki*, 137 S.Ct. 380 (2016) ]. This remains the law in this Circuit, absent a Circuit decision otherwise. Therefore, when Plaintiff swore that Defendant was informed of the constitutional deficiency but failed to correct it, this

was sufficient to create a triable issue as to [Defendant]'s personal involvement.

*Tolliver v Skinner*, 12 CIV. 971 (DAB), 2017 WL 1017649, at *4 (S.D.N.Y. Mar. 13, 2017), *reconsideration denied in part*, 12 CIV. 971 (DAB), 2017 WL 3482074 (S.D.N.Y. Aug. 10, 2017).[3] Therefore, the Court will assume, *arguendo*, that Plaintiff may establish personal liability through any of the five *Colon* categories.[4]

[3]    In discussing a jury charge limited to the third *Colon* factor, the Court noted that "there is no evidence in the record before us sufficient to establish that the plaintiffs could have demonstrated any of the other four *Colon* factors." *Warren*, 823 F.3d at 139.

[4]    "The majority of district courts, however, have held that all five *Colon* factors survive where the constitutional violation at issue does not require a showing of discriminatory intent. Indeed, courts within this Circuit have continued to apply the *Colon* factors post-*Iqbal*." *Carpenter v. Apple*, 915CV1269GTSCFH, 2017 WL 3887908, at *9 (N.D.N.Y. Sept. 5, 2017).

However, accepting as true that Wenderlich was aware of the alleged wrongs, he did not fail to correct them because he had no opportunity to do so. *See* 7 N.Y.C.R.R. §§ 252.7, 253.9, 254.9; *Barnes v. Henderson*, 628 F. Supp. 2d 407, 413 (W.D.N.Y. 2009) ("It does not appear that [the Superintendent] even had the authority to overturn [plaintiff]'s findings of guilt, but that at most, he could have reduced the penalty imposed on plaintiff.").

Another individual handled Plaintiff's administrative appeal, which reversed the Second Hearing. Therefore, the all claims against Wenderlich are DISMISSED.

**V. Defendant Tanea**

Defendants request that the Court dismiss Plaintiff's Complaint in its entirety, but they do not specifically argue for the dismissal of the individual capacity claims against Tanea, who conducted the Second Hearing. Therefore, the motion to dismiss as to Tanea is DENIED and Plaintiff's due process claim against him may move forward.

<u>CONCLUSION</u>

Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Plaintiff's official capacity claims and all claims against Defendants Taylor, Chappius, and Wenderlich are dismissed. The Clerk of the Court is directed to terminate Defendants Taylor, Chappius, and Wenderlich as parties to this action.

The sole remaining cause of action in this case is Plaintiff's due process claim against Defendant Tanea.

 **\*4**  IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 488950

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 106 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie Cole, Plaintiff,

v.

New York State Department of Corrections and
Community Supervision, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)
|
Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**
N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-
A-9212, Five Points Correctional Facility, Caller Box 119,
Romulus, NY 14541.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
615 Erie Boulevard West, Suite 102, OF COUNSEL:
KEVIN M. HAYDEN, ESQ., Ass't Attorney General,
Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

*1 *Pro se* plaintiff Ronnie Cole has commenced this
action asserting civil rights claims arising out of his
confinement in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS") pursuant to 42 U.S.C. § 1983. Plaintiff's
claims, which are multi-faceted, arise out of events
occurring at two separate DOCCS facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For
the reasons set forth below, I recommend that defendants'

motion for summary judgment be granted in part, but
otherwise denied.

I. BACKGROUND [1]

[1]    The record herein contains few undisputed facts.
Plaintiff and defendants disagree on many of
the events that transpired and provide conflicting
accounts of the circumstances surrounding the
relevant incidents. In light of the procedural posture
of the case, the following recitation is derived from
the record now before the court, with all inferences
drawn and ambiguities resolved in the plaintiff's
party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d
Cir. 2003). To the extent that plaintiff's deposition
testimony is at odds with his memorandum of law
or submissions in his statement of facts, the court
will follow the rule that "a party may not create an
issue of fact by submitting an affidavit in opposition
to a summary judgment motion that, by omission or
addition, contradicts the affiant's previous deposition
testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d
Cir. 1997).

Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1. [2] Plaintiff
is serving a sentence for robbery, possession of stolen
property, criminal possession of a weapon, and promoting
prison contraband. Dkt. No. 45-15 at 1. Plaintiff's claims,
however, arise out of his previous confinement at the
Walsh Regional Medical Unit ("Walsh") and the Upstate
Correctional Facility ("Upstate"). [3] *Id.* at 2.

[2]    Citations to page numbers refer to the pagination
generated by CM/ECF, not the page numbers
generated by the parties.

[3]    Upstate is a maximum security prison comprised
exclusively of special housing unit ("SHU") cells in
which inmates are confined for twenty-three hours
each day, primarily for disciplinary reasons. *Samuels
v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4
n.11 (S.D.N.Y. Sept. 12, 2002).

A. Use of Force Incidents at Walsh

On October 29, 2013, defendant Corrections Officer
Anthony M. Durante entered plaintiff's room to conduct
a strip frisk of plaintiff and a search of his area. Dkt.
No. 29-1 at 15. [4] At the time, plaintiff was in his
pajamas and seated in his wheelchair. Dkt. No. 45-3 at

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Case 9:16-cv-01157-FJS-TWD   Document 57   Filed 08/31/18   Page 107 of 314

27. Plaintiff maintains that defendant Sergeant John A. Wagner followed Durante into plaintiff's room in the E-Wing and blocked the door.[5] *Id.* Plaintiff asserts that he attempted to comply with Durante's orders and began to unbutton his shirt. *Id.* at 29. Plaintiff claims that Durante said "Happy Anniversary," and struck plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff maintains that defendant Stephen M. LoRusso entered the room and joined defendants Durante and Wagner as they repeatedly hit, kicked, and punched plaintiff in the head, face, and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and LoRusso then pulled plaintiff out of his wheelchair, lifted him overhead, and "slammed" him into the floor causing plaintiff to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were applied and the assault terminated when the medical staff and other officers entered the room. Dkt. No. 45-3 at 57-59.

4      The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

5      Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

**\*2** Defendant Durante, by contrast, has executed a sworn affidavit in which he denies having assaulted the plaintiff.[6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims that plaintiff became agitated during the search and began swinging his closed fists at Durante. *Id.* Plaintiff struck Durante on the right side of his head and Durante responded by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell backwards into a locker. *Id.* Durante avers that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

6      That affidavit, which is included with defendants' motion, was given by defendant Durante in

connection with a matter brought by the plaintiff in the New York Court of Claims.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present.[7] *Id.* at 126.

7      Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

## B. Facts Related to Plaintiff's Medical Treatment at Walsh[8]

8      In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. *Id.* at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked.

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. *Id.* at 74-85. Plaintiff maintains that he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

[9]    The record does not indicate what prescribed medications were administered.

 **\*3**  The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

C. Facts Related to Medical Treatment at Upstate

Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a "one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. *Id.* at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. *Id.* at 14.

1. Medications and Supplies

 **\*4**  From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace.

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa (an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. *Id.* at 64, 69.

10    On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. *Id.* Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." *Id.* at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." *Id.* Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." *Id.* The nurse called the pharmacy technician to request a clear catheter, and was advised that one

would need to be located. *Id.* Plaintiff refused the catheter change and said he would wait for a new one to arrive. *Id.* The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. *Id.* Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

**\*5** On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Case 9:16-cv-01157-FJS-TWD   Document 57   Filed 08/31/18   Page 110 of 314

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges. [11] Dkt. No. 45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges. [12] *Id.* at 41-42. Cole was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. *Id.* at 40.

---

[11]   The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[12]   Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

Plaintiff appealed the disciplinary determination on November 20, 2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf, requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

*6 On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 *et seq.*, and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether

Case 9:16-cv-01157-FJS-TWD   Document 57   Filed 08/31/18   Page 111 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477

U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[.]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

13    All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit.[14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

14    Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 &18.

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*,

*Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross*, 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, that no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross*, the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno*, ___ F.3d ____, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams*, plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at *2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having

Case 9:16-cv-01157-FJS-TWD   Document 57   Filed 08/31/18   Page 113 of 314
Cole v. New York State Department of Corrections and..., Not Reported in...
2016 WL 5394752

received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams*, 2016 WL 3729383, at \*5-6. Although not the centerpiece of its decision in *Williams*, the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at \*7.

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235761, at \*4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw*, No. 09-CV-1354, 2011 WL 4345299, at \*5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

## 1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical

restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

**\*10** Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

## 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Ross*, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension." *Brooks v. Rock*, No. 11-CV-1171 (GLS/ ATB), 2014 WL 1292232, at \*11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill*, 380 F.3d at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

## C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis.* Dkt. No. 45-16 at 15-16.

Case 9:16-cv-01157-FJS-TWD Document 57 Filed 08/31/18 Page 115 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness.[16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

[16] This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12** In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner

Cole v. New York State Department of Corrections and..., Not Reported in...
Case 9:16-cv-01157-FJS-TWD Document 57 Filed 08/31/18 Page 116 of 314
2016 WL 5394752

reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh.[17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

[17]    The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2.

Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

## D. Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

by evidence establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

### E. Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

### 1. Legal Standard Governing Deliberate Medical Indifference Claims

While the Eighth Amendment " +'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d

59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

**\*14** A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes

chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

**\*15** It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998)

(citation omitted). Accordingly, mere disagreement with prison officials regarding a course of treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

### 2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent*, 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni*, No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge*, No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

#### a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 119 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

hearing aids.[18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

[18]    Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

**\*16** While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. See Johnson v. Woods, No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at \*13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. See, e.g., Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); Morris v. Hoke, No. 87-CV-7812, 1992 WL 310792, at \*2 (S.D.N.Y. Oct. 21, 1992) ("[T]he

[plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. Id. The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. Id. at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. See Alster v. Goord, 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); see also Fate v. Goord, 2012 WL 3104884, at \*7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. See Savage v. Brue, No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at \*12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D.

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 120 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison*, 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

**\*17** In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted, and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally* Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2 at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at \*5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly*, No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at \*5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

**\*18** As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth

Case 9:16-cv-01157-FJS-TWD Document 57 Filed 08/31/18 Page 121 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights. [19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

[19]      Defendants have not submitted any argument in response to this claim.

In the prison context, it is will established that alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate

post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings. [20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

[20]      Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ – ____, *post*.

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

#### 1. Liberty Interest

**\*19** As to the first element, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[21] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

[21]  In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' +" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' +" Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were extraordinary,[22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' +" and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

[22]  Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

Case 9:16-cv-01157-FJS-TWD   Document 57   Filed 08/31/18   Page 123 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

**\*20** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

### b. November 2013 Hearing

#### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin,* 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne,* 155 F. 3d at 28. That determination was ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing. [23] *Id.* Under these circumstances, the Second Circuit concluded that it was unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

[23]    That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne,* in which it stated:

It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he was released from SHU

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 124 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

thirteen days after the six –month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

*Horne*, 155 F. 3d at 31, n. 4.

**\*21**  In this matter, as in *Horne*, the record establishes that plaintiff was confined in the SHU as a result of penalties imposed following the November 2013 hearing, and remained in SHU confinement until and after the second hearing commenced on March 20, 2014, at which he was again found guilty. Accordingly, based upon the Second Circuit's decision in *Horne*, it is unnecessary to determine whether plaintiff was afforded due process in connection with his first hearing, and his claims against defendant Corey are subject to dismissal on this basis.

### ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing was not rendered a nullity, for purposes of the plaintiff's procedural due process claims, I will address his substantive arguments. In connection with the first hearing, plaintiff claims that defendant Corey precluded him from questioning witnesses and improperly removed him from the first hearing. Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues that Hearing Officer Corey's failure to call an inmate, nurses, and Imam Muhammad violated his Fourteenth Amendment rights. *Id.* Plaintiff claims that Muhammad was present in his room after the assault, and would have offered testimony concerning his injuries. Dkt. No. 45-3 at 109-110.

### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support of his procedural due process claim with regard to the first hearing is a deprivation of his right to call witnesses. While the Fourteenth Amendment guarantees an inmate's right to call witnesses and present evidence in his defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky*, 487 F.Supp.2d 340, 342 (W.D.N.Y. 2007) (citing *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a witness can be denied

on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). "Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff to call defendants Peterson and Judway as witnesses. Dkt. No. 45-9 at 42. On November 20, 2013, defendant Corey completed the required Form 2176 with an explanation of his decision not to call RN Hart, RN Schram, and Imam Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation. [24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing." *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

[24]  Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

**\*22**  Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff*, 418 U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at *13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 125 of 314
Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. *See* Vogelfang v. Capra, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); Clark v. Dannheim, No. 02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); Mims v. Ufland, No. 07 CV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. Johnson v. Doling, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' +" Id. (citing, inter alia Wolff, 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "beligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." Id. at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see* Ponte, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

**\*23** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 132 S.Ct. 2088, 2093 (2012); *see also* Pearson v. Callahan, 555 U.S. 223, 231 (2009); Sudler v. City of N.Y., 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. Sudler, 689 F.3d at 174 (citing Saucier v. Katz, 533 U.S. 194, 206 (2001), abrogated on other grounds by (Pearson, 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." Pearson, 555 U.S. at 231 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a

Case 9:16-cv-01157-FJS-TWD   Document 57   Filed 08/31/18   Page 126 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' +" *Terebesi, 764 F.3d at 230* (quoting *al-Kidd*, 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky*, No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

### c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by

defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips*, No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly, I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

### H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

*25 With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2)

the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 128 of 314

16 ¶¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

25    The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' +" [26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

26    In their motion, defendants do not dispute that plaintiff suffered adverse actions.

**\*26** Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante, which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's

retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

### 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I*. For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ether v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

### 3. Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

**\*27** I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy. [27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I.* These defendants were not named as defendants in *Cole I*, and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of

any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

[27]    The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

### 4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

### I. Personal Involvement/Supervisory Liability

Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration

Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28** It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information

indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 131 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

### 3. Defendant Prack

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

### 4. Defendants Danforth and Sharma

**\*29**  Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the

Case 9:16-cv-01157-FJS-TWD Document 57 Filed 08/31/18 Page 132 of 314

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See* Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); Barnes v. Henderson, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

### K. ADA Claims [28]

[28]  Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

**\*30** Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See* Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. Henrietta D., 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of

architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In Cole v. Goord, et. al., No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("Cole II"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See* Cole v. Goord, 2009 WL 2601369, at \*8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him. (See Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick [ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); see also Fall v. New York State United Teachers, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. Proctor v. LeClaire, 715 F.3d 402, 414 (2d Cir. 2013); McKithen v. Brown, 481 F.3d 89, 105 (2d Cir. 2007), cert denied, 552 U.S. 1179, 128

S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

> **\*31** (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

> the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented – that is,

whether his hearing loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

### L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 134 of 314

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Couglin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.). [29]

[29]    To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied

to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss these claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06-CV-0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

**\*33**  To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N. Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment,

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5394752

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 135 of 314

I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante.[30]

[30]    As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

**\*34** Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court

discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. §

636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 5394752

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. New York State Department of Corrections and..., Not Reported in...

2016 WL 5374125

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 137 of 314

2016 WL 5374125
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie Cole, Plaintiff,
v.
New York State Department of Corrections and
Community Supervision, et al., Defendants.

9:14-CV-0539 (BKS/DEP)
|
Signed 09/26/2016

**Attorneys and Law Firms**

Ronnie Cole, 91-A-9212, Five Points Correctional
Facility, Caller Box 119, Romulus, NY 14541, Plaintiff,
pro se.

Kevin M. Hayden, Esq., Hon. Eric T. Schneiderman,
Office of New York State Attorney General, 615 Erie
Blvd. West, Suite 102, Syracuse, NY 13204, Attorney for
Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge.

 *1 Plaintiff Ronnie Cole, a New York State inmate,
commenced this civil rights action asserting claims under
42 U.S.C. § 1983 arising out of his confinement at the
Walsh Regional Medical Unit at Mohawk Correctional
Facility and Upstate Correctional Facility. In the
Amended Complaint, Plaintiff alleges Eighth Amendment
excessive force, failure to protect, and medical indifference
claims; Fourteenth Amendment due process claims;
claims under the Americans With Disabilities Act, 42
U.S.C. § 12101 et seq.; and New York State negligence
claims. Dkt. No. 29. On November 13, 2015, Defendants
filed a motion for summary judgment under Fed. R.
Civ. P. 56(a). Dkt. No. 45. Plaintiff filed a response
in opposition on December 28, 2015. Dkt. No. 54.
This matter was referred to United States Magistrate
Judge David E. Peebles who, on August 25, 2016, issued
a Report and Recommendation recommending that
Defendants' motion for summary judgment be granted in
part and denied in part. Dkt. No. 58. Magistrate Judge

Peebles advised the parties that under 28 U.S.C. § 636(b)
(1), they had fourteen days within which to file written
objections to the report, and that the failure to object to
the report within fourteen days would preclude appellate
review. Dkt. No. 58, pp. 100-01. No objections to the
Report-Recommendation have been filed.

As no objections to the Report and Recommendation
have been filed, and the time for filing objections
has expired, the Court reviews the Report and
Recommendation for clear error. See Petersen v. Astrue,
2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ.
P. 72(b) advisory committee's note to 1983 amendment.
Having reviewed the Report and Recommendation
for clear error and found none, the Report and
Recommendation is adopted in its entirety.

For these reasons, it is

**ORDERED** that the Report and Recommendation (Dkt.
No. 58) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary
judgment (Dkt. No. 45) is **GRANTED IN PART AND
DENIED IN PART**; and it is further

**ORDERED** that Plaintiff's claims against Defendants
DOCCS, Annucci, Prack, Bullis, Corey, Tousignant,
Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson,
D. Williamson, J. Henderson, Danforth, Mandalaywala,
Schroyer, Kowalachuk, Smith, and M. Williamson are
**DISMISSED**; and it is further

**ORDERED** Plaintiff's retaliation claims against
Defendants LoRusso and Wagner are **DISMISSED**; and
it is further

**ORDERED** that the Defendants' motion is otherwise
**DENIED** in all respects and that the matter will proceed
with regard to Plaintiff's excessive force claims against
Defendants Durante, Wagner, and LoRusso; retaliation
claims against Defendant Durante; supervisory claims
against Defendants Judway and Gonyea; and failure
to protect claim against Defendant Michaels based upon
events occurring at the Walsh Regional Medical Unit; and
it is further

**ORDERED** that the Clerk serve a copy of this Order upon
the parties in accordance with the Local Rules.

**\*2  IT IS SO ORDERED.**

Dated: September 26, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 5374125

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 111194

2008 WL 111194
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Elvin LeBRON, Petitioner

v.

Dale ARTUS, Respondent.

No. 06-CV-0532(VEB).
|
Jan. 9, 2008.

**Attorneys and Law Firms**

Elvin LeBron, Dannemora, NY, pro se.

Darren Longo, Office of the New York State Attorney
General, Buffalo, NY, for Respondent.

**DECISION AND ORDER**

VICTOR E. BIANCHINI, United States Magistrate
Judge.

**I. Introduction**

 **\*1** Petitioner Elvin Lebron ("Lebron" or "petitioner")
has filed a *pro se* petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254 challenging a prison
disciplinary determination which resulted in a loss of
"good time" credits. The parties have consented to
disposition of this matter by a magistrate judge pursuant
to 28 U.S.C. § 636(c)(1).

**II. Background**

The Tier III prison disciplinary proceeding at issue
occurred on December 8, 2003. At that time, Lebron
was incarcerated at Southport Correctional Facility
("Southport"). The charges against Lebron stemmed from
his alleged misconduct in connection with his attempts to
use the prison library.

On September 9, 2003, Beth Tomic ("Tomic" or "the
librarian"), the senior librarian at Southport, wrote a
misbehavior report charging Lebron with impersonation
(Prison Rule 111.10), solicitation of services (Prison Rule
103.20), correspondence procedure violations (Prison
Rule 180.11), and smuggling (Prison Rule 114.10).

According to the misbehavior report, Lebron had written
to Steele Memorial Library using inmate Darrell Wood's
name and identification number, had disguised the
envelope by labeling it "Legal Mail," and had enclosed
four (4) letters requesting services from that library
without prior permission of the prison superintendent.
R.87, 140.[1] In these letters, Lebron had requested the
addresses and phone numbers of several individuals, as
a well as newspaper articles about "alleged suspect Elvin
Lebron." *Id.* After Tomic compared the four letters with
samples of Lebron's handwriting, she determined that he
had sent the letters under the assumed name. *Id.*

[1]    Citations to "R.__" refer to the record of the
       proceedings below submitted by respondent in
       connection with his answer to the habeas petition.

Hearing Officer James Esgrow ("H.O. Esgrow" or "the
hearing officer") commenced the hearing on December
3, 2003. After being read his rights and obligations,
Lebron informed H.O. Esgrow that he had not been
served with a copy of the misbehavior report. Noting
that the proceedings were actually a re-hearing regarding
the September 9th misbehavior report, H.O. Esgrow
adjourned the hearing to determine whether petitioner
had been served with a copy of the report. R.123-24.

The hearing resumed on December 5, 2003. R.125. In
the course of reviewing Lebron's requests for witnesses
and documents, R.125-38, Lebron stated that his hearing
assistant had failed to provide him with copies of certain
documents which he had requested. Lebron also declared,
"I object to my assistance. I've been provided with
inadequate assistance." R.137. H.O. Esgrow adjourned
the hearing temporarily to look into the issues raised by
Lebron. R.139.

When H.O. Esgrow resumed the hearing later that
morning, he stated on the record that Lebron had
been served with a copy of the misbehavior report on
November 26, 2003, and that he had "been provided with
adequate, the opportunity for meaningful assistance."
R.139. Lebron, after being read the charges, pleaded "not
guilty." R.141. He objected to the hearing officer's finding
on the adequacy of the assistance he had been provided.
R.144.

 **\*2** After dealing with a number of procedural objections
raised by Lebron, H.O. Esgrow announced that for
"reasons of security," he was not going to have Lebron

2008 WL 111194

and any other inmate-witness in the same room together during the hearing. R.152. Lebron objected to this ruling. R.152-53. Lebron then provided H.O. Esgrow with the questions he would like asked of the inmates whom he had called to testify (Wood, Russell, Reddick, and Perry). R.152-60.

Inmate Wood, whom Lebron was alleged to have impersonated, testified first. He stated that he had addressed and mailed the envelope that had been sent to Steele Memorial Library and that the letters therein contained requests for information about Lebron. R.162. Wood testified that he "was helping [Lebron] with his case" and that he wrote the letters for him. R.162-63. Wood confirmed twice that the information requested was not anything he himself wanted; rather, it was something he was doing for Lebron R.162-63. Wood claimed that Lebron had not written the letters and that the handwriting on the letters was Wood's handwriting. R.164.

Tomic, the librarian who had filed the misbehavior report, testified via telephone. Tomic testified that the Southern Tier Library System had sent her an envelope that had been mailed to the Steele Memorial Library. Tomic explained that when a local library receives a letter from an inmate, the letter is forwarded to the library system, which provides library services to inmates in the region. She stated that when she received the envelope from the Southern Tier Library System, it already had been opened. R.171-72. After reading the contents of the envelope, she recalled that petitioner previously had sent her nearly identical requests. She had many exemplars of Lebron's handwriting from his earlier requests. After comparing them with the letters contained in the envelope, she concluded that the handwriting was the same on all the materials. She also was able to conclude that the material requested from the Steele Memorial Library related to petitioner's conviction. R.165-68.

Tomic explained that the proper procedure for an inmate to follow in order to obtain permission to access outside library services is to first write to the prison superintendent's office, which then forwards the letter to Tomic. In this case, Tomic noted, the letter had not been forwarded from the superintendent's office. R.173. Tomic therefore concluded that Lebron had violated the prison's correspondence rules by writing directly to Steele Memorial Library.

Lebron then cross-examined Tomic. Many of his questions were disallowed by the hearing officer as improper or irrelevant. Lebron asked whether Tomic had written the misbehavior report out of animosity towards him as a result of Lebron having filed a number of written complaints about her. Tomic testified that she had no knowledge of the complaints and had written the misbehavior report because it was part of her duties, as an employee, to do so upon discovering a rule violation had occurred. R.178-79.

 **3** After Tomic's testimony was completed, the hearing officer adjourned the hearing so that inmates Reddick, Perry, and Russell could be located. R.184. When the hearing resumed, all three witnesses refused to testify. Reddick, an inmate at Southport, stated his refusal on tape. R.184-85. Inmates Perry and Russell were no longer located at the facility, and therefore did not personally appear at the hearing. Instead, they signed forms indicating their refusal to testify which were faxed to the hearing officer. R.185. Lebron objected to the forms, so the hearing officer had the corrections officer who served the forms, Chris Clark ("C.O.Clark") testify by phone. C.O. Clark stated that he had both inmates report to the Tier Hearing Office; both told him that they did not know anything about the incident involving Lebron. R.185-89.

After C.O. Clark testified, the hearing officer asked petitioner if he had anything further he wished to put on the record. R.190. Lebron then made a number of objections; for instance, he alleged that it did not appear to be Perry's signature on the refusal form and protested the hearing officer's decision to have Wood and Tomic testify outside petitioner's presence. R.190-91. Lebron then made a closing argument and also claimed that the hearing officer had conducted an off-the-record investigation because Tomic had documents, such as the misbehavior report, questioning "how did [Tomic] know that she was going to be called as a witness?" R.191-94. The hearing officer stated, "no such investigation or off the record conversation exists" and that it "did not happen." R.194.

Lebron then requested that C.O. Annunziata testify so as to establish that Wood, not petitioner, had placed the envelope in question into the prison mail system. H.O. Esgrow stipulated that Wood had mailed the letter, so Lebron withdrew his request for C.O. Annunziata's

testimony. R.197-98. Lebron next asked that the "legal mail processor," who was later identified as mail clerk K. Washburn, testify about "the practice on something that's not deemed legal mail." Lebron requested that records officer V. Grover "testify concerning what is a FOIL request." Lebron requested that Special Housing Unit Director Donald Selsky testify concerning "what is suppose [sic] to be done if no written authorization is obtained to ... read a prisoner's mail." Finally, Lebron asked that C.O. Curran testify "[a]s a character witness to mitigate the penalties." The hearing officer denied these requests. R.199-200.

As his final point, Lebron indicated that he was "pretty sure that this hearing officer may ... intend to rely on a previous guilty finding concerning similar charges recently done ...." H.O. Esgrow stated that he had not reviewed Lebron's disciplinary record and would not do so unless and until he determined Lebron was guilty of the charges in the September 9th misbehavior report. R.200.

The hearing officer then entered his findings of fact and conclusions of law on the record, determining that Lebron was guilty of the four charges alleged. R.202-03. H.O. Esgrow relied upon the librarian's misbehavior report, the envelope addressed to Steele Memorial Library and the letters contained within it, the handwriting samples referred to in the report, the librarian's testimony concerning her investigation and the prison procedures for inmates to request outside library services, Lebron's testimony that the handwriting on the letters appeared to be written in his handwriting, R.154, and Lebron's statement that he gave the letters and envelope to a mail porter at the prison. R.203. The hearing officer also relied upon Wood's testimony that he had addressed and mailed the letters to assist Lebron. H.O. Esgrow further found that someone at the Steele Memorial Library (the addressee) had opened the letters and forwarded the envelope to the Southern Tier Library System for further action. Consequently, no further inquiry needed to be made into petitioner's claim regarding his claim that Tomic exceeded her authority and opened his mail. R.203. H.O. Esgrow credited Tomic's testimony that she had not filed the misbehavior report in retaliation, but because she had an obligation to report rule violations. He found that that Lebron had been served with a misbehavior report prior to the hearing and received an additional copy at the hearing, and that Lebron had been provided an adequate opportunity for meaningful assistance by a

hearing assistant/correction officer whom he had selected. R.203.

**\*4** The hearing officer wrote out his disposition and them imposed a penalty of 180 days in the Special Housing Unit ("SHU"). He further recommended a loss of six (6) months good time credits. R.202; *see also* R.206-08 (Hearing Officer's Written Disposition).

The Commissioner of the New York State Department of Correctional Services ("NYSDOCS") affirmed the hearing officer's determination. R.32. In January 2004, Lebron commenced a proceeding pursuant to Article 78 of New York's Civil Practice Law and Rules in New York State Supreme Court (Chemung County). Lebron's Article 78 proceeding alleged a number of substantive and procedural violations regarding both the December 8th Tier III hearing challenged in the instant habeas proceeding and a separate, unrelated Tier II hearing held in connection with a misbehavior report filed on September 8, 2003. R.2-21. In particular regard to the December 8th hearing, the Article 78 court found that Lebron appeared to be making the following claims: "unuseable evidence due to the failure to obtain a written authorization from the superintendent allowing petitioner's mail to be read; wrongful denial of documents and defense due to an inadequate assistant and the hearing officer's denial of certain documents; wrongful exclusion of witnesses and failure to obtain reasons for the refusal to testify; failure to record all portions of the hearing testimony and that the hearing officer improperly conducted investigations off the record; invalid disposition; biased hearing officer; and excessive sentence." R.233. The court dismissed Lebron's claims on the merits in a decision and order filed February 28, 2005, finding them to be contradicted by the record or without any legal basis. R.232-36. In particular, the Article 78 court found that Lebron had instructed the court to disregard one of his claims (*i.e.,* the allegation of insubstantial evidence) and therefore had waived it. R.233.

Lebron appealed the denial of his Article 78 petition to the Appellate Division, Third Department, of New York State Supreme Court. That court agreed with the Article 78 court's determinations, and rejected Lebron's appeal as follows:

> Initially, we note that petitioner expressly waived his substantial

evidence claim by retracting it before Supreme Court. In any event, the detailed misbehavior report and petitioner's admission that he wrote the requests for library services provide substantial evidence to support the determination of guilt. Next, although the employee assistant was unable to produce every document that petitioner requested, the record reveals that the assistant provided petitioner with all of the relevant information he requested and the Hearing Officer adjourned the hearing to afford petitioner a full opportunity to review the documents to which he was entitled. Finally, petitioner was not improperly denied documents or witnesses inasmuch as the evidence in question was either irrelevant or unavailable. We have reviewed petitioner's remaining contentions and find that they are without merit.

**\*5** *Lebron v. McGinnis,* 26 A.D.3d 658, 810 N.Y.S.2d 526 (App.Div.3d Dept.2006) (citations omitted); see also R.254-55. The New York Court of Appeals denied petitioner's request for leave to appeal. R.259-60.

This federal habeas petition followed. Respondent answered the petition, interposing the defense of non-exhaustion with regard to many of Lebron's claims. Respondent also addressed the merits of all of Lebron's claims, arguing that they are uniformly without merit. *See* Respondent's Memorandum of Law at 2-3, 10 *et seq.* (Docket No. 19) Lebron filed a Traverse in Reply to Respondent's Memorandum of Law in Response to the Petition ("Trav.") (Docket No. 21), arguing, *inter alia,* that he had fully exhausted his state-court remedies and that he never admitted that he had written the letters in the envelope sent to Steele Memorial Library. Trav. at 1 (Docket No. 21). He conceded that although he had waived his substantial evidence claim, it was not procedurally barred because the Article 78 court nevertheless addressed it on the merits.

The Court has reviewed the record of the state court proceedings and the law concerning the habeas statute's exhaustion requirement, and it appears that respondent is

correct. However, Lebron's claims are easily disposed of the merits. Therefore, in the interest of judicial economy, the Court will not discuss the exhaustion issue further and will proceed directly to the merits of Lebron's arguments. *See Boddie v. New York State Div. of Parole,* 285 F.Supp.2d 421, 428 (S.D.N.Y.2003) ("[I]n habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit.") (quotation omitted).

For the reasons that follow, the petition is denied.

## III. Standard of Review

In determining whether the Appellate Division properly rejected Lebron's arguments, this Court is constrained by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). [2] Under AEDPA, the state court's factual findings are presumed to be correct and may be overturned only if the petitioner offers clear and convincing evidence of their incorrectness. 28 U.S.C. § 2254(e). Where the state court has issued an "adjudication on the merits" of a petitioner's federal claim, [3] the writ may be granted only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

[2]     Pub.L. 104-32, 110 Stat. 1214 (effective April 24, 1996), 28 U.S.C. §§ 2244-66.

[3]     Even though the Appellate Division did not explicitly consider every claim raised by Lebron, its decision nevertheless was an "adjudication on the merits." *See Sellan v. Kuhlman,* 261 F.3d 303, 311-12 (2d Cir.2001).

## IV. General Legal Principles

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court recognized that prisoners retain a liberty interest and may not be deprived of that interest without due process of law. 418 U.S. at 556. Thus, an inmate facing disciplinary charges that could result in punitive segregation is entitled, at a minimum, to receive advance written notice of the charges against him and of the evidence available to the

factfinder. *Id.* at 563-64. The purpose of this notice is to give the inmate an opportunity to marshal the facts and prepare his defense. *Id.* at 564. Due process further requires that a written record of the proceedings be kept, along with a written statement by the factfinder as to the evidence relied upon and reasons for the disciplinary action imposed. *Id.; see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985). In addition, the inmate is entitled to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566; *see also McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983).

**\*6** The Second Circuit and other circuit courts have elaborated on the minimum due process requirements set forth in *Wolff* that pertain to an inmate facing disciplinary charges. In *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988), for instance, the Second Circuit held that "prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." 858 F.2d at 897. In *McCann v. Coughlin,* the Second Circuit recognized that the factfinder presiding over the disciplinary hearing must be fair and impartial. 698 F.2d at 122 (citing *Crooks v. Warne,* 516 F.2d 837 (2d Cir.1975)).

New York has enacted a comprehensive set of regulations under the heading, "Procedures for Implementing Standards of Inmate Behavior," 7 N.Y.Code R. & Reg. § 250.1-254.9, in order to codify the due process rights afforded to inmates in connection with the prison disciplinary process. Among the procedural rights codified in the regulations which are relevant to the instant case are the right to an assistant to interview witnesses and obtain documentary evidence on behalf of the inmate (7 N.Y.Code R. & Reg. § 251-4); the right to present documentary evidence and to call witnesses at the disciplinary hearing provided that the evidence or testimony is material and would not jeopardize institutional safety or correctional goals (7 N.Y.Code R. & Reg. § 254.5, 254.6); the right to written reasons from the hearing officer should a request for documentary evidence or witnesses be denied (*Id* ); and the right to an impartial hearing officer (7 N.Y.Code R. & Reg. § 253.1, 254.1). Generally speaking, New York's regulations more specifically delineate the rights accorded to prisoners and the obligations of prison officials than do the Supreme

Court's and Second Circuit's decisional law. It is well-settled that federal habeas relief not available for mere errors of state statutory, regulatory, or decisional law. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

## V. Merits of the Petition

### A. Claims Listed on the Amended Petition Form (Docket No. 6-4)

On page 5 of the amended habeas petition form (Docket No. 6-4), there is a list of the "most frequently raised grounds for relief in habeas corpus proceedings." In the space provided to list "Ground one", Lebron has written, "(f), (g), (i), right to petition, freedom of speech, due process, and equal protection[.]" Subsection (f) on the form denotes a claim based on the failure to disclose favorable evidence; subsection (g) describes a double jeopardy claim; and subsection (I) describes a claim of ineffective assistance of counsel. Lebron did not, either on the amended petition for, in the attachment to the amended petition, or in his Traverse, provide *any* factual grounds or legal argument regarding the double jeopardy claim, *i.e.,* "(g)"; how his "freedom of speech" was impinged upon; how he was denied his so-called "right to petition"; or how his "equal protection" rights were violated. The single allegation listed in "Ground one", without any supporting facts, is far too vague to state a colorable claim for habeas relief. Accordingly, the Court dismisses as frivolous Lebron's allegation concerning his "right to petition," "freedom of speech," and "equal protection". And, as respondent correctly argues, the double jeopardy clause of the Fifth Amendment is inapplicable to prison disciplinary proceedings. *E.g., Porter v. Coughlin,* 421 F.3d 141, 142, 147-49 (2d Cir.2005) (holding that prison disciplinary proceedings are not criminal sanctions for purposes of double jeopardy analysis and that petitioner's "[prison] disciplinary proceeding was civil in nature and therefore presented no violation of the Double Jeopardy Clause"). Lebron does not have a viable claim based on an alleged double jeopardy violation.

**\*7** With regard to Lebron's allegation concerning "due process," he has set forth numerous alleged violations of his due process rights in more detail in the Attachment to the Amended Petition Form. I shall discuss these claims fully below in this Decision and Order.

With regard to Lebron's allegations of "(f)" (*i.e.,* the failure to disclose exculpatory evidence) and "(i)" (*i.e.,* the denial of effective assistance of counsel), Lebron has not set forth any supporting facts under "Ground one." However, the attachment to the amended petition can be read to allege claims falling under these headings. These shall be discussed in full *infra.*

Next, in the space provided to list "Ground two" on the form habeas petition, Lebron has written, "any grounds existent [sic] in the attached copy of issues which petitioner may have failed to mention due to laymanness [sic]." In addressing the present petition, the Court is mindful that the plaintiff is proceeding pro se and that his submissions should be held " 'to less stringent standards than formal pleadings drafted by lawyers....' " *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (*per curiam* ) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). However, as respondent points out, the Court is not required to "scour the entire record for potential mistakes," Resp't Mem. at 15 (Docket No. 19). This statement by Lebron seeking to raise "any grounds" that he omitted to mention because of his lack of legal training does not set forth a viable claim for habeas relief and must be dismissed.

Lebron has not asserted any other claims on the amended petition form.

**B. Claims Listed in the Attachment to the Amended Petition Form**

**1. "INADEQUATE DEFENSE/DENIED DOCUMENTS" (Ground A, pp. 8-9 of Attachment to Amended Petition Form (Docket No. 6-4)**

Lebron claims that his "defense was made inadequate by the Assistant, and Hearing's [sic] Officer's, denial of" a number of documents which he then lists. Attachment to Amended Petition Form at 8 (Docket No. 6-4). Lebron's claims regarding the alleged denial of access to documents will be discussed below in the context of his claims of "INADEQUATE ASSISTANT" and "WRONGLY EXCLUDED WITNESSES."

He also contends that "[n]o Misbehavior Report was ever provided to petitioner prior to the Hearing and the one provided by the Hearing Officer petitioner [sic] of knowledge that he had the right to call witnesses." Attachment to Amended Petition Form at 8-9 (Docket

No. 6-4). When Lebron stated that he had not been provided with a copy, the hearing officer adjourned the hearing for two days to investigate the matter. When the hearing resumed, the hearing officer handed Lebron a copy of the misbehavior report. The hearing officer conceded that he did "not have specifically a document signed by [Lebron] admitting that [he][was] served with the Misbehavior Report." R.140. However, the hearing officer did have the "Tier Assistance Selection Form" which "indicate[d] on the [sic] 11/26/03 [Lebron] selected from the assistance list." R.140. New York State Department of Correctional Services' regulations entitled Lebron to an "inmate assistant" to "assist the inmate when a misbehavior report has been issued[.]" 7 N.Y.Code R. & Regs. § 251.4.1. [4] Thus, based on the fact that the Tier Assistance Selection Form indicated that Lebron had selected an assistant on November 26, 2003, to help him with the charges stemming from the library incident, the hearing officer found as a fact that Lebron had been simultaneously served with a copy of the Misbehavior Report by C.O. Qualey. R.139. This finding of fact is presumed to be correct, and Lebron has not come forward with "clear and convincing evidence" to rebut that presumption of correctness. *See* 28 U.S.C. § 2254(e) (1). Thus, Lebron has not established that he was denied his due process right to advance notice of the charges against him.

[4]     "The assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary." 7 N.Y.Code R. & Regs. § 251.4.2.

**2. "INADEQUATE ASSISTANT" (Ground B, p. 9 of Attachment to Amended Petition Form (Docket No. 6-4)**

**\*8** As noted above, New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 251-4.1, 251-4.2. The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney." *See Wolff,* 418 U.S. at 570 ("The insertion of counsel

into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings."); *accord Silva v. Casey,* 992 F.2d 20, 21 (2d Cir.1993). The *Wolff* court noted two circumstances where an inmate would be entitled to some assistance in preparing for the hearing, but not the services of retained or appointed counsel: "Where an illiterate inmate is involved ... or [where] the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Id.; accord Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). The Second Circuit has expanded the disabling circumstances enunciated in *Wolff* to include confinement in a Special Housing Unit ("SHU"),[5] reasoning that in such a situation, an inmate will be unable to exercise his constitutional right to "marshal evidence and present a defense," *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988), *Wolff,* 418 U.S. at 570, without some assistance. Thus,

[5]     At the time of hearing at issue here, Lebron was confined to the SHU as part of his punishment for an earlier disciplinary infraction.

for inmates disabled by confinement in SHU,[6] or transferred to another facility, the right to substantive assistance is an obligation imposed by the Due Process Clause of the Fourteenth Amendment. Further, the assistance must be provided in good faith and in the best interests of the inmate.

[6]     *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 304.1-.14, 305.1-.6 (2003) (listing the "services" and "controls" of the special housing units). The Second Circuit has explained that under the "normal conditions of SHU confinement in New York," the prisoner is:

        placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges

available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited. *Colon [v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) ] (citation omitted); *see also Sealey [v. Giltner,* 197 F.3d 578, 581 (2d Cir.1999) ] ("An inmate is confined to his cell 23 hours per day, can take no more than three showers per week, has limited library privileges and no telephone privileges."); *Frazier [v. Coughlin,* 81 F.3d 313, 315 (2d Cir.1996) ] (*per curiam* ) ],(providing a similar description).

*Palmer v. Richards,* 364 F.3d 60, 66 n. 3 (2d Cir.2004)

*Eng v. Coughlin,* 858 F.2d at 898 (internal citation omitted); *accord Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). However, the Second Circuit cautioned, "[t]he assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled." *Silva v. Casey,* 922 F.2d at 22 (citing *Wolff,* 418 U.S. at 570) (declining to hold that inmates have a right to retained or appointed counsel in disciplinary proceedings).

**\*9** As initial matter, I note that due process does not require that a prisoner be provided with all the documentary evidence he has requested. *See Shephard v. Coughlin,* No. 91 CIV. 8725(MBM), 1993 WL 77385, at \*5 (S.D.N.Y. Mar.16, 1993) ("When a prisoner is in SHU, an employee assistant should gather evidence, obtain documents and relevant tapes, and interview witnesses. At a minimum, he should perform the investigating tasks which the inmate, were he able, could perform for himself. *Eng,* 858 F.2d at 898. The law does not, however, require the assistant to obtain all documentary evidence. Plaintiff had no right to a private investigator."). As a matter of federal law, a prisoner's requests to present testimony and other evidence may be denied on the basis of lack of relevance or necessity, provided that the hearing officer provides the prisoner with reasons for the denials. *See Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *see also Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994).

Here, Lebron presented twenty-two (22) document requests to his prison employee assistant. R.106. His

2008 WL 111194

assistant responded in writing to each request and provided a written explanation when particular materials were not available, were not relevant or appropriate, or would be available from other sources, such as from the library or at the hearing itself. R.107. The assistant was unable to provide all of the documentation requested by petitioner, either because it did not exist, did not pertain to petitioner's hearing, would be available at the hearing, or could be obtained by inmates by other means (*e.g.,* copies of prison directives were available from the law library). R.107. The only documents which existed but were not going to be provided by the inmate assistant to Lebron were the "mail room log (sign in & out)"; "mail room search log"; "mail room activity log"; and "general library sign in and out log." R.106-07. With regard to the mail room documents, the inmate assistant indicated to Lebron that they were "not required" for the hearing. R.107. Lebron has not explained how they were relevant or how the failure to have access to them prejudiced his defense. With respect to the "general library sign in and out log," the assistant noted that it did "not pertain (and already has been Foiled [sic] [*i.e.,* requested by means of a Freedom of Information Law request] )." R.107. The assistant added a note that the log was "completely redacted," however. Thus, it would have been of no use to Lebron.

Here, Lebron's employee assistant addressed each of Lebron's document requests in writing. The assistant provided him with many of the documents requested; noted which ones were available from other sources; and provided legitimate reasons for not being able to provide them to Lebron. Lebron received constitutionally adequate assistance from his prison employee assistant.

### 3. "WRONGLY EXCLUDED WITNESSES" (Ground C, pp. 9-11, Attachment to Amended Petition (Docket No. 6-4).

**\*10** A disciplinary procedure that results in a loss of good time credits is not a criminal trial. *Superintendent, Mass. Corr. Inst. at Walpole v. Hill,* 472 U.S. 445, 456, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and "the full panoply of rights due a defendant in such proceedings does not apply." *Wolff,* 418 U.S. at 556. The requirements of Due Process in the prison context involve a balancing of inmate rights and institutional security concerns, *Wolff,* 418 U.S. at 560-63. An inmate is constitutionally entitled to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional

goals." *Id.* at 566; [7] *see also McCann v. Coughlin,* 698 F.2d at 122. When an inmate is precluded from obtaining certain witness testimony or other evidence, due process requires that the inmate be provided reasons for the denial either at the disciplinary hearing or at a later time. *See Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *see also Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994) ("*Ponte* holds only that some explanation must be provided either at the time of the disciplinary hearing or subsequently in court, and perhaps only *in camera* in the latter instance.") (citing 471 U.S. at 498-99). The Second Circuit clearly has held that " ' "a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." ' " *Russell,* 35 F.3d at 59 (quoting *Scott,* 962 F.2d at 147) (quoting *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)) and citing *Wright v. Smith,* 21 F.3d 496, 499 (2d Cir.1994) (state procedures concerning number of witnesses allowed in prison disciplinary hearing do not create constitutionally protected liberty interest). Due process is not violated when the hearing officer decides to take the testimony of a witness outside the presence of an inmate. *Kalwasinski v. Morse,* 201 F.3d 103, 108-09 (2d Cir.1999) (citing *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) (citing *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987)). Furthermore, a prison inmate does not enjoy the Sixth Amendment's right of confrontation. *Id.* (citing *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (citing *Wolff,* 418 U.S. at 567-68).

[7]  Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause,

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 147 of 314
LeBron v. Artus, Not Reported in F.Supp.2d (2008)
2008 WL 111194

and we stop short of imposing a more demanding rule with respect to witnesses and documents.

*Wolff,* 418 U.S. at 567.

Lebron first contends that his "requests for prisoners Perry, Reddick, [and] Russell ... to testify were never waived so their exclusion required Reasons." Attachment to Amended Petition at 9, ¶ 1 (citations omitted) (Docket No. 6-4). The hearing officer summoned the three inmates to testify, but they all refused. Reddick was personally questioned by the hearing officer about his refusal to testify. R.184. Inmates Perry and Russell were not personally interviewed because they both had been transferred to another facility; rather, they were served with forms, which they signed so as to verify their unwillingness to testify. Lebron was given an opportunity to review the forms and when he indicated that he was not satisfied with them, the hearing officer called the corrections officer, C.O. Clark, who had served the forms, to testify. R.185. C.O. Clark explained that both Perry and Russell had told him that they "didn't want to get involved" and that he did nothing to influence their decision. R.188-89. A prison disciplinary hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer need not call that witness. *Dumpson v. Rourke,* No. CIVA96CV621 (RSP/ GJD), 1997 WL 610652, at *5 (S.D.N.Y. Sept.26, 1997) (citing *Silva v. Casey,* 992 F.2d at 21-22 ("Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him."); *see also Wolff,* 418 U.S. at 568-69 (recognizing that prison officials have the discretion to decline to call as witnesses fellow inmates who do not wish to testify).

**\*11** Lebron next contends that his request to call Sr. Legal Mail Clerk K. Washburn to "verify that the mail in question was opened at the facility [*i.e.,* Southport, where Lebron was incarcerated]." Attachment to Amended Petition at 10, ¶ 2 (Docket No. 6-4). The evidence showed, and the hearing officer found as a fact, that the mail in question was not opened by prison officials, but rather was opened by the addressee (Steele Memorial Library). R.234, 117. The hearing officer, on the Witness Interview Notice, explained this and concluded that the mail clerk's testimony therefore was not relevant.

According to Lebron, he should have been permitted to call "F.O.I.L. Records Access Officer I.R.C. II V. Grover whom [sic] would have verified that mailing a F.O.I.L. Request to a local public library was not a solicitation of services ...." Attachment to Petition at 10, ¶ 4. Again,

the hearing officer denied the request to call this witness, finding that the proposed testimony was not material to the hearing issues. R.117. What constitutes a F.O.I.L. request was a question of law for the hearing officer and the opinion of that employee was irrelevant. In any event, the misbehavior report did not characterize the letters in question as F.O.I.L. requests.

Lebron next contends that H.O. Esgrow "erroneously denied petitioner's right to call C.O. Curren [sic] as a character witness for the purpose of mitigating the penalties that were to be imposed." Attachment to Amended Petition at 10, ¶ 5 (Docket No. 6-4). The hearing officer determined that such testimony was "not material to the hearing." R.117; *see also* R.235. Lebron never alleged, however, that his proposed character witness had any personal knowledge of the charges at hand, or any issue relevant to the determination of guilt. The hearing officer's evidentiary ruling therefore was not erroneous as a matter of state or federal law. *See Torres v. Goord,* 67 A.D.2d 732, 733, 700 N.Y.S.2d 280, 281 (App.Div.3d Dept.1999) ("[T]he Hearing Officer did not err in denying petitioner's request to call a character witness with no personal knowledge of the incidents giving rise to the charge[.]") (citing *Matter of Joyce v. Goord,* 246 A.D.2d 926, 667 N.Y.S.2d 833 (App.Div.3d Dept.1998); *Matter of Danaher v. Coombe,* 242 A.D.2d 754, 661 N.Y.S.2d 858 (App.Div.3d Dept.1997)); *Simon v. Selsky,* No. 99CIV5747(LAP)JCF, 2002 WL 1205737, at *5 (S.D.N.Y. Mar.12, 2002) ("It appears that [habeas petitioner] Simon also wanted to use character witnesses [at his prison disciplinary hearing] to demonstrate 'the kind of person' he is. Testimony to that effect was properly excluded because it would have been unnecessary and irrelevant.") (citing *Wolff,* 418 U.S. at 566 ("prison officials must have the necessary discretion to keep [disciplinary hearings] within reasonable limits," and may refuse to call witnesses "for irrelevance [or] lack of necessity")); *Graham v. Baughman,* 772 F.2d 441, 445 (8th Cir.1985) (holding that prison disciplinary hearing officials were "well within their discretion in concluding that such [character] evidence was either irrelevant or unnecessary").

**\*12** Lebron also demanded the right to call "Steele Memorial Library [sic]" to testify as to whether the envelope was open when it was received; Lebron claimed throughout the hearing that the librarian, Tomic, had violated prison regulations regarding the opening of inmates' mail. The hearing officer was well within his

discretion in refusing this request, since the expected testimony was not directly relevant to the issue or Lebron's guilt or non-guilt of the charges against him. Moreover, there already was evidence supporting the finding that the envelope had been opened by the addressee (the library), not by Tomic or another prison official, and therefore any testimony from a representative of the library would have been cumulative.

Lebron wished to call an inmate by the name of Moore "whom [sic] would have verified that his signature was forged by a different Hearing Officer in a different/ Reversed [sic] Hearing and therefore he had never refused to testify for petitioner." Attachment to Amended Petition at 10, ¶ 7 (Docket No. 6-4); *see also* R.201. The hearing officer indicated that he would not call inmate Moore because the present hearing was "not the forum to challenge a prior disciplinary disposition." R.118. Lebron has not alleged that Moore had any information or knowledge about the incident which formed the basis of the charges being explored at instant disciplinary hearing. Therefore, Moore's testimony would have been irrelevant and it was well within the hearing officer's discretion to deny Lebron's request to call inmate Moore to testify.

The record reveals that Lebron was provided with adequate evidence and witnesses to present a meaningful defense. The hearing officer's denial of Lebron's request to call certain witnesses did not violate Lebron's due process rights, as prison officials may deny requested testimony or documentary evidence where, as here, is irrelevant or unnecessary to the proceeding. *Scott v. Kelly,* 962 F.2d 145, 147 (2d Cir.1992) (quoting *Kingsley v. Bureau of Prisons,* 937 F.2d at 30). Furthermore, the hearing officer properly provided legitimate reasons for refusing to call all of Lebron's requested witnesses; these reasons were provided in writing, on the Witness Interview Notice, dated December 8, 2003, which was the date of the hearing. *See Ponte,* 471 U.S. at 497. Thus, it appears to this Court that the hearing officer fully complied with New York's state regulations and the federal constitution's requirements, as articulated by the Supreme Court, with regard to Lebron's right to call witnesses.

### 4. "LACK OF ANY EVIDENCE" (Ground D, p. 11-12, Attachment to Amended Petition (Docket No. 6-4)

A prisoner may not properly be deprived of a cognizable liberty interest without due process of law. *See, e.g., Wolff*

*v. McDonnell,* 418 U.S. at 555, 556. In *Superintendent v. Hill,* the Supreme Court ruled that where the prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least "some evidence" to support the decision. 472 U.S. at 455. It bears noting that the burden on the inmate to show that an adverse disciplinary finding was not supported by sufficient proof is exceedingly high:

> **\*13** Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board.

*Id.* at 455-56 (emphasis added).

Lebron asserts six (6) evidentiary deficiencies in connection with his hearing. First, he contends that "[t]here was no evidence to support the Sr. Librarian's claim that the Envelope was forwarded to her already opened by the Steele Memorial Library for further action." Attachment to Amended Petition, ¶ 1 (Docket No. 6-4). Tomic, the librarian, testified that the envelope was already open when she received it, and that it had first been sent directly to Steele Memorial Library, without having passed through the Superintendent's office, contrary to established procedure. R.87, 173. Lebron was unable to impeach Tomic at all on this point, which ultimately was not directly relevant to whether or not Lebron was guilty of the charges at issue.

Lebron next asserts that "[t]he record in the instant case never had a Written Authorization from the Superintendent to allow the reading of the mail." Attachment to Amended Petition, ¶ 2 (Docket No. 6-4). There was no need for an authorization as there is no indication-apart from Lebron's speculative assertions-that an individual within the prison system opened the item of mail in question. The librarian's uncontradicted testimony was that it first was opened by an individual at the Steele Memorial Library. Petitioner's repeated insistence that his case involves an alleged unauthorized opening of his mail

by prison officials is simply unsupported by any facts in the record.

Third, Lebron faults the librarian for not checking with the Superintendent to see if he had forwarded to her authorization for Lebron to access outside library services. Attachment to Amended Petition, ¶ 3 (Docket No. 6-4). This is a non-issue. It should be noted that Lebron has never asserted or come forward with any evidence that he *had* obtained authorization from the Superintendent to request outside library services.

Fourth, Lebron contends that the "Misbehavior Report did not State what correspondence procedure petitioner violated, F.O.I.L. Requests are not solicitation of services which require the consent not [sic] approval of a Superintendent ...." Attachment to Amended Petition, ¶ 4 (Docket No. 6-4). The misbehavior report cites each prison rule number which Lebron was alleged to have violated. Lebron admitted at the hearing that the misbehavior report did *not* characterize the letters sent by him to the Steele Memorial Library as "FOIL requests." Furthermore, Lebron has set forth no legal authority supporting his argument that a request for documents and information from the Steele Memorial Library did not constitute an unauthorized solicitation of services. Moreover, the cited sections of New York Public Officers Law by Lebron are inapposite.

**\*14** Fifth, Lebron argues that he "could not have impersonated anybody merely because it was deemed that [he] wrote the F.O.I.L. Requests which Mr. Wood in turn mailed out" because he claims he was permitted under NYSDOCS regulations to assist another prisoner prepare correspondence. Attachment to Amended Petition, ¶ 5 (Docket No. 6-4). Even if the Court were to accept Lebron's premise for the sake of argument, this was not a situation where Lebron had written a letter on another inmate's behalf, requesting information about *that inmate.* Rather, Lebron wrote the letter using Wood's name and requested information about himself, *not* Wood. Furthermore, Wood's testimony negated any possibility that Lebron had written the letters to assist Wood: Wood testified that he addressed and mailed the envelope, which was labeled "Legal Mail," to help Lebron with "legal work on [Lebron's] case." R.162. Wood also acknowledged that "this [information] wasn't something [he] wanted, this [wa]s something [he was] doing for [petitioner]." R.163. Tomic, the librarian, testified that petitioner previously

had asked for the same information requested in the letters at issue and that the requested information pertained to petitioner and his conviction.

Sixth, Lebron contends that "[t]he Sr. Librarian's testimony was not true but the truth was the opposite of her story," and that "her actions were obviously retaliation for petitioner's June 29, 2003, August 12, 2003, August 13, 2003, and August 19, 2003, complaints on her-which were acknowledged and responded to on Grievance SPT-27815-03...." Attachment to Amended Petition, ¶ 6 (Docket No. 6-4). Here Lebron is merely attacking the credibility of a witness, which is a matter within the province of the factfinder; a court reviewing claims of sufficiency of the evidence may not revisit or second-guess a factfinder's determinations about witness credibility. *See, e.g., United States v. Arena,* 180 F.3d 380, 391 (2d Cir.1999) (in a challenged to the sufficiency of the evidence, the court is to "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility"); *accord United States v. Parkes,* 497 F.3d 220, 223 n. 1 (2d Cir.2007) Even assuming for the sake of argument that the librarian had knowledge of the other grievances filed against her by petitioner, that, without more, would not give rise to an inference that she harbored a bias against Lebron.

In sum, Lebron has failed to demonstrate that the hearing officer's guilty finding was not based on sufficient evidence. I note that in the context of prison disciplinary proceedings, the Supreme Court has set the constitutional bar rather low with regard to the amount of evidence necessary to support a finding of guilty. *See Hill,* 472 U.S. at 456-57. [8] After reviewing the entire record, it is apparent that there was more than sufficient evidence of Lebron's guilt as to all of the charges considered at the hearing to satisfy the constitutional standard.

[8]    In *Hill,* a prison guard testified that he heard a commotion and, upon investigating, discovered an inmate who apparently had just been assaulted. He then saw three other inmates "fleeing together"; no other inmates were in the area. Although the Supreme Court noted that this evidence "might be characterized as meager," it held that the information constituted "some evidence" and was sufficient to support the finding of guilt against the prison inmate.

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 150 of 314
LeBron v. Artus, Not Reported in F.Supp.2d (2008)
2008 WL 111194

### 5. "BIASED HEARING OFFICER" (Ground E, pp. 12-13 of the Attachment to the Amended Petition (Docket No. 6-4).

**\*15** A prison inmate subject to a disciplinary hearing is constitutionally entitled to an impartial hearing officer. *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 570-71). "[A]n impartial decisionmaker is one who ... does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569-70 (2d Cir.1990). The hearing officer need not come from outside the prison, however. *Allen,* 100 F.3d at 258 (citing *Vitek v. Jones,* 445 U.S. 480, 496, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Powell v. Ward,* 542 F.2d 101, 103 (2d Cir.1976)). The due process clause's requirements are " 'flexible and variable dependent upon the particular situation being examined.' " *Allen,* 100 F.3d at 258 (quoting *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), *modified on other grounds, Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). It is important to note that the impartiality required of prison officials does not rise to the level of that required of judges generally, and "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell,* 35 F.3d at 60; *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989); *Hill,* 472 U.S. at 455-56 (holding that the "requirements of due process are satisfied if *some* evidence supports the decision by the prison disciplinary board to revoke good time credits") (emphasis added)). Rather, as the Supreme Court explained in *Wolff,* 418 U.S. at 571, due process requires that the hearing officer not be so insufficiently impartial as to present a "hazard of arbitrary decisionmaking."

Lebron contends that H.O. Esgrow "failed to record all portions of the hearing and conducted investigations off the record"; "should not have pulled petitioner's Disciplinary History since such was not relevant"; and "arbitrarily denied answers by the Sr. Librarian to petitioner's relevant questions that would have produced [sic] petitioner's request for other beneficial witnesses...." Attachment to Amended Petition at 12-13 (Docket No. 6-4). Lebron also states that the hearing officer "was partial by his disregard of the above [errors] and by stating that petitioner's Disciplinary History was relevant for when he found petitioner guilty, [stating that] petitioner was beating around the bush, to cut to the chase ...."

*Id.* at 13. [9] As respondent argues, the record provides no factual support for Lebron's assertions that the hearing officer failed to record the entire hearing or conducted "investigations" while the hearing was adjourned and not being recorded. Lebron has not pointed to anything related to H.O. Esgrow's handling of the disciplinary hearing that would indicate bias or that H.O. Esgrow prejudged the evidence. Further, I have reviewed the entire transcript of the disciplinary hearing and I find no evidence there of bias on the part of H.O. Esgrow. Lebron's claim of bias boils down to his disagreement with the hearing officer's evidentiary rulings against him, an insufficient basis upon which to rest a claim that the disciplinary hearing was infected with constitutionally impermissible bias on the part of the hearing officer. *See Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal.") (citation omitted). Furthermore, the fact that hearing officer at times addressed Lebron brusquely in an attempt to keep the hearing focused on relevant topics does not, in and of itself, demonstrate bias. *See id.* ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.").

9    The remainder of Lebron's allegations under this point heading of hearing officer bias actually attack the sufficiency of the evidence against him and, as discussed above, are without merit.

**\*16** A review of the hearing transcript as well as the hearing officer's determination fails to reveal any basis to conclude predisposition or bias. Rather, the transcript demonstrates that Lebron was permitted to question witnesses on relevant topics, to articulate his defense to the charges, to present legal argument regarding his objections to evidentiary rulings, and present a closing argument. *See, e.g., Russell v. Ricks,* No. 9:02CV0940(LEK)(DEP), 2006 WL 1555468, at \*15 (N.D.N.Y. May 31, 2006). To the extent that Lebron challenges the hearing officer's acquisition of his prior disciplinary record before ruling upon the question of

guilt, I note that H.O. Esgrow stated he would not examine that history unless it became relevant, and in any event there is no indication that it influenced his finding of guilt. In sum, none of the examples cited by Lebron of H.O. Esgrow's handling of issues that arose at the hearing, whether considered alone or in the aggregate, support a finding that H.O. Esgrow was biased against Lebron or pre-disposed to find him guilty. Accordingly, this claim fails to provide a basis for habeas relief.

### 6. EXCESSIVE SENTENCE (Ground F, Attachment to Amended Petition at 14) (Docket No. 6-4)

Lebron contends that "[t]he disciplinary sentence was excessive and violated the Sentencing Guidelines for Disciplinary Dispositions on Soliciting, Impersonation, Smuggling, and Correspondence violations (Though no Soliciting, Smuggling, and Correspondence violation ever took place.)." Attachment to Amended Petition at 14 (Docket No. 6-4). Petitioner has overlooked the well-settled principle that "the failure to follow a[NYS]DOCS Directive or prison regulation does not give rise to a federal constitutional claim." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002); *accord Claudio v. Herbert,* No. 01-CV-0120, 2005 WL 327106, at *11 (W.D.N.Y. Feb. 10, 2005). As an initial matter, the New York Court of Appeals has held that "[n]either loss of good-time credits and other special privileges nor placement in a Special Housing Unit extend the period of incarceration originally imposed" and, accordingly, disciplinary sanctions [10] imposed upon incarcerated defendants "do not constitute criminal punishment triggering double jeopardy protections." *People v. Vasquez,* 89 N.Y.2d 521, 533, 655 N.Y.S.2d 870, 678 N.E.2d 482 (N.Y.), *cert. denied sub. nom., Cordero v. Lalor,* 522 U.S. 846, 118 S.Ct. 131, 139 L.Ed.2d 80 (1997). Furthermore, an inmate has no federal constitutional right to a sentence in accordance with the guidelines promulgated by the Commissioner of NYSDOCS regarding the appropriate sanction following a disciplinary proceeding. *Id.* Indeed, under New York law, "the guidelines [sic] are nothing more than that-they do not bind the Hearing Officer[;]" *People v. Vasquez,* 89 N.Y.2d at 532 n. 6, 655 N.Y.S.2d 870, 678 N.E.2d 482. Accordingly, such guidelines do not rise to a level of constitutional significance, and the failure to sentence within them does not present a basis for habeas relief. *See, e.g., Rivera v. Wohlrab,* 232 F.Supp.2d at 123. "In any event, '[a]t a Tier III hearing, the maximum penalty

that may be imposed is keeplock or SHU confinement for a period of time limited only by the length of the inmate's sentence, as well as a loss of good time credit and privileges.' " *Claudio,* 2005 WL 327106, at *11 (quoting *Jackson v. Johnson,* 15 F.Supp.2d 341, 355 (S.D.N.Y.1998)). Lebron's claim concerning his sentence does not present a cognizable federal constitutional claim and is dismissed. *Accord, e.g., Claudio,* 2005 WL 327106, at *11.

[10] In order to "carry out the 'formidable tasks' of maintaining order and security in correctional facilities and protecting the safety of inmates and employees, the [New York] Legislature has granted the Commissioner of Correctional Services broad discretion in the formulation and implementation of policies relating to security and to the disciplining of inmates[.]" *Arteaga v. State,* 72 N.Y.2d 212, 217, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (N.Y.1988) (quotation omitted); *see also* N.Y. Correction Law §§ 112, 137 (granting legislative authority to the Commissioner of NYSDOCS). "Procedures for Implementing Standards of Inmate Behavior," *see* N.Y.Code R. & Regs., tit. 7, §§ 250-254, have been adopted by NYSDOCS, and "include rules and regulations pertaining specifically to the filing and content of reports of misbehavior, confinement of inmates, requirements for timely hearings, the designation of authorized Hearing Officers, and procedures for conducting Superintendent's hearings." *Arteaga v. State,* 72 N.Y.2d at 217-18, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (internal citations omitted); *see* N.Y.Code R. & Regs., tit. 7, §§ 251-1.4, 251-3.1; 251-1.6; 251-5.1; 253.1; 254 *et seq.* Prison officials are directed to follow the general policies on discipline of inmates, which include basic guidelines and directives to the effect that disciplinary action must not be overly severe, must be administered 'in a completely fair, impersonal and impartial manner', be appropriately varied to fit such factors as the particular circumstances involved, the behavior pattern of the inmate and the present atmosphere of the facility, and must be taken only to the extent necessary to regulate an inmate's behavior within acceptable limits and to 'assist in achieving compliance by the entire inmate population with required standards of behavior'. *Arteaga,* 72 N.Y.2d at 218, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (internal citations and quotations omitted); *see generally* N.Y.Code R. & Regs., tit. 7, § 250.2. "Because of the problems of maintaining security and discipline within correctional facilities, the discretion

2008 WL 111194

delegated to the employees and officers is necessarily comprehensive and calls for the exercise of judgment under widely varying conditions." 72 N.Y.2d at 218-19, 532 N.Y.S.2d 57, 527 N.E.2d 1194.

## VI. Conclusion

**\*17** For the foregoing reasons, Elvin Lebron's request for a writ of habeas corpus is denied, and the petition is dismissed. Because Lebron has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *See* 28 U.S.C. § 2253(c).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 111194

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2014 WL 4627120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonard HINTON, Plaintiff,
v.
A. PRACK, et al., Defendants.

No. 9:12–CV–1844 (LEK/RFT).
|
Signed Sept. 10, 2014.
|
Filed Sept. 11, 2014.

**Attorneys and Law Firms**

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Joshua E. Mcmahon, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE KAHN, District Judge.

## I. INTRODUCTION

**\*1** This *pro se* action under 42 U.S.C. § 1983 comes before the Court following a Report–Recommendation filed on August 14, 2014, by United States Magistrate Judge Randolph F. Treece, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–Recommendation"). Judge Treece recommends that all of Plaintiff Leonard Hinton's ("Plaintiff") claims be dismissed, except that he be awarded nominal damages for violation of his due process rights by Defendant Uhler. Report–Rec. at 31–32. Plaintiff timely filed Objections. Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For the following reasons, the Report–Recommendation is adopted in its entirety.

## II. STANDARD OF REVIEW

When a party makes a timely objection to a Report–Recommendation, it is the duty of the Court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting "party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted); *see also Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

## III. DISCUSSION

### A. First Disciplinary Hearing

Plaintiff argues that the evidence presented at his first disciplinary hearing was not "reliable evidence" sufficient to support the hearing officer's determination that Plaintiff was guilty of the alleged conduct. Objs. at 1. Specifically, Plaintiff argues that the evidence was insufficient because there was no independent credibility assessment of, or written statements by, the confidential informant or alleged victim to corroborate Sergeant Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail in his Motion for summary judgment, *see* Dkt. No. 39 at 19–22, and Judge Treece explicitly addressed it in the Report–Recommendation, Report–Rec. at 12–15. Because Plaintiff's argument is "a mere reiteration of an argument made to the magistrate judge," *Dove v. Smith,* No. 13–CV–1411, 2014 WL 1340061, at *1 (N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews Plaintiff's objection only for clear error, *see Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)). The Court finds that Judge Treece committed no clear error in determining that Sergeant Gower's testimony was sufficiently corroborated by his written report and other evidence in the record. *See* Report–Rec. at 12–15; *see also Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted "reliable evidence" under the "some evidence" standard, and that an independent assessment of the witnesses' credibility was not required).

**B. Second Disciplinary Hearing**

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified [sic] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the

outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

**C. Third Disciplinary Hearing**

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

**D. Qualified Immunity**

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 155 of 314

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,
-v-

**A. PRACK,** *Commissioner's Designee,* **D. VENETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n, & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION

### A. Due Process

**\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty

interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement

may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4– 5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

*1. Liberty Interest*

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest. [1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010; [2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2– 3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue. [3]

[1]   We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three disciplinary hearings at issue. Dkt. No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing *Sims v. Artuz,* 230 F.3d 14, 23– 24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

[2]   A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

[3]   In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding

"that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http:// nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at *18 (S.D.N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that *"Heck [v. Humphrey]* does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence"); N.Y. CORR. LAW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

#### *2. First Disciplinary Hearing*

The following facts are undisputed.

On July 25, 2010, Sgt. Gower [4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. *See* Pl.'s App., Sec. I, at Exs. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). *Id.* at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York

State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. *Id.* at Ex. I, Dec., dated Nov. 9, 2012.

[4]     Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. *See* Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. *See* Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. *See, e.g.,* Dkt. No. 44–1, Pl.'s Opp'n at p. 2. [5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

[5]     Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference to the page numbers assigned by Plaintiff.

#### *a. Notice*

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from

a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. *See Sira v. Morton*, 380 F.3d at 70 (quoting *Taylor v. Rodriguez*, 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted). [6]

[6]  In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. *See generally* Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that the "report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton*, 380 F.3d at 71 (citing *Quinones v. Ricks*, 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban*, 2014 WL 2587746, at *6 (W.D.N.Y. June 10, 2014) (reaching similar conclusion).

*b. Opportunity to be Heard*

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not possess a constitutional right to confront or cross-examine

witnesses in prison disciplinary hearings." *Fernandez v. Callens*, 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell*, 418 U.S. at 567–68; *Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph*, 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin*, 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell*, 418 U.S. at 568–69 for the proposition that *"Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer*, 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

> **\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to be involved he claimed he does not

know anything about this incident on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional deficiency in Plaintiff's opportunity to appear, call witnesses, or present rebuttal evidence at the first disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at 564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October 8, 2010, Plaintiff received a written statement as to the evidence relied upon and the reasons for the disciplinary action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence to support Defendant Bullis's disciplinary determination. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges; it is true that he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.,* 472 U.S. at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported by ample reliable evidence, chiefly, the testimony and

misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I at Ex. C.

As noted above, the misbehavior report stated, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. At the hearing, Sgt. Gower explained, in sum and substance, that on the morning of July 25, 2010, an unidentified inmate told him that Plaintiff had attempted to solicit sex from Inmate Veach. As a result, Sgt. Gower conducted an investigation during which he interviewed Inmate Veach, who reported that "approximately 2 weeks before that he got two packs of tobacco from [Plaintiff] he was unable to pay him so [Plaintiff] had requested he perform sexual acts for approximately ten days to pay him for the tobacco." 1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower that Plaintiff had attempted to pull him into a toilet stall but stopped when Inmate Moody walked into the bathroom area. Gower verified with Inmate Moody that he saw Veach and Hinton in the bathroom at the same time; however, Moody did not see Hinton pulling Veach into the stall. Gower ordered that Veach be examined by medical, and no evidence of sexual misconduct was found. Gower also testified that Veach informed him that Plaintiff and Inmate McGee had set up a three-way call in an attempt to extort fifteen dollars from Inmate Veach's sister for the tobacco. Gower reported that he verified this with inmate McGee who admitted to helping to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims that Plaintiff solicited sex from Inmate Veach would be insufficient to satisfy the "some evidence" standard applicable to prison disciplinary hearings. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing *Sira v. Morton,* 380 F.3d at 78, for the proposition that "if any confidential informant's testimony was based solely on hearsay, a greater inquiry into the reliability of this hearsay information is required."); *Howard v. Wilkerson,* 768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for the proposition that "[s]ince *[Superintendent v.] Hill,* [472 U.S. 445 (1985) ] it has been held that hearsay evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported

by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton,* 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby,* 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly,* 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report is sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence.[7]

[7]   Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " "requirement is sterner than the 'some evidence' standard necessary to afford due process" ").

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing—reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks,* 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying

cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted).[8]

[8]   It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

**\*10**   Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this claim be **DISMISSED.**

### *e. Defendant Prack*

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of

such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability"). Furthermore, we also recommend that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### *3. Second Disciplinary Hearing*

The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio.[9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A, Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel

frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

[9]    Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman[10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

[10]    These individuals are not Defendants in the instant action.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant Haug because he was improperly denied the right to call witnesses on his behalf, and Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs.' Mem. of Law at pp. 17–19.

### *a. Notice*

It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010.

Accordingly, Plaintiff clearly received constitutionally sufficient notice.

### b. Opportunity to be Heard

According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011 WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Guitierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regulations, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at *10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness, Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers [11] nor the many documents submitted by Defendants indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton

approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.*, Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

11    It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha [d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

### c. Written Decision

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' CrossMotion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### d. Defendent Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED.**

### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commissary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge

Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

### b. Opportunity to be Heard

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel. [12]

[12]    On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from

his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs.' Lt.-Br., dated July 21, 2014, & 56, Pl.'s Reply Lt.-Br., dated July 25, 2014.

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures —Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action. [13] *See Williams v. Pepin,* 2011 WL 7637552, \*6 (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

[13]    Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded

because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton, 2007 WL 1544629, at \*28 (S.D.N.Y. May 29, 2007)* (citing *Powell v. Coughlin, 953 F.2d 744, 750 [2d Cir.1991]* for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

### c. Some Evidence

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with

[sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

3rd Disciplinary Hr'g Tr. at p. 4.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly, 2012 WL 3776698, at \*23; Creech v. Schoellkoph, 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010)* (finding disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff. [14]

[14]    Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; see also Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)* (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton, 2007 WL 1544629, at \*28 (S.D.N.Y. May 29, 2007)* (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell"* ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this

violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978),* for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at *5 (N.D.N.Y. Aug. 19, 2008)* (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993)* (citing *McCann v. Coughlin,* 698 F.2d at 126, for the proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that

Judge Feldestein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6.[15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury.[16]

[15]    Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months. Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

[16]    To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003)* (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29* (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the

evidence relied upon, Plaintiff failed to add any new substantive arguments).

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at \*26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice. Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at \*2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory

official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must

2014 WL 4627120

first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at \*28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

1.  **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

2.  **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

1.  **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

2.  **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action; [17] and it is further

17      *See supra* Note 4.

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

2014 WL 4627120

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627120

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1086001
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.

Civil Action No. 9:07–CV–0432 (LEK/DEP).
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Nelson Rodriguez, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 *1 Plaintiff Nelson Rodriguez, a New York state prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him two fabricated misbehavior reports ("MBRs") falsely accusing him of violating prison rules and denied him procedural due process during the course of the ensuing disciplinary hearing.[1] Plaintiff attributes those actions to retaliation for his having filed a civil action against a corrections employee who was not named as a defendant in his complaint.

[1]  As originally constituted, plaintiff's complaint recited other purportedly unlawful conduct, alleging that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

The sole remaining claim in this action is asserted against defendant Donald Selsky, the former Director of Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging deprivation of procedural due process arising out of plaintiff's disciplinary hearing and defendant Selky's review of the resulting determination.

Currently pending before the court is defendant's motion for summary judgment dismissing plaintiff's amended complaint. In his motion, defendant argues that 1) he was not sufficiently involved in the constitutional deprivation alleged to support a finding of liability; 2) plaintiff was afforded procedural due process in connection with the disciplinary proceedings at issue, and 3) in any event he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend a finding that plaintiff was not deprived of procedural due process, and that his complaint therefore be dismissed.

I. *BACKGROUND*[2]

[2]  In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim plaintiff was housed at the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Amended Complaint (Dkt. No. 7) ¶ 3; Selsky Decl. (Dkt. No. 62–3) ¶ 15.

As a result of an incident involving another inmate occurring on December 30, 2003, plaintiff was issued two MBRs. Amended Complaint (Dkt. No. 7) ¶¶ 12–15. Selsky Decl. (Dkt. No. 62–3) ¶ 16. The first, issued on December 30, 2003 and authored by Corrections Officer Goosby, charged Rodriguez with fighting and refusal to obey a direct order. Selsky Decl. (Dkt. No. 62–3) ¶ 17 and Exh. A (Dkt. No. 62–4). The second, issued on January 2, 2004 by Corrections Lieutenant Wright, addressed the same incident and accused Rodriguez of fighting, engaging in violent conduct, and participating in a demonstration detrimental to the order of the facility. Selksy Decl. (Dkt. No. 62–3) ¶ 18 and Exh. A (Dkt. No. 62–4).

The parties differ as to when the two MBRs were served upon Rodriguez. Plaintiff and defendant appear to be in agreement that the second MBR was served upon him on

January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16. While defendant asserts that both MBRs were served on January 2, 2004, *see* Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4), plaintiff denies that he received the December 30, 2003 MBR until the commencement of his disciplinary hearing.[3] Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16.

[3]   As will be seen I have assumed, as I must at this juncture, that plaintiff's version of the facts is correct. *See* pp. 21–32, *post.*

**\*2** The two MBRs were consolidated, over plaintiff's objection, and a Tier III disciplinary hearing was conducted, on January 7, 2004, to address the charges set forth within them.[4],[5] Amended Complaint (Dkt. No. 7) ¶ 15; Selsky Decl. (Dkt. No. 62–3) ¶ 21 and Exhs. A (Dkt. No. 62–4) and B (Dkt. Nos. 62–5 and 62–6). In advance of the hearing plaintiff was given the opportunity to express his preferences for an assistant, and, based upon his selection Corrections Counselor Roddy was assigned to assist him. Selsky Decl. (Dkt.62–3) ¶ 20 and Exh. A (Dkt. No. 62–4).

[4]   The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

[5]   Plaintiff's disciplinary hearing was originally scheduled to start on January 5, 2004, in order to meet the requirements of a state regulation mandating that a disciplinary hearing commence within seven days of a prisoner's confinement in a facility's SHU, 7 N.Y.C.R.R. § 251–5.1(a) (1983). Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 18–19. While plaintiff assigns significance to the failure of prison officials to meeting the seven-day requirement, the record reveals that an extension was granted because plaintiff's assistant was unable to meet with him prior to January 5, 2004. *Id.* In any event, the

violation of state regulations is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject to constitutional standards, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No.9:04–CV–1160, 2007 WL 168238, at \*6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable).

Following its commencement on January 7, 2004, the hearing officer twice adjourned the hearing, initially to January 8, 2004, and again from January 8, 2004 to January 13, 2004, to allow the plaintiff an opportunity to prepare his defense. Selsky Decl. (Dkt. No. 62–3) and Exh. B (Dkt. No. 62–5) pp. 4–20, 20–58. During the course of the hearing plaintiff was permitted to call at least eleven witnesses to testify on his behalf, and also to introduce documentary evidence in his defense Selsky Decl. (Dkt. No. 62–3) ¶ 44 and Exh. A (Dkt. No. 62–4); Exh. B (Dkt. No. 62–5) at pp. 60–86, 94–115, 136–83, 185–209, and Exh. B (Part 2) (Dkt. No. 62–6) at pp. 2–12, 30–43, 59–71, 72–78, 76–83, 105–111, 111–117, 117–21,122–26, 128–39. Two inmate witnesses listed by the plaintiff declined to testify, and executed refusal forms stating that they did not wish to be involved in the matter. Selsky Decl. (Dkt. No. 62–3) ¶ 42 and Exh. A (Dkt. No. 62–4). The hearing officer rejected plaintiff's request that he be permitted to adduce testimony from two other witnesses, his wife and his attorney, concluding that the testimony would not be relevant to the issues involved in the hearing. Selsky Decl., Exh. B (Part 2) (Dkt. No. 62–6) pp. 98–99.

At the conclusion of hearing, plaintiff was found guilty of fighting (one count), refusing to obey a direct order, engaging in violent conduct, and participating in a demonstration, but was acquitted on the second count of fighting. Selsky Decl. (Dkt. No. 62–3) ¶ 22 and Exh. A (Dkt. No. 62–4). Based upon his findings, which were both noted in writing and stated orally at the hearing, the hearing officer imposed a penalty that included twenty-four months of disciplinary SHU confinement and a corresponding loss of package, commissary and telephone privileges. Selsky Decl. (Dkt. No. 62–3) ¶ 23; *see also* Exh. A (Dkt. No. 62–4) and Exh. B (Part 2) (Dkt. No. 62–6) pp. 156–58.

On February 11, 2004, plaintiff appealed the disciplinary determination to defendant Selsky's office. *See* Amended Complaint (Dkt. No. 7) ¶ 21; Selsky Decl. (Dkt. No. 62–3) ¶ 26 and Exh. C (Dkt. No. 62–7). Plaintiff also submitted a supplemental appeal on or about March 12, 2004. Selsky Decl. (Dkt. No. 62–3) ¶¶ 26–27, Exhs. C (Dkt. No. 62–7) and D (Dkt. No. 62–8). Defendant Selsky issued a determination on behalf of the DOCS Commissioner on April 8, 2004, modifying the results of the hearing by dismissing the charge of engaging in a demonstration and reducing the penalty imposed to twelve months of SHU confinement with a corresponding loss of privileges.[6] Selsky Decl. (Dkt. No. 62–3) ¶ 28 and Exh. E (Dkt. No. 62–9). That determination was based upon defendant Selsky's finding that the nature of the incidents giving rise to the MBRs did not warrant the full extent of the penalty imposed and that the charge of engaging in a demonstration was not substantiated. *Id.* at ¶ 28 and Exh. E (Dkt. No. 62–9). Based upon his review, however, Selsky concluded that plaintiff received all of the procedural due process mandated under the Fourteenth Amendment and that there was evidence in the record substantiating the charges for which Rodriguez was found guilty. *Id.* at ¶ 29.

[6]  Plaintiff's SHU term of disciplinary confinement and corresponding loss of privileges was further reduced to eighth months and nine days, ending on September 9, 2004, as a result of a discretionary time cut on or about July 14, 2004, occurring while plaintiff was housed at the Southport Correctional Facility. Selsky Decl. (Dkt. No. 62–3) ¶ 53.

## II. *PROCEDURAL HISTORY*

**\*3** This action was commenced on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007.[7] Dkt. Nos. 1, 3. Plaintiff's original complaint challenged not only the MBRs issued and the disciplinary action that ensued, but also chronicled alleged continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *See* Complaint (Dkt. No. 1).

[7]  While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the

complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007, Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5. In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District Judge Kahn issued an order on July 19, 2007 accepting the amended complaint for filing, but dismissing plaintiff's claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly-added defendant, Corrections Sergeant Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[8] As a result, Donald Selsky was left as the sole remaining defendant in the action.

[8]  District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Decision and Order (Dkt. No. 8) at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, *see* Dkt. No. 10, defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that it failed to allege the requisite degree of his personal involvement in any wrongdoing to support a finding of liability. Dkt. No. 47. The motion resulted in my issuance of a report on February 25, 2010 recommending that the motion be denied. Dkt. No. 54. That recommendation was adopted by District Judge Lawrence E. Kahn by order issued on September 13, 2010. Dkt. No. 67.

On June 18, 2010, defendant again moved, this time for summary judgment dismissing plaintiff's complaint. Dkt.

No. 62. In his motion defendant reiterates his claim of lack of personal involvement, and additionally asserts that in any event plaintiff's due process claim lacks merit since the plaintiff was afforded all of the procedural safeguards required under the Fourteenth Amendment, and further that he is entitled to qualified immunity from suit. *Id.* Plaintiff has since responded in opposition to defendant's motion, Dkt. No. 68, and defendant has submitted a reply memorandum addressing plaintiff's arguments and further supporting his motion. Dkt. No. 74.

**\*4** Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.

Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Personal Involvement*

**\*5** In his motion defendant Selsky renews an argument previously made and rejected—that his limited involvement in reviewing the disciplinary determination in question based upon plaintiff's appeal of that decision is insufficient to support a finding of liability for any procedural due process violation which may have occurred in the context of that hearing. In response, plaintiff counters that the record reveals facts from which a reasonable factfinder could conclude that the defendant personally participated in the due process violation, including by conducting an inadequate review of the disciplinary hearing record.

It seems clear, particularly in light of the Supreme Court's relatively recent decision in *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1948–49 (2009), that to be held accountable for a constitutional deprivation under section 1983 a defendant must have had personal involvement in the conduct giving rise to the deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (*citing Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978); *Scott*

*v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.") (quoting *McKinnon* ). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

As was noted in my prior report and recommendation, the question of whether defendant Selsky's review of an allegedly infirm disciplinary hearing provides grounds for establishing his personal involvement is one that has divided the courts. Some courts have found the mere allegation that Selsky has reviewed and affirmed a hearing determination that was the product of a due process deprivation is insufficient to establish liability for the underlying violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part."); [9] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

[9]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Selksy. *See, e.g., Bennett v. Fischer,* No. 9:09–CV–1236, 2010 WL 5525368 (N.D.N.Y. Aug 17, 2010) (Peebles, M.J.) (finding questions of fact regarding Commissioner Fischer's personal involvement in disciplinary precluding summary judgment), *Report and*

*Recommendation Adopted,* 2011 WL 13826 (N.D .N.Y. Jan. 4, 2011) (Scullin, S. J.); *Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion.") (citations omitted); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1– 2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

In support of his argument regarding personal involvement defendant cites *Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y. My 24, 2010), in which another magistrate judge of this court, in a report and recommendation adopted by the assigned district judge, wrote that "[t]he affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation." *Tafari,* 714 F.Supp.2d at 383. (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). I respectfully disagree with my esteemed colleague and maintain that the cases holding that Selsky's affirmance, or that of someone in his corresponding position, of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the

violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis. *See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).* In any event, this case is distinguishable from *Tafari* since here plaintiff has alleged that through his own conduct in inadequately reviewing the underlying determination defendant Selsky committed a due process violation, *see* Amended Complaint (Dkt. No. 7) ¶ 21, thereby satisfying the Supreme Court's admonition that a defendant can only be held liable for his or own conduct for purposes of a civil rights violation. *Iqbal,* 129 S.Ct. at 1948.

 **\*7** As I noted in my prior report, I believe that those cases concluding that a plaintiff's allegation that defendant Selsky reviewed and upheld an allegedly constitutionally-suspect disciplinary determination is enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review, the liberty interest deprivation allegedly effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.

### C. *Merits of Plaintiff's Due Process Claim*

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Defendant concedes that plaintiff's eight months of SHU disciplinary confinement "at least arguably" impacted a protected liberty interest, *see* Defendant's Memorandum (Dkt. No. 62–14) at p. 3, and I agree. *See Colon v. Howard,*

215 F.3d 227, 231 (2d Cir.2000) (finding that disciplinary confinement for a period of 305 days is "a sufficient departure from the ordinary incidents of prison life to require procedurally due process protections."). Plaintiff's claim, then, boils down to whether he was provided the procedural safeguards guaranteed under the Fourteenth Amendment prior to that deprivation. [10]

[10]    It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21.

The procedural rights to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80 (1974). [11] Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–67, 94 S.Ct. at 2978–80; *see also Eng v. Coughlin,* 858 F .2d 889, 897–98 (2d Cir.1988). In addition, to pass muster under the Fourteenth Amendment the hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

[11]    Many of the points raised in support of plaintiff's due process claim surround the alleged failure of prison officials to meet the requirements prescribed by regulation for disciplinary hearings. It is well established, however, that a violation of a state regulation is not actionable under section 1983. *Cusamano,* 604 F.Supp.2d at 482.

#### 1. *Notice of Charges*

 **\*8** The record now before the court, when interpreted in a light most favorable to the plaintiff, suggests that while the second of the two MBRs addressed at plaintiff's disciplinary hearing was served on Rodriguez on January

2, 2004, the earlier report was not received by him until the date on which the hearing was to begin. [12] Under *Wolff,* an accused inmate is entitled to meaningful advance written notice of the charges against him; in this circuit, a minimum of twenty-four hours of advance notice is generally considered to be required. *Sira v. Morten,* 380 F.3d 57, 70 (2d Cir.2004). The purpose of the notice requirement is to place the inmate on notice of the charges faced in order to permit the preparation of an adequate defense. *Id.* (citing *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001); *see also Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at *2 (N.D.N.Y. Nov. 24, 1995) (McAvoy, J.) (citing *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978) (holding that the purpose of the twenty-four hour notice rule is to provide inmates with sufficient time to prepare a defense, "not to hold hearing officers to a rigid and useless requirement that they only may call an inmate into a hearing room once they are positive that the inmate received a copy of the misbehavior report at least twenty-four hours earlier").

[12]    As was previously noted, defendant disputes plaintiff's claim in this regard and asserts instead that both misbehavior reports were served on the plaintiff on January 2, 2004 by Corrections Officer Ferguson on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A.

In this instance, any failure on the part of prison officials to provide plaintiff with notice of the charges lodged against him prior to the scheduled hearing was harmless in light of the hearing officer's agreement to adjourn the hearing, initially from January 7, 2004 to January 8, 2004, and then again to January 13, 2004, in order to allow the Rodriguez to prepare his defense. The record clearly reflects that, during those intervening periods, he was afforded the opportunity to prepare a defense to both charges before any testimony was taken. *See* Plaintiff's Memorandum (Dkt. No. 68–1) at p. 5 (admitting that plaintiff was served with the first misbehavior report at the hearing prior to any testimony having been taken).

The notice requirements of *Wolff* were therefore satisfied in this case, and no reasonable factfinder could conclude otherwise.

    2. *Assistance in Preparation of a Defense*
Under *Wolff* and its progeny, a prisoner is entitled to an "employee assistant" to aid in the preparation for a disciplinary hearing when the inmate is illiterate, confined to the SHU, or unable to grasp the complexity of the issues involved. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Eng,* 858 F.2d at 897. The Supreme Court has made it clear, however, that the assistance due prisoners is limited and is not equivalent of the right of a criminally accused legal counsel. *Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981. An assistant is only required to act as the inmate's "*surrogate*—to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel.")

**\*9** Because Rodriguez had been relegated to SHU confinement by the time of the disciplinary hearing he was entitled to and was in fact assigned an employee assistant, Ms. Roddy, to help him prepare for the hearing. Rodriguez asserts that the assistant, however, refused to provide him with requested documents and threatened to "write him up" if he requested further assistance. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 14–17. Specifically, plaintiff claims that he was refused access to documents that would have helped prove his innocence, including a list of officers involved in the incidents involved, letters written by another inmate, video footage of a different inmate being led to the SHU, all misbehavior reports concerning other inmates' involvement in the incidents, and all pertinent "To/From" memoranda produced by staff or inmates with knowledge of the relevant events. *Id.* at p. 15.

A careful review of the assistant forms and attachments in the record shows that the assigned assistant fulfilled her duty as plaintiff's surrogate. Plaintiff provided several lists of documents requested to prepare his defense. [13] Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 46–49, 54–61. Ms. Roddy indicated on the assistant form that she pursued all of plaintiff's requests and provided him with at least twenty pages of documents. *Id.* at pp. 17–18. On the handwritten lists, Ms. Roddy noted which documents were provided to plaintiff and gave brief explanations as to why some of the requested documents could not be produced. It was noted, for example, that plaintiff was denied access to the handwritten notes of another inmate, several requested "To/From" forms simply did not exist, and that the video footage would be available for viewing at the hearing if deemed pertinent to the pending charges. *Id.* at pp. 46–49.

Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 178 of 314
Rodriguez v. Selsky, Not Reported in F.Supp.2d (2011)
2011 WL 1086001

13      It is noted that plaintiff did not request that Ms.
        Roddy interview any inmates or other persons as
        potential witnesses and refused to sign the assistant
        form. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 17.

There is no indication that any documents were withheld
from plaintiff without justification or as a result of
Ms. Roddy's ineffective assistance. Ms. Roddy's role as
plaintiff's assistant was limited to acting as his surrogate;
if he was not permitted to receive certain documents, Ms.
Roddy likewise could not access them. Even assuming
plaintiff's claim that Ms. Roddy was rude and hostile
toward him is accurate, such conduct in and of itself
does not violate his federal due process rights. *See Gates
v. Selsky,* No. 02 CV 496, 2005 WL 2136914, at * 7
(W.D.N.Y. Sept. 02, 2005) (noting that the duty owed
by an employee assistant is the provision of requested
services in good faith and in the best interest of the inmate
and to perform as instructed by the inmate). In short,
there is no evidence now before the court from which
a reasonable factfinder could conclude that plaintiff was
denied effective assistance in preparing his defense to the
pending disciplinary charges.

### 3. *Opportunity to Present Evidence*

The due process clause of the Fourteenth Amendment
plainly guarantees the right of an accused inmate to
present a defense to disciplinary charges. *Wolff,* 418
U.S. at 555–56, 94 S.Ct. at 2974. That right, however,
is not unfettered and does not apply to the same
extent as the constitutional guarantee to a criminally
accused defendant of the right to present a meaningful
defense. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 454
(S.D.N.Y.2008) (citing *Wolff* ). Instead, in order to keep a
disciplinary hearing to within reasonable limits, a hearing
officer "must have the necessary discretion ... to refuse
to all witnesses that may create a risk of reprisal or
undermine authority" *Wolff,* 418 U.S. at 566, 94 S.Ct. at
2980.

**\*10** An inmate's request to have specific witnesses called
to testify may be refused if the hearing officer reasonably
finds that such witnesses' testimony would be duplicative,
non-probative, or would interfere with correctional goals.
*See Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). "[A]
hearing officer does not violate due process by excluding
irrelevant or unnecessary testimony." *Kalwasinski v.
Morse,* 201 F.3d 103, 109 (2d Cir.1999).

In support of his claim that he was denied the opportunity
to present a meaningful defense plaintiff first points to the
hearing officer's refusal to allow him to call his mother
and attorney as witnesses. According to the plaintiff,
both would have substantiated his claim of retaliatory
motives on the part of correctional officials. Plaintiff's
Memorandum (Dkt. No. 68–1) at p. 8; *see also* Selsky
Decl., Exh. B (Dkt. No. 62–6) pp. 98–99. Neither witness,
however, was present in the prison during any of the events
giving rise to plaintiff's claims. The only testimony those
individuals could have offered would not only have been
hearsay, but would have come directly from Rodriguez
himself, who was present to testify. Accordingly, the
hearing officer properly determined that such testimony
would have been irrelevant or unnecessarily redundant.

Plaintiff also challenges the hearing officer's failure to
submit written questions to two fellow inmates who
refused to testify at the hearing. Despite plaintiff's claim
to the contrary, a hearing officer is under no affirmative
duty to compel a response from an inmate who refuses to
testify at a disciplinary hearing. If a witness has indicated
that he or she will not testify if called, it would be futile
and unnecessary to pursue his or her testimony further.
*Silva,* 992 F.2d at 22; *see also Johnson v. Doling,* No.
9:05–CV–376, 2007 WL 3046701, at *7 (N.D.N.Y. Oct.
17, 2007) (McAvoy, J. and Treece, M.J.) (the failure
to summon the testimony of a witness who refuses to
testify does not violate due process); *Dumpson v. Rourke,*
No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N .Y.
Sept. 26, 1997) (Pooler, J. and DiBianco, M.J.) (a hearing
officer's failure to investigate why an inmate refused to
testify does not constitute a due process violation).

Here, inmates Colon and Berrios flatly refused to testify
at plaintiff's disciplinary hearing, signing the appropriate
refusal forms on January 14, 2004. Selsky Decl., Exh. A
(Dkt. No. 62–4) pp. 110–11. Colon explained his refusal
by noting that he had not witnessed the incident, and
Berrios likewise claimed to have no relevant information
because he was sleeping in his cell at the relevant times. *Id.*
Requesting further information from these inmates would
have been futile and unnecessary since they claimed not to
have actually witnessed the events that led to Rodriguez's
charges. It was therefore not a violation of plaintiff's due
process rights for the hearing officer to refuse to inquire
further into their involvement.

#### 4. *Impartial Hearing Officer*

**\*11** Among the due process dictates arising under the Fourteenth Amendment is the requirement that a hearing officer assigned to address a disciplinary charge against an inmate be unbiased. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N .Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983)). While the reality is that most hearing officers serving in that capacity are prison officials, and a prison hearing officer's impartiality generally does not have to mirror that of judicial officers, nonetheless the result of a disciplinary hearing should not be "arbitrary and adversely predetermined." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009). Within that context, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990).

It should be noted that a plaintiff's disagreement with a hearing officer's rulings alone does not give rise to a finding of bias. *See Johnson,* 2007 WL 3046701, at \*10 (hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections). Similarly, the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the involved corrections officer).

Because prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased, *Allen,* 100 F.3d at 259, plaintiff's conclusory allegations of bias in this case are insufficient to overcome this presumption. Plaintiff claims that Hearing Officer Ewanciw was biased because he sought assistance from Lt. Wright, who authored one of the two MBRs in issue. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 18–20. However, Rodriguez fails to explain how this evidences bias against him, reflects a predetermination on the hearing officer's part, or impacted the outcome of the proceeding. The

record reflects that the hearing officer disclosed to the plaintiff that he had consulted with Lt. Wright, the "disciplinary lieutenant," for the purpose of ascertaining whether plaintiff was permitted to receive copies of redacted investigation documents. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 130.

During the hearing plaintiff suggested that the hearing officer and Lt. Wright are friends outside of work. Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 131–32. While the allegation denied by Hearing Officer Ewanciew, even if true this fact does not show that he was predisposed to rule against plaintiff.

**\*12** In sum, plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that the hearing officer assigned to preside over plaintiff's disciplinary hearing was biased, or had prejudged plaintiff's guilt prior to considering the evidence presented at the hearing.

#### 5. *Determination Supported by "Some Evidence"*

In addition to repeated verbal explanations of his rulings throughout the hearing and of his ultimate findings, Hearing Officer Ewanciw provided plaintiff with a written explanation of the evidence relied upon in reaching his conclusion. Selksy Decl., Exh. A (Dkt. No. 62–4) pp. 3–4. In his written explanation, Hearing Ewanciw acknowledged that he relied in part on information from confidential witnesses. Selksy Decl., Exh. A (Dkt. No. 62–4) p. 4. The question next presented is whether these findings were supported by at least some credible evidence.

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nonetheless to pass constitute muster, the supporting evidence must be reliable. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001). The Second Circuit has made clear that "the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay." *Sira,* 380 F.3d at 82; *see also Dawkins v. Gonyea,* 646 F.Supp.2d 594, 614 (S.D.N.Y.2009) ("*Sira* clearly established that an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information.").

The hearing transcript reflects that the hearing officer did not make an independent inquiry into the reliability of the confidential inmate witnesses himself, but instead relied on Lt. Wright's independent finding of reliability. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 128. Had the disciplinary decision been based solely on such confidential information, an issue of material fact might have been presented as to whether the "some evidence" standard was met. With defendant Selsky's reversal of plaintiff's conviction on the demonstration charge contained within the January 2, 2004 MBR, the remaining charges for which he was found guilty included fighting, refusing a direct order, and violent conduct. To support his finding of guilt on those counts Hearing Officer Ewanciw relied on a correctional officer's assertion that he witnessed plaintiff raise his fists, throw punches, and fail to stop fighting when instructed to do so—an account that was corroborated by another officer's investigation—as well as the results of an investigation into the incident and evidence found in plaintiff's cell tying him to the relevant events. There was therefore sufficient reliable evidence on which to base a disciplinary decision related to the charges, independent of the confidential witness statements, and no reasonable factfinder could conclude otherwise.

IV. *SUMMARY AND RECOMMENDATION*

 **\*13** Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his procedural due process claim. Rodriguez received sufficient notice of the charges against him as well as adequate assistance in preparing a defense, and had ample opportunity to appear, call witnesses, and present evidence in his defense. In addition, the record fails to disclose any basis for concluding that Hearing Officer Ewanciw was biased, and the record before the court proves that he provided plaintiff with a written explanation of the reasons for his decision, which was supported by at least some reliable evidence. I therefore recommend dismissal of plaintiff's due process claim against defendant Selsky on the merits, and in light of this recommendation find it unnecessary to address defendant's claim of qualified immunity. It is therefore respectfully

RECOMMENDED, that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and that the complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1086001

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7629513
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Todd JOHNSON, Plaintiff,

v.

Christopher FERNANDEZ, et al., Defendants.

No. 9:09–CV–626 (FJS/ATB).
|
March 1, 2011.

**Attorneys and Law Firms**

Todd Johnson, pro se.

Michael G McCartin, Ass't Attorney General, for Defendants.

**REPORT RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge. On November 4, 2010, this case was reassigned to me from Magistrate Judge David R. Homer. (Dkt. No. 48).

In this civil rights complaint (Dkt. No. 1), Plaintiff alleges that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments. Plaintiff seeks $1 million in damages, as well as injunctive relief. Presently before this court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 39). Plaintiff responded in opposition to the motion. (Dkt. No. 43). For the following reasons, the court recommends granting Defendants' motion, and dismissing the complaint in its entirety.

**DISCUSSION**

**I.** *Facts*

**A. Excessive Force Claims Against Christopher Fernandez and Jason Yung**

Plaintiff alleges [1] that he was assaulted by Defendant Christopher Fernandez, a correctional officer, on February 9, 2008, while incarcerated at Coxsackie Correctional Facility ("Coxsackie"). (Dkt. No. 1, Compl. at 8 [2]; Dkt. No. 39–3, Pl.'s Dep. at 13). At approximately 3:00 P.M., Defendant Fernandez approached Plaintiff's cell and started screaming about people who were "loud at the gate" earlier in the week. (Compl. at 8; Pl.'s Dep. at 12). Defendant Fernandez told another correctional officer, known only as Officer Ryan, to open Plaintiff's cell. (Compl. at 8; Pl.'s Dep. at 12–13). After Officer Ryan opened the cell, Defendant Fernandez told Plaintiff to "step out" and "place [his] hands on the wall." (Compl. at 8; Pl.'s Dep. at 13) Defendant Fernandez allegedly began punching Plaintiff in the ribs once he exited his cell. (Compl. at 8; Pl.'s Dep. at 16). Although Defendant Fernandez supposedly told Plaintiff to "fight back," Plaintiff refused to do so. (Compl. at 8; Pl.'s Dep. at 16). Defendant Fernandez then began "trashing" Plaintiff's cell, as if he were searching for contraband. (Compl. at 8; Pl.'s Dep. at 13). Finding none, Defendant Fernandez ordered Plaintiff to get on his knees. (Compl. at 8; Pl.'s Dep. at 13). Defendant Fernandez then kicked Plaintiff's lower back, causing Plaintiff's neck to snap. *Id.* (Compl. at 8; Pl.'s Dep. at 13).

[1]     Plaintiff was deposed on February 23, 2010 (Dkt. No. 39–3), and this court has incorporated facts that were brought out in plaintiff's deposition.

[2]     All references to page numbers in the Complaint will be to the page numbers assigned by the court's electronic docketing system.

After Defendant Fernandez locked Plaintiff in his cell, Defendant Fernandez walked over to Inmate Green's cell and ordered Officer Ryan to open that cell. (Compl. at 8; Pl.'s Dep. at 25). Although Plaintiff did not see what transpired immediately after Defendant Fernandez entered Inmate Green's cell, Plaintiff claims that he later witnessed Defendant Fernandez slapping Inmate Green. (Compl. at 8; Pl.'s Dep. at 26). Defendant Fernandez then proceeded to Inmate Palmer's cell and ordered Officer Ryan to open that cell. (Compl. at 8; Pl.'s Dep. at 30). Plaintiff does not claim that he witnessed any assault on Inmate Palmer, but claims that he heard repeated sounds of a stick hitting a body and cries for help. (Compl. at 8;

Pl.'s Dep. at 35). Plaintiff also claims to have witnessed Inmate Palmer being dragged to the day room in bloody clothing. (Compl. at 8; Pl.'s Dep. at 35).

**\*2** On February 15, 2008, Plaintiff states that a correctional officer told Plaintiff that he was being called as a witness in Inmate Palmer's disciplinary hearing that arose from the February 9 incident. (Compl. at 8; Pl.'s Dep. at 59). The officer asked Plaintiff: "Do you want to get involved with that?" (Compl. at 8). After Plaintiff responded affirmatively, the officer allegedly told Plaintiff that getting involved was not a "good idea." *Id.* After that officer left, another officer approached Plaintiff and asked him the same question. *Id.* Once again, Plaintiff replied affirmatively. *Id.* The officer then told Plaintiff that he would be called after lunch. *Id.*

Plaintiff states that he wanted to bring a written statement and other documents into Inmate Palmer's hearing. (Compl. at 8; Pl.'s Dep. at 64–65). On his way to the hearing room, after retrieving those items and placing them in an envelope, Plaintiff claims that he was stopped by Defendant Sergeant Jason Yung and an unidentified correctional officer. (Compl. at 8; Pl.'s Dep. at 65). Defendant Yung then allegedly threatened Plaintiff with being "locked up" if he testified at the hearing. (Compl. at 8; Pl.'s Dep. at 64).

As Plaintiff sat in the waiting pen, Correctional Officer (C.O.) Nieves told Plaintiff that his envelope would need to be searched before he could bring it into the hearing room. (Dkt. No. 39–11, Disciplinary Hr'g at 11; Dkt. No. 39–12, Hr'g Papers at 4). Plaintiff then shouted that he would not permit the officers to search his envelope, claiming that C.O. Nieves was interfering with his ability to testify for Inmate Palmer. (Pl.'s Dep. at 65; Disciplinary Hr'g at 11–12; Hr'g Papers at 4). C.O. Nieves then issued Plaintiff a disciplinary ticket. (Hr'g Papers at 4).

Based upon this misbehavior, Defendant Yung and another officer escorted Plaintiff back to his cell to pack for confinement in the special housing unit ("SHU"). (Compl. at 8; Disciplinary Hr'g at 17). During the escort to SHU, Defendant Yung allegedly called for more officers. (Compl. at 8). Plaintiff claims that Defendant Yung and the other officers began punching and kicking Plaintiff in the face and ribs. (Compl. at 8; Pl.'s Dep. at 70–73).

Once Plaintiff arrived at SHU, Plaintiff told his mental health counselor, Mr. Tatum, that he was crying because he had been assaulted. (Compl. at 8; Pl's Dep. at 78). Mr. Tatum transferred Plaintiff to the Office of Mental Health ("OMH") infirmary. (Compl. at 8; Pl.'s Dep. at 78). Plaintiff claims that was not seen by a doctor until February 27, 2008. (Compl. at 15). He believes that the delay in treatment occurred because he told Investigator Begmann of the Inspector General's Office about the February 9 and 15 assaults. *Id.*

### B. Mail Interference Claim Against M. Bathrick

As an initial matter, the court notes that Plaintiff fails to allege which Defendant (or any other individual) deprived him of his First Amendment right to the free flow of mail. Although Defendant Bathrick is named as a defendant in the caption of the Complaint and is later identified as a clerk in the Inmate Account Unit (Compl. at 3), the Complaint fails to contain any allegations indicating how Defendant Bathrick violated the law or injured Plaintiff. Under these circumstances, the claim would ordinarily have been subject to dismissal. [3] Defendants, however, have interpreted the allegation of mail interference to refer to Defendant Bathrick. (Dkt. No. 39–14, Defs.' Mem. of Law at 15). Moreover, Plaintiff states, in his opposition to summary judgment, that Defendant Bathrick is the defendant responsible for this alleged violation of Plaintiff's First Amendment rights. (Dkt. No. 43 at 24, Pl.'s 7.1 Statement ¶ 14). Accordingly, the Court will construe the Complaint as asserting a First Amendment mail interference claim against Defendant Bathrick. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (holding that where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest").

[3] *See, e.g., Orraca v. McCreery,* No. 9:04–CV–1183, 2006 U.S. Dist. LEXIS 22941, 2006 WL 1133254, at \*6 (N.D.N.Y. Apr.25, 2006) (dismissing claim against defendant where defendant named in complaint but complaint and supporting documents "fail[ed] to disclose any basis on which to conclude" that defendant was personally involved in the alleged unlawful conduct); *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) ( "Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion

2011 WL 7629513

to dismiss the complaint in regard to that defendant should be granted."), *aff'd,* 210 F.3d 354 (2d Cir.2000).

**\*3** Plaintiff alleges that his First Amendment rights were violated at Coxsackie because he was denied his right to "communicate with the outside world." (Compl. at 13). Following the alleged assaults discussed above, Plaintiff claims that he was depressed and wanted to communicate with this family. *Id.* Plaintiff states, however, that he was prevented from writing to his family because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008. (Pl.'s Dep. at 102). He states that he was unable to obtain stamps until March 2008. *Id.* at 106.

### C. Due Process Claims Against Defendant Kim Gerwer

Defendant Kim Gerwer, a Coxsackie Education Supervisor, presided over Plaintiff's Tier III hearing. (Compl. at 15; Disciplinary Hr'g at 1). Plaintiff alleges that his due process rights were violated at this hearing in a number of ways. (Compl. at 15). First, he claims he was not provided with notice of the charges against him twenty-four hours before the hearing. *Id.* Second, he claims that Defendant Gerwer refused, without a legitimate reason, to call a witness that would have supported Plaintiff. *Id.* Third, Defendant Gerwer failed to collect documents that Plaintiff had requested. *Id.* Fourth, Defendant Gerwer relied upon Officer Germaine's testimony, even though the officer did not endorse the disciplinary ticket as someone with "personal knowledge" of the incident. (Pl.'s Dep. at 85– 87). Finally, Plaintiff was not provided with an impartial hearing because Defendant Gerwer had stated that the officer who wrote the ticket was a "good person." *Id.* at 82.[4]

[4]   Plaintiff also appears to assert a conditions of confinement claim. (Compl. at 14). Plaintiff, however, has failed to make any allegations about how any of the named defendants are related to a possible condition of confinement claim. Accordingly, the Court will only address the claims asserted against the named defendants.

## II. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**\*4** In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d at 790 (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## III. *Eighth Amendment Excessive Force Claims*

Defendants Fernandez and Yung argue that Plaintiff has failed to properly exhaust the excessive force claims. (Defs.' Mem. of Law at 5). The Prison Litigation Reform Act's ("PLRA") exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes regardless

of the subject matter of the claim. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). In *Woordford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, 765 L.Ed. 368 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 92–93. "Proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 89–94. An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

However, the Second Circuit has held that certain exceptions to exhaustion apply. The proper inquiry is to determine "whether: (1) administrative remedies were in fact available to the prisoner; (2) the defendants may have forfeited the affirmative defense of non-exhaustion by failing to preserve it ... or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special circumstances may have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Chavis v. Goord,* 333 Fed. App'x 641, 643 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program (IGP) encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a).

**\*5** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but

is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8. The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id* . § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the Central Office Review Committee as in the regular grievance procedure. *Id.* § 701.8(h).

Here, Defendants argue that Plaintiff did not properly exhaust his administrative remedies because he failed to grieve the excessive force claims through the state's three-tiered process in a timely and appropriate manner. (Defs.' Mem. of Law at 5.) Plaintiff claims that a grievance officer told him that the grievance office did not handle staff assaults, and that he should, instead, complain to the Inspector General. (Compl. at 1; Pl's Dep. at 52–53; Pl.'s 7 .1 Statement ¶ 1). Plaintiff then wrote to the Inspector General's Office. (Pl.'s Dep. at 36–37).

An inmate's attempt to exhaust by simply writing a letter directly to the Inspector General will not suffice to exhaust administrative remedies. *See Grey v. Spearhawk,* No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS, at \*5, 2000 WL 815916 (S.D.N.Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse plaintiff from "adhering to the available administrative procedures"). It has been held that "a grievance through informal channels will satisfy the exhaustion requirement if the prisoner thereby obtained a *favorable resolution* of his grievance." *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (citations omitted) (emphasis added). The exhaustion requirement will be satisfied in that situation because the inmate would not have any reason to appeal a favorable resolution. *Andrews v. Cruz,* No. 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, at \*16, 2010 WL 1141182, at \*6 (S.D.N.Y. Mar. 24, 2010) (citations omitted). Thus, Plaintiff did not exhaust administrative remedies by writing to the Inspector General's Office, even though the Inspector General

2011 WL 7629513

investigated plaintiff's allegations and found them to be unsubstantiated.

Defendants may "forfeit the affirmative defense of non-exhaustion ... [if] defendants' own actions inhibit[ed] the inmate's exhaustion of remedies .... " *Chavis v. Goord,* 333 Fed. App'x at 641 (citations omitted); *see, e.g., Jacoby v. Phelix,* No. 9:07–CV–872 (DNH/ATB), 2010 U.S. Dist. LEXIS 44222, at *26–28, 2010 WL 1839299, at *8–9 (N.D.N.Y. Mar.31, 2010) (Baxter, Mag. J.) (summary judgment denied where issues of fact remained on whether plaintiff was threatened by defendants into withdrawing his grievance), *report-recommendation adopted,* 2010 U.S. Dist. LEXIS 44201, 2010 WL 1839264 (N.D.N.Y. May 6, 2010) (Hurd, J.). Although plaintiff claims that an unidentified grievance officer told him that the grievance office did not handle staff assaults, nothing in the record indicates that Defendants Fernandez and Yung or any other DOCS employee actually inhibited Plaintiff's ability to exhaust administrative remedies. First, the IGP Supervisor at Coxsackie denied telling plaintiff that allegations of assault are not grievable. (Dkt. No. 39–7, Bellamy's 7/30/2008 Letter at 1). Further, plaintiff has acknowledged that he wrote one grievance regarding the assaults on February 25, 2008, and then wrote another grievance after March 8, 2008, when the grievance office supposedly told him that "they do not deal with assaults on inmates by staff."[5] (Dkt. No. 39–8, Pl. 6/20/2008 Letter at 4). Whatever the Grievance Supervisor said, plaintiff's own statements indicate that he was not deterred from pursuing grievance regarding the alleged assaults.

[5]     Contrary to this purported advice, DOCS regulations clearly permit an inmate to file harassment grievances. 7 NYCRR § 701.8; see also *id.* § 701.2(e) (defining "harassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate").

**\*6** Plaintiff states that the he did mention the February 9 and February 15 incidents in a grievance that he filed on June 25, 2008. (Pl.'s Dep. at 55–56). The regulations provide, however, that an inmate must file a grievance within twenty-one days of the alleged occurrence. 7 NYCRR § 701.5(a)(1). An exception to this time limit may be granted based on "mitigating circumstances" if the extension is requested within forty-five days of the alleged occurrence. 7 NYCRR § 701.6(g)(1)(i)(a). Thus, to the extent that the June 25 grievance complained about

the February 9 and 15 assaults, it would have been time-barred.[6]

[6]     Captain J.R. Raymond also responded to a April 29, 2008, letter of complaint that Plaintiff sent to Superintendent Lape. (Compl. at 38, Ex. 8). Even if the April 29 letter could be considered a grievance complaint, it would likewise be time-barred under 7 NYCRR § 701.6(g)(1)(i)(a).

Plaintiff appealed the denial of his June 25, 2008 grievance. In the CORC's decision, dated July 30, 2008, the Committee stated that "CORC notes that there is no record of the grievant filing prior grievances addressing the allegations of assaults by staff on 2/9/08 and 2/15/08. However, it is noted that both allegations were investigated by the Office of the Inspector General and determined to be unsubstantiated." (Dkt. No. 39–6 at 1). Thus, it is clear from the CORC's response to plaintiff that there was no record of a prior grievance, complaining about these alleged assaults.

Even though the forty-five day window to file a grievance regarding the alleged assaults had already expired, IGP Director Karen Bellamy advised Plaintiff on June 30, 2008, that he could contact the IGP supervisor with his mitigating circumstances. (Dkt. No. 39–7, Bellamy's 7/30/2008 Letter at 1). There is nothing in the record, however, to indicate that Plaintiff did so. No rational fact finder could determine that Plaintiff exhausted his administrative remedies, or was deterred from doing so by the actions of the Defendants or any DOCS employee.[7] Accordingly, it is recommended that summary judgment be **granted** as to the Eighth Amendment claims.

[7]     See *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted). See also *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to

Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 186 of 314
Johnson v. Fernandez, Not Reported in F.Supp.2d (2011)

2011 WL 7629513

withstand a motion for summary judgment once the moving party has set forth a documentary case").

### IV. *First Amendment Mail Interference Claim*

Plaintiff alleges that his First Amendment rights were violated because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008, and was unable to buy stamps until "some time in March" 2008. (Pl.'s Dep. at 102, 106). Because he was unable to buy stamps, Plaintiff claims that he was unable to communicate with this family about the February 15 assault. (Compl. at 13). At his deposition, however, he admitted that he was able to send out at least one letter between February 15 and March 2008, in which he notified his family about the February 9 assault. (Pl.'s Dep. at 106).

Under the First Amendment, prisoners have a right to "the free flow of incoming and outgoing mail." *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (citations omitted). A plaintiff may bring a claim under the First Amendment for interference with non-legal mail, based upon his free speech right to send or receive mail. *See Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Id.* (quotation omitted).

**\*7** Although "[t]he boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise[,] ... when analyzing such claims courts have consistently made distinctions between outgoing mail and incoming mail ... based on the various rights and interests at stake." *Id.* "[T]he Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quotation omitted). Thus, "the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail." *Id.* (citation omitted). However, when reviewing an interference with mail claim, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not

obvious on its face." *Davis v. Goord,* 320 F.3d 346, 351–52 (2d Cir.2003); *see also John v. N.Y .C. Dep't of Corr.,* 183 F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Cancel v. Goord,* 2001 WL 303713 at *6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice).

In this case, Plaintiff admits that he was able to send out at least one letter between February 15, 2008, and March 2008. (Pl.'s Dep. at 106). Moreover, any inability to send mail to his family was limited to, at most, a one month period because Plaintiff was able to buy stamps in March 2008. [8] Thus, any alleged occurrences of mail interference were few, any delay was minimal, and there is no indication that it was an ongoing practice. Plaintiff has also failed to show any harm, physical or otherwise, caused by his failure to communicate with his family, and he has failed to show that Defendant Bathrick (or anyone else) acted with invidious intent. Accordingly, the Court recommends **granting** Defendants' motion for summary judgment as to Plaintiff's First Amendment claims.

[8]    Plaintiff could not remember the exact time in March that he was able to purchase the stamps. (Pl.'s Depo. at 102).

### V. *Due Process Violations*

Defendant Kim Gerwer is an Education Supervisor at Coxsackie. (Dkt. No. 39–10, Gerwer Decl. ¶ 1; Dkt. No. 39–13, Defs.' 7.1 Statement ¶ 2). She served as the hearing officer for Plaintiff's Tier III disciplinary hearing, which arose from the misbehavior report that was issued on February 15. (Gerwer Decl. ¶ 2; Defs.' 7 .1 Statement ¶ 2). Plaintiff asserts that Defendant Gerwer's conduct at the disciplinary violated due process. (Compl. at 15–17).

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

**\*8** In *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer).

### A. Liberty Interest

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Second Circuit, however, has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998) (citations omitted).

Here, Plaintiff was sentenced to 180 days of SHU confinement. (Disciplinary Hr'g at 49). He also lost commissary, phone, and package privileges for 180 days. *Id.* The Second Circuit has found that SHU confinement for 180 days may impose an "atypical and significant hardship." *See Kalwasinski v. Morse,* 201 F.3d 103, 106–08 (2d Cir.1999) (per curiam). Defendants do not address this issue, and the court will assume that plaintiff had a protected liberty interest without further analysis because the court finds that plaintiff received due process in any event.

### B. Notice

Generally a prisoner must be provided with advanced written notice of the charges against him at least twenty-four hours prior to the hearing. *Wolff v. McDonnell,* 418 U.S. at 564–66; *see also Taylor v. Rodriguez,* 238 F.3d 188,

192 (2d Cir.2001); *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986).

In this case, Plaintiff argues that his due process rights were violated because he did not receive notice of the charges against him at least twenty-four hours before the hearing. (Compl. at 15; Pl.'s Dep. at 84–85). Plaintiff admitted at his disciplinary hearing that he was served with formal notice of the charges on February 20, 2008, at 9:20, but it is unclear from the hearing transcript and other documents in the record whether Plaintiff was served at 9:20 A .M. or 9:20 P.M. (Disciplinary Hr'g at 1). The disciplinary hearing commenced on February 21, 2008, at 11:30 A.M. *Id.* If Plaintiff were served at 9:20 P.M., then he would not have received exactly twenty-four hour notice. Even assuming that plaintiff's allegation about the time that the misbehavior report was served is true, his due process rights were not violated by what was ultimately a technicality that had absolutely no impact upon plaintiff's right to proper notice of the disciplinary charges.

**\*9** The purpose of the twenty-four hour rule is to provide inmates with sufficient time to prepare to defend charges filed against them. *See Wolff v. McDonnell,* 418 U.S. at 564; *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). A review of the hearing transcript shows that Plaintiff received sufficient notice to prepare for the hearing. Although the hearing began at 11:30 A.M. on February 20, 2008, Defendant Gerwer adjourned the hearing at 11:35 A.M., five minutes after the hearing started. (Disciplinary Hr'g at 3). Plaintiff did not have to defend himself against anything on February 20th. The hearing did not commence again until one week later, on February 27, 2008, at 1:29 P.M. *Id.* This six-day adjournment, which guaranteed that Plaintiff would have sufficient time to prepare for his defense, cured any deficiencies that may have occurred. The February 27th hearing was also adjourned at 2:05 P.M. and began again on March 6 at 3:25 P.M. *Id* . at 22. The second adjournment was necessary because Defendant Gerwer wanted secure the witnesses that Plaintiff requested. *Id.* The March 6 hearing adjourned at 3:45 P.M. so that Defendant Gerwer could secure another witness that Plaintiff requested. *Id.* at 32. The hearing reconvened on March 10 at 12:45 P.M. when that witness became available to testify. *Id.* The hearing was adjourned on at least three different occasions, ensuring that Plaintiff had sufficient time to prepare to defend the charges against him. Plaintiff has not alleged, and cannot claim, any

prejudice to him that resulted from the fact that the initial hearing may have started less than twenty-four hours after he was served with the misbehavior report, because there was no "hearing" on that day. Plaintiff had plenty of time to defend against the charges and to produce evidence and witnesses in his defense.

### C. Evidence and Witnesses

An inmate has a right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. at 566; *see also Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority ....") (citations omitted). Moreover, a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citing *Wolff v. McDonnell,* 418 U.S. at 566). A hearing officer may refuse to call a witness "on the basis of relevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d at 30; *see also Scott v. Kelly,* 962 F.2d 145, 145–47 (2d Cir.1992) ("It is well settled that an official may refuse to call a witness as long as the refusal is justifiable.").

**\*10** Plaintiff alleges that his due process rights were violated because Defendant Gerwer excluded a log book from evidence. (Pl.'s Dep. at 88–89; Disciplinary Hr'g at 29–30). C.O. Nieves's signature appears on a misbehavior report dated February 15, 2008. (Dkt. No. 39–12, Disciplinary Hr'g Papers at 4). Plaintiff requested the log book because he did not believe that C.O. Nieves was assigned to the site of the incident at the time it occurred. (Pl.'s Dep. at 88; Disciplinary Hr'g at 29). C.O. Nieves testified at the disciplinary hearing that she wrote the February 15 report because Plaintiff had disobeyed her orders. (Disciplinary Hr'g at 11–12). Plaintiff questioned C.O. Nieves at the disciplinary hearing. *Id.* at 12–18. C.O. Donovan also testified that C.O. Nieves was present at the site of the incident. (Disciplinary Hr'g at 32). Plaintiff also had an opportunity to question C.O. Donovan. *Id.* at 33–34.

Thus, Defendant Gerwer had a rational basis to conclude that excluding the log book was proper because its inclusion was unnecessary as C.O. Nieves's presence at the

site of the incident was substantiated by C.O. Donovan. Plaintiff questioned both officers at the disciplinary hearing. Since C.O. Nieves was the officer claiming that plaintiff violated her orders, the log book, showing whether she was assigned to the location in question at the time of the incident, was totally irrelevant.

Defendant Gerwer also allegedly refused, without a legitimate reason, to let Plaintiff call Mr. Tatum to testify on Plaintiff's behalf. (Compl. at 15; Pl.'s Dep. at 90). Plaintiff wanted Mr. Tatum, a mental health counselor, to testify about Plaintiff's mental state after the alleged February 15th assault. (Pl.'s Dep. at 90; Disciplinary Hr'g at 25). Plaintiff admits, however, that Mr. Tatum was not present at the time of the incident that gave rise to the disciplinary hearing, and plaintiff's mental state when he was taken to SHU had nothing to do with the incident that gave rise to the disciplinary hearing. (Disciplinary Hr'g at 25). The alleged assault, even if it did occur, happened after the conduct giving rise to the misbehavior report occurred. As such, Defendant Gerwer had a proper basis to deny Mr. Tatum's testimony as his testimony would not be relevant to any issues or incidents that gave rise to the disciplinary hearing. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108–109 (2d Cir.1999) (indicating that testimony on the record that no one else was present at incident gave rational basis for excluding plaintiff's witnesses as irrelevant and unnecessary). Moreover, at Plaintiff's request, Defendant Gerwer attempted to call another inmate who was present at the scene of the incident. *Id.* at 22. That inmate, however, refused to testify. *Id.* Finally, at Plaintiff's request, Defendant Gerwer called Officers Donovan and Germaine to testify. *Id.* at 32, 41, 43. Thus, Defendant Gerwer's refusal to call Mr. Tatum did not violate Plaintiff's due process rights because Mr. Tatum's testimony was irrelevant, and Defendant Gerwer called other witnesses that Plaintiff requested.

**\*11** Defendant Gerwer allegedly committed another due process violation when C.O. Germaine was permitted to testify even though he had failed to sign the misbehavior report as DOCS regulations require. (Pl.'s Dep. at 85–87). However, violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)

(state law violation does not necessarily rise to the level of a constitutional violation). [9] Plaintiff's claim that this error violated his due process rights is further undermined because Defendant Germaine testified at Plaintiff's request. (Disciplinary Hr'g at 43).

[9] "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* No. 01 Civ. 8235, 2002 U.S. Dist. LEXIS 17089, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978)).

**D. Impartiality**

Finally, Plaintiff alleges that he was deprived of due process because Defendant Gerwer was not fair or impartial. (Compl. at 15; Pl.'s Dep. at 82, 85–87). "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

Plaintiff first accuses Defendant Gerwer of saying on the record that C.O. Nieves was a "good person." (Disciplinary Hr'g at 48). Later, Plaintiff claims that Defendant Gerwer made this statement off the record. (Disciplinary Hr'g at 52). A review of the disciplinary hearing transcript shows Defendant Gerwer never made such a statement on the record. [10] But even if Defendant Gerwer made such a statement, either on the record or off the record, it is not evidence of bias. As the hearing officer, Defendant Gerwer could make

credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, at *39–40 n. 25, 2010 WL 3785771, at *11 n. 25 (N.D.N.Y. Aug.5, 2010) (Baxter, Mag. J .) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *report-recommendation adopted,* 2010 U.S. Dist. LEXIS 98084, at *1, 2010 WL 3762016, at *1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.). Moreover, a review of the record belies Plaintiff's accusation that Defendant Gerwer had pre-determined Plaintiff's guilt. The disciplinary hearing spanned several weeks to locate witnesses and schedule a time for them to testify. Plaintiff was permitted to call witnesses to testify on his behalf, and was permitted to cross-examine the witnesses against him. (Disciplinary Hr'g at 12, 32, 41, 43). The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was clearly sufficient evidence supporting the hearing officer's determination. Thus, the record establishes that Defendant Gerwer was not biased and did not prejudge the evidence. Accordingly, Defendant Gerwer's summary judgment motion with respect to plaintiff's due process claim should be granted. [11]

[10] Plaintiff, however, kept accusing defendant Gerwer of stating that fact. (Disciplinary Hr'g at 48, 50). At one point, plaintiff stated that "I object to this Hearing Officer on the grounds as she said on the record that Ms. Nieves is a good person.... so therefore I'm feeling like she feels like I'm the bad person." *Id.* at 48. Defendant Gerwer then stated that she wanted to "clarify for the record" that she was "an unbiased Tier Hearing Officer." *Id.* This court cannot find any statement on the record, made by Defendant Gerwer, that Officer Nieves was a "good person." Later during the hearing, Defendant Gerwer interrupted plaintiff and stated that "I said that 'the testimony of Ms. Nieves was believable to this Tier Hearing Officer." *Id.*

[11] In his response to the summary judgment motion, Plaintiff asserts that Defendant Gerwer and others were engaged in a conspiracy to deprive him of his constitutional rights. (Dkt. No. 43 at 12). A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by

Johnson v. Fernandez, Not Reported in F.Supp.2d (2011)
Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 190 of 314

2011 WL 7629513

allegations of conduct easily explained as individual action, is insufficient. *See* *Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007), *rev'd on other grounds sub nom.* *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also* *Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations, such as those in this Plaintiff's response, are insufficient to support a civil rights conspiracy claim. *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002); *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). In any event, as discussed herein, Plaintiff has not asserted any viable substantive constitutional claims that would support a conspiracy claim.

## VI. *Qualified Immunity*

**\*12** Defendants argue that they are entitled to qualified immunity with respect to all of Plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified,* *Person v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in

*Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz,* 533 U.S. at 201. Accordingly, this Court need not address qualified immunity with respect to Plaintiff's claims because, as discussed above, he has not established those alleged violations of constitutional rights.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** and the complaint be **DISMISSED IN ITS ENTIRETY .**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 7629513

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3046701
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Andre JOHNSON, Plaintiff,

v.

Richard DOLING, Hearing Officer, Great Meadow
Correctional Facility; Robert Murphy, Acting
Director, Special Housing Unit, Defendants.

Civ. No. 9:05-CV-376 (TJM/RFT).
|
Oct. 17, 2007.

**Attorneys and Law Firms**

Andre Johnson, Pine City, NY, pro se.

Hon. Andrew Cuomo, Attorney General for the State
of New York, Jeffrey P. Mans, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants Doling
and Murphy.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

 **\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. Randolph F. Treece,
United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the Report-
Recommendation and Order dated September 17, 2007
have been filed. Furthermore, after examining the
record, this Court has determined that the Report-
Recommendation and Order is not subject to attack for
plain error or manifest injustice. Accordingly, the Court
adopts the Report-Recommendation and Order for the
reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary
judgment (Docket No. 34) is **GRANTED** and the
complaint is **DISMISSED** as to all defendants.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Andre Johnson brings this civil action,
pursuant to 42 U.S.C. § 1983, alleging Defendants
Doling and Murphy denied him due process rights in
a Disciplinary Hearing in violation of the Fourteenth
Amendment. Dkt. No. 1, Compl., Facts at ¶¶ 1-35 &
Cause of Action at ¶¶ 36-47. Specifically, Plaintiff alleges
Defendants violated his due process rights by denying him
the right to present a defense, call witnesses, be present,
receive a written disposition and statement of the evidence
relied upon, and receive a fair and impartial hearing.
Compl. at ¶ 39. Defendants now bring a Motion for
Summary Judgment. Dkt. No. 34. Plaintiff opposes the
Motion. Dkt. No. 35. For the following reasons, it is
recommended that the Motion for Summary Judgment be
**granted.**

**I. FACTS**

During all relevant times pertaining to this action, Plaintiff
was incarcerated at Great Meadow Correctional Facility.
Dkt. No. 34, Defs' 7.1 Statement at ¶ 2. [1] Plaintiff was
served with an Inmate Misbehavior Report, dated March
17, 2002, in which he was charged with possession of a
weapon, assault, fighting, and threat of violence. *Id.* at ¶ 3.
Prior to the Disciplinary Hearing, Plaintiff was provided
an assistant of his choice with whom he met, received all
requested documents, and requested one inmate witness,
Angulo. *Id.* at ¶ 4.

[1]     When the Plaintiff has not objected to a particular
        statement of fact proffered in the Defendants' 7.1
        Statement, we will not cite to both 7.1 Statements,
        only to the Defendants'. *See* N.D.N.Y.L.R. 7.1(a)
        (3) ("*Any facts set forth in the Statement of Material
        Facts shall be deemed admitted unless specifically
        controverted by the opposing party.*" ) (emphasis in
        original).

Defendant Officer Doling commenced the Hearing on
March 21, 2002, advising Plaintiff of the procedure and his
rights. *Id.* at ¶ 7. Doling then read the Inmate Misbehavior

2007 WL 3046701

Report into the record and asked Plaintiff to enter a plea, to which Plaintiff entered a plea of not guilty. *Id.* at ¶¶ 7-8. During the Hearing, Plaintiff objected to the evidence tag number identified in the Misbehavior Report (# 8621), which was not the same evidence tag number on the physical weapon (# 8629). *Id.* at ¶ 9. Doling dismissed the objection, indicating that because the weapon marked # 8629 had the same physical description as the weapon in the Misbehavior Report, he believed the mixup in numbers was the result of a typographical error. Dkt. No. 34, Jeffrey P. Mans, Asst. Att'y Gen., Affirm., dated Jan. 10, 2007, Ex. A-10, Hr'g Tr. at p. 2.

**\*2** Correction Officer Young authored the Misbehavior Report which formed the basis for the charges against Plaintiff. Mans Affirm., No. 34, Ex. A-3, Inmate Misbehavior Report, dated Mar. 17, 2002. In the Report, Young stated he saw Plaintiff swing at and stab another inmate, Angulo, with a weapon about eight inches long and sharpened to a point with a piece of bed sheet wrapped around it as a handle. *Id.* Young also stated he recovered the weapon after Plaintiff threw it away as he was falling to the floor. *Id.* The Misbehavior Report does not mention any other inmate besides Plaintiff and the victim, Angulo. Plaintiff objected that the Misbehavior Report should include other inmates involved in the incident pursuant to Departmental Regulation, codified at N.Y. COMP.CODES R. & REGS. (N.Y.CRR) tit. 7, § 251-3.1(c)(4), which states that "when more than one inmate was involved in an incident, the report should, to the extent practicable under the given circumstances, indicate the specific role played by each inmate." Hr'g Tr. at pp. 3-6. Because Young had not mentioned other inmates in the Report, Doling dismissed Plaintiff's objections to the Report as irrelevant. *Id.* at pp. 3-4.

An Unusual Incident Report (UIR), dated March 17, 2002, indicates that four inmates were involved in the altercation Young observed. Mans Affirm., Ex. A-6 at pp. 1-3, Unusual Incident Rep., dated Mar. 17, 2002 (stating "[O]fficer [Y]oung observed three inmates fighting with inmate Angulo"). Plaintiff attempted to introduce the UIR into evidence in order to call into question the accuracy of the Misbehavior Report, however, Doling denied said introduction for lack of relevancy because the Misbehavior Report alone constituted the formal charge against Plaintiffs under 7 NYCRR § 254.3, and because the UIR was not written by Young. Hr'g Tr. at pp. 3-5 & 10.

At Plaintiff's request, Officer Young and Inmate Ingram testified at the Hearing. Defs.' 7.1 Statement at ¶ 11. Young testified he observed Plaintiff and two other inmates attacking Inmate Angulo, that Plaintiff attempted to stab Angulo with the shank he subsequently threw away as he slipped and fell to the floor, and that after he recovered the weapon he "screwed up" the tag number, creating the aforementioned tag number discrepancy. Hr'g Tr. at pp. 6-10.

Plaintiff then called as witnesses Inmate Angulo and the other inmates named in the UIR, Temple and Ingram. Hr'g Tr. at p. 5. Angulo refused to testify in the case, stating in his refusal form that he didn't know Plaintiff. Mans Affirm., Ex. A-9 at p. 4, Requested Inmate Refusal to Testify Form, dated Mar. 21, 2002. Defendant Doling was satisfied that Angulo's refusal was fair, reasonable and not occasioned by any wrongdoing. Hr'g Tr. at p. 13. Doling called Officer Stemp in order to request Inmate Temple to testify, but Officer Stemp indicated Temple did not want to testify. *Id.* at p. 18. Officer Stemp did not know why Temple refused, nor did he know if Temple had been threatened or promised anything if he didn't testify. *Id.* Based upon that conversation, Doling found that Temple had voluntarily refused to testify. *Id.* at p. 19.

**\*3** Plaintiff also called as a witness Sergeant (Sgt.) Brown, who investigated the incident, and Lieutenant (Lt.) Armstrong, who received an interdepartmental communication from Officer Young indicating that Young recovered a different weapon from the scene of the altercation, a four-and-a-half inch long piece of sharpened metal wrapped with plastic food covering. Hr'g Tr. at pp. 13-17; Mans Affirm., Ex. A-6 at p. 4, Ex. 5, Interdepartmental Commc'n, dated Mar. 17, 2002. Doling refused to call these officers for lack of relevancy. Hr'g Tr. at pp. 13-17. In Sgt. Brown's case, Doling deemed his testimony irrelevant because he did not witness the incident nor write the Misbehavior Report. *Id.* Lt. Armstrong's testimony was deemed irrelevant because Doling saw no inconsistencies between the Interdepartmental Communication and the Misbehavior Report. *Id.*

Doling excluded Plaintiff from the Hearing after Plaintiff allegedly exhibited threatening behavior and, in Doling's opinion, attempted to prolong the Hearing by calling

2007 WL 3046701

irrelevant witnesses. Hr'g Tr. at pp. 19-20. Officer Doling stated:

> Upon asking Mr. Johnson to step out so I could arrange for further witnesses, Mr. Johnson became threatening and I had him removed from the hearing room because of his clear refusal to um, move this hearing along and his threatening manner. Mr. Johnson has been excluded from this hearing. I have decided to complete this hearing without him. It is clear that Mr. Johnson is making requests for witnesses who are not relevant or material to the issue has become very angry with hearing officer for refusing to uh, subject himself, the hearing officer refusal to subject himself to the_____ of the inmate and have become argumentative, threatening and otherwise uh, dangerous to the safety and security of the facility. The inmate has requested a number [of] witnesses most of whom have been dealt with by either hearing the testimony of or obtaining the refusal of the witnesses.

Hr'g Tr. at pp. 19-20.

Plaintiff denies exhibiting any threatening or obstructive behavior, and further asserts that Doling stopped the audio recorder while rudely dismissing him.[2] Pl.'s 7.1 Statement at ¶ 7. Doling continued the Hearing without Plaintiff and questioned Inmate Ingram, the final witness Plaintiff had requested prior to his removal. Hr'g Tr. at pp. 20-22. Doling found Plaintiff guilty of the charges and imposed a penalty of 730 days disciplinary confinement in the Special Housing Unit (SHU). *Id.* at p. 22. Doling made a statement of the evidence relied upon, and requested that Officer Catalfamo give copies of the Hearing Disposition along with an appeal form to Plaintiff within twenty-four hours. *Id.* at pp. 22-23. Plaintiff denies ever receiving these documents. Pl.'s 7.1 Statement at ¶ 7; Compl. at p. 2. However, Plaintiff did receive a copy of the audio tape of the Hearing and successfully requested an extension of time to appeal the disposition. Mans. Affirm., Ex. A-11,

Letter from Andre Johnson to Glenn S. Goord, dated Apr. 18, 2002 (stating "I received the hearing tape in SHU"); Mans. Aff., Ex A-13, Letter from Deputy Comm'r Lucien J. Leclaire, Jr. to Andre Johnson, dated Apr. 29, 2002 (granting Johnson's request for an extension to supplement his appeal).

[2]     Plaintiff asserts Doling told Officer Catafalmoto to "get this piece of shit out of here." Pl.'s 7.1 Statement at ¶ 7. There does appear to be a break in the transcript before Doling announces he has expelled Plaintiff. Hr'g Tr. at p. 19.

**\*4** Plaintiff appealed Doling's Tier III determination. Defs.' 7.1 Statement at ¶ 21. Defendant Robert Murphy, Acting Director of Special Housing and Inmate Discipline, modified the Tier III disciplinary determination by reducing the penalty imposed from 730 days to 540 days in SHU. *Id.* at ¶ 22. Subsequently, by determination dated June 23, 2002, Donald Selsky, Director of Special Housing and Inmate Discipline, administratively reversed the Tier III disciplinary determination, although Plaintiff had already served the entirety of the modified sanction. Defs.' 7.1 Statement at ¶ 26; Pl.'s 7.1 Statement at ¶ 12.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## B. Due Process Claims Against Defendant Doling

**\*5** In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing

*Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also, Washington v. Harper,* 494 U.S. 210 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU does not constitute an "unexpected" change in condition, nor did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at *4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and

significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus, a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*6** While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F .3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

Thus, while Plaintiff cannot claim a liberty interest emanating from the Due Process Clause itself, he has by virtue of being confined in SHU for over a year passed the *Sandin* threshold for constitutional protection of a state-created liberty interest. Because New York State has created by statute or regulation a liberty interest in remaining free from segregated confinement, Plaintiff has stated a valid due process claim based on a constitutionally protected, state-created liberty interest. *Sher v. Coughlin,* 739 F.2d 77, 81 (2d. Cir.1984); *Alvarez v. Coughlin,* 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (holding *Sandin* does not affect the validity of prior decisions holding New York State Regulations create a protected liberty interest in remaining free from disciplinary segregation).

Having made a threshold showing of atypical and significant confinement, we must consider whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence

relied upon and the reasons for the disciplinary action taken. *Id.* at 564-66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983).

### 1. Notice

"Notice" should be something more than a mere formality. *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d at 192-93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n.11 (2d Cir.1977)) (alteration in original).

In this case, Plaintiff was served with an Inmate Misbehavior Report, dated March 17, 2002, in which he was charged by Officer Young with possession of a weapon, assault, fighting, and threat of violence. Mans Affirm., Ex. A-3, Inmate Misbehavior Rep. Johnson acknowledged receipt of the Misbehavior Report by signing the Hearing Record Sheet and does not contest receipt of such Report. Mas Affirm. Ex. A-9 at p. 2, Hr'g Record Sheet.

**\*7** We find that Plaintiff was provided sufficient notice to fulfill the requirements of due process.

### 2. Hearing

A prisoner must be afforded the opportunity to appear at the Disciplinary Hearing, to call witnesses, and to present rebuttal evidence. *Wolff v. McDonnell,* 418 U.S. at 556. "Although the hearing requirement for placement in administrative segregation may be met by an 'informal, nonadversary' proceeding, *Hewitt [v. Helms,]* 459 U.S. at 476, it is a bedrock requirement of due process that such hearing be held 'at a meaningful time and in a meaningful manner,' *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976)." *Taylor v. Rodriguez,* 238 F.3d at 193.

2007 WL 3046701

Plaintiff was provided an assistant of his choice, received all requested documents, and requested Inmates Angulo and Temple to testify as his only inmate witnesses. At the Hearing presided by Defendant Officer Doling on March 21, 2002, Plaintiff was advised of the procedure and of his rights and was read the charges against him as reflected in the Misbehavior Report. Hr'g Tr. at pp. 1-2. Plaintiff claims Doling violated his due process rights at various times during the course of the Hearing. Compl. at ¶ 39.

**a. Witnesses**

First, Plaintiff asserts he was denied the opportunity to call witnesses as part of his defense. *Id.* An inmate's right to call witnesses is not the same as a defendant in a criminal trial, but rather, is qualified by the circumstances of prison life. *Wolff v. McDonnell,* 418 U.S. at 566-67. The Supreme Court has stated that disciplinary hearing officers must have the discretion to deny witnesses, noting that valid bases for the denial of witnesses would include irrelevance, lack of necessity, and other hazards particular to each case. *Id.* (noting that the right to call witnesses must be balanced against legitimate penological interests).

Plaintiff attempted to call as witnesses Inmates Angulo (the victim) and Temple (mentioned in the Unusual Incident Report). Angulo refused to testify, stating in his signed refusal form he didn't know Plaintiff. Mans Affirm., Ex A-9 at p. 4, Requested Inmate Witness Refusal to Testify Form, dated Mar. 21, 2002. Inmate Temple, without offering any reasons, also refused to testify as recounted by Officer Stemp. Hr'g Tr. at p. 18.

A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Rossi v. Goord,* 2006 WL 2811505, at *14 (N.D.N.Y. Sept. 28, 2006). The hearing officer does not have to conduct an independent investigation before accepting an inmates-witness's refusal to testify. *Dumpson v. Rourke,* 1997 WL 610652, at *1 (N.D.N.Y. Sept. 28, 2006) (citing *Greene v. Coughlin,* 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995). In this case, the record provides no evidence nor intimation that either refusal was made because of intimidation. The fact Temple did not sign a refusal form

did not even amount to a violation of any New York State Regulation, let alone a constitutional due process violation. *See,* 7 N.Y. COMP.CODES R. & REGS. tit. 7, § 253 .5. Therefore, Officer Doling's refusal to compel these witnesses' appearance does not constitute a due process violation.

**\*8** Plaintiff also attempted to call as witnesses Sgt. Brown, who investigated the incident, and Lt. Armstrong, who received an interdepartmental communication about the incident from Officer Young. Defendant Officer Doling denied calling them for lack of relevancy. Hr'g Tr. at pp. 13-17. Doling ruled that neither Lt. Armstrong nor Sgt. Brown personally witnessed the incident, and thus could not offer any relevant information. Irrelevancy is a valid grounds for the denial of a witness. *Wolff v. McDonnell,* 418 U.S. at 566-67. Although Plaintiff correctly points out that the Misbehavior Report did not include information pertaining to other inmates who were allegedly involved in the incident, possibly in contravention of the protocol laid out in Departmental Regulation § 251-3.1, such an omission does not change the charges against him nor the evidence relevant to that charge. Violation of state law alone is generally insufficient to establish a constitutional violation. *See Soto v. Walker,* 33 F.3d 169, 173 (2d Cir.1993). Additionally, the UIR, which identified other inmate participants, is congruent with Young's Misbehavior Report in that both state that Young observed Johnson stabbing and slashing Angulo with an eight inch sharpened metal shank with a cloth handle. In determining that their testimony was irrelevant, Doling's refusal to call Brown and Armstrong did not violate due process.

Plaintiff was allowed to call and question Officer Young as a witness. Hr'g Tr. at pp. 6-10. Young affirmed the charges described in his Misbehavior Report. *Id.* Doling also called Inmate Ingram and examined him after Plaintiff was removed from the Hearing .[3] *Id.* at pp. 20-22. For the reasons stated above, it is therefore recommended that summary judgment be **granted** as to this claim.

3    We consider Plaintiff's ejection and the continuation of the Hearing in his absence below.

**b. Ejection from Hearing**

Second, Plaintiff asserts Doling deprived him of due process when he evicted him from the Hearing and continued it in his absence. Compl. at ¶ 39. Defendants argue due process does not entail the right to be physically present at a disciplinary hearing. Dkt. No. 34-24, Defs' Mem. of Law, at p. 17 (citing *Bogle v. Murphy,* 2003 WL 22384792 (W.D.N.Y. Sept. 9, 2003) for the proposition that violations of New York State Regulations do not necessarily constitute constitutional due process violations, and *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) for the Second Circuit's determination that "[p]rison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding"). We recently recognized in *Holloway v. Selsky* the existence of conflicting Second Circuit opinions regarding whether prisoners have a right to be present at disciplinary hearings under the Due Process Clause. 2007 WL 433375, at *7 (N.D.N.Y. Feb. 6, 2007). In that case, we noted that in *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), the Second Circuit declared nonexistent the right of an inmate to be present at a disciplinary hearing, while in two subsequent cases, the Second Circuit affirmed a limited right to be present during disciplinary hearings: in *Young v. Hofman,* 970 F.2d 1154 (2d Cir.1992), the Second Circuit stated that "[t]he Due Process Clause provides inmates with several protective procedures that they may expect at disciplinary hearings, *including the opportunity to appear at the hearing* and to call witnesses" (emphasis added) and in *Chavis v.. Zodlow,* 2005 WL 834646, at *3-4 (2d Cir.2005), it stated that prisoners have a "limited right to be present" during disciplinary hearings. In *Holloway,* we declined to address this constitutional issue because the Plaintiff failed to make the threshold showing of a constitutionally protected liberty interest under the atypical and significant standard. *Holloway v. Selsky,* 2007 WL 433375, at *7. In the case at bar, no such roadblock prevents our consideration of this constitutional issue.

**\*9** The Second Circuit has held that the limited right to call witnesses, present evidence, and comment on the charges brought are facially valid constitutional claims. *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2000) (citing *Wolff v. McDonnell,* 418 U.S. at 555-72). We find implicit in the Supreme Court's decision in *Wolff* the limited right to be physically present at disciplinary hearings in order to exercise the aforementioned basic due process rights. *Chavis v. Zodlow,* 2005 WL 834646 at *3-4 (stating that the Supreme Court in *Wolff v. McDonnell* "acknowledge[ed] an

inmate's limited right to be present during his disciplinary hearing"). While this right must necessarily be limited by penological interests, the *per se* denial of such right would undermine the requirement that disciplinary hearings be held "at a meaningful time and in a meaningful manner." *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976); *see also Wolff v. McDonnell,* 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required").

However, because we recognize that neither the Supreme Court nor the Second Circuit has clearly articulated the right of prisoners to be present at disciplinary hearings, Defendants are entitled to qualified immunity. *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002). Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Violation of a duty under state law does not defeat qualified immunity because there must be a clearly established *federal* right on which the claim for relief is based. *Elder v. Holloway,* 510 U.S. 510, 515-16 (1994) (citing *Davis v. Scherer,* 468 U.S. 183, 197 (1984)). In order for the constitutional right to be clearly established, three elements must be met: "1) ... [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica v. Volker,* 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

Because neither the Supreme Court nor the Second Circuit has clearly established the right of prisoners to be present at a disciplinary hearing, qualified immunity applies and it is recommended that summary judgment on this claim be **granted.**

### c. Right to Present a Defense

Plaintiff asserts Doling denied him the opportunity to present a defense. Compl. at ¶ 39. Specifically, Plaintiff

objects to Doling's determination that the discrepancy of the numbered label on the evidence bag was due to a typographical error, to his refusal to call certain witnesses, and to the Misbehavior Report, which failed to include a description of the participation of three other inmates who were named in the UIR. Pl.'s Mem. of Law at pp. 15-20. These objections are without merit. As discussed above, Doling acted within his authority when he declined to call witnesses for lack of relevancy. *See supra* Part II.B.2.a at pp. 12-14. Further, the charges brought against Plaintiff in the Misbehavior Report are not contradicted by the UIR, and are in fact affirmed by it. *Compare* Inmate Misbehavior Report (stating Plaintiff was "swinging and stabbing inmate Angulo") *with* Unusual Incident Report (stating Plaintiff was "using a metal shank stabbing and slashing at Angulo"). Finally, Doling's determination that a typographical error was the cause of the mislabeled evidence bag, affirmed by Officer Young's testimony, was not unreasonable. Hr'g Tr. at pp. 6-9. And, as previously discussed with respect to Plaintiff's dismissal from the hearing, qualified immunity applies, and it is therefore recommended that summary judgment on this claim be **granted.**

#### d. Fair and Impartial Hearing

**\*10** Plaintiff claims he received an unfair and partial hearing before Hearing Officer Doling. Compl. at ¶ 39. An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer who does not prejudge the evidence. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). But, it has been held that "prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* at 259 (citing *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994) and *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989).

The Hearing Transcript reveals a contentious proceeding characterized by frequent interruptions and heated exchanges between Plaintiff and Doling. *See generally* Hr'g Tr. Notwithstanding, until his dismissal from the proceeding, Plaintiff was provided the opportunity to testify, call and question witnesses, and raise objections on which Doling ruled and explained his reasoning to Plaintiff. *Id.* Disagreement with rulings made by a hearing officer does not constitute bias. *Cf. Dumpson v. Rourke,* 1997 WL 610652, at \*6 (N.D.N.Y. Sept. 26, 1997) (stating "[t]he fact that the hearing officer did

not decide in the plaintiff's favor does not make him biased in the constitutional sense"). We find no genuine issues of material fact concerning Doling's impartiality and therefore it is recommended that summary judgment be **granted** on this claim.

#### 3. Written Statement of the Evidence Relied Upon

Plaintiff claims he did not receive a written disposition of the Disciplinary Hearing or statement of the evidence relied upon. Compl. at ¶ 39. Prisoners are entitled to a "written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Wolff v. McDonnell,* 418 U.S. at 563. Provision of a written disposition is a mechanism that ensures the inmate protection against "collateral consequences based on a misunderstanding of the nature of the original proceeding.... Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others." *Id.* at 565.

After declaring Plaintiff guilty of the charges brought, Doling imposed a penalty of 730 days in SHU with attendant loss of privileges, annunciated a statement of the evidence which was relied upon, and directed Officer Catalfamo to deliver the Hearing Disposition together with an appeal form to Plaintiff within 24 hours. Hr'g Tr. at p. 22. Defendants provide an Interdepartmental Communication from Officer Catalfamo, dated March 29, 2002, wherein he asserts he delivered a copy of the disposition form to Plaintiff and also informed Plaintiff of his right to appeal the disposition within thirty days. Mans Affirm., Ex. A-9 at p. 6, Interdepartmental Commc'n, dated Mar. 29, 2002. Plaintiff asserts those documents were never delivered to him as Doling directed. Pl.'s Mem. of Law at pp. 20-21. However, Plaintiff did receive a copy of the disposition within a month after the Hearing, and was able to file an appeal on which he eventually prevailed. Mans Affirm., Ex. A, Dep. of Andre Johnson, dated Sept. 12, 2006, at pp. 47-51 (stating he received them sometime in April 2002); *see also* Mans Affirm. Exs. a-11 & A-12 (letters from Plaintiff requesting extensions of time to file an appeal and noting he received an audio tape of the Hearing along with a cassette player). Any potential constitutional violation was therefore cured because the delay in no way prejudiced Plaintiff, as evidenced by the fact that he filed an appeal and was ultimately successful,

and therefore it is recommended that summary judgement be **granted** on this claim.

### C. Due Process Claims Against Defendant Murphy

**\*11**  Plaintiff claims Murphy violated his due process rights by failing to remedy the alleged constitutional violations he suffered. Compl. at ¶¶ 40-41. Plaintiff does not allege that Defendant Murphy was personally involved in any wrongdoing, and thus his theory of liability rests solely on Murphy's supervisory status. Because we find that Defendant Doling did not violate any clearly established constitutional rights, Defendant Murphy cannot be held liable on any grounds. *See supra* Part B, Due Process Claims Against Defendant Doling. It is therefore recommended that summary judgment be **granted** as to the claims against Murphy.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 34) be **GRANTED** and the Complaint (Dkt. No. 1) be **DISMISSED** against all Defendants, and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3046701

---

End of Document                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5330366
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael A. MOORE, Plaintiff,
v.
Thomas GRIFFIN, Deputy of Security, Eastern
New York Correctional Facility, Defendant.

No. 9:13–CV–616 (FJS/TWD).
|
Signed Sept. 11, 2015.

**Attorneys and Law Firms**

Michael A. Moore, Ossining, NY, pro se.

Office of the New York, State Attorney General,
Colleen D. Galligan, Aag, of Counsel, Albany, NY, for
Defendant.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Colleen D. Galligan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**ORDER**

SCULLIN, Senior District Judge.

 **\*1** Plaintiff commenced this civil rights action, pursuant
to 42 U.S.C. § 1983, claiming that Defendant violated his
Fourteenth Amendment right to due process at a Tier
III disciplinary hearing. Defendant moved for summary
judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure. See Dkt. No. 33. In a Report–
Recommendation and Order dated August 4, 2015,
Magistrate Judge Dancks recommended that this Court
grant Defendant's motion. See Dkt. No. 38 at 25. Plaintiff
filed objections to that recommendation. See Dkt. No. 41.

After reviewing a magistrate judge's recommendations,
the district court may accept, reject or modify those
recommendations. See 28 U.S.C. § 636(b)(1). The court
reviews de novo those portions of the magistrate judge's
recommendations to which a party objects. See Pizzaro
v. Bartlett, 776 F.Supp. 815, 817 (S.D.N.Y.1991). "
' "If, however, the party makes only conclusory or

general objections, ... the Court reviews the Report
and Recommendation only for clear error.' " " Salmini
v. Astrue, No. 3:06–CV–458, 2009 WL 179741, \*1
(N.D.N.Y. June 23, 2009) (quoting Farid v. Bouey,
554 F.Supp.2d 301] at 306 [ (N.D.N.Y.2008) ] (quoting
McAllan v. Von Essen, 517 F.Supp.2d 672, 679
(S.D.N.Y.2007))). Finally, even if the parties file no
objections, the court must ensure that the face of the
record contains no clear error. See Wilds v. United
Parcel Serv., Inc., 262 F.Supp.2d 163, 169 (S.D.N.Y.2003)
(quotation omitted).

In this case, Plaintiff takes issue with Magistrate
Judge Dancks' failure to make certain factual findings.
Specifically, Plaintiff complains that Magistrate Judge
Dancks "never actually resolved how much time [Plaintiff]
was confined to or what injuries [Plaintiff] suffered from
as a result of ... [his] confinement [in the special housing
unit]." See Dkt. No. 41 at ¶ 6. As Plaintiff acknowledges,
however, Magistrate Judge Dancks did determine that the
due process that Plaintiff received was sufficient. See id.

In her Report–Recommendation and Order, Magistrate
Judge Dancks noted that "Defendant concede[d], for the
purposes of the motion, that the amount of time Plaintiff
was confined in the SHU was sufficient to implicate a
protected liberty interest." See Dkt. No. 38 at 11–12.
She also noted, however, that the parties disagreed about
the total number of days that Plaintiff was confined to
SHU. See id. at 12 n. 10. Since Defendant conceded that
the amount of time Plaintiff was confined in SHU was
sufficient to implicate a protected liberty interest, it was
not necessary for Magistrate Judge Dancks to resolve
the parties' dispute regarding this issue. Nor was the
resolution of this dispute relevant to her determination of
whether Defendant violated Plaintiff's right to procedural
due process.

Likewise, whether Plaintiff suffered injury as a result of his
confinement in SHU was not relevant to the resolution of
his procedural due process claim. Therefore, Magistrate
Judge Dancks' failure to address any such injuries was not
error.

 **\*2** Accordingly, for the above-stated reasons, the Court
hereby

**ORDERS** that Magistrate Judge Dancks' Report–
Recommendation and Order dated August 4, 2015, see

Dkt. No. 38, is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 33, is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION AND ORDER*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Michael Moore claims that Defendant Thomas Griffin ("Griffin") violated Plaintiff's Fourteenth Amendment right to due process at a Tier III disciplinary hearing. Currently pending before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 33.) For the reasons discussed below, I recommend that Defendant's motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY [1]

[1]    Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of

Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
Local Rule 7. 1(a)(3).
Defendant filed a Statement of Material Facts. Plaintiff has not properly responded or objected to Defendant's Statement of Material Facts. Defendant advised Plaintiff of the potential consequences of failing to respond to the motion for summary judgment. (Dkt. No. 33 at 3.) To the extent that the "facts" asserted by Defendant in the Statement of Material Facts are supported by the record, the Court will consider them in the context of the within motion. The facts recited are for the relevant time period as referenced in the complaint. In addition, on the motion, both parties annexed documents that have not been properly authenticated. To the extent that the parties do not object to the admissibility of any document(s), the Court will consider the document(s) in the context of the within motion. *See Livingston v. Griffin,* 2007 WL 1500382, at *2, n. 2 (N.D.N.Y.2007) (citing *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991)).

On November 30, 2010, Plaintiff was an inmate in the custody of the Department of Corrections and Community Supervision ("DOCCS") at Eastern N.Y. Correctional Facility ("Eastern C.F."). (Dkt. No. 34 at 2.) [2] At that time, Plaintiff was a porter assigned to the basement of the Family Reunion Program ("FRP") area. *Id.* Plaintiff's duties included: bringing supplies such as towels, bedding and utensils to the FRP units in advance of family visits; snow blowing and shoveling; and grounds keeping. *Id.* at 3. On November 30, 2010, after a suspicious cell search, Plaintiff received a Misbehavior Report charging him with possessing contraband, destroying state property, and altering an electrical device. (Dkt. No. 33–4 at 3.) On December 3, 2010, at a Tier II hearing, Plaintiff pled guilty to having excessive property and altering a pair of gloves and was sentenced to thirty days in the Special Housing Unit ("SHU") and loss of privileges. (Dkt. No. 34 at 3.)

2    Page numbers in citations to the Docket refer to the page numbers assigned by the Court's electronic filing system.

On December 4, 2010, Plaintiff was served with a Tier III Misbehavior Report prepared by Sergeant Parkhurst, dated December 3, 2010. (Dkt. Nos. 33–4 at 16; 34 at 3.) The Misbehavior Report charged Plaintiff with the following violations: 113.13 Inmate shall not posses alcohol; 113.17 Inmate shall not possess unauthorized jewelry; 113.21 Inmate shall not possess non-approved media; and 113 .22 Inmate shall not possess article where it is prohibited. *Id.* The Misbehavior Report described the incident as follows:

> Subsequent to an area search of the FRP Basement Area and a corresponding investigation, the following items of contraband were discovered. 3–1 Gallon plastic containers half full with homemade alcoholic beverage, 1 bottle of Pina Colada Drink Mix, 1 bottle of Vanilla Extract which contains alcohol, 12 Pornographic DVD's, 4 Pornographic VHS Tapes, 25 Pornographic Magazines, 17 Male Condoms, 2 female condoms, 1 Polaroid Camera with package of film, 1 Computer Memory Card, 1 Electric Motor, 8 coins, 5 Earrings, 1 Necklace, [and] other assorted non-serious contraband items. All items were discovered in well hidden areas of the FRP Basement, secreted inside or amongst other non-contraband items. Inmate Moore is one of only two inmates to have regular access to the basement in the FRP area. He has been assigned as a porter in this area for approximately 8 years.

**\*3** *Id.* at 4.

On or about December 4, 2010, Plaintiff wrote a letter to an inmate in the facility law library with regard to the December 3, 2010, Misbehavior Report. [3] During his deposition, Plaintiff testified that he wrote the letter to "Mustaph" stating:

3    The letter is part of the record herein but it has not been properly authenticated by Plaintiff and thus, is not in proper evidentiary form.

> ... basically, I just told them, you know, the magazines, I can explain. The clothes, the rings, that stuff was left in the lost and found. The other porter was not there at the time and that I had word that they were trying to change things.
> (Dkt. No. 33–5 at 42.)

Plaintiff did not receive a response to this correspondence. *Id.* at 43. On December 7, 2010, Plaintiff was released from the SHU and advised that the charges in the December 3, 2010, Misbehavior Report had been dropped because Plaintiff did not receive timely notice of the charges. (Dkt. No. 34 at 5.) Plaintiff remained confined to keeplock due to his disciplinary time for his Tier II violations. *Id.* at 6.

On December 14, 2010, Plaintiff returned to the SHU. [4] (Dkt. No. 34 at 6.) On December 15, 2010, Plaintiff received a Tier III Misbehavior Report, written by Captain Russo ("Russo"), dated December 14, 2010. *Id.* The December 14, 2010, Misbehavior Report charged Plaintiff with the following violations: 107.20 Lying; 130.11 Failing to Follow Correspondence Procedures; 109.10 Out of Place; and 103.20 Solicitation. *Id.* Under "Description of Incident," the Misbehavior Report provided:

4    The record lacks information regarding why Plaintiff was returned to the SHU.

> On November 30, 2010 as I entered the Family Reunion Compound, Inmate Moore 92A9240 was observed exiting the basement area. As a result of the inspection and subsequent frisk[,] numerous amounts of contraband were discovered[,] some of which included: 4 altered video cassettes which contained pornographic movies, 12 DVD's which contained pornographic movies, 3½ gallon jugs of homemade alcohol, 1 necklace, 5 earrings, 1 brassiere, 19 condoms, 1 memory card.

> During a subsequent interview on November 30, 2010 with Inmate Moore, he claimed to have no knowledge of the items found in the R.F .P. basement area.

However, on December 5, 2010 Officer DuBois received a letter in the law library written to an inmate 'Mustaph' who has been identified as Rodriguez 83B2044, one of the SHU clerks in the law library soliciting him to do law library work. Furthermore, in this letter he admits to knowing of the contraband items in the FRP basement, specifically, the pornographic movies, magazines, jewelry, memory card and condoms.

Additionally, further information obtained during this investigation indicates that on numerous occasions Inmate Moore was in the occupied units (while other inmates and their families were present) without authorization.

*Id.* at 6–7.

On December 15, 2010, Plaintiff requested legal assistance with his Tier III Misbehavior Report. (Dkt. No. 34 at 7.) Officer Ahearn [5] ("Ahearn") was assigned to assist Plaintiff in preparing for his hearing. [6] *Id.* On December 19, 2010, Plaintiff met with Ahearn and requested copies of the following documents: Request for Urinalysis; the November 30, 2010, Strip Frisk Form; and the FRP log book entry for November 30, 2010. *Id.*

[5]      In Dkt. No. 34, "Ahearn" is spelled "Ahern."

[6]      Ahearn is not a defendant herein.

**\*4** Defendant Griffin, the Deputy of Security at Eastern C.F., was assigned as the hearing officer for Plaintiff's Superintendent's Hearing regarding the December 14, 2010, Misbehavior Report. *Id.* at 8. On December 20, 2010, the hearing commenced. (Dkt. No. 34 at 8.) Plaintiff confirmed that on December 15, 2010, at 9:45 a.m., he received a copy of the Misbehavior Report. (Dkt. No. 33–1 at 23.) [7] Plaintiff pled "not guilty" to all four charges. (Dkt. No. 34 at 9.) On the first day of the hearing, Plaintiff objected to Griffin acting as the hearing officer claiming that Griffin was present on the day of the incident. *Id.* at 9; Dkt. No. 33–1 at 24. Plaintiff also cited to DOCCS Directive 254.1 and stated:

[7]      Dkt. No. 33–1 is a copy of the transcript from Plaintiff's Tier III disciplinary hearing. The transcript is a certified record and therefore, in proper admissible form. *See* Dkt. No. 33–1 at 22.

[t]he following person should not be appointed to conduct the proceeding, the person who actually witness [sic] the incident[,] the person who is directly involved in the incident, the review office[,] who reviewed the misbehavior report and the person who has investigated the incident. Again, you were there on 11/30[.]

Dkt. No. 33–1 at 25.

Griffin responded, "... I didn't conduct an investigation regarding these charges and the Captain did and therefore I am going to continue to do the hearing [and] that objection is noted." *Id* . at 25. Griffin continued, "I'm here a lot of days when things happen and when evidence gets written up [,] again your objection is noted for the record." *Id.* Plaintiff requested an adjournment so that he could obtain additional documents including his "original tickets." *Id.* at 24. The hearing was adjourned so that Plaintiff could review the Misbehavior Report and his letter to "Mustaph." *Id.* at 27.

On January 12, 2011, the hearing resumed. (Dkt. No. 33–1 at 27.) Russo was called as a witness and provided testimony regarding Plaintiff's letter:

HO: Captain[,] I'm going to hand you a document that was handed to me with the [ ] misbehavior report, can you explain exactly what that is?

\* \* \*

CAPT: This letter that was forwarded by inmate Torres in SHU in unit 2, inmate in the law library that was intercepted by one of the staff members.

HO: Ok can you tell me what [ ] in that letter is of particular importance regarding inmate Moore's charges against him which includes lying in correspondence procedures, out of place and solicitation[?]

CAPT: [ ] in this letter he basically states that he was senior man in the FRP area. [H]e cleaned out the units, he [brought] stuff downstairs and disposed of it ... more was found and put back where it was found. Because the Deputy ILC was out on the site [sic] had to put it back, all porn magazines where [sic] his they was holding [sic] them until they downsize his cell, condoms

have always been collected, the condom return supply. The camera that was there was a back up he's claiming when the officer left there was one FRP visit.

*Id.* at 27.

Russo also testified that during his interview with Plaintiff, Moore claimed to have no knowledge of the contraband. *Id.* Plaintiff was given an opportunity to ask Russo questions. *Id.* at 28. Plaintiff asked Russo about the "out of place" charges. (Dkt. No. 33–1 at 28.) Specifically, Plaintiff asked, "[m]y question is on numerous occasions, I was observed going into an occupied unit why wasn't I written up before, nobody said nothing before, if that was true." *Id.* Russo responded, "I don't know why." *Id.*

**\*5** At Plaintiff's request, Sergeant Barg ("Barg"), the sergeant in charge of the FRP area, and Correction Officer Segal ("Segal") were called to testify. *See id.* at 29–32. Upon questioning from Plaintiff, both witnesses testified that they never saw Plaintiff enter an FRP area when family was present. (Dkt. No. 33–1 at 29.) Plaintiff also asked Griffin to call two inmates, Livingston and McCrone [8], as witnesses. *Id.* at 31. Griffin denied Plaintiff's request due to relevancy. *Id.* At Griffin's request, Corrections Counselor DeJesus ("DeJesus") testified. (Dkt. No. 33–1 at 33.) DeJesus stated that, on more than one occasion, she witnessed Plaintiff go into the housing units without security present. *Id.* at 33–34. Plaintiff was given an opportunity to ask DeJesus questions. *See id.* Plaintiff asked DeJesus why she never reported this to the officer on duty. (Dkt. No. 33–1 at 33.) DeJesus responded, "I didn't think that I had to." *Id.* At Plaintiff's request, Officer Meineke ("Meineke") was called to testify. *See id.* at 34. Plaintiff asked Meineke if he ever saw Plaintiff enter the FRP units while the units were occupied by other inmates and their families. *Id.* at 35. Meineke responded, "Nope, I never known [sic] him to [do] that." (Dkt. No. 33–1 at 35 .)

[8]    "McCrone" is also referred to as "McCullum" by the correctional officer. (Dkt. No. 33–1 at 31.)

On February 14, 2011, after an adjournment, Plaintiff asked Griffin to call Officer Wilson ("Wilson") as a witness. *Id.* at 36. Wilson testified that she escorted Plaintiff from the FRP area on November 30, 2010, with Officer Torres ("Torres"). *Id.* at 37. Wilson stated that Captain Ramirez and Russo may have been present. *Id.* Plaintiff asked if Wilson remembered seeing Griffin and

she responded, "Well, when he showed up to pick you up wasn't it just Ramirez standing there with you, when me and Torres came to get you?" (Dkt. No. 33–1 at 37.) At that time, Griffin interjected and stated, "[i]ts not on the report you have to say if you don't recall." *Id.* Wilson stated, "I don't ... remember Captain Ramirez." *Id.*

On February 25, 2011, after an adjournment, Plaintiff asked Griffin to call Torres to testify. *See id.* at 38. Torres testified that he escorted Plaintiff from the FRP site for a strip frisk on November 30, 2010. (Dkt. No. 33–1 at 38.) The strip frisk was authorized by Griffin. *Id.* at 39.

On March 2, 2010, after an adjournment, Plaintiff asked Griffin to call Sergeant Mikesh ("Mikesh"), the sergeant in charge of the law library, to testify. *Id.* at 40. Upon Plaintiff's questioning, Mikesh testified that it is normal procedure for an officer to forward any suspicious letters to his/her supervisor. *Id.* at 41.

At the conclusion of Mikesh's testimony, Griffin asked Plaintiff if there were any other witnesses he wished to call to testify. (Dkt. No. 33–1 at 42.) Plaintiff stated, "I don't believe there is nobody [sic] else ... I'm done." *Id.*

**\*6** Griffin prepared a written disposition finding Plaintiff guilty of the four charges and read it into the hearing record on March 3, 2011. *Id.* at 42–43. On March 3, 2011, Plaintiff signed the Hearing Disposition. (Dkt. No. 33–1 at 43; 34 at 15.) On the Hearing Disposition, in the section entitled "Statement of Evidence Relied Upon," Griffin handwrote the following:

> The written report of Captain Russo detailing how his investigation revealed I/M Moore secreted several items of contraband in his work area including 12 DVDs, pornographic video cassettes, three½ gallons of homemade alcohol, necklace, 5 earrings, 1 memory card and female clothing (bra). Capt. Russo testified at the hearing detailing his investigation of confiscated letter (kite) sent from I/M Moore detailing where and why he stored previously listed contraband items and showing his solicitation to do unapproved legal work. CO Menieke [sic] and CO Segal testimony that they never

authorized Moore to enter occupied FRP trailer. Testimony of CC DeJesus that she saw I/M Moore enter occupied FRP units w/o security escort or authorization. Sgt. Barg testify as the area supervisor that I/M's are not permitted in the FRP units that are occupied. I/M Moore never offered testimony of CC that the confiscated letter that details Moore's involvement was not written by him. In closing, I/M Moore never provided credible testimony or evidence to contradict Capt. Russo misbehavior report.

*Id.*

Griffin imposed a penalty of twelve months in the SHU and loss of phone, commissary and packages and loss of 12 months of good time. (Dkt. No. 34 at 15.) On or about March 21, 2011, Plaintiff appealed the decision. *Id.* at 16. On May 23, 2011, the Hearing Disposition was reviewed and reversed by Albert Prack, Director, Special Housing/Inmate Disciplinary Program. *Id.* at 17. As a result of the reversal, the December 14, 2010, Misbehavior Report, Hearing Determination and finding of guilt were expunged from Plaintiff's record. *Id.* On May 23, 2011, Plaintiff was released from the SHU into the general population. (Dkt. No. 34 at 17.)

On May 30, 2013, Plaintiff filed this action. (Dkt. No. 1.) On August 14, 2013, the Court issued a Memorandum–Decision and Order dismissing Plaintiff's claims that Griffin violated Plaintiff's Eighth Amendment rights and dismissing all claims against Russo. (Dkt. No. 9.) Griffin filed an Answer to Plaintiff's Complaint and an Amended Answer. (Dkt.Nos.16, 18.) On May 2, 2014, Plaintiff was deposed. (Dkt. No. 33–5.) Presently before the Court is Defendant's motion for summary judgment. (Dkt. No. 33.) Plaintiff filed opposition to the motion. (Dkt. No. 36.)

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears

the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

[9]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**\*7** Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts, the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding pro se, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)(3); *Vermont Teddy Bear Co. v. 1 800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As noted *supra,* Defendant provided Plaintiff with notice of the potential consequences. (*See* Dkt. No. 33 at 3.)

## III. ANALYSIS

Defendant moves for judgment as a matter of law and dismissal of all of Plaintiff's allegations. Defendant argues that Plaintiff was afforded the procedural protections guaranteed by the Fourteenth Amendment during his Tier III disciplinary hearing.

### A. Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any

person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted); *see also J.S. v. T'Kach,* 714 F.3d 99, 106 (2d Cir.2013) ("We have held that a prisoner has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ") (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)); *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004).

### 1. Liberty Interest

Defendant concedes, for the purposes of the motion, that the amount of time Plaintiff was confined in the SHU was sufficient to implicate a protected liberty interest.[10] (Dkt. No. 33–8 at 4, n. 2.)

[10]   The parties offer conflicting accounts of the total number of days that Plaintiff was confined to the SHU. Defendant argues that Plaintiff served 80 days. (Dkt. No. 33–8 at 4.) Plaintiff claims that he remained confined to the SHU for a total of 177 days. (Dkt. No. 36 at 5.)

### 2. Procedural Due Process

The Fourteenth Amendment due process protections afforded a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira,* 380 F.3d at 69. An inmate is entitled to "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ..." *Wolff v. McDonnell,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The due process clause also requires that a hearing officer's determination be supported by "some evidence." *Sup't v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356

(1985). "This standard is extremely tolerant and is satisfied if there is *any* evidence in the record that supports the disciplinary ruling ." *Sira,* 380 F.3d at 69 (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004).

#### a. Notice

**\*8** An accused prisoner has the right to be provided with advanced written notice of the charges brought against him. *Sira,* 380 F.3d at 69. Here, it is undisputed that Plaintiff received a copy of the Misbehavior Report on December 15, 2010. (Dkt. No. 33–1 at 23.) Plaintiff does not contest that he received timely notice of the charges.[11]

[11]   In Plaintiff's Memorandum of Law, he includes the heading "Timeliness of the Hearing". (Dkt. No. 36 at 10.) However, the arguments set forth in the section do not relate to timely notice of the disciplinary hearing and charges at issue. Rather, the arguments involve Plaintiffs res judicata claims and thus will be discussed *infra.*

#### b. Assistance

Plaintiff was confined to the SHU and thus was entitled to an inmate assistant. *See Murray v. Arquitt,* No. 9:10–CV–1440 (NAM/CFH), 2014 U.S. Dist. LEXIS 68665, at *48, 2014 WL 4676569, at *19 (N.D.N.Y. Sept.18, 2014) (citation omitted).[12] An inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). The assistant need only perform what the plaintiff would have done but need not go beyond. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, at *33–35, 2010 WL 3785771, at *10 (N.D.N.Y. Aug.5, 2010).

[12]   The Court will provide Plaintiff with a copy of all unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

In his opposition to Defendant's motion, Plaintiff claims that he was denied legal assistance for "over a month" and that the responses to his F.O.I.L. requests "omit[ted] the defendant as being present at the time of the investigation, for the purpose [of] being confronted at the Hearing." (Dkt. No. 36 at 10.) During his deposition, Plaintiff testified that on December 16, 2010, he spoke

2015 WL 5330366

with C.O. Ahearn, who "was assigned as my assistant in helping me obtain requested documents and to get in touch with possible witnesses." (Dkt. No. 33–5 at 52.) On December 19, 2010, Plaintiff had a second conversation with Ahearn. *Id.* at 53. Plaintiff requested, but did not receive, a copy of the urinalysis request, the strip search request, and the log book for the FRP area. (Dkt. No. 33–5 at 53.) Ahearn told Plaintiff that he could not obtain the paperwork that Plaintiff requested. *Id.* Plaintiff was then, "left on his own." *Id.*

On December 20, 2010, at approximately 2:27 p.m., the Tier III disciplinary hearing commenced. (Dkt. No. 33–1 at 24.) Before any testimony was offered or any evidence presented, Griffin gave Plaintiff a copy of the Misbehavior Report and his letter to "Mustaph." *Id.* At 2:37 p.m., Griffin adjourned the hearing so that Plaintiff could review the documentation. *Id.* at 27. Twenty-three days later, on January 12, 2011, the hearing resumed. *Id.* After Russo and Barg testified, Plaintiff asked Griffin to call Officer Segal. (Dkt. No. 33–1 at 31.) The hearing was adjourned so that Griffin could contact Segal. *Id.* at 32. On January 18, 2011, the hearing resumed. *Id.* After Segal testified, Griffin asked Plaintiff if he had any other witnesses or if he wished to make a statement. *Id.* at 33. Griffin noted that one of Plaintiff's witnesses, Meineke, was not present and would be called to testify upon his arrival, along with any other witnesses Plaintiff wished to call. *Id.* Plaintiff indicated that he needed to retrieve paperwork in his cell. *Id.* The hearing was adjourned and resumed on January 24, 2011. *Id.* After Meineke and DeJesus testified, Plaintiff asked Griffin to call Torres. (Dkt. No. 33–1 at 35.) Plaintiff also advised Griffin that he previously requested a copy of the strip frisk and urinalysis authorization but that his legal assistant did not provide the documents. *Id.* at 36. Griffin told Plaintiff that he would provide him with copies of those documents and adjourned the hearing. *Id.*

**\*9** On February 14, 2011, the hearing resumed. *Id.* After Wilson testified, Griffin noted, "the record indicates that you were given copies of some of the documents you requested by your assistant and by a sergeant, is that correct?" *Id.* at 37. Plaintiff replied, "Yes sir." (Dkt. No. 33–1 at 38.) Griffin then asked, "[d]id you have any questions you want to make or any statements that you want to make in regards to those documents you received?" *Id.* Plaintiff responded, "No." *Id.* Plaintiff then asked Griffin to call Torres to testify and the hearing

was adjourned. *Id.* On February 25, 2011, the hearing resumed and Torres testified. (Dkt. No. 33–1 at 38.) While questioning Torres, Plaintiff referred to the documents he was provided regarding the strip frisk. *See id.* at 39. Plaintiff asked Griffin to call one further witness, Mikesh, and the hearing was adjourned. *Id.* at 40. On March 2, 2011, the hearing resumed and Mikesh was questioned. *Id.* At the completion of Mikesh's testimony, Griffin asked Plaintiff if he received the "2176 form" explaining why Griffin was denying Plaintiff's request to call Livingston and McCrone. (Dkt. No. 33–1 at 42.) Plaintiff responded in the affirmative. *Id.*

After an exhaustive review of the hearing transcript, the Court finds that even assuming Ahearn's assistance was inadequate, no reasonable factfinder could conclude that the deprivation resulted in any prejudice to Plaintiff. There is no evidence that Plaintiff was unable to present a defense or that the result of Plaintiff's hearing would have been any different had Ahearn supplied Plaintiff with the requested documents in December 2010. *See Lewis v. Murphy,* No. 9:12–CV–0268 (NAM/CFH), 2014 U.S. Dist. LEXIS 102659, at \*36, 2014 WL 3729362, at \*13 (N.D.N.Y. July 25, 2014) (the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results). Plaintiff testified, at the beginning of the hearing, that he understood the charges in the Misbehavior Report. (Dkt. No. 33–1 at 23.) Plaintiff was given ample opportunity, with several adjournments, to prepare for the hearing. Moreover, Griffin provided Plaintiff with all requested documentation/evidence. *See Murray,* 2014 U.S. Dist. LEXIS 68665, at \*48–49, 2014 WL 4676569, at \*19 (the record established that the hearing officer took steps to provide the inmate with the requested evidence). Griffin permitted Plaintiff to call six witnesses and provided Plaintiff with sufficient time to question each witness. The questions posed by Plaintiff to Russo, Barg, Segal, DeJesus, and Meineke regarding the "out of place" charge clearly indicate that Plaintiff understood the charge. *See* Dkt. No. 33–1 at 29–34; *see also Lewis,* 2014 U.S. Dist. LEXIS 102659, at \*37, 2014 WL 3729362, at \*13 (the questions posed by the inmate demonstrated that he had an understanding of the bribery charge). Similarly, Plaintiff's questions to Mikesh reveal that he had an understanding of the "correspondence procedures." *See* Dkt. No. 33–1 at 40–41.

**\*10** Accordingly, the Court finds that Plaintiff did not suffer from any constitutional violation as a result of the purported lack of assistance.

### c. Opportunity to Be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69. The record establishes that Plaintiff was present at the hearing, able to call witnesses, question witnesses and offer evidence. Plaintiff does not dispute that he was given an opportunity to be heard. With respect to the two witnesses that Griffin refused to call, Griffin stated, on the record,

> I'm going to answer it on the form 2176 [13] which is a witness interview notice. And basically, what it says is Livingston 10a2302 permission to call his witnesses [is] denied. The request[ed] witnesses no [sic] other [relevant] testimony as to Moore entering FRP trailer. Inmate Moore is being [alleged] to ha[ve] gone inside trailers on numerous occasions without authorization. The [hearing officer] will [concede that the witness will testify that Moore did not go into his trailer during Livingston's visit.] Also on inmate McCrone ... the request[ed] witness [has] no relevant testimony as to inmate Moore entering numerous ... FRP trailers. The hearing officer concedes ... the fact that this witness will testify that Moore never entered this trailer during his visit.

[13]    The Witness Interview Notice Form is part of the record herein (*see* Dkt. No. 33–1 at 53) but the document is not in proper evidentiary form.

(Dkt. No. 33–1 at 31; 53.)

The Court finds that no triable issue of fact exists as to whether Plaintiff had an opportunity to appear and call witnesses.

### d. Impartial Hearing Officer and "Some Evidence"

An accused prisoner has the right to have a fair and impartial hearing officer preside over his disciplinary hearing. *Sira,* 380 F.3d at 69. "It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("We recognize that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally. Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). Prison officials "enjoy a rebuttable presumption that they are unbiased." *See Rodriguez v. Selsky,* No. 9:07–CV–0432 (LEK/DEP), 2011 U.S. Dist. LEXIS 21023, at \*34, 2011 WL 1086001, at \*11 (N.D.N.Y. Jan.25, 2011) (citation omitted). However, "both DOCS regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford,* No. 91 Civ.1776 (KMW)(KAR), 1994 U.S. Dist. LEXIS 11568, at \*38, 1994 WL 455170, at \*12 (S.D.N.Y. Aug. 18, 1994) (internal citation omitted) (the hearing officer was the watch commander at time of the incident and received reports from other officers regarding the incident); *see also Powell v. Ward,* 542 F.2d 101, 103 (2d Cir.1976) ("[N]o person who has participated in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts."). However, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias." *Phelan v. Hersch,* No. 9:10–CV–0011 (GLS/RFT), 2011 U.S. Dist. LEXIS 140025, at \*32–33, 2011 WL 6031940, at \*9 (N.D.N.Y. Sept.13, 2011) (citations omitted). "A hearing officer may satisfy the standard of impartiality if there is some evidence in the record to support the findings of the hearing." *Fernandez v. Callens,* No. 06–CV–0506(Sr), 2010 U.S. Dist. LEXIS 115496, at \*36, 2010 WL 4320362, at \*12 (W.D.N.Y. Oct.29, 2010) (internal quotation marks and citation omitted). To establish a constitutional violation, the hearing officer must "present a hazard of arbitrary decisionmaking." *Black v. Selsky,* 15 F.Supp.2d 311, 317 (W.D.N.Y.1998) (citing *Wolff,* 418 U.S. at 571).

**\*11** Here, Plaintiff claims that Griffin should not have presided over his disciplinary hearing because Griffin was present on the day of the incident and investigated the incident. (Dkt. No. 36 at 6–7.) Defendant argues that he was not part of the investigation and further, that he did not issue the subject Misbehavior Report. (Dkt. No. 37 at 4–6.)

The record indicates that Griffin ordered the strip frisk of Plaintiff and was present in the FRP area when Plaintiff was escorted, by other officers, for the search. However, Griffin did not participate in the actual search and there is no evidence that Griffin was present during the search of Plaintiff or his cell. Based upon the record herein, the Court finds that Griffin's involvement in the incident does not, without more, equate to bias and impartiality. *See Madera v. Goord,* 103 F.Supp.2d 536, 541 (N.D.N.Y.2000) (the hearing officer ordered the search but was not involved in the search or its execution) *but cf. Silva,* 1994 U.S. Dist. LEXIS 11568, at \*38, 1994 WL 455170, at \*12 (the hearing officer was involved in the investigation and told someone before the hearing began the punishment he would impose); *compare Vigliotti v. Selsky,* No. 08–CV–00875–JJM, 2014 U.S. Dist. LEXIS 51442, at \*16, 2014 WL 1451984, at \*5 (W.D.N.Y. April 14, 2014) (question of fact with respect to the hearing officer's impartiality as he was the "reporting person" on the Unusual Incident Report and was responsible to "insure that the report [was] complete and factual"). Plaintiff has failed to cite to any portion of the hearing transcript that establishes Griffin's predisposition to finding Plaintiff guilty or any other mishandling of the testimony, evidence or procedure that would indicate bias.[14] Plaintiff claims that Griffin, "intentionally [lied] about his part in the investigation, ... to ensure that Plaintiff was transferred out of his jail; for reasons being that a large amount of contraband found in an area exposed to civilians and other inmates. Defendant charged Plaintiff to no avail, (the first ticket) then trumped up another ticket to fit the incident of the first failed attempt." (Dkt. No 36 at 7–8.) These conclusory and speculative allegations are unsupported by competent, admissible evidence. *See Rodriguez,* 2011 U.S. Dist. LEXIS 21023, at \*34, 2011 WL 1086001, at \*11 (the plaintiff's conclusory allegations of bias, due to hearing officer seeking assistance from the author of the misbehavior report, were unsupported by evidence and failed to suggest a predetermination on the hearing officer's part or impact on the proceedings). The Court has reviewed the entire hearing transcript and

finds no evidence that Griffin was biased or predisposed to any conclusion. Indeed, the transcript establishes that Plaintiff was permitted to call six witnesses in his defense, present documents in support of his defense, pose relevant questions to all witnesses, and make objections.

[14]   On Page 10 of Plaintiff's Memorandum of Law, Plaintiff recites a conversation that allegedly occurred during the disciplinary hearing. However, Plaintiff does not cite to any portion of the record supporting that recitation. Further, on it's own accord, the Court has reviewed the hearing transcript and finds no support in the record for Plaintiffs allegations. *See* Dkt. No. 36 at 10.

**\*12** While not addressed in his opposition, during Plaintiff's deposition Plaintiff stated that on "several" occasions throughout the hearing Griffin turned the tape off during the proceeding. (Dkt. No. 33–5 at 55.) Due process does not require that proceedings be recorded. *See Livingston v. Griffin,* 9:04–CV–00607–JKS, 2007 U.S. Dist. LEXIS 36941, at \*17, 2007 WL 1500382, at \*5 (N.D.N.Y. May 21, 2007) (while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process); *see also Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) (New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection). The "failure to record the entire [h]earing [does] not deprive Plaintiff of any minimum requirements of due process." *Scott v. Frederick,* No. 9:13–CV–605, 2014 U.S. Dist. LEXIS 179705, at \*40–41, 2015 WL 127864, at \*15 (N.D.N.Y. Jan.8, 2015) (citing *Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (failure to record a portion of Plaintiff's disciplinary hearing did not rise to a due process violation)).

Moreover, the record shows that Griffin's determination of guilt was supported by "some evidence" as required in *Hill,* 472 U.S. at 455, and "reliable evidence" pursuant to *Luna,* 356 F.3d at 488. The evidence considered in Plaintiff's disciplinary hearing included the Misbehavior Report; the letter to inmate Mustaph; and testimony from Russo. The Misbehavior Report was written by Russo, who participated in the investigation, frisk, and inspection and interviewed Plaintiff. Thus, Russo had first hand knowledge of the events. *See Hinton v. Prack,* No. 9:12–CV–1844 (LEK/RFT), 2014 U .S. Dist. LEXIS 126955, at

*39, 2014 WL 4627120, at *15 (N.D.N.Y. Sept.11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident). Plaintiff has not come forward with evidence of any motive for Russo to falsely accuse Plaintiff or any reason to doubt the conclusions in the Misbehavior Report. *See Reed v. Terbush,* No. 9:10–CV–1449 (LEK/RFT), 2015 U.S. Dist. LEXIS 68963, at *11, 2015 WL 3447743, at *5 (N.D.N.Y. May 28, 2015). While the guilty determination was later reversed, there was "some evidence" to support Griffin's decision that Plaintiff was guilty of the charges set forth in the Misbehavior Report. *See Shabazz v. Bezio,* No. 9:10–CV–1212 (NAM/DEP), 2014 U.S. Dist. LEXIS 134904, at *5, 2014 WL 4794432, at *2 (N.D.N.Y. Sept.25, 2014) (the guilty determination was later reversed but the plaintiff testified during the hearing that he refused to cut his hair, which supported the due process requirement that there be "some evidence" to support the decision to find the plaintiff guilty of refusing to obey a direct order). Further, Plaintiff's reliance upon DOCCS regulations governing hearing officers to create a constitutional violation is misplaced. "[A]bsent some proof of actual bias," a violation of state regulations regarding the assignment of hearing officers do not rise to the level of a constitutional violation. *See Russell v. Coughlin,* 774 F.Supp. 189, 197 (S.D.N.Y.1991) (rev'd on other grounds) 15 F.3d 219 (2d Cir.1993) aff'd 35 F.3d 61 (2d Cir.1994). The Court finds that Griffin was impartial and that his guilty determination was supported by "some evidence" sufficient for due process. [15]

[15]    It is undisputed that Plaintiff received a written decision with the evidence relied upon and the reasons for the determination.

**\*13** Based upon the aforementioned, the Court finds that Plaintiff received due process during his Tier III disciplinary hearing with respect to his December 14, 2010, Misbehavior Report. Therefore, I recommend that Griffin's motion for summary judgment be granted on the grounds that he did not violate Plaintiff's due process rights.

**B. Res Judicata**

In further opposition to Defendant's motion, Plaintiff claims that the charges in the December 14, 2010, Misbehavior Report are barred by the doctrine of res judicata and the December 3, 2010, Misbehavior Report. (Dkt. No. 36 at 10–11.) Plaintiff relies upon *In re Gustus,* 64 A.D.3d 1034, 883 N.Y.S.2d 624 (N.Y.App.Div.2009). *See* Dkt. No. 36 at 11. Defendant argues that *In re Gustus* does not apply because the charges in the December 3, 2010, Misbehavior Report were dismissed before Plaintiff's Tier III disciplinary hearing was held. (Dkt. No. 33–8 at 10.)

In *In re Gustus,* the plaintiff received a misbehavior report for fighting and refusing a direct order in an incident on April 17, 2007. *See In re Gustus,* 883 N.Y.S.2d at 625. After a Tier III hearing, the plaintiff was found guilty of both charges. *Id.* Upon appeal, the charge of fighting was dismissed. *Id.* A few days after the incident, as a result of an investigation of the same incident, the plaintiff received a second misbehavior report charging him with assaulting an inmate and engaging in violent conduct. *Id.* Following a second Tier III hearing, the plaintiff was found guilty. *Id.* The plaintiff commenced an Article 78 proceeding claiming that the second determination was barred by res judicata. *Id.* The State Supreme Court dismissed the petition and the State Appellate Division reversed. *Id.*

The Court noted that "res judicata bars a cause of action that was raised and adjudicated, or which could have been raised or adjudicated, in a prior action of proceeding." *Id.* (citing *In re Burgess,* 285 A.D.2d 753, 729 N.Y.S.2d 203, (N.Y.App.Div.2001)). The Court held that both misbehavior reports charged the plaintiff with violations related to his conduct on April 17, 2007. *Id.* Moreover, while the second report was generated with additional information, that information was available before the first hearing began. *Id.* Indeed, the hearing on the second report commenced one hour after the first hearing was completed. *Id.* "Because the two misbehavior reports charged violations concerning one incident and all of the information necessary to support the charges was available before the commencement of the first hearing, the hearing on the second misbehavior report was barred by the doctrine of res judicata." *Id.* at 626. (citation omitted).

An exception to the res judicata doctrine may exist where there is newly discovered, material evidence. *In re Josey,* 35 A.D.3d 993, 826 N.Y.S.2d 479 (N.Y.App.Div.2006). Moreover, res judicata does not apply if the factual bases for the disciplinary determinations are based upon different conduct. *In re Alicea,* 108 A.D.3d 888,

968 N.Y.S.2d 736 (N.Y.App.Div.2013) (finding that res judicata did not bar a hearing on a second misbehavior report that charged the plaintiff with possessing gang-related material when first misbehavior report charged the plaintiff with possessing contraband, an altered item, and forgery).

**\*14** Here, Plaintiff was served with a Tier III Misbehavior Report prepared by Sgt. Parkhurst and dated December 3, 2010. (Dkt. No. 34 at 3.) The Misbehavior Report charged Plaintiff with the following violations: 113.13 Inmate shall not possess alcohol; 113.17 Inmate shall not possess unauthorized jewelry; 113.21 Inmate shall not possess non-approved media; and 113.22 Inmate shall not possess article where it is prohibited. *Id.* On or about December 4, 2010, Plaintiff wrote a letter to an inmate in the facility law library with regard to the December 3, 2010, Misbehavior Report. *Id.* at 4. On December 7, 2010, Plaintiff was released from the SHU and advised that the charges in the December 3, 2010, Misbehavior Report had been dropped because Plaintiff did not receive timely notice of the charges. *Id.* at 5. On December 15, 2010, Plaintiff received a copy of a Tier III Misbehavior Report, written by Captain Russo, dated December 14, 2010. *Id.* at 6. The December 14, 2010, Misbehavior Report charged Plaintiff with the following violations: 107.20 Lying; 130.11 Failing to Follow Correspondence Procedures; 109.10 Out of Place; and 103.20 Solicitation. *Id.*

The Court finds that the doctrine of res judicata does not bar the disciplinary hearing because the issues raised in the two misbehavior reports are not "identical." The second misbehavior report charged Plaintiff with different conduct arising out of the same incident as the first misbehavior report. The second misbehavior report was issued based upon events that occurred *after* the first misbehavior report was prepared; i.e., Plaintiff's letter to "Mustaph." The information upon which the second misbehavior report was based was not available at the time the first report was prepared. To the extent that Plaintiff is attempting to assert "collateral estoppel," the doctrine only bars relitigation of an issue if the identical issues were "necessarily decided" in a prior action and the party to be precluded from relitigating had a "full and fair opportunity" to litigate the issue in the prior action. *See Sidney v. Fischer,* No. 9:09–CV1326 (GTS/ATB), 2012 U.S. Dist. LEXIS 137180, at \*32–33, 2012 WL 4450015, at \*8 (N.D.N.Y. Jan.3, 2012). In this case,

the first misbehavior report was dismissed prior to the commencement of the disciplinary hearing. Therefore, the parties did not have the opportunity to fully and fairly litigate the issues.

### C. Qualified Immunity

"The doctrine of qualified immunity shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Salahuddin,* 467 F.3d at 273 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

> For a constitutional right to be 'clearly established' for purposes of determining whether an officer is entitled to qualified immunity, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in light of pre-existing law the unlawfulness must be apparent.'*

**\*15** *Mollica v. Volker,* 229 F.3d 366, 370 71 (2d Cir.2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (emphasis in original). Even if a state official violates a plaintiff's constitutional rights, the official is afforded protection under the qualified immunity doctrine if "he objectively and reasonably believed that he was acting lawfully." *Creech v. Schoellkoph,* 688 F.Supp.2d 210, 215 (N.D.N.Y.2010) (citing *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (citation and internal quotation marks omitted).

In light of the foregoing, I recommend that in the event Griffin is not found to be entitled to summary judgment on the grounds that he did not violate Plaintiff's due process rights, that he be granted summary judgment on qualified immunity grounds because his conduct did not violate clearly established statutory or constitutional rights.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 33) be **GRANTED;** and it is further

**ORDERED,** that the Clerk provide Plaintiff with copies of *Murray v. Arquitt,* No. 9:10–CV1440 (NAM/CFH), 2014 U.S. Dist. LEXIS 68665, 2014 WL 467656 (N.D.N.Y. Sept. 18, 2014); *Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, 2010 WL 3785771 (N.D.N.Y. Aug.5, 2010); *Lewis v. Murphy,* No. 9:12–CV–0268 (NAM/CFH), 2014 U.S. Dist. LEXIS 102659, 2014 WL 3729362 (N.D.N.Y. July 25, 2014); *Rodriguez v. Selsky,* No. 9:07–CV–0432 (LEK/DEP), 2011 U.S. Dist. LEXIS 21023, 2011 WL 1086001 (N.D.N.Y. Jan.25, 2011); *Silva v. Sanford,* No. 91 Civ. 1776(KMW)(KAR), 1994 U.S. Dist. LEXIS 11568, 1994 WL 455170 (S.D.N.Y. Aug. 18, 1994); *Phelan v. Hersch,* No. 9:10–CV–0011 (GLS/RFT), 2011 U.S. Dist. LEXIS 14025, 2011 WL 6031940 (N.D.N.Y. Sept.13, 2011); *Fernandez v. Callens,* No. 06–CV–0506(Sr), 2010 U.S. Dist. LEXIS 115496, 2010 WL 4320362 (W.D.N.Y. Oct.29, 2010); *Vigliotti v. Selsky,* No. 08–CV–00875–JJM, 2014 U.S. Dist. LEXIS 51442, 2014 WL 1451984 (W.D.N.Y. April 14, 2014); *Livingston v. Griffin,* No. 9:04–CV–00607–JKS, 2007 U.S. Dist. LEXIS 36941, 2007 WL 1500382 (N.D.N.Y. May 21, 2007); *Scott v. Frederick,* No. 9:13–CV–605, 2014 U.S. Dist. LEXIS 179705, 2015 WL127864 (N.D.N.Y.

Jan. 8, 2015); *Hinton v. Prack,* No. 9:12–CV–1844 (LEK/RFT), 2014 U.S. Dist. LEXIS 126955, 2014 WL 4627120 (N.D.N.Y. Sept.11, 2014); *Reed v. Terbush,* No. 9:10–CV–1449 (LEK/RFT), 2015 U.S. Dist. LEXIS 68963, 2015 WL 3447743 (N.D.N.Y. May 28, 2015); *Shabazz v. Bezio,* No. 9:10–CV–1212 (NAM/DEP), 2014 U.S. Dist. LEXIS 134904, 2014 WL 4794432 (N.D.N.Y. Sept.25, 2014); and *Sidney v. Fischer,* No. 9:09–CV–1326 (GTS/ATB), 2012 U.S. Dist. LEXIS 137180, 2012 WL 4450015 (N.D.N.Y. Jan.3, 2012).

**\*16** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b) (1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Aug. 4, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5330366

---

2014 WL 4794432
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raheem SHABAZZ, Plaintiff,

v.

G.R. BEZIO, Correction Lt., Clinton Annex
Correctional Facility; E. Rice, Correction
Sgt.; Clinton Annex Correctional Facility;
and P. Chase, Correction Lt., Clinton
Annex Correctional Facility, Defendants.

No. 9:10−CV−1212 (NAM/DEP).
|
Signed Sept. 25, 2014.

**Attorneys and Law Firms**

Raheem Shabazz, Albion, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Tiffinay M. Rutnik Esq., Assistant
Attorney General, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**INTRODUCTION**

*\*1* Plaintiff Raheem Shabazz, an inmate in the custody
of the New York State Department of Corrections
and Community Supervision ("DOCCS"), brought this
action under 42 U.S.C. § 1983 for compensatory and
punitive damages. Defendants' motion (Dkt. No. 57) for
summary judgment dismissing the action was referred
to United States Magistrate Judge David E. Peebles
pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule
72.3(c). Magistrate Judge Peebles issued a Report and
Recommendation (Dkt. No. 72) recommending summary
judgment dismissing all claims against all defendants on
the basis that: no reasonable factfinder could conclude
that plaintiff was denied adequate due process before
being sentenced to keeplock confinement; and verbal
harassment, without more, is not cognizable under § 1983.

Plaintiff has objected to Magistrate Judge Peebles's
Report and Recommendation. Dkt. No. 73. He claims

that: the Administrative Supervisor's reversal of both
misbehavior reports, which led to keeplock confinement,
demonstrates that both hearing officers were biased; and
Magistrate Judge Peebles erred in finding there was no
issue of material fact requiring trial with respect to his
harassment claim.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews
*de novo* those parts of a report and recommendation
to which a party specifically objects. Failure to object
to any portion of a report and recommendation waives
further judicial review of the matters therein. *See Roldan v.
Racette,* 984 F.2d 85, 89 (2d Cir.1993). The Court resolves
the issues as set forth below.

**DISCUSSION**

The Court adopts Magistrate Judge Peebles's summary
of the facts, procedural history, and applicable law. The
Court does not repeat them here.

**Due Process**

In his objection (Dkt. No. 73), plaintiff asserts that the
reversal of the misbehavior reports supports his claim that
the hearing officers were biased and raises a question of
fact requiring trial on his due process claim. Magistrate
Judge Peebles addressed both disciplinary hearings (April
17, 2008 and May 2, 2008) and found that: (1) there
was an issue of material fact concerning whether plaintiff
was deprived of a cognizable liberty interest; (2) but
that defendants were nevertheless entitled to summary
judgment because plaintiff failed to raise a question of fact
with respect to whether he was deprived of that interest
without sufficient process.

As Magistrate Judge Peebles explained:

> As a general matter, to prevail on
> a section 1983 due process claim
> arising out of a disciplinary hearing,
> a plaintiff must show that he both (1)
> possessed an actual liberty interest,
> and (2) was deprived of that interest
> without being afforded sufficient
> process. *Tellier v. Fields,* 280 F.3d
> 69, 79–80 (2d Cir.2000); *Hynes v..
> Squillace,* 143 F.3d 653, 658 (2d

Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

Dkt. No. 72, p. 17. Further:

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*2** The due process clause of the Fourteenth Amendment guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \*5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Dkt. No. 72, pp. 24–25.

Magistrate Judge Peebles found, and plaintiff does not dispute, that the evidence in the record indicates: plaintiff received written notice of the charges underlying the two hearings; an opportunity to appear at the disciplinary hearing and to present witnesses in his defense; a written statement of decision; and the right to assistance in preparing a defense. Plaintiff's principal objection is that the Magistrate Judge failed to consider the fact that both defendants' determinations were ultimately reversed and plaintiff's record expunged as material to the issue of defendants' impartiality as hearing officers. "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \*5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

At the April 17, 2008 hearing, Bezio found plaintiff guilty of refusing a direct order, which was to cut his hair, and not guilty of having "unfastened long hair". Plaintiff admitted at the hearing that he refused to cut his hair. Although the guilty determination was later reversed, plaintiff admitted at the hearing that he refused to cut his hair, which supports the due process requirement that there be "some evidence" to support Bezio's decision to find plaintiff guilty of refusing to obey a direct order. *See Smith v. Fischer,* No. 9:07–cv–1264, 2010 WL 145292, at \*9 (N.D.N.Y. Jan. 11, 2010) (adopting Report–Recommendation which found that even though the guilty determination had been reversed administratively, because there was "some evidence" to support the defendant's decision to find the plaintiff prisoner guilty, the due process standard was satisfied).

**\*3** At the May 2, 2008 hearing, defendant Chase found plaintiff guilty of refusing a direct order by wearing a head covering known as a Tsalot-kob after defendant Bezio instructed him not to, and guilty of having "unfastened long hair". Even viewing the facts in the light most favorable to plaintiff, and assuming that defendant Bezio never told plaintiff that he could not wear a Tsalot-kob, and that there was no evidence to support a finding that plaintiff refused a direct order, defendant Bezio testified at the hearing that he observed plaintiff with his dreadlocks unfastened. Thus, there was "some evidence" to support the guilty finding, the due process standard is satisfied, and there is no question of fact requiring trial on plaintiff's claim that the hearing officers were impartial.

Case 9:16-cv-01157-FJS-TWD    Document 57    Filed 08/31/18    Page 215 of 314
Shabazz v. Bezio, Not Reported in F.Supp.3d (2014)
2014 WL 4794432

Accordingly, the Report and Recommendation is adopted in its entirety as to this claim.

**Harassment**

Plaintiff claims, in his objection to Magistrate Judge Peebles's recommended dismissal of his harassment claims, that he did not file a grievance against defendant Rice, but against defendant Bezio and that "he did the investigation of the harassment grievance himself." This allegation is different than the claim before Magistrate Judge Peebles, which was that defendant Bezio verbally harassed plaintiff during the second disciplinary hearing. Regardless of whether plaintiff's claim is that defendant Bezio harassed plaintiff by filing misbehavior reports or conducted a biased investigation of plaintiff's grievance, his claim fails. *See See Boddie,* 105 F.3d at 862 ("a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report"); *Green v. Herbert,* 677 F.Supp.2d 633, 639 (W.D.N.Y.2010) ("an inmate 'has no constitutional right to have his grievances processed or investigated in any particular manner.' ") (quoting *Shell v. Brzezniak,* 365 F.Supp.2d 362, 379 (W.D.N.Y.2005)). Thus, plaintiff's objection is without merit.

## CONCLUSION

For these reasons, it is

**ORDERED** that the Report and Recommendation of United States Magistrate Judge David E. Peebles (Dkt. No. 72) is accepted; and it is further

**ORDERED** that the motion (Dkt. No. 57) for summary judgment is granted; and it is further

**ORDERED** that the amended complaint (Dkt. No. 37) is dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment and close this case; and it is further

**ORDERED** that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Raheem Shabazz, a New York State prison inmate, has brought this action pursuant to 42 U.S.C. § 1983 against three corrections employees alleging that they deprived him of his civil rights. In his complaint, plaintiff claims that his Fourteenth Amendment procedural due process rights were violated when two of the defendants subjected him to two separate impartial disciplinary proceedings that led to guilty determinations and the imposition of punishments resulting in an aggregate period of keeplock confinement of more than thirty days, with the third defendant acting in concert with their actions.

**\*4** Currently pending before the court is a motion brought by the three named defendants for summary judgment seeking dismissal of plaintiff's complaint in its entirety. For the reasons set forth below, I recommend that defendants' motion be granted.

## I. *BACKGROUND* [1]

[1]   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate currently being held in custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *Dkt. No. 37 at 1.* While he is now incarcerated elsewhere, at all times relevant to his claims in this action, Shabazz was confined at the Clinton Correctional Facility Annex ("Clinton Annex"), which is located in Dannemora, New York. *Dkt. No. 37 at 2.*

Plaintiff was transferred to the Clinton Annex on March 27, 2008. *Dkt. No. 57–4 at 1.* Upon his arrival, he was interviewed by defendant Edwin Rice who, at the time, served as a draft sergeant at the facility. *Id.* at 1. When plaintiff arrived at the Clinton Annex, his hair was styled in long dreadlocks. *Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 16–17.* Plaintiff had previously worn his hair in

2014 WL 4794432

dreadlocks while in DOCCS custody since 1996, and at no point during his period of incarceration had he ever been questioned about, or disciplined as a result of, his hair style. *Dkt. No. 57–9* at 16, 43. During the initial interview at the Clinton Annex, however, defendant Rice advised plaintiff that only members of the Rastafarian faith were allowed to wear their hair in dreadlocks in DOCCS facilities. *Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 18.* Because plaintiff was, at the time, a DOCCS-registered adherent to the Moorish Science Temple religion, defendant Rice ordered plaintiff to cut his hair or change his religion to Rastafarian. *Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 20.*

On an unknown date between March 27, 2008 and April 2, 2008, plaintiff submitted a written complaint regarding Rice's orders to comply with DOCCS rules, and requested permission to maintain his dreadlocks pursuant to the "grandfather clause." *Dkt. No. 57–5 at 13; Dkt. No. 57–9 at 25.* Defendant Gary Bezio, a lieutenant at the Clinton Annex who was assigned to investigate the complaint, interviewed plaintiff concerning his dreadlocks on April 2, 2008.[2] *Dkt. No. 57–5 at 13.* During the interview, at which defendant Rice was also present, defendant Bezio observed plaintiff wearing a Tsalot–Kob, a head covering that allows a person to tuck long dreadlocks inside. *Dkt. No. 57–3 at 1, 2; Dkt. No. 57–9 at 13, 23–24.* Through his investigation, defendant Bezio learned that plaintiff was not a Rastafarian, and therefore was not permitted to wear dreadlocks pursuant to a DOCCS directive stating that only Rastafarians were allowed to wear dreadlocks. *Dkt. No. 57–3 at 2; Dkt. No. 57–5 at 13–14; Dkt. No. 57–9 at 27,* 28. Thereafter, defendant Bezio gave plaintiff a direct order to comply with DOCCS regulations, though the substance of that direct order is unclear. The record reflects that one of three possible verbal directives may have been given to plaintiff, including to (1) either stop wearing a Tsalot–Kob or change his religion to Rastafarian; (2) cut his dreadlocks because only Rastafarians were permitted to wear dreadlocks; or (3) tie his hair back in a ponytail, which would comply with DOCCS grooming standards. *Dkt. No. 57–3 at 2; Dkt. No. 57–5 at 14,* 18.

[2]     In his affidavit, defendant Bezio denies being assigned to investigate plaintiff's written complaint on April 2, 2008. *Dkt. No. 57–3 at 3.* Instead, defendant Bezio states that he was making rounds at the Clinton Annex on that date when he observed plaintiff wearing a Tsalot–Kob, a head covering that

enables the wearer to tuck long dreadlocks inside, and questioned him about it. *Id.* at 2. A review of the transcript from plaintiff's disciplinary hearing on May 2, 2008, however, indicates otherwise. *Dkt. No. 57–5 at 13.* At the hearing, defendant Bezio testified, "On April 2 I conducted an interview with Inmate Shabazz pertaining to his ah dreadlocks. Ah he filed a written complaint on [defendant Rice] and it was my duty to ah investigate that complaint and at that time I ah interviewed Inmate Shabazz pertaining to his dreadlocks." *Dkt. No. 57–5 at 13; see also Dkt. No. 57–5 at 17* ("Inmate Shabazz field a written complaint against Sergeant Rice ah during a previous interview and it was my responsibility to ah investigate this ah this complaint."). As will be discussed more completely below, whether defendant Bezio was assigned to investigate plaintiff's complaint against defendant Rice is material to plaintiff's due process claim.

**\*5** Following this interview, plaintiff applied to change his religion to Rastafarian. Dkt. 57–3 at 19. On April 13, 2008, that request was denied on the basis that plaintiff had applied to change his religion within the previous twelve months.[3] *Id.*

[3]     According to DOCCS Directive 4202, inmates are only allowed to change religious designations once every twelve months. *Dkt. No. 57–3 at 19.* In this case, plaintiff had last changed his religious designation on September 21, 2007, rendering his request to change his religion in April 2008 untimely. *Id.*

On or about April 14, 2008, defendant Rice observed plaintiff wearing his hair in a style that violated DOCCS rules, and ordered that he cut his hair. *Dkt. No. 57–4 at 2–3.* When plaintiff refused, defendant Rice issued an inmate misbehavior report charging him with violating two DOCCS rules.[4] *Dkt. No. 57–4 at 2,* 5. Although plaintiff contends that defendant Rice issued this report at the direction of defendant Bezio, both defendants Rice and Bezio deny that allegation. *Dkt. No. 57–3 at 3; Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 29; Dkt. No. 66–3 at 2.*

[4]     Specifically, defendant Rice accused plaintiff of violating (1) DOCCS rule 110.33, which provides that "[a]n inmate wearing hair below shoulder length shall keep his or her hair tied back in a ponytail with a barrette, rubber band, or other fastening device approved by the superintendent"; and (2) DOCCS rule 106.10, providing "AN INMATE SHALL OBEY ALL ORDERS OF DEPARTMENT

PERSONNEL PROMPTLY AND WITHOUT ARGUMENT." 7 N.Y.C.R.R. § 270.2(B) (emphasis in original).

Three days after the misbehavior report was issued, defendant Bezio conducted a Tier II disciplinary hearing on the charges contained in the report.[5] *Dkt. No. 57–3 at 2–3.* At plaintiff's deposition in connection with this action, he testified that he requested defendant Bezio to recuse himself from conducting the disciplinary hearing in light of the fact that defendant Bezio had been involved in the underlying investigation preceding the misbehavior report. *Dkt. No. 57–9 at 44–45.* According to plaintiff, defendant Bezio denied that request.[6] *Id.* at 45. During the disciplinary hearing, although plaintiff admitted that he refused defendant Rice's direct order to cut his hair, he claimed he did have his hair tied back in a ponytail. *Dkt. No. 57–3 at 4,* 15; *Dkt. No. 57–5 at 15.* In light of defendant Rice's report and plaintiff's testimony, defendant Bezio found plaintiff guilty of refusing a direct order but found him not guilty of having unfastened hair. *Dkt. No. 57–3 at 4.* Prior to rendering his decision, defendant Bezio also independently reviewed the DOCCS directive that permitted only Rastafarians to wear their hair in dreadlocks. *Id.* Defendant Bezio recorded his findings on a disposition sheet, and sanctioned plaintiff to thirty days of keeplock confinement, with a corresponding loss of certain prison privileges. *Id.* at 4, 21. Plaintiff's appeal of that disposition to the superintendent was denied on April 21, 2008. *Id.* at 24.

[5]    The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n. 1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[6]    The transcript of the disciplinary hearing held on April 17, 2008, does not reflect either plaintiff's request that defendant Bezio recuse himself or defendant Bezio's refusal. *Dkt. No. 57–3 at 11–17.*

On April 29, 2008, while plaintiff was being escorted by another corrections officer to receive his daily medication,

defendant Bezio again observed him wearing his hair in a Tsalot–Kob, in violation of his order on April 2, 2008. *Dkt. No. 57–3 at 5; Dkt. No. 57–9 at 41.* Plaintiff's Tsalot–Kob was confiscated, revealing that he also did not have his hair tied back in a ponytail. *Dkt. No. 57–3 at 5.* Following this encounter, defendant Bezio issued an inmate misbehavior report charging plaintiff with violating his April 2, 2008 order, and not wearing his hair tied back in a ponytail. *Id.* at 5, 26.

On May 2, 2008, a Tier II disciplinary hearing was held by defendant Peter Chase, another corrections lieutenant at the Clinton Annex, in connection with the inmate misbehavior report issued by defendant Bezio. *Dkt. No. 57–5 at 1–2.* After plaintiff testified in his defense, defendant Chase adjourned the hearing for approximately one hour while he located defendant Bezio to secure his testimony.[7] *Dkt. No. 57–5 at 13; Dkt. No. 66–4 at 2.* While plaintiff understood and consented to the adjournment, he allegedly objected, off the record, to the manner in which defendant Bezio was summoned to testify, arguing that defendant Bezio could (and should) have been paged or summoned by telephone. *Dkt. No. 57–5 at 13,* 30; *Dkt. No. 66–4 at 2.* The hearing tape did not record any conversations that took place during the period of adjournment. *Dkt. No. 57–5 at 13; Dkt. No. 66–4 at 2.* According to defendants Bezio and Chase, they did not discuss defendant Bezio's testimony in advance, and did not have any off-the-record conversations regarding the plaintiff's disciplinary charges. *Dkt. No. 57–3 at 5; Dkt. No. 57–5 at 3.* Plaintiff, however, contends that defendant Chase "held off the record discussions with Bezio about the case." Dkt. No. 66–4 at 2. Plaintiff also alleges that, off the record, defendant Bezio harassed him by instructing him to "just plead guilty and get this over with." *Dkt. No. 57–9 at 60* .

[7]    Specifically, defendant Chase adjourned at 11:20 AM, and resumed the hearing at 12:40 PM. *Dkt. No. 57–5 at 13.*

**\*6** After the disciplinary hearing resumed on the record, defendant Bezio testified concerning the information contained in his misbehavior report and the orders he issued to plaintiff on April 2, 2008. *Dkt. No. 57–5 at 13.* Following defendant Bezio's testimony, defendant Chase found plaintiff guilty of both violating a direct order and having untied hair, and imposed a second sentence of thirty days keeplock confinement, with a corresponding loss of privileges. *Id.* at 3, 13, 27. Plaintiff's

appeal of defendant Chase's hearing disposition to the superintendent was denied on May 9, 2008. *Dkt. No. 57–5 at 29.*

On March 16, 2009, the DOCCS administratively reversed and expunged the disciplinary determinations rendered by both defendants Bezio and Chase. *Dkt. No. 57–9 at 49.* By the time his sentences were vacated, plaintiff had served an aggregate total of thirty-six days in keeplock confinement as a result of the two Tier II hearings. *Id.* During that period of confinement, plaintiff was allowed to leave his cell for an hour of recreation each day, twice per day to receive his medication, and during his allotted shower time three days per week. *Dkt. No. 57–9 at 36–37.* Whenever he left his cell, plaintiff was placed in restraints. *Id.* at 36.

At his deposition, plaintiff distinguished between the conditions of his keeplock confinement from those in general population. While inmates in general population have access to a shower at any given time, those in keeplock are allowed to shower only three times per week. *Dkt. No. 57–9 at 37.* During his keeplock confinement, plaintiff was not permitted to attend religious services, work at his job in the tailor shop, or tutor the inmates in the college program, as he had while in general population. *Id.* at 38–39, 74–75.

Some of the conditions of plaintiff's keeplock confinement are disputed between the parties. While defendants contend that the two keeplock cells at the Clinton Annex contain a bed, mattress, pillow, washstand, and lighting, plaintiff testified at his deposition that his cell had no furniture and he was forced to eat his meals on the floor. [8] *Dkt. No. 57–8 at 1–2; Dkt. No. 57–9 at 33.* According to plaintiff, while confined in keeplock, the toilet in his cell would not flush for five days. *Dkt. No. 57–9 at 33–34.* Additionally, plaintiff testified that other inmates on his floor would throw feces and it, "along with urine and water and stuff like that," would seep underneath the door into his cell. *Dkt. No. 57–9 at 33,* 35. Defendants have submitted evidence, however, reflecting that during the time of plaintiff's keeplock confinement, there were no documented instances of either inmates throwing feces on his cell block or feces being cleaned up. *Dkt. No. 57–6 at 3; Dkt. No. 57–8 at 2–3.*

[8]     There is also record evidence that one of the two keeplock cells has a locker and the other has a built-in desk with a chair. *Dkt. No. 57–8 at 2.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 12, 2010. *Dkt. No. 1.* Plaintiff's complaint names as defendants Corrections Sergeant E. Rice and Corrections Lieutenants G.R. Bezio and Peter Chase, all three of whom were stationed at the Clinton Annex at the relevant times. *See generally id.*

**\*7** In response to plaintiff's complaint, defendants moved to dismiss plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Dkt. No. 17.* Following a review of the motion, Magistrate Judge David R. Homer issued a report to Senior District Judge Norman A. Mordue recommending that it be granted. *Dkt. No. 21.* Judge Mordue adopted the report, and plaintiff's complaint was dismissed on February 8, 2012. *Dkt. No. 23.* The resulting judgment dismissing plaintiff's complaint, however, was reversed on appeal by the United States Court of Appeals for the Second Circuit, which concluded, *inter alia,* that plaintiff's complaint should not have been dismissed without first granting him leave to amend. [9] *See generally Dkt. No. 31.* Plaintiff's case was remanded for further proceedings, and the matter was reassigned to me. Dkt. Nos. 31, 32.

[9]     More completely, following its *de novo* review of the district court's decision, the Second Circuit found the aggregated time plaintiff allegedly spent in keeplock may have been sufficient to constitute an "atypical and significant hardship," but noted that plaintiff failed to allege detailed facts concerning the conditions of his keeplock confinement. *Dkt. No. 31 at 2,* 5. The court also found that plaintiff's complaint alleged facts which, taken as true, were sufficient to plausibly suggest that defendant Bezio was not an impartial decisionmaker. *Id.* at 6. Further, because there was some ambiguity as to which document defendant Bezio relied upon to make his guilty determination at the disciplinary hearing on April 17, 2008, the court was unable to analyze whether there was reliable evidence of plaintiff's guilt. *Id.* at 6–7. In addition, because no case law was cited in support of the dismissal of the claims against defendants Rice and Chase, the Second Circuit held that plaintiff should be afforded an opportunity to amend his complaint to further develop his factual allegations with regard to those defendants. *Id.* at 7–8. Finally, the Second Circuit inquired into whether plaintiff's complaint inartfully alleged a claim against Norman Bezio, the DOCCS employee designated to

2014 WL 4794432

hear appeals from inmate disciplinary hearings and allegedly the brother of defendant G.R. Bezio, and determined plaintiff should be allowed to add him as a defendant if he decided to file an amended complaint. *Id.* at 8.

Pursuant to the Second Circuit's mandate, plaintiff filed an amended complaint on April 24, 2013. [10] *Dkt. No. 37.* Liberally construed, plaintiff's amended complaint alleges that he was denied due process because he was twice denied impartial disciplinary hearings as a result of which he was placed in keeplock confinement for an aggregate period of thirty-six days, with a corresponding loss of privileges. *See generally id.*

[10]  Although it appears that plaintiff requested summary judgment in his amended complaint, *Dkt. No. 37 at 10,* he has failed to adhere to requirements governing a summary judgment motion set forth in the local rules of practice for this court. *See* N.D.N.Y. L.R. 5.1(a) (requiring memorandum of law and supporting affidavit for all motions); N.D.N.Y. L.R. 7.1(a)(3) (requiring submission of a statement of material facts in support of a motion for summary judgment). For that reason, to the extent his amended complaint may be liberally construed as a motion for summary judgment, that motion is denied. *See, e.g., Dorsey v. Artus,* No. 09–CV–1011, 2013 WL 5463720, at *6 (N.D.N.Y. Sept. 30, 2013) (Sharpe, C.J., *adopting report and recommendation by* Peebles, M.J.) (dismissing the plaintiff's motion for summary judgment because, *inter alia,* he failed to comply with the procedural requirements set forth in rule 7.1 of the local rules of practice).

Following the completion of discovery, defendants filed the pending motion for summary judgment, arguing that, despite plaintiff's efforts to cure the deficiencies contained in his initial complaint, the claims set forth in his amended complaint nonetheless lack merit. *Dkt. No. 57 at 5.* Defendants further argue that they are entitled to immunity from suit pursuant to the Eleventh Amendment, to the extent they are sued in their official capacities, and are likewise entitled to qualified immunity. *Dkt. No. 57 at 8–9,* 21–22. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and the Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Legal Standard Governing Motions for Summary Judgment*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*8** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Tolan,* 134 S.Ct. at 1866; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Eleventh Amendment Immunity*

Defendants contend that they are shielded from suit under the Eleventh Amendment to the extent plaintiff's amended

2014 WL 4794432

complaint asserts claims for damages against them in their official capacities. *Dkt. No. 57–1 at 8–9.* The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan,* 415 U.S. 651, 662–63 (1974); *Cory v. White,* 457 U.S. 85, 90–91 (1982); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. [11] *See, e.g., Daisernia v. State of N.Y.,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman,* 415 U.S. at 663)); *see also Richards v. State of N.Y.App. Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing, *inter alia, Cory v. White,* 457 U.S. 85, 89–91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [12] *Ying Jing Gan,* 996 F.2d at 529; *see also Hafer v. Melo,* 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

[11]      In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of N.Y. v. Chatham Cnty.,* 547 U.S. 189, 193 (2006).

[12]      By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo,* 502 U.S. 21, 30–31 (1991).

**\*9** Plaintiff's damage claims in this action against the named defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia,* 582 F.Supp. at 798–99.

Accordingly, I recommend that those claims be dismissed with prejudice.

### C. *Plaintiff's Due Process Claims*
Plaintiff contends that he was denied due process at the April 17, 2008, and May 2, 2008, disciplinary hearings. *Dkt. No. 37 at 2–9.* Liberally construed, plaintiff's complaint alleges that he was deprived of his liberty interest in remaining free from keeplock confinement for an aggregate total of thirty-six days without being afforded sufficient process at those disciplinary hearings. *Id.* Defendants argue that plaintiff's claims are without merit. *Dkt. No. 57–1 at 9–19.*

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v.. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). I will address each requirement in turn.

#### 1. *Liberty Interest*
In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* inquiry. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). [13] Accordingly, to avoid the entry of summary judgment, plaintiff must have proffered evidence from which a reasonable factfinder could conclude that the conditions of his keeplock confinement rose to the level of an atypical and significant hardship under *Sandin. See, e.g., Thompson v. Gjivoje,*

2014 WL 4794432

896 F.2d 716, 720 (2d Cir.1990) ("[W]here the nonmoving party bears the burden of proof at trial ... it is [his] burden to come forward to demonstrate that there are issues that must be decided by the factfinder because they may reasonably be decided in favor of either party." (citations omitted)).

13      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*10**  When analyzing the conditions of an inmate's keeplock confinement, the relevant factors for consideration include " 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed [.]' " *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d 133 (citing *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000)). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n. 5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir.1999)).

The Second Circuit has stated that disputes regarding the conditions of a plaintiff's confinement may not be resolved on summary judgment. *Davis,* 576 F.3d at 134 (quoting *Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004). "Only when the conditions are uncontested may a district court resolve the issue of a typicality of confinement as a matter of law." *Id.*

Here, according to plaintiff, he was confined in keeplock for thirty-six days. *Dkt. No. 57–9 at 49.* Accordingly, the court must inquire into the conditions of plaintiff's keeplock confinement because the duration of his disciplinary confinement does not, on its own, rise to the level of an atypical and significant hardship. *Davis,* 576

F.3d at 133; *see also Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 248 (S.D.N.Y.1998) ("The decisions of the Second Circuit are unanimous that keeplock ... confinement of 30 days or less in New York is not 'atypical or significant hardship' under *Sandin."* (quotation marks omitted) (listing cases)). Plaintiff has set forth evidence that the conditions of his keeplock confinement were more serious than the conditions imposed on those inmates in general population. For example, at his deposition, plaintiff testified that he had no furniture on which to eat, and was therefore required to eat on the floor. *Dkt. No. 57–9 at 33.* He also testified that, whenever he left his cell, he was restrained by "shackles," and he was permitted a ten-minute shower only three times per week. *Id.* at 36–37. Shabazz was also allegedly precluded from attending church services and working either in the tailor shop or as a tutor, and specifically testified that, "[a]t no time do you leave the keep-lock cell unless you go to medication, hour of recreation, or a ten-minute shower." *Id.* at 37–39. Finally, plaintiff alleges that his toilet would not flush for five days, and feces seeped into his keeplock cell during his confinement. *Id.* at 33, 35.

**\*11**  To counter these assertions, defendants have submitted evidence in support of their motion suggesting plaintiff's keeplock cell, at a minimum, had a bed, mattress, pillow, washstand, and lighting. *Dkt. No. 57–8 at 1–2.* Moreover, one of the two keeplock cells at the Clinton Annex had a locker, and the other had a built-in desk with a chair. *Id.* Kathryn Lehman is a Keyboard Specialist 1 for the DOCCS who has access to the Clinton Annex logbook as part of her duties. *Dkt. No. 57–6 at 3.* In her affidavit submitted in support of defendants' pending motion, she stated that, during plaintiff's keeplock confinement, there were "no incidents of inmates on plaintiff's cell block being charged with disciplinary offenses for throwing feces," nor were there any "documented incidents of staff cleaning in that time period[.]" *Id.* at 3. There is also evidence that plaintiff was permitted to leave his cell twice per day for approximately twenty minutes to obtain his medications. *Dkt. No. 57–9 at 36–37.*

Although I am doubtful that plaintiff will be able to demonstrate that the conditions of his keeplock confinement were sufficient to create an "atypical and significant hardship," [14] I remain mindful that such a consideration, where there is a dispute of fact regarding the conditions, should be left for the factfinder at trial.

*See Palmer,* 364 F.3d at 64 ("Disputes about conditions may not be resolved on summary judgment, but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." (citations omitted)); *Sealey,* 197 F.3d at 585 ("The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the confinement are reasonably in dispute, the jury ... must resolve those disputes[.]").

14    *See Sealey,* 197 F.3d at 587, 589–90 (affirming the district court's conclusion that the plaintiff's 101–day confinement in the facility's special housing unit did not constitute an atypical hardship, even where the plaintiff was confined in his cell for twenty-three hours a day, permitted one hour for recreation, limited to three showers per week, subject to noisy neighboring cells, lost various privileges, and had feces thrown at him "a few times"); *Arce v. Walker,* 139 F.3d 329, 336–37 (2d Cir.1998) (finding the plaintiff's eighteen-day administrative segregation to did not constitute an atypical and significant hardship where he was entitled to only one hour of exercise per day and could not attend church services or communal meals, even considering that, for fifteen days, the plaintiff was deprived exercise because, during those fifteen days, he was provided "out-of-cell privileges," including attendance at court proceedings).

2. *Process Afforded at the Disciplinary Hearings*
Having found an issue of material fact concerning whether plaintiff was deprived of a cognizable liberty interest, I must next examine whether he was afforded sufficient due process during the disciplinary proceedings resulting in his keeplock confinement. *See Tellier,* 280 F.3d at 79–80 (requiring that a plaintiff demonstrate that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process in order to prevail on a due process cause of action). Plaintiff alleges his due process rights were violated because he was denied impartial disciplinary hearings giving rise to his keeplock confinement. *See generally Dkt. No.* 37. Specifically, with respect to the disciplinary hearing held on April 17, 2008, he contends that defendant Bezio should have recused himself as the hearing officer because he participated in the underlying investigation giving rise to the issuance of the misbehavior report. *Dkt. No. 37 at 2–5; see also Dkt. No. 57–9 at 51* (clarifying allegations in complaint). Plaintiff also maintains that

defendant Rice is implicated in the due process violation because he (1) instructed plaintiff to cut his hair and (2) allegedly followed the orders of defendant Bezio to issue plaintiff a misbehavior report. *Dkt. No. 37 at 2–4; see also Dkt. No. 57–9 at 66* (clarifying allegations in complaint). The basis for plaintiff's claim that he was denied an impartial disciplinary hearing on May 2, 2008, is that defendant Chase postponed the hearing for more than an hour while he located defendant Bezio for his testimony. *Dkt. No. 37 at 5–6; see also Dkt. No. 57–9 at 57* (clarifying allegations in complaint). During the adjournment, defendants Bezio and Chase allegedly rehearsed defendant Bezio's testimony. *Dkt. No. 37 at 5–6; see also Dkt. No. 57–9 at 58* (clarifying allegations in complaint).

**\*12**  The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

The due process clause of the Fourteenth Amendment guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators

2014 WL 4794432

in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

a. *Disciplinary Hearing on April 17, 2008*
In this case, plaintiff's allegation that he was denied due process at the hearing on April 17, 2008 because defendant Bezio both participated in an investigation on April 2, 2008 regarding plaintiff's dreadlocks, and conducted the disciplinary hearing is not, on its own, sufficient to give rise to a cognizable due process violation. *See Allred,* 2010 WL 3911414, at *5 (finding no due process violation where the plaintiff alleged that the hearing officer presiding over the disciplinary hearing also participated in the underlying investigation). Moreover, there is no evidence in the record to support plaintiff's suggestion that defendant Bezio prejudged the facts prior to hearing the evidence adduced at the disciplinary hearing.

**\*13** Plaintiff's reliance on the DOCCS regulation that precludes "person[s] who ha[ve] participated in any investigation of the [underlying acts]" from presiding over the hearing as a hearing officer is misplaced. *Dkt. No. 37 at 3–4; Dkt. No. 57–9 at 53–55.* It is well settled that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred,* 2010 WL 3911414, at *5 (quoting *Baker v. McCollan,* 443 U.S. 137, 139–40 (1979)). Accordingly, to the extent that plaintiff in this case was afforded the protections required by the Constitution, defendant Bezio's apparent violation of state law does not also constitute a due process violation.

Significantly, plaintiff does not allege, and there is no record evidence from which a reasonable factfinder could conclude, that he was denied (1) written notice of the charges giving rise to the hearing on April 17, 2008, (2) an opportunity to appear at the disciplinary hearing, (3) an opportunity to present witnesses in support of his defense, (4) a written statement of decision by defendant Bezio, or (5) the right to assistance in preparing a defense. *See generally Dkt. No. 37; Dkt. No. 57–3 at 11–17,* 21–22; *Wolff,* 418 U.S. at 564–70. Moreover, even viewing the facts in the light most favorable to plaintiff, there was

certainly reliable evidence of plaintiff's guilt with respect to the allegation that he failed to follow a direct order—the charge for which plaintiff was ultimately found guilty at the hearing on April 17, 2008. The court need not go any further than plaintiff's own admission at the disciplinary hearing that he "refused Sergeant Rice's order" to cut his hair to conclude that reliable evidence existed upon which defendant Bezio could support his guilty finding. *Dkt. No. 57–3 at 15.* In addition, to the extent plaintiff asserts a due process claim against defendant Rice based on allegations that Rice (1) ordered plaintiff to cut his hair and (2) followed defendant Bezio's order to issue him a misbehavior report, it is not cognizable in light of the protections afforded plaintiff during the hearing. For all of these reasons, and based on the record evidence, I find that no reasonable factfinder could conclude that plaintiff was afforded inadequate due process during the disciplinary hearing on April 17, 2008. Accordingly, I recommend that plaintiff's due process claim arising from that hearing be dismissed.

b. *Disciplinary Hearing on May 2, 2008*

Plaintiff's due process claim in connection with the hearing on May 2, 2008, stems from defendant Chase's alleged impartiality as the hearing officer. *Dkt. No. 37 at 5–6; Dkt. No. 57–9 at 57.* Specifically, plaintiff objects to the decision by defendant Chase to adjourn the proceeding so that he could locate and secure the testimony of defendant Bezio, one of the misbehavior report at issue in the hearing. *Dkt. No. 37 at 5–6; Dkt. No. 57–9 at 58.* Plaintiff contends that during the adjournment, defendants Chase and Bezio rehearsed defendant Bezio's testimony. *Id.*

**\*14** Initially, I find nothing in the record revealing a dispute of material fact with respect to whether plaintiff was denied (1) written notice of the charges giving rise to the hearing on May 2, 2008, (2) an opportunity to appear at the disciplinary hearing, (3) an opportunity to present witnesses in support of his defense, (4) a written statement of decision by defendant Chase, or (5) the right to assistance in preparing a defense. *Dkt. No. 57–5 at 7–27.* Moreover, a review of the hearing transcript and defendant Chase's written disposition reveals that there was reliable evidence on which he based his decision, including (1) plaintiff's own testimony that he was wearing the Tsalot–Kob and did not have his hair tied back on the day defendant Bezio issued the misbehavior report;

2014 WL 4794432

and (2) the testimony of defendant Bezio that, on April 2, 2008, he had ordered plaintiff to cut his hair and not wear the Tsalot–Kob because plaintiff was not Rastafarian. *See id.* at 10 (plaintiff's testimony), 13–14 (defendant Bezio's testimony). Plaintiff's allegation that defendant Chase failed to conduct an impartial hearing—because he allegedly rehearsed the testimony of defendant Bezio off-the-record—is unsupported by any record evidence aside from plaintiff's claim that the two conversed before Bezio testified. *See Dkt. No. 57–9 at 68–69* (plaintiff testifying at his deposition that "Lieutenant Chase admitted and Lieutenant Bezio admitted themselves (sic) that they had off the record conversations"). Both defendants Chase and Bezio flatly deny having rehearsed defendant Bezio's testimony off the record at the disciplinary hearing on May 2, 2008. *Dkt. No. 57–3 at 5; Dkt. No. 57–5 at 3.*

Assuming, however, that defendants Chase and Bezio did discuss defendant Bezio's testimony in advance, that fact alone does not render defendant Chase partial as a hearing officer, or otherwise constitute a violation of plaintiff's due process rights. As an initial matter, plaintiff has failed to provide any legal support for his contention that, within the contours of due process, a right exists prohibiting witnesses participating in a prison disciplinary hearing from speaking with the hearing officer prior to testifying. Notably, despite its efforts, the court has similarly found no legal support for this proposition. [15] In any event, whatever due process violation may have occurred (and the court does not concede that a violation did occur) was cured by plaintiff's ample opportunity to question defendant Bezio at the hearing. Defendant Chase permitted plaintiff to ask defendant Bezio nearly all of his proposed questions, with the limited exception of those that were duplicative of earlier questions or those that were deemed irrelevant. [16] *Dkt. No. 57–5 at 14–20.*

[15]    Relatedly, the court is reminded that, with respect to the law governing the right of inmates to call their own witnesses at a prison disciplinary hearing, hearing officers are afforded significant discretion to permit or deny the testimony of a witness on multiple grounds, including institutional safety, relevance, or futility. *See, e.g., Wolff,* 418 U.S. at 566 ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses ... whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases."); *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)

( "We hold that if a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). By implication, the existence of this discretion suggests that hearing officers are permitted to contact witnesses in advance of a hearing to evaluate, for example, the relevance or necessity of their proposed testimony. *Cf. Shell v. Brzezniak,* 365 F.Supp.2d 362, 377 (W.D.N.Y.2005) (rejecting an inmate-plaintiff's claim that his due process rights were violated when a hearing officer failed to speak with two inmate witnesses personally to inquire into their reasons for refusing to testify at the plaintiff's hearing).

[16]    For example, on the basis of relevance, defendant Chase did not permit plaintiff to ask defendant Bezio "[w]hy [defendant Bezio] is racist." *Dkt. No. 57–5 at 16.*

Accordingly, in light of the undisputed record evidence that plaintiff was afforded the process demanded by the Constitution, as identified by the Supreme Court, with respect to the May 2, 2008 disciplinary hearing, I recommend that plaintiff's due process claim arising from that hearing be dismissed.

### D. *Plaintiff's Harassment Claims*

**\*15** Liberally construed, plaintiff's amended complaint also asserts a claim against defendant Bezio stemming from an allegation that he verbally harassed plaintiff during the disciplinary hearing on May 2, 2008. *Dkt. No. 37 at 5; see also Dkt. No. 57–9 at 60* (clarifying allegations in complaint). Verbal harassment, however, without more, is not cognizable under section 1983. *See, e.g., Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) (McAvoy, J.) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under [section] 1983." (citing cases)). Accordingly, I recommend that plaintiff's harassment claim be dismissed.

### IV. *SUMMARY AND RECOMMENDATION*

After a careful review of the record in this case, I find that, although a dispute of material fact exists regarding whether plaintiff was deprived of a liberty interest, no reasonable factfinder could conclude, based on the record evidence, that plaintiff was denied adequate due process before being sentenced to keeplock confinement. [17]

2014 WL 4794432

17      In light of these findings, I have not addressed
        defendants' argument regarding the applicability of
        qualified immunity.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for
summary judgment (*Dkt. No. 57* ) be GRANTED, and
that the plaintiff's complaint be DISMISSED in its
entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties
may lodge written objections to the foregoing report.
Such objections must be filed with the clerk of the

court within FOURTEEN days of service of this report.
FAILURE TO SO OBJECT TO THIS REPORT WILL
PRECLUDE APPELLATE REVIEW. 28 U.S.C. §
636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,*
*984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a
copy of this report and recommendation upon the parties
in accordance with this court's local rules.


Dated: July 30, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4794432

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.    13

2010 WL 5625919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kevin SHEILS, Plaintiff,

v.

R.J. MINOGUE, Commissioner's Hearing
Officer; P. Ano, Tier Hearing Assistant; D.
Selsky, Director, Special Housing, Defendants.

Civ. No. 9:06–CV–482 (GLS/RFT).
|
Nov. 1, 2010.

**Attorneys and Law Firms**

Kevin Sheils, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Charles J. Quackenbush, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Kevin Sheils brings this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that
the Defendants violated his due process rights when
they (collectively and/or individually) (1) intentionally
withheld documents he requested in preparing for a
Disciplinary Hearing, thereby preventing Plaintiff from
framing "appropriate questions to inmate witnesses" and
"disput[ing] the evidence against him[;]" and (2) denied
him the opportunity to question and call certain witnesses
and to view and introduce documentary evidence. Dkt.
No. 1, Compl.

On February 29, 2008, Defendants filed a Motion for
Summary Judgment pursuant to Federal Rule of Civil
Procedure 56(c), which Plaintiff opposed. Dkt. Nos. 27
& 30. On August 21, 2008, this Court issued a Report–
Recommendation and Order in which we noted that
Plaintiff's disciplinary hearing resulted in mixed sanctions,
namely confinement in a special housing unit (SHU)

with corresponding loss of privileges and loss of good
time credits. We concluded that by Plaintiff's due process
claims, he was inevitably challenging both the conditions
and duration of his confinement, the latter of which
are barred by the "favorable termination rule" of *Heck
v. Humphry,* 512 U.S. 477 (1994), which states that a
claim must be dismissed if a judgment in plaintiff's favor
"would imply the invalidity of his conviction or sentence."
Dkt. No. 34 at p. 6 (quoting *Heck* ). Because Plaintiff's
due process claims challenged the conditions of his
confinement in addition to its duration, we recommended
that, pursuant to the Second Circuit's ruling in *Peralta
v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006), Plaintiff's
Complaint be conditionally dismissed "until Plaintiff
informs the Court that he wishes to proceed with his § 1983
claims concerning the conditions of his confinement and
forgo for all time his claims concerning the duration of his
confinement." *Id.* at p. 7. We did not reach the portion of
Defendants' Motion for Summary Judgment concerning
the merits of Plaintiff's due process claims.

Prior to the District Court's issuance of a decision on
this Court's recommendations, Plaintiff filed a Response
indicating his desire to "relinquish all future challenges
regarding the [twelve] months loss of good-time credits."
Dkt. No. 40 at p. 6. On March 26, 2009, the District Court
adopted our recommendations *in toto,* noting Plaintiff's
desire to forgo his barred claims and ordered that
Plaintiff's conditions of confinement challenges would
proceed. Dkt. No. 42 at p. 2. With that decision in tow,
we now address the merits of Defendants' Motion for
Summary Judgment.

### I. FACTS

In our Report–Recommendation and Order, we
summarized the relevant facts as follows: [1]

[1]     Footnotes included in the following block text reflect
        footnotes originally included in our August Report–
        Recommendation and Order.

During the time period relevant to this action, Plaintiff
was incarcerated at the Clinton Correctional Facility
("CCF"). Dkt. No. 27, Defs.' 7.1 Statement, at ¶ 2. [2] On
October 31, 2003, Plaintiff was housed in cell # 9 of the
E–3 housing unit of CCF. On that day, security staff

2010 WL 5625919

were conducting cell searches on Plaintiff's gallery. *Id.* at ¶ 3. During the search of his cell, Plaintiff was involved in an altercation with the CCF security staff members, who used physical force to subdue him. Defendants' assert Plaintiff caused the incident when he became verbally abusive and punched a correctional officer in the face; Plaintiff asserts he was wantonly beaten for a half-hour without cause or justification. *Id.* at ¶ 4; Compl. at 14.

[2]    When the Plaintiff has not objected to a particular statement of fact proffered in the Defendants' 7.1 Statement, or visa versa, we will not cite to both 7.1 Statements. *See* N.D.N.Y.L.R. 7.1(a)(3) ('*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*') (emphasis in original).

**\*2** On November 1, 2003, Plaintiff was served with copies of Misbehavior Reports issued by Correctional Officers (C.O.'s) Evens and LaBombard. The Misbehavior Reports stated that while standing outside his cell during the search,[3] Plaintiff became angry when Evens began to look through his photos, and attempted to approach Evens in the cell. However, LaBombard interceded and ordered him to step back, at which point Plaintiff punched LaBombard on his left cheek, requiring Evens and LaBombard to force Plaintiff into mechanical restraints. Dkt. No. 30, Pl.'s Resp. to Defs.' Mot. for Summ. J., Exs., Inmate Misbehavior Reps., dated Oct. 31, 2003, at A1, A–2, A–6, & A–7.

[3]    Prisoners are customarily required to vacate their cells during routine searches.

Defendant Captain Robert Minogue was designated to serve as the Superintendent's representative and conduct a Tier III Disciplinary Hearing on the charges filed by C.O.'s Evens and LaBombard. Defs.' 7.1 Statement at ¶ 6. Defendant Correctional Counselor Roy Ano was assigned to assist Plaintiff in his defense against the disciplinary charges. *Id.* at ¶ 7. At some point before the Hearing, Plaintiff met with Ano,[4] and advised him of the witnesses he wanted to have called and documentary evidence he wished to procure. *Id.* at ¶¶ 8–9; Pl.'s Resp. to Defs.' 7.1 Statement at ¶¶ 8–9.

[4]    Defendants assert Ano met with Plaintiff twice before the Hearing, once on November 3, and again on November 12, 2003. Defs.' 7.1 Statement at ¶¶ 8–9. Plaintiff asserts his only meeting with Ano was on

November 12, 2003. Pl.'s Resp. to Defs.' 7.1 Statement at ¶¶ 8–9.

Defendant Captain Minogue convened the Disciplinary Hearing on November 13, 2003. Defs.' 7.1 Statement at ¶ 10. The Hearing spanned several days, and on November 19, 2003, Defendant Ano met with Plaintiff and discussed his requests for additional inmate witnesses and facility personnel. *Id.* at ¶ 12; Compl. at ¶ 20. Ano contacted the inmates, recorded their responses, and advised Plaintiff accordingly. Defs.' 7.1 Statement at ¶ 12. Over the course of the proceedings Plaintiff argued with Defendant Minogue over a range of issues including his requests to have security staff subjected to polygraph examinations, to have over a dozen inmates called to testify, and to have access to the medical records of security staff. *Id.* at ¶ 13; Pl.'s Resp. to Defs.' 7.1 Statement at ¶ 13. On November 25th, Defendant Minogue ejected Plaintiff from the Hearing after Plaintiff repeatedly failed to control his outbursts. Defs.' 7.1 Statement at ¶ 14. Minogue continued to receive testimony from witnesses in Plaintiff's absence. *Id.* at ¶ 15.

On November 26th, Minogue completed the Hearing and found Plaintiff guilty of Interference with an Employee, Assault on Staff, and several related charges. *Id.* at ¶ 16. Minogue sentenced Plaintiff to twelve (12) months confinement in the Special Housing Unit (SHU) with concomitant loss of packages, commissary, and telephone privileges; he also recommended a twelve (12) month reduction in good-time credits. *Id.* at ¶ 17. Plaintiff appealed the decision to Donald Selsky on December 21, 2003, who affirmed the decision. Dkt. No. 27, Donald Selsky Decl., dated Feb. 21, 2008, Ex. A, Rev. of Supt. Hr'g, dated Feb. 12, 2004.

**\*3** On March 8, 2004, Plaintiff filed another appeal with Selsky, asking him to reconsider his denial of Plaintiff's appeal on the grounds that he was wrongly denied the opportunity to bring in certain witnesses and that Minogue was impartial. Selsky Decl., Ex. A, Pl.'s Lt. Appeal, dated Mar. 8, 2004. In a letter written on Plaintiff's behalf, the Prisoners' Legal Services of New York asked Selsky to reconsider his denial of Plaintiff's appeals on the grounds of improper denial of witnesses and preclusion of relevant documentary evidence at Plaintiff's Hearing. Selsky Decl., Ex. A,

Lt. from Theresa Wells to Donald Selsky, dated Apr. 9, 2004.

Although the record does not contain a formal response to these petitions, both parties assert that they were denied by Selsky. *See* Selsky Decl. at ¶ 9; Compl. at ¶ 43. Plaintiff filed the instant federal action on April 18, 2006.

Dkt. No. 34, Rep.-Recommendation and Order at pp. 2–4.

We add the following facts that are relevant to our consideration of the merits of Defendants' Motion. In September 2004, Plaintiff received copies of documents related to the October 31, 2003 Incident from Prisoners' Legal Services, who had received the documents from the Department of Correctional Services (DOCS) in connection with their effort to appeal Plaintiff's disciplinary sanctions. Defs.' 7.1 Statement at ¶ 18; Pl.'s Resp. to Defs.' 7.1 Statement at ¶ 18; Compl. at ¶ 25. In addition to copies of the Misbehavior Reports issued by C.O.s Evens and LaBombard, which Plaintiff received before the Disciplinary Hearing, Plaintiff received hand-edited versions of those same Misbehavior Reports. LaBombard's original Misbehavior Report stated the following: "I then grabbed Sheils around the waist area in a bear hug type hold and placed him on the wire fencing of 3 company." Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex., Inmate Misbehavior Rep., dated Oct. 31, 2003, at A–2. Evens's original Misbehavior Report stated: "I came out of the cell and forced Sheils into the wire fencing[.]" *Id.* at A–7. Both edited versions simply added the words "face first", so as to read: "I then grabbed Sheils around the waist area in a bear hug type hold and placed him *face first* on the wire fencing of 3 company," and "I came out of the cell and forced Sheils *face first* into the wire fencing[.]" respectively. *Id .,* Edited Inmate Misbehavior Reps.,[5] dated Oct. 31, 2003, at A–3 & A–8 (emphasis added). Along with the edited Misbehavior Reports were addenda from Evens and LaBombard to Sergeant (Sgt.) Brannen, stating they were submitting the edited Misbehavior Reports in order to clarify Sgt. Brannen's questions regarding the October 31st Incident. *Id.,* Addenda, dated Nov. 5 & Nov. 4, 2003,[6] at A–4 & A–9.

[5]    The edits to the original handwritten Misbehavior Reports we done by hand and were followed by the initials of C.O.s Evens and LaBombard, respectively.

[6]    The dates on the edited Misbehavior Reports were not changed from those on the original Misbehavior Reports. However, the dates of the addenda explaining the genesis of the edited Misbehavior Reports are dated November 5 & 4, 2003, respectively.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d

Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Due Process Claims**

Plaintiff claims his due process rights were violated during the course of his November 2007 Disciplinary Hearing. Generally speaking, a prisoner placed in administrative segregation must be provided: (1) advanced written notice of the charges against him at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action taken.[7] *Wolff v. McDonnell,* 418 U.S. 539, 564–66 (1974); *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983)).

[7]   Defendants do not contest Plaintiff's assertion that, as a consequence of his twelve (12) month SHU confinement, he was subjected to an atypical and significant hardship thereby vesting him with a liberty interest. *See* Dkt. No. 27–2, Defs.' Mem. of Law, at p. 8. Therefore, we presume the existence of such a liberty interest. *See Sims v. Artuz,* 230 F.3d 14, 23

(2d Cir.2000) (stating that a confinement in SHU exceeding 305 days was atypical).

**\*5** In this case, Plaintiff asserts that: (1) relevant evidence was withheld from him prior to and during his Disciplinary Hearing, Compl. at ¶¶ 2, 18–19, & 45; (2) Defendant Minogue denied him the opportunity to present objections, question witnesses, and introduce evidence, Compl. at ¶¶ 40 & 45; and (3) Defendant Ano denied Plaintiff access to records and generally failed to meet his duties as a Hearing Assistant, Compl. at ¶ 29, 39, & 48. We address these due process claims in turn.

### 1. *Access to Evidence*

As Defendants accurately note, Plaintiff's due process claim rests "upon his conclusion that he was entitled to copies of all editions of written statements by prison personnel regarding the October 31, 2002 incident, something akin to the New York State rule in criminal proceedings established under *People v. Rosario,* 9 N.Y.2d 286 (1961) (prosecution required to turn over witnesses' prior statements relating to their trial testimony)." Defs.' Mem. of Law at p. 9. Essentially, Plaintiff alleges that he was not provided with all of the documentary evidence available at the time of his Hearing, including copies of the Amended Misbehavior Reports, which added the words "face first" to the originals. Plaintiff contends such evidence was withheld in order to cover up the alleged beating he suffered.

But, Plaintiff does not deny that he was provided with the original Misbehavior Reports that do not contain the "face first" annotations. Plaintiff clearly had notice of the nature of the charges against him, and the only difference between the original Misbehavior Reports and the Amended Misbehavior Reports are the specification that Plaintiff was pushed "face first" into the wire fence. Although Plaintiff asserts that such amendments reveal Defendants' intent to cover up his facial injuries, which he asserts were the result of several C.O.s' blows to his face, Plaintiff acknowledged at the Disciplinary Hearing that his face was pushed up against the screened wall, stating: "I was put on the wall. On the ... screen, the grill. And they mushed my head into it. Cut my head open on it." Dkt. No. 27, Charles J. Quackenbush, Esq., Decl., dated Feb. 24, 2008, Ex. B, Disciplinary Hr'g Tr., dated Nov. 26, 2003 [hereinafter "Hr'g Tr."], at p. 7. Several other witnesses, including C.O.s and inmates, testified to the fact that

2010 WL 5625919

Plaintiff was restrained face first against the metal fencing. *Id*. at pp. 31, 51, 61, 64 & 68. Moreover, Plaintiff was given the opportunity to question C.O.s Evens and LaBombard regarding the Misbehavior Reports they authored. *Id.* at pp. 12–24 & 28–43. Finally, during the course of his administrative appeal, Plaintiff eventually received all of the documents that DOCS provided to Prisoners' Legal Services. Plaintiff presented those documents, as did Prisoners' Legal Services, to Defendant Selsky, who reviewed and ultimately denied his administrative appeal. Selsky Decl. at ¶¶ 8–9 & Ex. A.

**\*6** Thus, Plaintiff does not appear to have been prejudiced in any way as a consequence of not having received copies of the Amended Misbehavior Reports, which were duplicative of his own testimony and that of the other witnesses. Given Plaintiff's access to the original Misbehavior Reports and his opportunity to question the C.O .s, upon whose *oral testimony* his conviction was based, we find that Plaintiff's due process rights were not violated by his non-receipt of the Amended Misbehavior Reports. *See, e.g., Lebron v. Artus,* 2008 WL 111194, at \*9 (W.D.N.Y. Jan. 9, 2008) ("[D]ue process does not require that a prisoner be provided with all the documentary evidence he has requested.") (citation omitted).

## 2. *Present Objections, Question Witnesses, and Introduce Evidence*

Plaintiff's second due process claim is that Minogue denied him the opportunity to present objections, question witnesses, and introduce evidence during his Disciplinary Hearing. Plaintiff's claim regarding evidence appears to be a repetition of his previously discussed claim that various relevant documents were not provided to him prior to nor during the Disciplinary Hearing. Because we have already concluded that Plaintiff suffered no due process violation resulting from his lack of access to such documents, we need not rehash that discussion.

Furthermore, a review of the Hearing Transcript reveals that Plaintiff was provided ample opportunity to question witnesses and that his numerous objections were noted by Minogue. *See generally* Hr'g Tr. To the extent Plaintiff's claim is based on the fact that he was ejected from the Hearing and was therefore unable to question witnesses in person, the Transcript shows that Minogue excused Plaintiff after warning him several times that his frequent

interruptions and commentary would not be tolerated. *Id.* at pp. 16, 28, 38, & 46–50. There is no due process violation when a hearing officer is forced to remove an obstreperous inmate from disciplinary proceedings. *See, e.g., Carter v. Cleveland,* 1995 WL 818678, at \*4–5 (W.D.N.Y. Feb. 15, 1995) (finding no due process violation when prisoner was removed from hearing due to his own misbehavior). Minogue continued to call and question witnesses in Plaintiff's absence, including several inmates who were on Plaintiff's cell block on the date of the incident. Hr'g Tr. at pp. 52–70 (questioning Inmates Chambers, McDonald, Taylor, and Perkins).

Therefore, we find that Plaintiff's due process rights were not violated during the course of his Disciplinary Hearing, before or after his ejection. As such, the above claim should be **dismissed.**

## 3. *Defendant Ano's Assistance*

Plaintiff asserts that Defendant Ano violated his due process rights by denying him access to evidence and failing to adequately assist Plaintiff in his defense at the Disciplinary Hearing. Plaintiff's allegation against Ano appears to be that Ano failed to produce the documentary evidence that was later obtained by Prisoners' Legal Services. Compl. at ¶¶ 38–39. For the reasons stated above, Plaintiff's due process rights were not violated as a result of not having such documents during his Disciplinary Hearing. *See supra* Part II.B.1; *see also Lebron v. Artus,* 2008 WL 111194 at \*9.

**\*7** Therefore, it is recommended that this claim also be **dismissed.**

## C. Supervisory Liability

Plaintiff has sued Defendant Superintendent Selsky based upon a theory of supervisory liability. Compl. at ¶¶ 51–52. The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing

*Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1948 (2009).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, because we find that Plaintiff's underlying due process claims are without merit, none of the above bases for supervisory liability are applicable. [8] *See Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course,

for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.").

[8]    For the same reason, we also need not decide whether Defendants would be entitled to qualified immunity. *Saucier v. Katz,* 533 U .S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 27) be **GRANTED** and the Complaint (Dkt. No. 1) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 5625919

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2973687
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Khaliq CLARK, Plaintiff,

v.

A. DANNHEIM, Dennis Hardy, T. Breckon, # 1
John Doe, Donald Selsky, in their individual and
official capacities, David Matayas, Defendants.

No. 02–CV–6525L.
|
July 21, 2011.

**Attorneys and Law Firms**

Mark A. Young, Rochester, NY, for Plaintiff.

Gary M. Levine, New York State Office of the Attorney General, Rochester, NY, for Defendants.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

**\*1** Plaintiff, Khaliq Clark, commenced this action under 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges that his constitutional rights have been violated in a number of respects in connection with an altercation between plaintiff and three guards on May 3, 2001, and a subsequent hearing on disciplinary charges that were brought against plaintiff as a result of that altercation.

In December 2008, the Court issued a Decision and Order, 590 F.Supp.2d 426, granting summary judgment for defendants on two of plaintiff's claims, relating to the denial of plaintiff's request for certain documents at the disciplinary hearing, and the refusal by the hearing officer, defendant Thomas Breckon, to call a particular witness requested by plaintiff.

Since defendants had not moved against plaintiff's other claims, that decision did not address those claims. Following the Court's December 2008 decision, then, the following claims remained: a due process claim against defendants Breckon and Donald Selsky, alleging that Breckon violated plaintiff's constitutional rights by having plaintiff removed from the hearing, and that Selsky, in his capacity as DOCS Director of Special Housing, affirmed Breckon's decision finding plaintiff guilty of the charges against him; an Eighth Amendment excessive-force claim against three correction officers; and a First Amendment claim against the officers, alleging that they assaulted plaintiff in retaliation for plaintiff's having complained about certain matters.

Defendants Breckon and Selsky now move for summary judgment on the remaining due process claim against them. Defendants' motion is granted.

The hearing transcript shows that plaintiff became argumentative with Breckon after Breckon denied plaintiff's request for a copy of a certain document. Breckon then warned plaintiff, "Now, if you interrupt me again while I'm giving you an instruction, I'll have you removed from the hearing." Tr. (Dkt.# 45–5) at 9. Plaintiff then again interrupted Breckon, who again warned him, "Do you understand that? I'm talking to you now. If you interrupt me again, I will have you removed from the hearing." Plaintiff immediately began to interrupt Breckon, stating, "It's a violation of the hearing," at which point Breckon stated, "Fine. Inmate Clark, you are done. You can go back to your cell. If you're not gonna allow me to conduct the hearing, you can go back and sit in your cell." Tr. at 10.

"The Supreme Court has made clear that due to the special nature of the prison environment, inmates are not guaranteed the 'full panoply of rights due a [criminal] defendant ... [and that] there must be some mutual accommodation between institutional needs and the objectives and the provisions of the Constitution.' " *Carter v. Cleveland,* No. 93–CV–0254, 1995 WL 818678, at \*5 (W.D.N.Y. Feb.15, 1995) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Thus, where an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion. *See, e.g., id.* (finding that hearing officer "was well within his discretion in ejecting plaintiff from the hearing, given his raised voice and threatening behavior"); *see also Figueroa v. Storm,* No. 07–CV–18, 2011 WL 1598922, at \*7 (W.D.N.Y. Apr. 28, 2011) (defendants did not violate plaintiff's due

2011 WL 2973687

process rights by having him removed from hearings after plaintiff became disruptive); *Purdle v. Graham,* No. 09–CV–971, 2011 WL 941283, at *3 (N.D.N.Y. Jan.19, 2011) (dismissing claim against hearing officer where record showed that plaintiff was removed from hearing because he was irate and would not be quiet), *Report and Recommendation Adopted,* 2011 WL 940469 (N.D.N.Y. Mar.16, 2011); *Sheils v. Minogue,* No. 06–CV–482, 2010 WL 5625919, at *6 (N.D.N.Y. Nov. 1, 2010) (no due process violation arose from removal of obstreperous inmate during disciplinary hearing, where hearing officer "warn [ed] him several times that his frequent interruptions and commentary would not be tolerated"), *Report and Recommendation Adopted,* 2011 WL 210580 (N.D.N.Y. Jan.21, 2011).

 *2  Based on the undisputed facts before me, I conclude that defendant Breckon acted well within his discretion in having plaintiff removed from the hearing. In addition, I find that plaintiff has failed to show that the outcome of the hearing would likely have been different had plaintiff not been removed, or that plaintiff was otherwise prejudiced by Breckon's actions. Finally, I conclude that even if a violation could be found here, it was objectively reasonable for Breckon to believe, in light of plaintiff's

contumacious behavior, that plaintiff's removal did not give rise to a constitutional violation, and that Breckon is therefore entitled to qualified immunity. *See Garcia v. Selsky,* 697 F.Supp.2d 442, 445 n. 3 (W.D.N.Y.2010).

Since there is no basis for a finding of liability on Breckon's part, there is likewise no basis upon Selsky could be held liable for affirming Breckon's decision. *See Crenshaw v. Sciandra,* 766 F.Supp.2d 478, 482 (W.D.N.Y.2011). Plaintiff's claim against Selsky must therefore be dismissed as well.

### CONCLUSION

The motion for summary judgment (Dkt.# 52) filed by defendants Thomas Breckon and Donald Selsky is granted, and plaintiff's claims against those two defendants are dismissed.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2973687

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 234 of 314

2008 WL 2986497
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert MIMS, Plaintiff,
v.
Correction Officer D. UFLAND, Correction Officer
B. Stevens, Correction Officer R. Westfield,
Correction Officer M. Seaman, Correction Officer M.
Rhynders, Correction Officer R. Tilley, Correction
Officer S. Niles, Sergeant M. Scott, Sergeant S.
Rogers, Sergeant Lonzack, Director Thomas G.
Eagen, Hearing Officer Gerard Guiney, Green
Haven Superintendent Robert Ercole, Director
Donald Selsky and John Does 1-8, Defendants.

No. 07 Civ.1926(DLC).
|
Aug. 1, 2008.

**Attorneys and Law Firms**

Jason L. Lopez, New York, NY, for Plaintiff.

Christine Anne Ryan, Office of New York State Attorney
General, New York, NY, for Defendants.

*OPINION AND ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff Robert Mims ("Mims") brings this action
pursuant to 42 U.S.C. § 1983 alleging various deprivations
of his constitutional rights during his incarceration at
Green Haven Correctional Facility ("Green Haven").
Mims filed an amended complaint on August 10, 2007,
which included causes of action (1) under the Eighth
Amendment in connection with a beating he allegedly
suffered at the hands of the staff at Green Haven on
March 27, 2006 (the "March 27 attack"); (2) under the
Due Process Clause in connection with a grievance and a
disciplinary proceeding related to the March 27 attack; (3)
under the Eighth Amendment for denial of medical care;
(4) under New York State law for assault and battery;
and (5) under New York State law for general negligence.
On August 21, 2007, defendants filed a partial motion to
dismiss the state law causes of action, as well as the Eighth

Amendment claim alleging denial of medical care. In his
opposition, Mims agreed to withdraw his state law claims;
an Opinion dated November 21, 2007, denied the motion
as to the Eighth Amendment medical care claim.

Defendants now move for partial summary judgment
as to (1) the medical care claim, (2) the Due Process
claim, and (3) the Eighth Amendment claim arising out
of the March 27 attack insofar as it is alleged against
defendants Sergeants Scott and Lonzack, and Officers
Niles, Rhynders, Tilley, and Stevens, whom defendants
claim were not personally involved in the alleged attack. [1]
In his opposition, Mims withdraws the medical care
claim, and all claims against defendants Director Thomas
G. Eagen, Green Haven Superintendent Robert Ercole,
Director Donald Selsky, and Officer Niles. Mims does
defend his Eighth Amendment claim as to the sergeants
and officers noted in defendants' summary judgment
motion, as well as the due process claim against defendant
Hearing Officer Gerard Guiney regarding his conduct
of Mims's disciplinary proceeding. [2] In reply, defendants
reassert that the due process claim should be dismissed,
and that Sergeants Scott and Lonzack were not personally
involved in the March 27 attack. [3] Thus, as presently
configured, the claims to be addressed in this motion are
the Eighth Amendment claims against Sergeants Scott
and Lonzack and the due process claim against Hearing
Officer Guiney. For the following reasons, defendants'
motion for partial summary judgment is denied in part
and granted in part.

---

[1]    Defendants concede that the Eighth Amendment
       claim as to defendants Sergeant Rogers and Officers
       Ufland, Westfield, and Seaman involves disputed
       issues of material fact.

[2]    In opposition, Mims also argues that defendants'
       motion papers are deficient because certain exhibit
       pages were missing. Defendants counter that this was
       inadvertent, that Mims had been given these pages
       during discovery, and that they have now filed the
       missing pages. No further discussion of this issue is
       necessary.

[3]    Although the reply briefly mentions Officers
       Rhynders, Tilley, and Stevens, no argument is
       presented as to those defendants in response to the
       plaintiff's identification of various passages of Mims's
       deposition during which the involvement of these
       Officers was described. Defendants are therefore

2008 WL 2986497

considered to have abandoned their argument that no issues of disputed fact remain as to the personal involvement of Officers Rhynders, Tilley, and Stevens in the March 27 attack.

## BACKGROUND

The following facts are relevant to the issues presented by this motion, and are either undisputed or taken in the light most favorable to Mims, unless otherwise noted. During all relevant times, Mims was incarcerated at Green Haven. On February 13, 2006, while traveling to the evening meal, Mims was confronted by Officer Ufland, who cursed at him and directed him to return to his cell. Afterward, cold food was delivered to Mims and approximately twenty other inmates that had not been permitted to eat at the mess hall. Mims promptly filed a grievance regarding this incident.

 **\*2** The next day, Sergeant Lonzack indicated to Mims that he "had no business" filing a grievance against Officer Ufland and told Mims that he would not process his grievance. Sergeant Lonzack also told Mims that he should "watch [himself]," which Mims understood to be some form of threat. For these actions, Mims also filed a grievance against Sergeant Lonzack.

On the afternoon of March 27, 2006, Officer Ufland again confronted Mims while he, in the company of a group of fellow inmates, was on his way to the mess hall. Again using foul language, Officer Ufland told Mims to stand against a nearby wall so that he could be searched. He was then frisked by another officer, and again told by Officer Ufland to return to his cell. Mims verbally protested, but did return to his cell and began writing up another grievance against Officer Ufland. Upon his return, Mims was placed in "keeplock" status. [4]

[4]   "Keeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006) (citation omitted).

At approximately 5:50 p.m. that same day, Mims's cell was opened for the apparent purpose of allowing him to take a shower. Mims was uncertain whether he was permitted to shower due to his keeplock status, but he exited the cell with his soap, towel, and wash cloth and headed toward the shower. When he arrived at the shower door, he discovered that it was locked. He then yelled

to the officer in the nearby "bubble," Officer Seaman, to tell him that the shower was locked. Mims asked Officer Seaman why he was let out for a shower if the shower door was locked, at which time Officer Westfield arrived, approached Mims, and asked him, in vulgar terms, why he was out of his cell. Mims explained that his cell had been opened for him to shower; Officer Westfield did not respond, but rather closed an adjacent door, thereby preventing Mims from returning to his cell.

Thereafter, approximately four other officers arrived, including Officer Ufland. These officers told Mims to stand against the wall, at which time, Mims alleges, they began to beat him, including hitting him in the head, back, and legs with batons. Mims also alleges that he was kicked in the face by Officer Ufland and stabbed in the leg with an unknown object by Officer Stevens. Mims was handcuffed, taken downstairs into a supply room, and thereafter to the Special Housing Unit ("SHU") and the medical facility, during which time, Mims alleges, the beating and verbal abuse continued while Mims loudly protested.

Although Mims could not identify all of the prison officials who were involved with the attack-at his deposition, Mims indicated that it seemed as though as many as twenty officers were present-he testified at his deposition that, in addition to the officers noted above (Westfield, Seaman, and Ufland), Sergeant Scott and Sergeant Rogers were involved in taking him downstairs and to the SHU, and that Sergeant Scott admitted him to the SHU. Contemporaneous inter-departmental memoranda written by Officers Rhynders and Tilley indicate that they also responded at the scene of the incident and were involved in escorting Mims to the SHU, and a "Report of Strip Frisk on Admission to SHU" further indicates that Sergeant Scott was present during Mims's admission to the SHU. Finally, Officers Ufland, Westfield, Seaman, and Sergeant Rogers completed memoranda that indicate that they were present at and involved in the incident . [5]

[5]   These memoranda present a different version of events, in which Mims initiated the incident by striking Officer Ufland in the face, and in which Mims was not repeatedly struck or beaten, but rather subdued using, in the words of Sergeant Rogers's memorandum, "only minimal and necessary" force, consisting principally of "body holds" and handcuffs.

2008 WL 2986497

**\*3** Mims alleges that, when he was examined following the attack, his lip, leg, and mouth were bloody. During the subsequent disciplinary proceeding, however, medical staff who treated Mims testified that while Mims did have a small laceration on his leg, another on his lip, and some pain in his right hand, he had no notable bruises or injuries consistent with an attack of the severity described by Mims.

Later on March 27, an inmate misbehavior report was issued to Mims, authored by Officers Ufland and Niles. Mims was charged with violations of prison rules regarding violent conduct, creating a disturbance, assault on staff, and the possession of alcohol (which Officer Niles reported had been discovered in Mims's cell during a search on the evening of March 27). Defendant Guiney was assigned to conduct the Tier III disciplinary hearing on these charges, which commenced on April 2, 2006, and concluded on May 3, when Mims was found guilty on all four charges and sentenced principally to eighteen months in the SHU and loss of various privileges for twenty-four months. As discussed in greater detail below, Mims alleges that Guiney was a biased and partial hearing officer because he did not permit him to call certain witnesses, curtailed relevant witness testimony, improperly removed him from the hearing, unreasonably credited the testimony of corrections officers, and generally displayed a biased and unfair attitude toward Mims.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims or defenses cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248.

As noted, only two issues presented by defendants' partial motion for summary judgment remain to be decided here: whether a material issue of disputed fact exists regarding (1) the personal involvement of Sergeants Scott and Lonzack in the March 27 attack, and (2) the due process claim against Guiney. These issues will be addressed in turn.

I. Personal Involvement of Sergeants Scott and Lonzack

**\*4** It is well-settled that "[p]roof of an individual defendant's personal involvement in the alleged wrong is ... a prerequisite to his liability on a claim for damages under § 1983." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). First, defendants contend that Mims has not proffered evidence that Sergeant Scott was personally involved in the March 27 attack, noting particularly that Mims's deposition testimony indicates that Mims does not know who was involved in transporting him downstairs or into the supply room. Furthermore, Sergeant Scott has submitted a declaration stating that he did not respond at the scene of the alleged attack, and that his "only connection to Mr. Mims" on March 27, 2006, was related to the later search of his cell.

Based on the record submitted by the parties, a material issue of disputed fact exists as to Sergeant Scott's personal involvement in the alleged March 27 attack. Officer Seaman testified at the Tier III hearing that it was Sergeant Scott who placed restraints on Mims at the scene of the alleged attack. Defendants also overlook portions of Mims's deposition testimony during which he indicates that, although he was disoriented due to the alleged attack, he believed that either Sergeant Scott or Sergeant Rogers was involved in escorting him downstairs. Thus, based on the current record, a reasonable jury could conclude that Sergeant Scott was "personal[ly] involve[d] in the alleged wrong." *Id.*

Second, while defendants do not dispute at this stage that Sergeant Lonzack refused to process Mims's grievance against Officer Ufland and told Mims to "watch [himself]," they argue that because Mims "does not place Sergeant Lonzack at the scene of the use of force," Mims has not proffered sufficient evidence to create a triable issue of fact as to that defendant's personal involvement in the March 27 attack. Although defendants' analysis of this

point misses the mark, there is nevertheless insufficient evidence in the record to permit a reasonable jury to conclude that Sergeant Lonzack was personally involved in the March 27 attack.

Contrary to defendants' contention, personal involvement is not a concept limited to physical presence.

> The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty,* 490 F.3d 142, 153 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Here, Mims's deposition testimony regarding Sergeant Lonzack, if credited, could lead a reasonable juror to conclude that (1) Sergeant Lonzack exercised some supervision over Officer Ufland, insofar as he was reviewing Mims's grievance regarding her conduct, and (2) Sergeant Lonzack was aware that Officer Ufland or other officers held a grudge against Mims as a result of his grievances. It would be pure conjecture to conclude further based on this testimony, however, that Lonzack "knew or should have known that there was a high degree of risk that" Officer Ufland or others would engage in an act of physical violence against Mims, "but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk." *Poe v. Leonard,* 282 F.3d 123, 142 (2d Cir.2002). Mims has identified no other evidence in the record in support of this theory. Thus, summary judgment will be granted to the defendants on Mims's excessive force claim insofar as it is asserted against Sergeant Lonzack.

## II. Due Process and the Tier III Proceeding

**\*5** Mims claims that his due process rights were violated because Hearing Officer Guiney was biased in his conduct of the Tier III proceeding. As evidence of Guiney's bias, Mims cites the following: that Guiney (1) refused to call certain witnesses and curtailed Mims's questioning of certain witnesses; (2) unreasonably credited the testimony of prison staff and found Mims guilty on all four charges; (3) removed Mims from the hearing; and (4) generally "exhibited an attitude of bias and predisposition" regarding Mims's guilt and credibility. Notably, however, Mims's opposition to the motion for summary judgment makes clear that he does not contend that each of these actions constitutes a separate due process violation-and, indeed, the record and case law generally would not support such claims [6] -but rather that these actions collectively demonstrate that Guiney lacked the impartiality required to conduct the Tier III hearing in accordance with constitutional standards.

[6]
> In particular, to the extent that Mims alleges that his due process rights were violated because Hearing Officer Guiney did not permit him to call certain witnesses, Mims acknowledged at his deposition that the fifteen additional witnesses he was not allowed to call "would [have] nothing different to testify to" than the five witnesses he called. Mims stated, "[e]verybody would have testified to the same thing." While an "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense," *Wolff v. McDonnell,* 418 U.S. 539, 566 (1974), witnesses requested by an inmate need not be called if their testimony would be "irrelevant or unnecessary." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). Guiney explained at the hearing that while Mims would only be permitted five witnesses initially, "if at any time you can demonstrate [that] one of the other ones could add something that the other [five] haven't done, then we'll call them up." Similarly, with regard to any claim that witnesses were questioned outside of Mims's presence, or that Mims was deprived of an opportunity to cross-examine those witnesses by his removal from the hearing, it must be noted that "[i]t is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate. Nor does an inmate have a constitutional right of confrontation," *id.* (citing, *inter alia, Wolff,* 418 U.S. at 567-68), or cross-examination, *Wolff,* 418 U.S. at 567-68. While the case law does imply that Mims had a limited right to be present at the hearing, *compare Young v. Hoffman,* 970 F.2d 1154, 1156 (2d

2008 WL 2986497

Cir.1992) (noting that the prisoner must be provided "the opportunity to appear at the hearing and to call witnesses"), *with Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) ("Prison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding."), that right is certainly not absolute, and can be waived by engaging in disruptive conduct. *Cf. Davis v. Grant,* 532 F.3d 132, 2008 WL 2651096, at *8 (2d Cir. July 8, 2008) (noting the circumstances in which a criminal defendant may be removed from the courtroom).

It is undisputed that Mims had a constitutional right to have a "fair and impartial hearing officer" preside over his Tier III disciplinary hearing. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). "The degree of impartiality required of prison officials," however, "does not rise to the level of that required of judges generally. It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Nevertheless, a hearing officer must "not prejudge the evidence" or state with certainty "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). *See also Colon,* 58 F.3d at 871 (summary judgment not appropriate on bias allegation where statement made by hearing officer "at least creates an issue of fact as to whether [the Hearing Officer] refused even to consider, on the evidence, the merits of [the plaintiff's] principal defense to the charges against him."); *Francis,* 891 F.2d at 46 (noting that "it would be improper for prison officials to decide the disposition of a case before it was heard"); *cf. Edwards v. Balisok,* 520 U.S. 641, 647 (1997) ("The due process requirements for a prison disciplinary hearing are in many respects less demanding than those for criminal prosecution, but they are not so lax as to let stand the decision of a biased hearing officer who dishonestly suppresses evidence of innocence.")

Mims has not cited sufficient evidence of bias to permit a reasonable jury to conclude that Hearing Officer Guiney was a biased and partial hearing officer. Although Mims has identified several decisions made by the hearing officer during the course of the proceeding that he contends were mistaken, Mims has not identified any evidence indicating that these decisions were the result of bias rather than reasoned decisionmaking with which Mims simply disagrees. Fair-minded hearing officers could have decided the issues to which Mims points in different ways. Mims has not shown that any of Guiney's rulings fall

outside the range of reasonable conduct for unbiased hearing officers.

**\*6** The transcript of the Tier III proceeding, on which both parties rely and the accuracy of which is not contested, reveals that Hearing Officer Guiney permitted Mims to present his defense to the charges–*i.e.,* that he did not attack the staff on March 27, but rather the staff attacked him–and admitted testimony from several inmates who corroborated Mims's account. In addition, the transcript and hearing record demonstrates that Hearing Officer Guiney obtained several adjournments of the hearing for the purpose of obtaining witnesses requested by Mims, including the one inmate who had been transferred to another facility, who ultimately testified via telephone. No competent evidence of bias can be gleaned from these events.

Many of Mims's complaints regarding Hearing Officer Guiney's conduct of the hearing relate to Guiney's decision to focus the testimony almost exclusively on accounts of what took place at approximately 5:50 p.m. on March 27, 2006, the time of the alleged attack, [7] and not to permit questioning or testimony regarding other topics, including prior confrontations between Officer Ufland and Mims. Mims fails to acknowledge, however, that a hearing officer may refuse to admit testimony or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing. *Kalwasinski,* 201 F.3d at 109. Mims has not pointed to admissible evidence indicating that Hearing Officer Guiney's relevance determinations were driven by bias against Mims rather than a conclusion regarding which topics would (or would not) shed light on whether Mims was (or was not) guilty of the charges against him. A reasonable jury therefore would have no basis to conclude that these evidentiary rulings were evidence of bias.

[7]     This included, of course, medical testimony that could further illuminate that issue.

Finally, and perhaps most importantly, Hearing Officer Guiney's decision to credit the account of the events of March 27 presented by the officers and not the inmates– and thus to find Mims guilty of the disciplinary charges– was supported by ample evidence, and is not evidence of bias. *Cf. Sira,* 380 F.3d at 76 (citing *Superintendent v. Hill,* 472 U.S. 445, 454-56 (1985)). The written disposition noted in particular that Mimis's injuries, described by

prison nurses as little more than minor lacerations and pain in his right hand (or ankle, according to one witness), "were consistent with the staff's report" of the incident and not the testimony provided by the inmates, who described Mims receiving a severe beating at the hands of Officers Ufland, Westfield, and others. [8] Mims has not offered any cogent argument explaining why Hearing Officer Guiney's conclusion that the medical testimony corroborated the corrections officers' accounts of the events of March 27 was evidence of bias. [9]

---

[8]   Inmate Gonzalez, for example, testified that the first officer to arrive on the scene (presumably Officer Westfield) was the first to punch Mims, and that when the other officers arrived, they "threw [Mims] on the floor and they held him down punching him while [Officer Ufland] continuously beat him with her stick, striking him in the head and poking him with it, nonstop, I mean, it was crazy."

[9]   Although Mims identifies various inconsistencies in the officers' accounts, and argues that the hearing officer should have therefore concluded that their testimony was not credible, Mims does not acknowledge the larger point, on which Hearing Officer Guiney focused-namely, that the medical testimony appeared to conclusively contradict the version of events described by Mims and his witnesses-nor has he identified admissible evidence tending to show that Guiney's conclusion on this point was a result of bias against Mims.

In sum, Mims has not identified any evidence indicating that Hearing Officer Guiney "refused even to consider, on the evidence, the merits of [the plaintiff's] principal defense to the charges against him," *Colon,* 58 F.3d at 871, that he otherwise "prejudge[d] the evidence" in Mims's case, *Patterson,* 905 F.2d at 570, or "dishonestly suppresse[d] evidence of innocence." *Edwards,* 520 U.S. at 647. Summary judgment therefore will be granted to the defendants on this claim.

## CONCLUSION

**\*7** Defendants' partial motion for summary judgment, filed on April 15, 2008, is granted in part and denied in part. Defendants Director Thomas G. Eagen, Green Haven Superintendent Robert Ercole, Director Donald Selsky, Sergeant Lonzack, Correction Officer Niles, and Hearing Officer Gerard Guiney are dismissed from this action. The Eighth Amendment claim against defendants Sergeants Rogers and Scott and Officers Ufland, Westfield, Seaman, Rhynders, Tilley, and Stevens is the only claim remaining in this action. An Order issued in conjunction with this Opinion will set a schedule for further proceedings.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 2986497

---

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 912008
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Lord Natural SELF–ALLAH, Plaintiff,
v.
Anthony ANNUCCI, George J. Bartlett, Floyd
G. Bennett, and Dana M. Smith, Defendants.

No. 97–CV–607(H).
|
Oct. 14, 1998.

DECISION AND ORDER

HECKMAN, Magistrate J.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have
consented to have the undersigned conduct any and all
further proceedings in this case, including entry of final
judgment. Currently before this court is plaintiff's motion
for preliminary injunctive relief (Item 9) and defendants'
motion for dismissal (Item 15). For the following reasons,
an evidentiary hearing is ordered where plaintiff's motion
will be considered. Defendants motion to dismiss will be
granted in part and denied in part.

BACKGROUND

Plaintiff Lord Natural Self–Allah is an inmate currently
residing at the Clinton Correctional Facility. Defendant
Floyd G. Bennett is the Superintendent of the Elmira
Correctional Facility. Defendant Dana M. Smith is the
First Deputy Superintendent of the Elmira Correctional
Facility. Defendants Anthony Annucci and George
Bartlett are Deputy Commissioners of the New York State
Department of Correctional Services.

Plaintiff alleges that defendants violated his First and
Fourteenth Amendment rights when they withheld
delivery of certain mail addressed to him while he was an
inmate at Elmira Correctional Facility ("Elmira") (Item
1). On March 31, 1997, plaintiff indicates he renewed
his subscription to *The Five Percenter,* a publication
produced by The Allah Youth Center In Mecca, Inc.
He claims he received this publication at Elmira for at

least six months prior to renewing his subscription. On
April 9, 1997, plaintiff received a memorandum from
Elmira's Correspondence Department stating that several
issues of *The Five Percenter* were discovered "during a
routine examination of [plaintiff's] incoming mail," and
were determined to be "non -allowable/contraband items"
in violation of Department of Corrections ("DOCS")
Inmate Behavior Rule 105.12. Plaintiff received a similar
notice on or about April 14, 1997, indicating that another
issue of *The Five Percenter* was being withheld. Plaintiff
was given the option of having the materials destroyed by
prison personnel or having the publications mailed to an
address outside the prison at his own expense. Plaintiff
chose the latter option and had the publications mailed to
an address outside the facility.

Plaintiff filed an inmate grievance protesting defendants'
confiscation of *The Five Percenter,* but was informed that
the confiscation was not a grievable issue. No appeal
process was made available to plaintiff. Plaintiff then
made separate written requests to each defendant to have
the matter reviewed. Each request was denied.

On July 30, 1997, plaintiff filed this action under
42 U.S.C. § 1983 seeking monetary damages, a
declaratory judgment, and injunctive relief, alleging that
his constitutional rights under the First and Fourteenth
Amendments were violated because he was denied access
to *The Five Percenter.* On February 3, 1998, plaintiff
moved for a preliminary injunction, pursuant to FED.
R. CIV. P. 65. On March 19, 1998, defendants moved to
dismiss the complaint pursuant to FED. R. CIV. P. 12(b)
(6).

DISCUSSION

I. MOTION FOR PRELIMINARY INJUNCTION

**\*2** Pursuant to FED. R. CIV. P. 65, plaintiff has
moved to enjoin defendants from interfering with delivery
of his copies of *The Five Percenter.* In order to
obtain a preliminary injunction, the moving party must
demonstrate that without injunctive relief he will suffer
irreparable harm. *Polymer Tech. Corp. v. Mimran,* 37 F.3d
74, 77–78 (2d Cir.1994). The moving party is also required
to show " 'either (1) a likelihood of success on the merits
of its case or (2) sufficiently serious questions going to
the merits to make them a fair ground for litigation and
a balance of hardships tipping decidedly in its favor."

' *Polymer Tech. Corp.,* 37 F.3d at 77–78 (2d Cir.1994) (quoting *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982)). It should be noted that the award of a preliminary injunction is an extraordinary and drastic remedy that will not be granted absent a clear showing that the plaintiff has met his burden of proof. *Beech–Nut, Inc. v. WarnerLambert Co.,* 480 F.2d 801, 803 (2d Cir.1973); *Kraft General Foods, Inc., v. Allied Old English, Inc.,* 831 F.Supp. 123, 127 (S.D.N.Y.1993).

An adverse party is entitled to notice before a preliminary injunction is granted. FED. R. CIV. P. 65(a)(1). The notice requirement implies the necessity for a hearing, giving the adverse party a fair opportunity to oppose the motion. *Granny Goose Foods, Inc., v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 433 n. 7 (1974); *Visual Sciences, Inc., v. Integrated Communications Inc.,* 660 F.2d 56, 58 (2d Cir.1981). Even though oral testimony is not required, an evidentiary hearing is necessary to make an appropriate finding of facts if essential facts are in dispute. *See Drywall Tapers & Pointers Local 1974 v. Local 530,* 954 F.2d 69, 76–77 (2d Cir.1992); *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.1989); *Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 747 (2d Cir.1987); *Visual Sciences,* 660 F.2d at 58. Given that there are essential facts in dispute in this case, an evidentiary hearing will be held in order to make appropriate findings of fact.

Plaintiff alleges that he will suffer an immediate and irreparable injury because adherents of The Five Percent Nation of Islam are obligated to study and memorize material that is made available in *The Five Percenter* (Item 10). *See generally, Patrick v. LeFevre,* 745 F.2d 153, 155 (2d Cir.1984)(presenting an overview of the Five Percenter creed). Loss of First Amendment rights "unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Abdul Wali v. Coughlin,* 754 F .2d 1015, 1026 (2d Cir.1985); *but see e.g., Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125 (1977). Plaintiff, therefore, has met his burden showing irreparable harm since DOCS' prohibition of *The Five Percenter* infringes upon his First and Fourteenth Amendment rights.

**\*3** A party seeking preliminary injunctive relief must also demonstrate a likelihood of success on the merits of the claim. *Polymer Tech. Corp,* 37 F.3d at 77. It is not necessary for the moving party to demonstrate that he will be successful on his claim, only that the probability of

prevailing on the merits exceeds fifty percent. *Abdul Wali,* 754 F.2d at 1025.

The underlying issue is whether an absolute ban of Five Percenter literature is permissible if it impedes plaintiff's ability to study the tenets of his beliefs. Prisoners do not lose their First Amendment rights simply because they are incarcerated. See *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *Bell v. Wolfish,* 441 U.S. 520, 545 (1979); *Pell v. Procunier,* 417 U.S. 817, 822 (1974). This does not mean that a prisoner's First Amendment rights are absolute. The fact of incarceration, and legitimate penological objectives, limit inmates' abilities to exercise their constitutional rights. *Bell,* 441 U.S. at 545–46; *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 129 (1977); *Pell,* 417 U.S. at 501. However, regulations impinging on a prisoners' rights are valid only if they are "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987).

Reasonableness is determined by a four part test outlined in *Turner:*

1. There must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it;

2. Whether there are alternative means of exercising the right that remain open to prison inmates;

3. Determining the impact of accommodation of the asserted constitutional right on guards and other inmates, and on the allocation of prison resources generally;

4. Whether there is a ready alternative to the regulation that fully accommodates prisoners' rights at *de minimus* cost to valid penological interests.

*Turner,* 482 U.S. at 89–91.

A rational relationship does exist between DOCS' policy and the governmental interest used to justify the regulation. Efforts to end gang-related activity in penal institutions and fostering institutional security are legitimate penological interests. *See e .g., Pell,* 417 U.S. at 823 (indicating that the problem of internal security is central to all other concerns of the prison system). However, when applying the facts surrounding plaintiff's claim to the other *Turner* requirements, the court notes that there are several essential factual issues in dispute.

These involve questions as to the relationship between Five Percenter literature and gang activity, and whether alternatives exist for plaintiff to study the tenets of his beliefs. These factual disputes mandate that an evidentiary hearing be held prior to deciding plaintiff's motion for injunctive relief.

This is not the first time courts have been asked to examine the appropriateness of DOCS' blanket ban on literature produced by unauthorized groups. *See Leitzsey v. Coombe,* 998 F.Supp. 282 (W.D.N.Y.1998); *Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533 (S.D.N.Y. Mar. 27, 1997); *Nogueras, v. Coughlin,* No. 94 Civ. 4094, 1996 WL 487951 (S.D.N.Y. Aug. 27, 1996). All three cases have similar fact patterns in which a search of an inmate's cell uncovered literature produced by an unauthorized organization. In *Nogueras* the literature was produced by the Latin Kings. The literature in *Breland* was produced by the Five Percenter Nation of Islam. And in *Leitzsey* the literature was produced by the Black–A–Moor Kings and Queens Knights Nation. The district court in both *Leitzsey* and in *Nogueras* granted summary judgment in favor of DOCS. However, summary judgment as it related to plaintiff's claims for declaratory and injunctive relief was denied in *Breland*.

**\*4** The courts were able to grant summary judgment in both *Nogueras* and *Leitzsey* because the record in both cases was better developed than the record here. On the other hand, the court in *Breland* denied defendants' request for summary judgment and held that a trial was necessary in order to examine factual questions before the court. *See 1997 WL 139533, at 8.* As I have already noted, there are essential factual issues in dispute in this matter. The necessary findings of fact can be made in an evidentiary hearing. *See Fengler,* 832 F.2d at 747.

Defendants request the court defer to their policy prohibiting inmate possession of all literature produced by unauthorized organizations (Item 16, at 4–5). However, courts must be cautious in "substitut[ing] the rhetoric of judicial deference for meaningful scrutiny of constitutional claims in the prison setting." *Block v. Rutherford,* 468 U.S. 576, 593 (1984)(Blackmun, J., concurring); *see also Giano v. Senkowski,* 54 F.3d 1050, 1058 (2d Cir.1995)(Calabresi, J., dissenting); *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) As Justice Brennan stated, the Constitution "was meant to provide a bulwark against infringements that might otherwise

be justified as necessary expedients of governing." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 356 (1987)(Brennan, J., dissenting). Even though the courts are to accord "appropriate deference to prison officials," it is also appropriate for the courts to carefully scrutinize constitutional claims within the prison setting. *O'Lone,* 482 U.S. at 349; *Giano,* 54 F.3d at 1058 (Calabresi, J., dissenting).

Accordingly, an evidentiary hearing will be held to further investigate the merits of plaintiff's claim and to determine whether a preliminary injunction will issue.

## II. DEFENDANTS' MOTION TO DISMISS

Also pending before the court is defendants' motion to dismiss (Item 15). A motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) is to be treated as a motion for summary judgment when material outside the pleadings is presented to the court and the parties have been given the opportunity to present material that would be pertinent to a motion by Rule 56. FED.R.CIV.P. 12(b); *see also Fonte v. Board of Mgers of Continental Towers Condo.,* 846 F.2d 24, 25 (2d Cir.1988). Summary judgment is appropriate if there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). Also, the facts put forward must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255.

Defendants make four arguments in support of their motion to dismiss: that plaintiff's claim lacks merit; that plaintiff's complaint must be dismissed under the Prison Litigation Reform Act ("PLRA"); that punitive damages are unavailable since plaintiff has not alleged wanton, reckless or willful misconduct; and that defendants are entitled to qualified immunity (Item 16, Item 23). Each argument is addressed in turn.

### A. *Merits of Plaintiff's Claim.*
**\*5** Referring to *Turner v. Safely,* defendants argue that plaintiff's case lacks merit and therefore should be dismissed. An evidentiary hearing is being held where factual disputes surrounding plaintiff's claims will be further examined. Therefore, defendants' motion for dismissal on these grounds is denied.

B. *Dismissal under Prison Litigation Reform Act is Inappropriate.*

Defendants argue that plaintiff's action should be dismissed pursuant to 42 U.S.C. § 1997e(e) because plaintiff seeks to recover for a non-physical injury. The Prison Litigation Reform Act provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Courts have upheld the physical injury requirement of § 1997e(e) when the underlying claim involves an injury to a prisoner's physical being. *See Siglar v. Hightower,* 112 F.3d 191, 193–94 (5th Cir.1997); *Zehner v. Trigg,* 952 F.Supp. 1318, 1322–23 (S.D.Ind.1997), *aff'd* 133 F.3d 459, 461 (7th Cir.1997); *Brazeau v. Travis,* 1996 WL 391701, at *1 (N.D.N.Y. July 9, 1996). However, this standard is inapplicable when a prisoner makes a First Amendment claim. *See Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998); *see also Warburton v. Underwood,* 2 F.Supp.2d 306, 315 (W.D.N.Y.1998). As the Ninth Circuit held in *Canell,* "[t]he deprivation of First Amendment rights entitles a plaintiff judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred." 143 F.3d at 1213. Plaintiff's claim will not be dismissed because he has failed to meet the injury requirement of the PLRA. Section 1997e(e) simply does not apply to First Amendment claims.

C. *Unavailability of Punitive Damages.*

Defendants move to dismiss plaintiff's claims for punitive damages asserting that the complaint is devoid of the necessary allegations of intent. Punitive damages can be awarded in § 1983 cases when defendants' conduct is malicious, or involves callous or reckless indifference to federally protected rights. *Smith v. Wade,* 461 U.S. 30, 56 (1983); *Rickets v. City of Hartford,* 74 F.3d 1397, 1412 (2d Cir.1996), *cert. denied,* ____ U.S. ____. 117 S.Ct. 65, 136 L.Ed.2d 26 (1996); *Jeffries v. Harleston,* 21 F.3d 1238, 1249 (2d Cir.), *vacated on other grounds,* 513 U.S. 996 (1994). Even construing plaintiff's allegations liberally, there is nothing in the complaint that alleges that defendants were motivated by evil intent or reckless or callous indifference towards the plaintiff. All of the facts put forward by the plaintiff support defendants' assertion that they were following a policy of prohibiting all Five Percenter publications regardless of who desired to possess them. Because plaintiff has failed to put forward

evidence alleging "wanton behavior or conduct evidencing a criminal disregard for civil liability," defendants' motion to dismiss plaintiff's claim for punitive damages is granted." *See Ethicon Inc., v. Aetna Causalty and Surety Co,* 737 F.Supp. 1320, 1336 (S.D.N.Y.1990).

D. *Qualified Immunity.*

**\*6** Finally, defendants' argue that they are entitled to qualified immunity. Government officials are entitled to qualified immunity from civil suits for damages so long as their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is appropriate if:

> (1) it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution; or (2) it was not clear at the time of the acts at issue that an exception did not permit those acts; or (3) it was objectively reasonable for the official to believe that his acts did not violate those rights.

*Gittens v. Lefevre,* 891 F.2d 38, 42 (2d Cir.1989)(internal citations omitted). Whether a right is clearly established turns on the " 'objective legal reasonableness 'assessed in light of the legal rules that were 'clearly established' at the time [the official action] was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)(internal citation omitted); *See Gittens,* 891 F.2d at 42. The established right must be more than just an abstract concept; it "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 639–40.

The interest in question is whether plaintiff has a right to possess Five Percenter literature. This question is only now beginning to appear before the courts. *See Breland v. Goord,* 1997 WL 139533 (S.D.N.Y. Mar. 27, 1997); *Buford v. Goord,* Index No. 911–98, N.Y. Sup.Ct. (Albany County) (Mar. 27, 1998). It was reasonable for defendants to conclude that they were not violating plaintiff's rights by withholding plaintiff's copies of *The Five Percenter. See Breland v. Goord,* 1997 WL 139533, at *8. Therefore, plaintiff is not entitled to monetary damages from defendants.

1998 WL 912008

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss (Item 15) is denied in part and granted in part.

It is ordered that an evidentiary hearing will be held on November 23, 1998, at 2:00 p.m., where the court will examine the factual disputes surrounding plaintiff's request for a preliminary injunction (Item 9). Both plaintiff and defendants shall be prepared to provide testimony as to the following issues: the relationship between Five Percenter literature and gang activities; alternative avenues available for plaintiff to exercise his religious beliefs; the impact granting plaintiff's requested relief would have on DOCS and the prison community; and the impact plaintiff's proposed remedy of subjecting Five Percenter literature to the media review process would have on DOCS and the prison community.

Plaintiff has not requested appointment of counsel. Nonetheless, pursuant to 28 U.S.C. § 1915(e), and in the interests of justice, I appoint Glenn Edward Murray, Esq., to represent the plaintiff in all on-going matters related to this litigation. *See, e.g., Sears, Roebuck & Co. v. Charles W. Sears Real Est.* 865 F.2d 22, 23 (2d Cir.1988).

**\*7** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 912008

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    5

2017 WL 1381859
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald MICHEL, Plaintiff,
v.
Sgt. MANNA, et al., Defendants.

9:15-CV-1187 (DNH/ATB)
|
Signed 01/17/2017

**Attorneys and Law Firms**

DONALD MICHEL, pro se.

TIMOTHY P. MULVEY, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge. In this civil rights complaint, plaintiff, an inmate, alleges that defendants have violated his First Amendment right to practice his Rastafarian religion by enforcing a New York State Department of Corrections and Community Supervision ("DOCCS") grooming policy in a manner that prevents him from growing and styling his hair in accordance with his religious beliefs. (Compl. ¶ 15) (Dkt. No. 1). Plaintiff also includes an Equal Protection claim. (Compl. ¶ 16). Plaintiff seeks a substantial amount of monetary damages. (Compl. at 10 [1]).

[1]    All page references in the record citations are to the pagination in the CM/ECF system.

Presently before the court is the defendants' motion for summary judgment on qualified immunity grounds. (Dkt. No. 23). Plaintiff has responded in opposition to the defendants' motion. (Dkt. No. 30). For the following reasons, this court agrees with defendants and recommends granting their motion for summary judgment as to plaintiff's First Amendment claim. This court also recommends dismissing plaintiff's Equal

Protection claim without prejudice, *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

**DISCUSSION**

**I. Facts**

DOCCS Directive 4914, dated March 1, 2013, is the DOCCS grooming policy at issue in this proceeding ("Grooming Policy"). It provided in relevant part that:

> Only basic haircuts will be allowed. Only one straight part is allowed with no other lines, designs, or symbols cut into the hair.... The only braids allowed are the corn row style.... No designs or symbols may be woven into the hair.... The dreadlock hairstyle is allowed. When worn, dreadlocks must extend naturally from the scalp and may not be woven, twisted, or braided together forming pockets that cannot be effectively searched.

(Dkt. No. 23-3, Ex. B. to Mulvey Decl., at 21).

At all times relevant to this proceeding, plaintiff was an inmate at the Auburn Correctional Facility. [2] (Compl. at 2). He is a registered member of the Rastafarian faith, and therefore required by his religion to grow his hair in dreadlocks. (Compl. at 3; Dkt. No. 23-3, Ex. B. to Mulvey Decl, at 22). On two occasions in August 2013, plaintiff was stopped by defendant Manna, an Auburn Correctional Officer, who informed him that his hairstyle violated the Grooming Policy, because his hair was woven into a pattern or design. (*Id.*). Plaintiff disagreed, and insisted that his hair was merely in the "beginning stages" of dreadlocks. (Dkt. No. 23-2, Ex. B. to Mulvey Decl., at 5). Defendant Manna still ordered plaintiff to remove the design from his hair. (Compl. at 3).

[2]    Plaintiff is currently housed at the Clinton Correctional Facility. (Compl. at 2).

Frustrated by defendant Manna's response, plaintiff filed a grievance seeking guidance regarding his dreadlocks. (Dkt. No. 30-2, Ex. A to Pl.'s Decl., at 1). Plaintiff states that when he appeared before the Inmate Grievance Resolution Committee ("IGRC"), they advised him that

the First Amendment guaranteed his right to grow dreadlocks. (Compl. ¶ 3; Dkt. No. 30-1, Pl.'s Reply to Statement of Material Facts ¶ 14; Dkt. No. 30-2, Ex. A. to Pl.'s Decl., at 1). Plaintiff also states that the IGRC provided a written determination to that effect on or about September 6, 2013. [3] (Compl. at 3).

[3]    Plaintiff did not receive a copy of this September 6, 2013 grievance determination in response to his discovery requests. Plaintiff first brought this issue to the court's attention on August 12, 2016, almost three months after the discovery deadline had passed. (Dkt. No. 22). As part of his opposition to defendants' motion, plaintiff argues that this document is essential to his response, and that summary judgment should be denied pursuant to Fed. R.Civ.P. 56(d). (Dkt. No. 30, Pl.'s Br. at 10). I have considered plaintiff's argument, but conclude that documentary proof of the IGRC's finding that plaintiff had a right to wear dreadlocks is not necessary to respond to defendants' motion. Although such proof may go to the merits of plaintiff's First Amendment claim, it does not impact the qualified immunity arguments raised in this summary judgment motion, as discussed below.

**\*2** On September 10, 2013, defendant Manna stopped plaintiff again and advised him that his hair was not in compliance with the Grooming Policy. (Dkt. No. 23-7, Manna Decl. ¶ 10). Plaintiff argued that his hairstyle was permitted, by both the First Amendment and the Grooming Policy. (Compl. at 5). Defendant Manna issued plaintiff a misbehavior report dated September 10, 2013 for failure to follow his earlier direct order to conform to the Grooming Policy. (Dkt. No. 23-3, Ex. B. to Mulvey Decl., at 9). In the misbehavior report, defendant described plaintiff's hair as "woven to look like a checker board with large diamonds woven into the side of his head." (Id. at 9).

Defendant Tabate presided over the disciplinary hearing in connection with the misbehavior report. (Dkt. No. 23-8, Tabate Decl. ¶ 2). At the commencement of the hearing on September 14, 2013, defendant Tabate observed plaintiff's hairstyle and noted that it had "designs" in it. (Dkt. No. 23-2, Ex. A. to Mulvey Decl. ("Hearing Transcript") at 3-4). Plaintiff's hearing was then adjourned so that defendant Manna could testify. (Hearing Transcript at 2). When the hearing reconvened on September 27, 2013, plaintiff testified that he had changed his hairstyle so that it no longer had designs in it. (Hearing Transcript at 3). Defendant Manna agreed that plaintiff's hairstyle no

longer had the prohibited designs or shapes in it. (Hearing Transcript at 2). After considering the testimony and other evidence, defendant Tabate found plaintiff guilty of disobeying a direct order from a correctional officer and imposed a penalty of 17 days keeplock [4] confinement, with associated loss of privileges. (Hearing Transcript at 3-4). On October 4, 2013, defendant Graham denied plaintiff's appeal of the hearing officer's decision. (Dkt. No. 23-6, Graham Decl. ¶ 2).

[4]    "Keeplock" is confinement to one's own cell. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989).

While his disciplinary hearing was pending, plaintiff filed a grievance which claimed that defendant Manna's actions had violated his right to practice his religion and were inconsistent with the September 6, 2013 IGRC decision. (Dkt. No. 30-2, Ex. C to Pl.'s Decl., at 3). On September 20, 2013, plaintiff was interviewed by Lt. T. Blowers (who is not named as a defendant) as part of the grievance investigation. (Dkt. No. 23-3, Ex. B. to Mulvey Decl., at 20). In his interview notes, Blowers recorded his observation that plaintiff's hair was "just as [defendant Manna] described." (Id.). Blowers also noted that "I agree with Sgt. Manna and believe that [plaintiff's] hairstyle violates directive #4914." (Id.). On September 23, 2013, defendant Graham denied the grievance. (Dkt. No. 23-5, Ex. D. to Mulvey Decl., at 3). Plaintiff timely appealed this decision to CORC, which upheld the Superintendent's determination on March 26, 2014. (Id. at 1). Plaintiff commenced this action on October 15, 2015. (Dkt. No. 5).

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**\*3** The moving party has the burden to show the absence of disputed material facts by informing the court of

portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

### III. Qualified Immunity

#### A. Legal Standards

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining if a particular right was clearly established, the Court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *K.D. ex rel. Duncan v. White Plains School Dist.*, No. 11 Civ. 6756, 2013 WL 440556, at *10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). The court must ask whether the right at issue was established " 'in a particularized sense so that the contours of the right [were] clear to a reasonable official' " in light of the specific context of the case, "not as a broad general proposition." *Id.* (citing, *inter alia*, *Reichle v. Howards*, ––– U.S. ––––, 132 S. Ct. 2088, 2094 (2012)). A case directly on point is not required, and the question is not whether an attorney would learn about the right from researching case law, but whether existing precedent has "placed the statutory or constitutional question beyond debate." *Id.* (citing, *inter alia*, *Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012)). Only Supreme Court and Second Circuit precedent, existing at the time of the alleged violation, is relevant in deciding whether the right is well established. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004).

Because qualified immunity is " 'an immunity from suit rather than a mere defense to liability,' " the Supreme Court has " 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (citations omitted). Defendants have based their summary judgment motion only on qualified immunity [5], so this court will focus its inquiry on that ground, and need not address the substance of plaintiff's First Amendment claim. *See Pearson*, 555 U.S. at 236 (in determining whether qualified immunity applies, it may often be beneficial for the court to first consider whether the facts alleged show a constitutional violation, pursuant to *Saucier v. Katz*, 533 U.S. 194, 201 (2001), but that sequence should no longer be regarded as mandatory).

[5]      Defendants also raised qualified immunity as an affirmative defense in their Answer. (Dkt. No. 8, ¶ 12).

#### B. Application

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). In *Benjamin*, the Second Circuit found that a DOCCS grooming policy (since amended) that required all male inmates to receive a haircut upon entry into a correctional institution violated a Rastafarian plaintiff's First Amendment rights. *Id.* at 576-77. As the Second Circuit explained, "[a] fundamental tenet of the religion is that a Rastafarian's hair is not to be combed or cut, resulting in rope-like strands known as 'dreadlocks.' "

**\*4** Accordingly, plaintiff has a clearly established First Amendment right to grow and maintain his hair in dreadlocks. The Grooming Policy has accommodated this right by expressly permitting "the dreadlock hairstyle" so long as the dreadlocks "extend naturally from the scalp." (Dkt. No. 23-3, Ex. B to Mulvey Decl., at 21). However, plaintiff has not alleged any facts that show that defendants prevented him from growing or wearing his hair in dreadlocks. He has only alleged that he was not allowed to grow and style his religiously-mandated dreadlocks in a manner that he preferred, based on DOCCS prohibitions on the display of shapes or designs in an inmate's hairstyle.

2017 WL 1381859

A long-standing principle of qualified immunity is that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al Kidd*, 563 U.S. 731, 742 (2011). The clearly established law must be particularized to the facts of the case. In applying that standard, this court cannot identify a case where a correctional officer acting under similar circumstances as defendants was held to have violated the First Amendment. Therefore, plaintiff's right to grow and style his dreadlocks in a manner that he prefers—distinct from his right to have dreadlocks—was not "clearly established" at the time that he was issued a misbehavior report for having what were perceived as shapes or designs in his hair.

This finding is consistent with other cases evaluating the scope of the First Amendment and application of qualified immunity in light of *Benjamin*. Courts considering the application of *Benjamin* to a prohibition on non-Rastafarian inmates' wearing of dreadlocks [6] have described the governing law as "unclear," due to the lack of additional Supreme Court or Second Circuit precedent. *Jouvert v. New York*, No. 10-CV-930, 2012 WL 6964386, at *10 (N.D.N.Y. Oct. 23, 2012) (Rep't Rec.), *adopted*, 2013 WL 372331, at *4 (N.D.N.Y. Jun. 29, 2013) (summarizing caselaw and granting summary judgment on qualified immunity grounds to correctional officers who ordered Muslim inmate to remove dreadlocks). Likewise, a recent decision found that there was no clearly established law invalidating DOCCS restrictions on when a Rastafarian inmate could wear his "crown," a religious head covering traditionally worn over dreadlocks. *Rodriguez v. Favro*, No. 9:14-CV-418, 2016 WL 1253848, at *10 (N.D.N.Y. Mar. 9, 2016) (Rep't Rec.), *adopted*, 2016 WL 1261120 (N.D.N.Y. Mar. 30, 2016).

[6]    DOCCS no longer limits the wearing of dreadlocks to Rastafarian inmates. *See Pilgrim v. New York State Dep't of Corr. Svcs.*, No. 9:07-CV-1001, 2011 WL 6031929, at *2 (N.D.N.Y. Sept. 1, 2011) (noting that policy was updated on September 2, 2010).

Even if plaintiff's right was well-established, this court would still recommend that defendants' summary judgment motion be granted, because a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.

1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990)). Objective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley v. Hendrickson*, —— U.S. ——, 135 S. Ct. 2466, 2473 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *Id.* Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**\*5** A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of prison officials "are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S.Ct. at 2473 (quoting *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979)). In addition, "[w]hen officials follow an established prison policy, as defendants did here, their entitlement to qualified immunity depends on 'whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting' the directive." *Barnes v. Furman*, 629 Fed.Appx. 52, 57 (2d Cir. 2015) (citations omitted).

Defendants have explained that the Grooming Policy prohibits any designs or shapes to be cut or woven into an inmate's hair in order "to deter inmates from displaying signs or symbols associated with prohibited associations or affiliations (e.g. "gangs")." (Dkt. No. 23-6, Graham Decl. ¶ 3). This is a legitimate penological interest. The record also shows that three different correctional officers—defendants Manna and Tabate, and non-party Blowers—separately observed what they believed was a "checkerboard" or "diamond" design woven into plaintiff's hair in violation of the Grooming Policy. In addition, plaintiff has not alleged that any of the defendants were aware that he was merely in the beginning stages of growing dreadlocks, or that any defendants had seen the IGRC determination on his earlier grievance. [7] Plaintiff has also failed to allege that any of the defendants had the authority to ignore the plain language of the Grooming Policy. Therefore, it was objectively reasonable for all of the defendants to believe that they were

not violating plaintiff's First Amendment rights when they found him in violation of the Grooming Policy's prohibition on designs or patterns in inmates' hair. Based on this analysis, this court recommends that defendants' motion for summary judgment on qualified immunity grounds be granted as to plaintiff's First Amendment claim.

7    As noted above, plaintiff asserted that the prior IGRC determination reaffirmed his basic right to wear dreadlocks, as required by his religion. (Compl. ¶ 3). He does not claim that the prior decision addressed whether he could or could not display shapes or patterns in his hair.

## IV. Equal Protection

Defendants have requested that plaintiff's entire complaint be dismissed, but their motion for summary judgment makes no reference to plaintiff's equal protection claim. (Dkt. No. 23). However, based upon a review of all papers submitted in connection with this action, this court recommends dismissing plaintiff's equal protection cause of action for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). This section provides that the court may dismiss an *in forma pauperis* action *sua sponte* at any time if the court determines that, *inter alia*, the action fails to state a claim on which relief can be granted.

### A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.' " *Engquist v. Or. Dep't of Agric.*, 533 U.S. 591, 601 (2008). To establish an equal protection violation, the plaintiff must show that the defendants applied a different standard to similarly situated individuals. *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 111 (2d Cir. 2006). Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). Then, plaintiff must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

### B. Application

**\*6** In his Complaint, plaintiff asserts that:

> [i]t is a fact that defendants do not throw Jews in the box or in keeplock when they are growing their sidelocks. (The little curles [sic] that the Jews wear on the side of their heads). However, if an inmate is a Rastafarian, we have to either cut off our hair, or in the alternative, be sent to the box or keeplock until the direct order to violate our religion is adhered to.... it is apparently clear that the defendants have one set of laws for the jews and another set of laws for Rastafarians.

Compl. ¶ 16-17. Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), I allowed this Equal Protection claim to proceed after initial review in my October 28, 2015 Decision and Order. (Dkt. No. 6, at 3-4). However, after consideration of the more fully developed record provided in connection with this motion, I recommend that this unsubstantiated equal protection claim be dismissed.

As described above, an Equal Protection claim must state that the defendants applied a different standard to similarly situated individuals. Although the pleading standard does not require "detailed factual allegations," it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Furthermore, a complaint does not suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 557).

Plaintiff's Equal Protection argument is one such claim. Plaintiff has provided no examples to support his allegations that defendants treated Rastafarian inmates differently than Jewish inmates, or that defendants forced Rastafarian inmates to cut off their hair or face punishment. The record does not support plaintiff's allegation that he was ordered to cut off his dreadlocks, only that he could not maintain them in a particular

hairstyle displaying shapes or patterns. In addition, plaintiff has not alleged, and the record does not show, one instance in which any of the three named defendants treated plaintiff differently than other inmates because of his Rastafarian faith, or handled any perceived violations of the Grooming Policy more favorably for other inmates because of their religion. Plaintiff must remember that he is suing individuals, and that the defendant must have had *personal responsibility* for the conduct making up plaintiff's claim. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

The generality in plaintiff's Equal Protection claim fails to meet this standard, and this court recommends that it be dismissed for failure to state a claim. However, if the court adopts this recommendation, I also recommend that plaintiff be given the opportunity to propose an amendment that would add specific factual allegations to support the claim that he was treated differently than any other inmate under the same circumstances because plaintiff was Rastafarian, in light of the *sua sponte* dismissal and defendants' failure to address the Equal Protection argument in their motion. *See Ellis v. Wilkinson*, 81 F. Supp. 3d 229, 238-39 (E.D.N.Y. Jan. 28, 2015) (considering whether to grant plaintiff leave to amend after finding that plaintiff failed to state a plausible claim under section 1983); Fed. R. Civ. P. 15(a)

(2) (providing that a court should freely give leave to amend "when justice so requires.").

**\*7  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 23) be **GRANTED AS TO PLAINTIFF'S FIRST AMENDMENT CLAIM**; and it is

**RECOMMENDED**, that plaintiff's **EQUAL PROTECTION CLAIM BE DISMISSED WITHOUT PREJUDICE FOR FAILURE TO STATE A CLAIM** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2017 WL 1381859

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1380583
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald MICHEL, Plaintiff,
v.
Sgt. MANNA, Correctional Sergeant, Auburn
Correctional Facility; Lt. Tabate, Hearing
Officer, Auburn Correctional Facility;
and Harold Graham, Superintendent,
Auburn Correctional Facility, Defendants.

9:15-cv-1187 (DNH/ATB)
|
Signed 04/17/2017

**Attorneys and Law Firms**

DONALD MICHEL, 12-A-1124, Clinton Correctional Facility, P.O. Box 2000, Dannemora, NY 12929, pro se.

HON. ERIC T. SCHNEIDERMAN, New York State Attorney General-Syracuse, 615 Erie Boulevard West, Suite 102, TIMOTHY P. MULVEY, ESQ. Ass't Attorney General, Syracuse, NY 13204, Attorney for Defendants.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Donald Michel brought this civil rights action pursuant to 42 U.S.C. § 1983. On January 17, 2017, the Honorable Andrew T. Baxter, United States Magistrate Judge, advised by Report-Recommendation that defendants' motion for summary judgment be granted as to plaintiff's First Amendment claim, and that plaintiff's Equal Protection claim also be dismissed, without prejudice, sua sponte. Plaintiff filed untimely objections to the Report-Recommendation, despite having been given multiple extensions of time in which to do so. Though untimely, plaintiff's objections have been reviewed.

Based upon a de novo review of the portions of the Report-Recommendation to which plaintiff objected, the Report-Recommendation is accepted and adopted in all respects. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. Plaintiff's First Amendment claim is DISMISSED;

3. Plaintiff's Equal Protection claim is DISMISSED without prejudice;

4. Plaintiff has twenty (20) days in which to file an amended complaint asserting an Equal Protection claim which cures the deficiencies identified in the Report-Recommendation; and

5. The Clerk is directed to serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 1380583

---

2008 WL 699273
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William ESCALARA, Plaintiff,
v.
T. CHARWAND, C.O., et al., Defendants.

No. 9:04-CV-0983 (FJS/DEP).
|
March 12, 2008.

**Attorneys and Law Firms**

William Escalara, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Bruce J. Boivin, Esq., Christopher Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

## ORDER

FREDERICK J. SCULLIN, JR., Senior District Judge.

*1 Presently before the Court is Magistrate Judge David E. Peebles February 19, 2008 Report-Recommendation in which he recommends that defendants' motion for summary judgment dismissing plaintiff's complaint be granted and that plaintiff's complaint be dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice. The Court having reviewed the Report-Recommendation and the entire file in this matter, and no objections to said Report-Recommendation having been filed, the Court

**ORDERS** that the Report-Recommendation of Magistrate Judge David E. Peebles filed February 19, 2008, is for the reasons stated therein, **ACCEPTED** in its entirety and the Court further

**ORDERS** that defendants' motion for summary judgment dismissing plaintiff's complaint is **GRANTED,** and that plaintiff's complaint is dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin,

and J. Roch, but otherwise with prejudice, and the Court further

**ORDERS** that the Clerk of the Court is to enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff William Escalera, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this proceeding pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In an amended complaint which is both difficult to follow and couched in vague and conclusory terms, plaintiff appears to assert claims of First Amendment free speech and procedural due process deprivations arising from the issuance of misbehavior reports concerning his conduct as a prison inmate, implicating matters which include his verbal communications with fellow inmates, determined by prison officials to violate policies regarding such interaction, and the disciplinary proceedings which followed.[1]

[1] Plaintiff's complaint also purports to assert an equal protection denial cause of action, although the particulars of that claim are not well-defined.

Currently pending before the court is a motion filed by those defendants who to date have appeared in the action, seeking the entry of summary judgment dismissing plaintiff's claims as lacking in merit. Having carefully reviewed the record in the light of defendants' motion, without the benefit of any opposing submissions by the plaintiff, I conclude no reasonable factfinder could determine that plaintiff's constitutional rights have been abridged, and therefore recommend that defendants' motion be granted.

## I. *BACKGROUND*

Plaintiff is a prison inmate who has been entrusted to the custody of the New York State Department of Correctional Services (the "DOCS"). *See generally,* Amended Complaint (Dkt. No. 12); *see also* Defendants' Exhibits (Dkt. No. 59-4) Exh. A (Transcript of Plaintiff's

Deposition, held on May 23, 2006) at 11. At the times relevant to his claims plaintiff was designated to the Clinton Correctional Facility ("Clinton"), categorized by the DOCS as a maximum security prison. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11. At Clinton, plaintiff worked as a maintenance recycling porter and was permitted to sleep in a cubicle located within a dormitory in the Clinton Annex under conditions more akin to those existing in a medium security prison. *Id.* at 9-10.

**\*2** Between the time of his transfer into Clinton in May of 2004, *see* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11, and the end of 2004 the plaintiff, who as a prison inmate has amassed a lengthy disciplinary record, was the recipient of several misbehavior reports accusing him of violating various prison disciplinary rules. Defendants' Exhibits (Dkt. No. 59-5) Exh. D. The particulars of those misbehavior reports can be summarized as follows:

| *Date of Incident* | *Violations Alleged* |
| --- | --- |
| 6/14/04 | Creating a disturbance (Rule 104.13) and violation of refusal to obey a direct order (Rule 106.10) |
| 6/24/04 | Property in an unauthorized location (Rule 113.22) |
| 6/26/04 | Refusal to obey a hearing disposition (Rule 181.10) |
| 6/26/04 | Interference with prison officials (Rule 107.10), creating a disturbance (Rule 104.13), making a threat (Rule 102.10) and a messhall violation (Rule 124.16) |
| 8/11/04 | Creating a disturbance (Rule 104.13) and interference with prison officials (Rule 107.10) |
| 9/23/04 | Loss/damage to property (Rule 116.10), Creating a disturbance (Rule 104.13), refusal to obey an order (Rule 106.10) and interference with prison officials (Rule 107.10) |
| 10/27/04 | Creating a disturbance (Rule 104.13) |
| 12/15/04 | Interference with prison officials (Rule 107.10), refusal to obey a direct order (Rule 106.10), delay in count (Rule 112.20) and count violation (Rule 112.21) |
| 12/26/04 | Movement violation (Rule 109.12) |

*Id.* Tier II disciplinary hearings were conducted at various times in connection with a majority of those reports, in each instance resulting in a finding of guilt on one or more of the charged violations and the imposition of sanctions which generally included loss of recreation, package, commissary and/or telephone privileges of varying durations and, in some instances,

keeplock confinement extending up to thirty days on one occasion.[2] *Id.* Plaintiff appealed each of the adverse hearing determinations and resulting disciplinary penalties to the facility superintendent, defendant Artus, who on each occasion affirmed the hearing officer's decision. Amended Complaint (Dkt. No. 12) at 4; *see also* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 50.

[2]     The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

At one point plaintiff attempted to speak with his prison counselor, defendant Joswick, regarding the frequency with which misbehavior reports were being administered to him by prison officials. Amended Complaint (Dkt. No. 12) at 4; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 59-60. In apparent response to Escalara's persistence, defendant Joswick advised that he was not plaintiff's "pen pal" and threatened disciplinary action if plaintiff continued in his efforts to communicate with him. Amended Complaint (Dkt. No. 12) at 2; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 60. The situation between the two was alleviated, however, when plaintiff was assigned a new counselor to replace defendant Joswick, therefore making it unnecessary for prison officials to take the threatened disciplinary measures. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 61.

## II. *BACKGROUND*

 **\*3** Plaintiff commenced this action on August 19, 2004 and, at the direction of the court based upon perceived deficiencies in plaintiff's initial pleading, *see* Dkt. No. 6, submitted an amended complaint on December 27, 2004, the filing of which was authorized by the court following a review of the new pleading. Dkt. Nos. 12, 14. Named as defendants in plaintiff's amended complaint are Clinton Superintendent Artus; Mr. Douglas, a dietician at the facility; Mr. Joswick, plaintiff's former corrections counselor; Corrections Lieutenants Baldwin and Armitage; and Corrections Officers T. Charland,

West, W. Brown, R. Caron, C. Lambard, L. Favro, and J. Roch.[3] In his complaint, plaintiff claims violation of his rights of free speech and association, deprivation of procedural due process, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. Dkt. No. 12.

[3]     The clerk is directed to amend the docket to reflect the correct spelling of the last names of defendants Charland and Armitage.

On August 23, 2005 an answer was filed by the New York State Attorney General, acting on behalf of various of the defendants named by the plaintiff, including Thomas Charland, Jeffrey Joswick, Dale Artus, William Brown, and Randy Caron. Dkt. No. 31. In that answer defendants have generally denied plaintiff's allegations, additionally asserting various affirmative defenses. *See id.* A second answer was subsequently filed, also by the New York State Attorney General, on behalf of defendant Michael Douglas mirroring the earlier filed answer. Dkt. No. 52. To date, defendants Corrections Captain West, Corrections Lieutenant Baldwin, C. Lambard, and J. Roch have neither been served nor otherwise appeared in the action.

On January 30, 2007, following the close of discovery, the defendants who thus far have appeared in the action moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, as a matter of law. Dkt. No. 59. In their motion, defendants assert that the evidence in the record fails to support plaintiff's claimed constitutional deprivations. *Id.* Despite inclusion within defendants' motion of language properly advising Escalera of the significance of the motion and the potential consequences of any failure on his part to properly respond as required, *see* Dkt. No. 59, plaintiff has not filed any papers in opposition to the pending motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Status of Unserved Defendants*
Despite the filing on December 27, 2004 of plaintiff's amended complaint and the clerk's issuance on March 28, 2005 of summonses, four of the named defendants,

Escalara v. Charwand, Not Reported in F.Supp.2d (2008)

2008 WL 699273

including Captain West, Corrections Officer C. Lambard, Lieutenant Baldwin, and Corrections Officer J. Roch, have neither been served nor otherwise appeared in the action. [4]

[4]    The summonses issued to Captain West and C. Lambard were returned in July of 2005, unexecuted. Dkt. Nos. 20, 21. The record is unclear as to the status of efforts to serve the remaining two defendants, Corrections Lieutenant Baldwin and Corrections Officer J. Roch.

Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal of a plaintiff's claims against a defendant where a summons and complaint is not served upon that party within 120 days after filing of the complaint, absent a showing of good cause. [5] Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel). Inasmuch as the four missing defendants have not been served or otherwise appeared in the action within the appropriate time period, this court has never acquired jurisdiction over them, and the complaint should be dismissed as against those defendants, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

[5]    That period is further restricted by the local rules of this court, which require that service be effected within sixty days. *See* Northern District of New York Local Rule § 4.1(b).

### B. *Plaintiff's Failure to Oppose Defendants' Motion*

**\*4** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to respond to that statement. [6] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d

Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

6        According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3).

C. *Summary Judgment Standard*
 **5**  Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to

meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D. *Plaintiff's First Amendment Claim*
 **6**  The essence of plaintiff's First Amendment claim appears to be that when engaged in the behavior giving rise to the issuance to him of misbehavior reports, including laughing at corrections officers and talking loudly across a cell block to fellow inmates, in violation of well known and understood directives prohibiting such actions, his conduct was protected under the First Amendment and, accordingly, when disciplined for those actions his constitutional rights were abridged. Defendants assert that the record fails to support a First Amendment deprivation, as a matter of law.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble ...." U.S. Const. amend. I. The protections afforded by the First Amendment, like many other constitutional guarantees, are not necessarily forfeited by a person upon his or her entry into prison; many rights conferred by the Constitution, however, are by definition extinguished, or in some cases give way to legitimate, counterveiling penological concerns, upon incarceration. *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). As the Supreme Court has noted, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the

2008 WL 699273

First Amendment, which are implicit in incarceration."
*Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537-38 (1977).

While the point of demarcation is not always readily discernable, it is clear that prison inmates enjoy some measure of First Amendment protection, yet forfeit those free speech rights which are incompatible with legitimate penological considerations. *See Pell v. Procunier,* 417 U.S. 812, 822, 94 S.Ct. 2800, 2804 (1974). As the Supreme Court has observed,

> [a] prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Id.*

Thus, for example, prison officials may not deter the right of a prison inmate to voice complaints regarding prison conditions through established processes by taking adverse actions which are intended, or which have the affect, of chilling or abridging such rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Conversely, and at the other end of the spectrum, prison officials are empowered to control the use of threatening and abusive language by inmates. *Jermosen v. Coughlin,* 878 F.Supp. 444, 450-51 (N.D.N.Y.1995) (McAvoy, C.J.). The right of officials to control inmate speech and other behavior through the imposition of measures reasonably calculated to preserve the safety and security of a prison facility, its employees and inmates, is well established, even though such measures may impinge upon an inmate's ability to speak freely or to associate with others. *See Auleta v.. LaFrance,* 233 F.Supp.2d 396, 399 (N.D.N.Y.2002) (Kahn, D.J.) (noting that restrictions on inmate communication are constitutional if reasonably related to legitimate penological interests) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)).

*7 In this instance plaintiff does not allege, nor does the record disclose, that plaintiff was engaged in protected activity when disciplined for violating prison rules. Typical of plaintiff's claims, by contrast, is the contention that he was issued a misbehavior report by Corrections Officer Charland for talking loudly within the prison dormitory, despite his awareness that the officer was known to be particularly strict, and that he prohibited such potentially disruptive communications. *See* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11.

Clearly, policies of the type implicated by defendant Charland's response to plaintiff's actions are reasonably related to legitimate penological concerns, and thus do not give rise to the constitutional claims for deprivation of the First Amendment right of free speech or association. *Cf. Percy v. Jabe,* 823 F.Supp. 445, 448 (E.D.Mich.1993) (noting that prison officials should be afforded wide latitude in imposing visitation restrictions at prison in light of, *inter alia,* perceived threats to security and order at the institution). It would be novel indeed for prison inmates to assert a First Amendment right to speak freely and communicate with other inmates and prison officials, without restriction based upon legitimate penological concerns. Plaintiff has cited no case authority, nor is the court aware of any, which stands for such a broad proposition and supports an open-ended, unlimited right of prison inmates to speak freely within the prison setting, however disruptive the conduct might be.

Because plaintiff has failed to allege and prove that he was engaged in constitutionally protected activity when disciplined by prison officials, and finding that defendants' actions in disciplining him were reasonably related to legitimate penological concerns, I recommend a finding that his First Amendment claims are deficient as a matter of law.

### E. *Plaintiff's Procedural Due Process Claims*
Intertwined with his First Amendment cause of action is plaintiff's claim that during the course of issuance of misbehavior reports and the ensuing disciplinary proceedings, his procedural due process rights were abridged. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.

*See Tellier v.. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). In their motion the defendants, while not conceding any lack of sufficient due process, assert that plaintiff cannot establish the deprivation of a constitutionally cognizable liberty interest. [7]

[7]    The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F .2d 889, 897-98 (2d Cir.1988). Plaintiff's complaint does not elaborate on his claim that defendants failed to observe these guaranteed safeguards in connection with his various disciplinary proceedings.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's disciplinary confinement as alleged do not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted.

**\*8**  Atypicality in a *Sandin* inquiry is normally a question of law . [8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. [9] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

[8]    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

[9]    While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Most of the disciplinary charges against the plaintiff in 2004, virtually all lodged as Tier II level violations, resulted in only modest disciplinary sanctions by constitutional standards. On one occasion plaintiff was sentenced to keeplock confinement for a period of thirty days, receiving shorter keeplock confinements of ten or fifteen days or even more modest restrictions on certain other occasions. [10]  Plaintiff's keeplock confinement

stemming from the August 11, 2004 and September 23, 2004 misbehavior reports were served in his dormitory cubicle, and plaintiff was permitted to talk with other inmates and to maintain his prison employment during that period. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11-12, 18-19, 31-32. Similarly, the keeplock confinement sentences imposed as a result of the June 26, 2004 misbehavior reports were also served by the plaintiff within his dormitory cubicle, while maintaining his prison employment. *Id.* at 37, 46.

10    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens*); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Inmates can leave their cells for showers, visits, medical exams and counseling. *Id.* Inmates can have cell study, books and periodicals. *Id.* The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Conspicuously absent from either plaintiff's amended complaint or the record now before the court is any evidence establishing that the defendants deprived Escalera of any constitutionally significant liberty interest by their actions. This marked deficiency warrants summary dismissal of plaintiff's due process claims, as a matter of law, without the need to examine the sufficiency of the protections afforded to him in connection with those misbehavior reports.

### F. *Equal Protection*

Plaintiff's amended complaint also asserts a claim for denial of equal protection. Though this is far from clear, plaintiff's equal protection claim appears to be limited to defendant Joswick, his former prison counselor.

Defendants also seek dismissal of this claim as lacking in merit.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*9** Nothing either contained within plaintiff's amended complaint, or otherwise disclosed in the record, reflects any disparity in treatment by defendant Joswick, a corrections counselor, of the plaintiff and other inmates based upon plaintiff's inclusion in an identifiable or suspect class, nor does the record suggest that if such disparate treatment occurred, it was motivated by some other invidious, prohibited discrimination. Under these circumstances plaintiff's equal protection claim fails, as a matter of law, and is subject to dismissal. *See, e.g., Pena v. Racore,* No. 95-CV-5307, 2001 WL 262986, at *4 (E.D.N.Y. Mar. 14, 2001) (rejecting plaintiff's equal protection claim where he alleged only a difference in treatment and failed to suggest that defendants' actions demonstrated intentional and arbitrary discrimination).

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's amended complaint, drafted in exceedingly conclusory terms and bereft of factual allegations, alleges deprivation of his right to free speech under the First Amendment, his right to procedural due process, and his right to equal protection of the law. Having carefully reviewed the record now before the court I am unable to discern any triable, genuinely disputed issue of material fact, and conclude that no reasonable factfinder could determine, based upon the record, that plaintiff's

2008 WL 699273

constitutionally rights have been abridged. Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 59) be GRANTED, and that plaintiff's complaint be dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 699273

---

**End of Document**　　　　　© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Haponik v. Scully, Not Reported in F.Supp. (1990)

1990 WL 608764

1990 WL 608764
Only the Westlaw citation is currently available.
United States District Court, S.D. New York

Herbert THOMAS, Plaintiff,

v.

Charles SCULLY, Superintendent of Green
Haven Correctional Facility; Deputy C.R.
WINCH; DAS THOMAS BUSHEK; GAYLE
HAPONIK, Institution Stewart; THOMAS
LAVANDUSKI, Senior Counselor/Media Review;
Sgt. G. SKROCKI; KATE BUSHEK, Inmate
Account; TOM BUSHEK, Correspondence
Unit; and Captain TANNER, individually
and in their official capacities, Defendants.

No. 89 CIV. 4715 (DNE).
|
June 28, 1990.

*REPORT AND RECOMMENDATION*

BUCHWALD, United States Magistrate Judge.

**\*1** The plaintiff, Herbert Thomas ("Thomas"),
appearing *pro se,* filed this action under 42 U.S.C. §
1983 on July 11, 1989. By Order dated July 20, 1989
you referred this matter to me for pretrial supervision
and for a report and recommendation on any dispositive
motions. On March 9, 1990, the defendant filed a motion
for summary judgment.

The material facts of the case are not in dispute.
Plaintiff, an inmate at Green Haven Correctional Facility
("Green Haven"), mailed, on or about August 22, 1988,
a nude photograph of a female acquaintance to Capri
Photo Company to be enlarged and duplicated. The
plaintiff sent the envelope through the prison mail room
and Inmate Account office. A prison employee in the
Inmate Account office confiscated the photograph and
the photograph was not returned to the plaintiff. As a
result, the plaintiff filed a complaint through the Inmate
Grievance Review Committee ("IGRC"). IGRC found
that under the regulations then in effect, the plaintiff was
permitted to have the photograph and, thus, that the
deprivation was unauthorized. The IGRC recommended
that the plaintiff be compensated and that administrative

personnel not "arbitrarily destroy inmates property."
Motion for Summary Judgment, Exh. A. Superintendent
Scully accepted the IGRC's findings and awarded the
plaintiff $12.50. Plaintiff appealed the damage award
to the Central Office Review Committee which agreed
that the relief provided was appropriate; plaintiff's appeal
to the State Commissioner of Correction was denied.
Thereafter, Thomas commenced an action in the New
York State Court of Claims on February 16, 1989, for the
loss or destruction of his property. That suit is currently
*sub judice* in that court.

Some months after the specific incident involving plaintiff,
Scully enacted, on February 3, 1989, a policy banning
nude photos of persons other than those commercially
produced, the latter still being widely available to the
inmates at Green Haven. According to Superintendent
Scully, his sole interest in this policy review was
institutional security. Affidavit of Charles Scully, sworn
to on March 2, 1990 ("Scully Aff."), ¶ 12. The regulation
was aimed at barring photos that are emotionally charged
and that may lead to violence in this maximum security
facility. [1]

This action under § 1983 seeks damages as well as
declaratory and injunctive relief. First, plaintiff asserts
that the loss or destruction of his photograph constitutes
a deprivation of property without due process of law
in violation of the fifth and fourteenth amendments.
Second, he asserts that the "new" policy barring nude
photos encroaches on his freedom of expression in
violation of the first amendment. Plaintiff has named
as defendants: Charles Scully, Superintendent; C.R.
Winch, Deputy Superintendent; Thomas Bushek, Deputy
Superintendent; Gayle Haponik, Institution Stewart;
Thomas Levanduski, Senior Counselor; Gerald Skrocki,
Sergeant; Kate Bushek, Inmate Accounts Office; Tom
Bushek, Correspondence; and Jack Tanner, Captain.

**\*2** In order to establish a right to relief under § 1983
the plaintiff must show that the defendants, acting under
color of state law, have deprived him of a right, privilege or
immunity secured by the Constitution. *Parratt v. Taylor,
451 U.S. 527, 532 (1981); Eastway Const. Corp. v. New
York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied, 484
U.S. 918 (1987).* There is no dispute that the defendants'
conduct took place "under color of state law." We
must, therefore, focus on whether the plaintiff has been

Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 262 of 314
Haponik v. Scully, Not Reported in F.Supp. (1990)
1990 WL 608764

deprived of any right, privilege or immunity secured by the Constitution. [2]

### I. *Fifth and Fourteenth Amendment Claim—Deprivation of Property Without Due Process of Law*

The Supreme Court has insisted that prisoners be accorded rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration. *Hudson v. Palmer,* 468 U.S. 517, 523 (1984). The protection of due process is one of these rights. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). In the context of property rights, due process is not violated when the state provides meaningful postdeprivation relief for the random and unauthorized acts of state employees. *Hudson,* 468 U.S. at 533. [3] *Englom v. Carey,* 677 F.2d 957 (2d Cir.1982). This is such a case.

The plaintiff claims that defendants, namely Deputy Superintendent Bushek, Kate Bushek and Tom Bushek, intentionally deprived him of his property and such intentional conduct necessitates a predeprivation hearing. [4] However, "[w]here only property rights are involved mere postponement of judicial enquiry is not denial of due process, if [the] opportunity given ... is adequate." *Parratt,* 451 U.S. at 540 (citing *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 611 (1974) and citing *Phillips v. Commissioner,* 283 U.S. 589, 596–597 (1931)). In fact, the controlling inquiry on the propriety of a postdeprivation hearing is solely whether the state is in a position to provide for meaningful predeprivation process. *Hudson,* 468 U.S. at 534. When state employees act in a random and unauthorized manner, [5] rather than according to established state procedure, the state cannot intervene to prevent the deprivation. *Id.* at 533. In the present case it is difficult to see what steps the state could have taken to prevent the deprivation of plaintiff's property. Indeed, the statements by defendants Thomas Bushek, Kate Bushek and Tom Bushek indicate that they were not concerned with whether their actions conformed to prison policy, which prohibited their actions. Therefore, a predeprivation hearing, would have been simply "impracticable."

In the absence of the practical availability of predeprivation relief, the state must provide adequate postdeprivation remedies. In general, common law or statutory tort remedies can provide adequate compensation for property loss. *Id.* at 534–535. The availability of an action in the Court of Claims of the State of New York has been held to constitute an adequate remedy. *See Hickel v. King,* 659 F.Supp. 337 (E.D.N.Y.1987) and *Tigner v. New York, Commissioner of the Department of Corrections,* 559 F.Supp. 25 (W.D.N.Y.1983). Moreover, these remedies are adequate notwithstanding that the potential for relief available under § 1983 may be more extensive than that provided for by state law. *Englom,* 677 F.2d at 957. In addition, the plaintiff took advantage of the prisoner grievance process which afforded him a favorable finding of liability as well as an opportunity to investigate the incident.

**\*3** In sum, it is well established that all unlawful deprivations of property do not raise constitutional issues. *Parratt,* 451 U.S. at 537; *Eastway Const. Corp.,* 762 F.2d at 249. Given the impracticability of a predeprivation hearing and the existence of adequate state remedies, plaintiff's loss of property does not constitute a violation of his fifth and fourteenth amendment rights. Accordingly, the defendants' motion for summary judgment on the fifth and fourteenth amendment claims should be granted.

### II. *First Amendment Claim—Suppression of Freedom of Expression*

The Supreme Court has stated that prisoners retain such first amendment rights that are not inconsistent with their status as prisoners. *Pell v. Procunier,* 417 U.S. 817, 822 (1974). In addition, the Court has stated that first amendment rights of free speech and press are among the pre-eminent privileges of all citizens. *Procunier v. Martinez,* 416 U.S. 396, 428–429 (Douglas, J., concurring). The Supreme Court, however, held in *Turner v. Safley,* that prison administrators can infringe on inmates' constitutional rights when the regulation was "reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987); *Benjamin v. Coughlin,* Nos. 89–2265(L), 89–2267 (2d Cir. May 18, 1990). Specifically, in *Turner,* the Court set forth four relevant factors to determine reasonableness: (1) whether there is a valid, rational connection between the regulation and a legitimate, neutral governmental interest; (2) whether there is an alternative means of exercising the right; (3) whether the accommodation of the asserted right will have an extensive impact on prison staff, other inmates and prison resources; and (4) whether there are ready alternatives to the challenged regulation. 482 U.S. at 89–91. In formulating this standard, the Court acknowledged

1990 WL 608764

the expertise of prison officials in dealing with the difficult problems of prison administration and afforded these officials considerable deference in policy decisions. *Id.* at 84–85.

We will discuss each factor in turn. The first factor is multifaceted requiring that the regulation have a valid and rational connection to a legitimate governmental interest and that the governmental objective be a neutral one, without regard to the content of the expression. *Id.* at 89–90. The governmental objective expressed here, internal security, is central to all other correctional goals. *Thornburgh v. Abbott,* 109 S.Ct. 1874, 1882 (1989) (citing *Pell v. Procunier,* 417 U.S. at 823). Scully's explanation of the rationale behind the policy noted that several prisons, including the Federal Bureau of Prisons, have enacted similar policies. Thus, we cannot say that there is not a rational connection between the regulation and a legitimate government objective. As to the neutrality prong, while the regulation has an impact on the content of permissible photos, the distinctions are drawn solely on the basis of their potential implications for prison security. Thus, the regulations are "neutral" for this analysis. *Thornburgh,* 109 S.Ct. at 1882–1883. Plaintiff's claim that the regulation was enacted to codify the defendant's (Kate Bushek) personal taste is wholly without support in the record. Moreover, in evaluating the neutrality of the regulation, we cannot overlook the continued availability of commercially-made, explicit photos.

 **\*4** The second factor is whether plaintiff has an alternative means of exercising the contested right. *Turner,* 482 U.S. at 90. The Supreme Court has made clear that the right in question should be viewed "sensibly and expansively." *Thornburgh,* 109 S.Ct. at 1883. This standard allows for flexibility in determining what qualifies as another means of expression. *See Turner,* 482 U.S. at 78 (a regulation which prohibits communication between inmates at different penal institutions does not deprive inmates of all means of communication); *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1986) (a regulation which prevents Muslim inmates from attending weekly afternoon services does not impinge on freedom of religion because inmates were allowed to attend other ceremonies); *Jones v. North Carolina Prisoner's Union,* 433 U.S. 119 (1977) (a prison ban on labor unions does not violate inmates' rights to communicate grievances or to associate). Thus, so long as the regulations foreclose only one of several ways in which inmates may exercise a

specific first amendment right, the fact that the prohibited activity may be a more desirable means of expression does not diminish the import of the remaining alternative. *Jones,* 433 U.S. at 130 n. 6. In addition, when alternative avenues remain available, courts should be particularly deferential to corrections officials. *Pell,* 417 U.S. at 827. Commercial nude photographs remain available to Green Haven inmates; the availability of these photos constitutes a sufficient alternative to noncommercial photos as a means of expression and gratification.

The third factor considers the impact that accommodating the asserted right will have on other inmates and prison officials. *Turner,* 482 U.S. at 90. The Green Haven regulation restricts photographs which are likely to be emotionally charged. Superintendent Scully has determined that if prisoners are allowed to possess noncommercial photos, potentially violent confrontations between inmates and guards will increase to the detriment of safety and security. Thus, the court should defer to the informed discretion of prison officials that the right can only be exercised at the cost of safety and order for the entire prison population. *Id.*

Finally, the court must determine whether the existence of ready alternatives indicates that the policy is an exaggerated response to prison concerns. *Id.* at 90–91. Specifically, the Court has suggested that the existence of easy alternatives that can accommodate the prisoners' right at a *de minimis* cost to legitimate penological interests is evidence that the regulation is not reasonable and is an "exaggerated response" to prison concerns. *Id.* at 91. Scully asserts that prison officials cannot prevent either a guard or another prisoner from seeing a personal photo because in a maximum security prison it is impossible to insure an inmate's privacy. Moreover, plaintiff has not proposed an effective alternative nor is one readily apparent.

 **\*5** The standard enunciated in *Turner* and *Thornburgh* superseded "the least restrictive alternative" test set forth in *Procunier v. Martinez,* 416 U.S. 396, 413–414 (1974). However, even under the stricter *Martinez* standard regulations such as the one in dispute have been upheld. *See Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir.1980).[6]

In conclusion, the Green Haven regulations satisfy the *Turner* and *Thornburgh* standard. Accordingly, the

1990 WL 608764

defendants' motion for summary judgment on the plaintiff's first amendment claim should be granted.

Copies of this Report and Recommendation have been mailed to all parties, who are hereby instructed that any objections to the Report and Recommendation must in accordance with Fed.R.Civ.P. 72 be filed with Your Honor within 10 days from this date, unless an extension of time is granted by you. Failure to object to the report within 10 days will preclude appellate review. 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. Rules 6(a) and 6(c), 72.

1    The policy distinguishes between photographs of persons to whom inmates might have an emotional attachment from those that provide impersonal gratification. (*Id.* at ¶ 16). Two dangers exist in permitting non-commercial or private photographs. First, an inmate who knows or believes that another inmate or guard has seen a sexually explicit photograph of his wife or girlfriend without his permission is likely to become angry and possibly violent. (*Id.* at ¶17). Second, even if the inmate has no objection to the viewing, the photograph can readily be a target of insult. In contrast to opinion differences about a stranger, derisive comments about a wife or girlfriend are particularly confrontational. (*Id.* at ¶¶ 16–18).

2    Resolution of this case by motion for summary judgment is appropriate as there are no material issues of fact in dispute. Indeed, plaintiff's sole argument for its denial does not address the merits of the motion but rather is based on a possibility that other individuals could be added as defendants. Given our recommendation that the motion be granted, this argument has little import.

3    The strict holding of *Hudson* is that an adequate postdeprivation remedy is sufficient for the intentional destruction of property by state employees. *Id.* at 533. In *Hudson,* the Court extended the ruling of *Parratt v. Taylor,* 451 U.S. 527 (1981), which had held that postdeprivation hearings were constitutionally sufficient when state employees negligently destroyed property, to situations of intentional destruction. *Id.* at 534. The *Hudson* court concluded that the state could no more anticipate

or control random and unauthorized intentional conduct than it could similar negligent conduct, and, thus, that predeprivation procedures were "impracticable." *Id.* at 533. After *Hudson,* the intent of the state employees is largely irrelevant and the pertinent inquiry is whether the action was random and unauthorized.

4    Plaintiff's reliance on *United States v. The Premises and Real Property at 4492 South Livonia Road,* 889 F.2d 1258 (2d Cir.1989) is misplaced. That case is distinguishable as it involved a seizure of property pursuant to a federal statute and thus was not "random and unauthorized." In addition, the court found that the nature of the property involved, the defendant's home, did not necessitate immediate seizure. Furthermore, the case does not involve the due process right of a prisoner.

5    Testimony from defendants Deputy Superintendent Bushek, Kate Bushek, Tom Bushek indicate that they may have shared a belief that nude photos were objectionable and should not have been mailed out of the Green Haven facility. The Busheks were in a position to impose their beliefs on the prison population, or at least those prisoners using the mail and inmate account departments. Nonetheless, the record does not support a conclusion that these individuals' beliefs constituted a policy of Green Haven. Perhaps evidence indicating repeated unauthorized action or acquiescence in this action by Superintendent Scully could constitute an official policy. However, the central fact here is that plaintiff prevailed on the merits of his claim before the IGRC and that the Committee's damage award was upheld by Superintendent Scully.

6    The plaintiff cites *Pepperling v. Crist,* 678 F.2d 787 (9th Cir.1982), which struck down a regulation similar to the one in contention because it was not the least restrictive alternative. The opinion did not indicate whether the facility in *Pepperling* was a maximum security one, a factor which the Court in *Trapnell* found significant.

**All Citations**

Not Reported in F.Supp., 1990 WL 608764

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1427247
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Enrique ORTIZ, Plaintiff,

v.

Anthony RUSSO, C.O. Gibb, C.O. D.
Parkhurst, Correction Officer Prindle,
Dir. D. Venettozzi, Defendants.

No. 13 CIV. 5317(ER).
|
Signed March 27, 2015.

### OPINION AND ORDER

RAMOS, District Judge.

**\*1** *Pro se* plaintiff Enrique Ortiz brings this suit pursuant
to 42 U.S.C. § 1983 alleging that he was issued a
misbehavior report ("Misbehavior Report") and held in
the Segregated Housing Unit ("SHU") for ninety days
while in the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS") in
violation of his constitutional rights. Defendants Russo,
Gibb, Parkhurst, Prindle, and Venettozzi (collectively,
"Defendants") bring the instant motion to dismiss
Plaintiff's Amended Complaint ("Am.Compl.") under
Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) on
the ground that Plaintiff has failed to state any plausible
claims of entitlement to relief. Def.'s Mem. L. Support.
Mot. Dismiss, Doc. 33. For the reasons set forth below,
Defendants' motion is GRANTED.

### I. Background

#### A. Factual Background
The Court accepts the following allegations as true for
purposes of this motion. [1]

[1] Some of the allegations appear in documents attached
to the original Complaint, which was partially
amended by Plaintiff. "Courts have held that it
may be appropriate to consider materials outside
of the Complaint in the *pro se* context ... and, in
particular, materials that a *pro se* plaintiff attaches

to his opposition papers[.]" *Ceara v. Deacon*, No.
13–CV–6023 (KMK), 2014 WL 6674559, at *8
(S.D.N.Y. Nov.25, 2014) (internal citations omitted)
(emphasis added); *see also Rodriguez v. McGinnis*, 1
F.Supp.2d 244, 246–47 (S.D.N.Y.1998) ("Although
material outside a complaint generally is not to be
taken into consideration on a motion to dismiss, the
policy reasons favoring liberal construction of *pro se*
complaints permit a court to consider allegations of
a *pro se* plaintiff in opposition papers on a motion
where, as here, those allegations are consistent with
the complaint.").

On May 21, 2010, Plaintiff was an inmate at the Eastern
Correctional Facility when Corrections Officer ("C.O.")
Prindle approached him in the prison yard and informed
him that Sgt. Parkhurst wanted to see him in his office.
Am. Compl., Doc. 28, ¶¶ 8–9. As C.O. Prindle escorted
Plaintiff across the yard, he said to Plaintiff, "take a
good look at this yard because it will be the last time
you ever see it, or this facility, ever again ... because
we don't allow gang members in our facility." *Id .* at ¶¶
11–12. Plaintiff was escorted into an office occupied by
Sergeant ("Sgt.") Parkhurst and Lieutenant ("Lt.") John
Doe, who questioned Plaintiff regarding a departmental
disbursement form he had used to access his inmate
account. *Id.* at ¶ 14. On the disbursement form at issue,
Plaintiff had written "33%" beside his signature. *Id.* The
officers told Plaintiff that that the 33% symbol is a known
"marking" of the Trinitarios Gang. *Id.* at ¶ 19. Plaintiff
explained that there had been a "rash of identity theft"
from other inmates' institutional accounts, and the 33%
symbol was simply his way of protecting his account from
theft. *Id.* at ¶ 15.

While Plaintiff was being detained by Sgt. Parkhurst and
Lt. John Doe, C.O.s Prindle and Gibb searched his cell. *Id.*
at ¶ 24–25. The search resulted in the discovery of "months
and years" worth of Plaintiff's old processed disbursement
receipts, all of which included the same "33%" symbol next
to his signature. *Id.* at ¶ 26. The officers also recovered a
newspaper article about the Jheri Curl gang. [2] *Id.* at ¶ 29.

[2] According to the Misbehavior Report, the Jheri Curl
gang is a Dominican gang from the New York City
area. Am. Compl. at 19.

Two days later, on May 23, 2010, Sgt. Parkhurst wrote
and issued Plaintiff a Misbehavior Report for violating
Rule 105.13 of the Standards of Inmate Behavior for New
York. *Id.* at ¶¶ 33, 36. Rule 105.13 provides, "[a]n inmate

shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten ... gang related material." N.Y. Comp.Codes R. & Regs. Tit. 7, § 270.2(B) (6)(iv) (May 28, 2008). The Misbehavior Report found that Plaintiff (1) used the 33% symbol next to his signature to signify gang involvement, and (2) possessed a prohibited newspaper article. Am. Compl. ¶¶ 21, 38.

**\*2** Plaintiff alleges that the Misbehavior Report was false and that Sgt. Parkhurst and Lt. John Doe issued it with the specific goal of harassing Plaintiff and depriving him of his liberty. *Id.* at ¶ 21. Specifically, Plaintiff alleges that all of the previous disbursement receipts had been approved, and no one had ever expressed to him the concern that the 33% symbol next to his signature was gang-related. *Id.* at ¶ 27. He also claims that he informed prison officials that a member of his family had sent him the article, which in turn was reviewed and provided to him by "the facility's Media Review." Compl., Doc. 2–1, at ¶ 9. Plaintiff claims Sgt. Parkhurst was retaliating against him for the dismissal of a prior misbehavior report issued to him three years earlier by Sgt. Parkhurst, on May 18, 2007. Am. Compl. ¶ 28. Immediately after the Misbehavior Report was served on Plaintiff, he was removed from the general population and placed in the Special Housing Unit ("SHU"). *Id.* at ¶ 37.

On May 28, 2010, Captain ("Cpt.") Russo conducted a Tier III hearing regarding the allegations in the Misbehavior Report and found Plaintiff guilty of both charges. *Id.* at ¶ 39. Cpt. Russo explained that Plaintiff provided no documentary evidence that Media Review had permitted him to possess the article at issue, Doc. 2–1 at 18,[3] and that Plaintiff's explanation that he was using the 33% symbol to prevent forgery was "unreasonable." *Id.* Cpt. Russo imposed a penalty of ninety days in solitary confinement in the SHU and six months loss of good time. Am. Compl. ¶ 39. Plaintiff claims that Cpt. Russo prevented him from defending himself at the hearing by denying him a reasonable amount of time to review documents and preventing him from calling witnesses. *Id.* at ¶¶ 38, 47; Pl.'s Mem. L. Opp., Doc. 39 at 12–14.

3    Given the numerous unnumbered attachments to the Complaint, the Court's citations to them refer to the page numbers reflected on ECF.

Plaintiff's appeal of the Tier III hearing determination was affirmed by Director ("Dir.") Venettozzi on July 30, 2010. *Id.* at ¶ 40.

## B. Procedural Background

Plaintiff filed an Article 78 petition in state court on November 23, 2010, naming the five Defendants herein as respondents, to review the determination that he had violated Prison Rule 105.13.[4] *See* Doc. 2–1 at 26. On January 5, 2012, the New York Supreme Court for Albany County confirmed the findings of the Tier III hearing. *See Ortiz v. Fischer*, 91 A.D.3d 1006, 935 N.Y.S.2d 914 (2012). The court stated, "[t]he [M]isbehavior [R]eport, together with the documentary evidence and testimony adduced at the hearing, including petitioner's admission to possessing the items in question and the testimony of the correction officials trained in identifying gang-related material, provide substantial evidence supporting the determination of guilt." *Id.* The court also determined that Plaintiff's "claim that he was denied adequate employee assistance because he was not provided copies of the disbursement forms and article [was] unavailing given that he was provided an opportunity to review these documents at the hearing, which he declined, and he ha[d] not demonstrated any prejudice." *Id.* Moreover, Plaintiff's "assertion that the symbols on the disbursement forms were his personal mark and that the [M]isbehavior [R]eport was retaliatory in nature presented a credibility issue for the Hearing Officer to resolve." *Id.* The court concluded that the Misbehavior Report itself contained "enough detailed and specific information to allow petitioner to prepare an adequate defense." *Id.*

4    Plaintiff's Article 78 petition names "Correction Officer Pringle" as a respondent, presumably referring to C.O. Prindle, who is a Defendant in the instant action.

**\*3** Plaintiff filed the instant action on July 30, 2013, followed by an Amended Complaint on February 7, 2014. Docs. 2, 28. Plaintiff alleges violations of his First Amendment rights against all Defendants under 42 U.S.C. § 1983. Am. Compl ¶¶ 43, 48, 54. Plaintiff also brings Fourteenth Amendment claims against Dir. Venettozzi and Cpt. Russo for violations of his due process rights.[5] *Id.* at ¶¶ 43, 47. Lastly, he claims that Sgt. Parkhurst, along with C.O.s Prindle and Gibb, violated his constitutional rights by harassing him. *Id.* at ¶ 54, 935 N.Y.S.2d 914.

Plaintiff sues all Defendants in both their official and individual capacities. *Id.* at ¶¶ 4–5.

5  In his opposition papers, Plaintiff states that he is dropping his conspiracy and failure to protect claims. Doc. 39 at 29. In any event, Plaintiff failed to assert any such claims in any of his pleadings.

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction over Plaintiff's claims for monetary damages against Defendants in their official capacities, and pursuant to Rule 12(b) (6) for failure to state a claim.

## II. Legal Standards

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed.R.Civ.P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings, such as affidavits, may be considered by the court to resolve the disputed jurisdictional fact issues. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000); see also *Morrison,* 547 F.3d at 170 (citing *Makarova,* 201 F.3d at 113). When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true, but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004) (citing *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998)).

Where, as here, a party also seeks dismissal on Rule 12(b) (6) grounds, the court must consider the Rule 12(b)(1) motion first. *Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.,* 820 F.Supp.2d 490, 499 (S.D.N.Y.2011), *aff'd sub nom. Baldessarre ex rel. Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.,* 496 F. App'x 131 (2d Cir.2012).

### B. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014). The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also id.* at 681 (citing *Twombly,* 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at 680.

**\*4** The question in a Rule 12 motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y.2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 278 (2d Cir.1995)) (internal quotation marks omitted). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,' " and without regard for the weight of the evidence that might be offered in support of Plaintiff's claims. *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006)).

The same standard applies to motions to dismiss *pro se* complaints. See *Zapolski v. Fed. Republic of Germany,* 425 F. App'x 5, 6 (2d Cir.2011). The Court remains obligated to construe a *pro se* complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret a *pro se* plaintiff's claims as raising the strongest arguments

2015 WL 1427247

that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor,* 709 F.Supp.2d 218, 224 (S.D.N.Y.2010) (citing *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). "However, even *pro se* plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (quoting *Twombly,* 550 U.S. at 555) (internal quotation marks omitted). A *pro se* plaintiff's pleadings still must contain "more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Iqbal,* 566 U.S. at 678. A complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted); *see also Triestman,* 470 F.3d at 477 ("[P]ro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' ") (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Additionally, as the Second Circuit recently held, "[a] district court deciding a motion to dismiss *may* consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013) (emphasis added).

A court may also take into account matters of which judicial notice can be taken. Although review is "generally limited to the facts and allegations that are contained in the complaint and in any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits ... we may also look to public records, including complaints filed in state court, in deciding a motion to dismiss." *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (internal citation and quotation marks omitted). It is routine for courts to take judicial notice of court documents, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see, e.g., Kendall v. Cuomo,* No. 12 CIV. 3438(ALC), 2013 WL 5425780, at *6 (S.D.N.Y. Sept.27, 2013) (taking judicial notice of a valid court order Plaintiff claimed was "false, fake, and nonexistent").

**\*5** Defendants' collateral estoppel argument requires the Court to consider Plaintiff's Article 78 petition and the corresponding New York State Supreme Court decision, in which the court affirmed the outcome of his Tier III hearing. *See Ortiz,* 935 N.Y.S.2d at 914. Where a defendant's issue preclusion argument rests on another court's judgment, it is appropriate for the court to take judicial notice of the plaintiff's complaint filed in the previous action, along with the judgment itself, without converting the motion into one for summary judgment. *See Simpson v. Melton–Simpson,* No. 10 CIV. 6347(NRB), 2011 WL 4056915, at *2 (S.D.N.Y. Aug.29, 2011). Thus, the Court takes judicial notice of Plaintiff's Article 78 petition, along with the state court's subsequent decision. [6]

[6]     The Court can also consider the Article 78 petition on the independent basis that it was included as an exhibit to the original complaint. Compl., Doc. 2–1 at 26.

## III. Discussion

### A. Subject Matter Jurisdiction

Defendants move to dismiss Plaintiff's claims for monetary damages due to lack of subject matter jurisdiction. Indeed, Defendants are entitled to Eleventh Amendment immunity and any claims brought against them in their official capacities must be dismissed. [7]

[7]     Furthermore, "state officials cannot be sued in their official capacity for damages because such officials are not 'persons' under § 1983." *A'Gard v. Perez,* 919 F.Supp.2d 394, 409 n. 13 (S.D.N.Y.2013), *reconsideration denied* (Feb. 11, 2013), *reconsideration denied* (Apr. 9, 2013), *appeal dismissed* (July 8, 2013) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

"It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). This bar "remains in effect when State officials are sued for damages in their official capacity." *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Here, each of the Defendants are employees of DOCCS, a state entity, and are therefore entitled to Eleventh Amendment immunity

from claims against them in their official capacity. *See Inside Connect, Inc. v. Fischer,* No. 13–CV–1138 (CS), 2014 WL 2933221, at *7 (S.D.N.Y. June 30, 2014) (finding the plaintiff's claims against current and former DOCCS employees to be barred the Eleventh Amendment). New York State has neither waived its sovereign immunity, nor has Congress abrogated the state's immunity through § 1983. *See Johnson v. New York,* No. 10 CIV. 9532(DLC), 2012 WL 335683, at *1 (S.D.N.Y. Feb.1, 2012) (citing *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 31 (2d Cir.1991)). Hence, all of Plaintiff's claims against Defendants in their official capacities are barred and must be dismissed. [8]

[8]     In his opposition papers, Plaintiff stated that he is "willing to forego all monetary damages in lieu of declaratory relief seeking to simply reverse the underlying decision." Doc. 39 at 12. Regardless, where "the only available declaratory relief would be that Defendants' past policy or practice violated Plaintiff's rights ... such relief is barred under the Eleventh Amendment." *Inside Connect, Inc.,* 2014 WL 2933221, at *7.

**B. Collateral Estoppel**

Defendants argue that many of Plaintiff's claims are barred by the doctrine of collateral estoppel because they were already litigated and decided in the underlying Article 78 proceeding in state court. Defs.' Reply Mem., Doc. 42 at 4–7.

A party who had full and fair opportunity to litigate an issue in a previous proceeding may, under of the doctrine of collateral estoppel, be barred from raising an identical issue in a later proceeding. *Curry v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003). Collateral estoppel, often referred to as issue preclusion, bars the "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *W & D Imports, Inc. v. Lia,* 563 F. App'x 19, 22 (2d Cir.2014) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

**\*6**   Under 28 U.S.C. § 1738, federal courts are required to give preclusive effect to state court judgments where the courts of the state would do so. *Ferris v. Cuevas,* 118 F.3d 122, 126 (2d Cir.1997) (citing *Allen v. McCurry,* 449 U.S. 90, 95–96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). Thus,

New York law applies when determining what preclusive effect the prior judgment in an Article 78 proceeding has on a § 1983 action in federal court. *Blasi v. New York City Bd. of Educ.,* No. 00–CV–5320 (RRM)(MDG), 2012 WL 3307227, at *7 (E.D.N.Y. Mar. 12, 2012) *report and recommendation adopted,* No. 00–CV–5320, 2012 WL 3307346 (E.D.N.Y. Aug.12, 2012) *aff'd,* 544 F. App'x 10 (2d Cir.2013); *see also Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996); *Bussa v. Educ. Alliance, Inc.,* No. 14–CV–449 GBD (JLC), 2014 WL 4744556, at *2 (S.D.N.Y. Sept.24, 2014).

In applying New York collateral estoppel rules, the Second Circuit has identified two essential elements. "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Jenkins v. City of New York,* 478 F.3d 76, 85 (2d Cir.2007) (quoting *Juan C. v. Cortines,* 89 N.Y.2d 659, 657 N.Y.S.2d 581, 679 N.E.2d 1061, 1065 (N.Y.1997)). Under New York law, "[t]he party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995).

Plaintiff's due process claim against Cpt. Russo raises issues identical to those already decided in his Article 78 proceeding. [9] Here, Plaintiff claims that Cpt. Russo violated his due process rights when he "denied him a reasonable amount of time to review the documents" that were the subject of the charges against him and the right to call witnesses. Doc. 39 at 12–14. Plaintiff also asserts that he was denied a fair and impartial hearing officer because Cpt. Russo was biased and unqualified to preside over the hearing. *Id.* at 15–16. Similarly, in his Article 78 petition, Plaintiff argued that Cpt. Russo failed "to afford petitioner adequate employee assistance" because the assistants assigned to Plaintiff told him he was not entitled to many of the documents and witnesses he wanted, and then "failed to meet back" with him to give him the documents he had requested. Compl., Doc. 2–1 at 28, 31–32, ¶¶ 10, 17. He also alleged that Cpt. Russo denied him "ample time to digest or review the documents" and the right to call witnesses. *Id.* at 30–31, ¶¶ 16–17. In addition, Plaintiff's Article 78 petition alleged

that he was denied the right to have his "innocence or guilt determined by a fair and impartial hearing officer" in that Cpt. Russo was "arbitrary and capricious[.]" *Id.* at 30, ¶ 15. In sum, it is clear that Plaintiff raised identical issues in his Article 78 petition with respect to Cpt. Russo as he does in the instant litigation.

> 9    Defendants also argue that Plaintiff's claims against C.O.s Prindle and Gibb are barred. Doc. 42 at 4–7. However, these claims are not clearly precluded. Although Plaintiff's Article 78 petition asserted that C.O.s Prindle and Gibb searched his cell and recovered the article at issue, Doc. 2–1 at 27, ¶ 8, nowhere in his Article 78 petition did Plaintiff argue that their actions violated his First Amendment rights or were retaliatory in nature. Given these facts, it is not apparent that Plaintiff is raising identical issues to those in his Article 78 petition.

**\*7** Plaintiff has also failed to prove that he was not given a full and fair opportunity to litigate the claims in the prior proceeding. *Giakoumelos,* 88 F.3d at 59; *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 491 (1984) ("[T]he burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in prior action or proceeding."). Nowhere in Plaintiff's papers does he demonstrate that he did not have a full and fair opportunity to litigate all the issues related to the Misbehavior Report and Tier III proceeding in state court. Any assertion to the contrary by Plaintiff would be without merit, given that he submitted a petition supported by exhibits, as well as a reply to the respondents' opposition papers. *See Fortunatus v. Clinton Cnty., N.Y.,* 937 F.Supp.2d 320, 332 (N.D.N.Y.2013) ("[The plaintiff] cannot gainsay that he had a full and fair opportunity to litigate his claims of denial of equal protection and due process. In addition to his lengthy petition, [the Plaintiff] submitted sworn affidavits, exhibits, and a memorandum of law in support of his claims, all of which would substantiate a full opportunity to litigate."). Therefore, Plaintiff's Fourteenth Amendment due process claims against Cpt. Russo are barred by the doctrine of collateral estoppel.

In the instant case, Plaintiff also alleges a retaliation claim against Sgt. Parkhurst. Am. Compl. ¶ 54. Although Plaintiff did not directly state a retaliation claim in his Article 78 petition, he concedes that the state court addressed the issue after Plaintiff "made the attempt" to argue it. Doc. 39 at 11–12. Indeed, the state court held

that Plaintiff's assertion "that the [M]isbehavior [R]eport was retaliatory in nature presented a credibility issue for the Hearing Officer to resolve[.]" *Ortiz,* 935 N.Y.S.2d at 916. Thus, because the issue was addressed by the Supreme Court, Plaintiff's retaliation claim against Sgt. Parkhurst is also precluded.

Finally, although the only reference to Dir. Venettozzi in the Article 78 petition is Plaintiff's statement that Dir. Venettozzi affirmed the Tier III hearing findings, Doc. 2–1 at 33, ¶ 20, Plaintiff does not appear to base the instant action on any other separate acts committed by him. *See* Am. Compl. ¶¶ 40, 43, 45. Therefore, to the extent Plaintiff is merely challenging Dir. Venettozzi's decision to uphold the results of the Tier III hearing, his claim is barred.

### C. Adequacy of Pleadings

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Id.*

### i. Constitutionality of Rule 105.13

**\*8** Liberally construed, Plaintiff's complaint alleges a variety of First Amendment violations related to his possession of the article. Plaintiff alleges that C.O.s Prindle and Gibb violated his First Amendment rights by confiscating the newspaper article from his cell, that Sgt. Parkhurst violated his First Amendment rights by penalizing him for possessing the article, and that Cpt. Russo violated his rights by finding him guilty of the charge in the Tier III Hearing. Am. Compl. ¶¶ 24, 29, 38, 48. He also accuses Dir. Venettozzi of confining him "for exercising his first amendment [sic] right[.]" *Id.* In effect, Plaintiff is either claiming that Defendants violated his First Amendment rights in the manner in which they

enforced Prison Rule 105.13 or the regulation itself is unconstitutional.

With respect to the prison regulation itself, although imprisonment does not automatically deprive a prisoner of his First Amendment rights, "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere ." *Beard v. Banks,* 548 U.S. 521, 528, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). In addition, courts owe "substantial deference to the professional judgment of prison administrators." *Id.* (quoting *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003)) (internal quotation marks omitted). Thus, challenges to prison regulations that allegedly inhibit First Amendment rights "must be analyzed in terms of the legitimate policies and goals of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

Prison regulations impinging on inmates' constitutional rights are valid "if they are reasonably related to legitimate penological interests ... and are not an exaggerated response to such objectives." *Beard,* 548 U.S. at 528 (internal citation and quotation marks omitted). In *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court identified four factors to consider in determining the reasonableness of a prison regulation. First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 482 U.S. at 89 (citing *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Second, courts must assess "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, courts should consider any "ready alternatives" to the regulation in question for furthering the governmental interest. *Id.* "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.*

The first *Turner* factor, requiring a valid and rational connection between the prison regulation and the legitimate government interest, is met in this case. The Supreme Court has recognized the prevalence of

dangerous gang activity within prison walls and the importance of preventing it. *Wilkinson v. Austin,* 545 U.S. 209, 227, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ("Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest [in determining placement in a supermax prison] ... gangs seek nothing less than to control prison life and to extend their power outside prison walls."); *Turner,* 482 U.S. at 91–92 ("the Missouri Division of Corrections had a growing problem with prison gangs, and ... restricting communications among gang members ... was an important element in combating this problem."). Here, the regulation seeks to minimize gang activity amongst inmates by limiting the amount of gang-related communication within a prison.

**\*9** As to the second *Turner* factor, the regulation provides for alternative means of exercising First Amendment rights. Specifically, Prison Rule 105.13 presumably allows inmates to possess published gang-related materials that are available through the library or approved through the Media Review process. [10] Regulations which limit, but do not eliminate, the availability of alternatives means of exercising a constitutional right may be permissible. *Beard,* 548 U.S. at 532. While the Court recognizes that Plaintiff alleges that he was issued the article by "the department's correspondence office," Am. Compl. ¶ 32, the transcript of the Tier III hearing indicates that Plaintiff was unable to provide any documentation establishing that Media Review had approved the article. Doc. 2–4 at 105–106. The New York Supreme Court subsequently affirmed the finding that Plaintiff was guilty of violating Rule 105.13. Regardless, the question for purposes of the second *Turner* factor is not whether prison authorities properly interpreted Rule 105.13; it is whether Rule 105.13 provides a reasonable alternative.

[10] The language of Rule 105.13 "excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process." N.Y. Comp.Codes R. & Regs. Tit. 7, § 270.2(B)(6)(iv) (May 28, 2008).

The third *Turner* factor evaluates the magnitude and nature of accommodating the asserted constitutional right. Allowing inmates to possess gang-related materials would likely cause a "ripple effect" on other inmates and prison staff; in such circumstances, "courts should

be particularly deferential to the informed discretion of corrections officials." *See Turner,* 482 U.S. at 90. Thus, given the threat of gang activity within prisons, accommodating the purported right to possess gang-related materials would likely produce a negative result.

Consideration of the final *Turner* factor also supports the reasonableness of this regulation. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable[.]" *Id.* at 90. Thus, if an inmate can suggest an alternative that accommodates his constitutional rights at a minimal cost to valid penological interests, this may be evidence that a regulation does not satisfy the "reasonable relationship" standard. *Id.* at 91. Here, Plaintiff has not provided any alternatives to the current regulation, nor has he pleaded facts which suggest that obvious alternatives exist. As a result, the Court cannot say the prison regulation fails the "reasonable relationship" standard set forth in the final prong of the *Turner* test.

Finally, the Court notes that substantial deference must be given to prison administrators in matters affecting discipline and safety. *Overton,* 539 U.S. at 132 ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). An analysis of the challeged regulation against the *Turner* factors in conjunction with the deference owed to prison officials compels the conclusion that the regulation in question does not unreasonably restrict Plaintiff's First Amendment rights.

**\*10** Therefore, to the extent that Plaintiff challenges the constitutionality of Prison Rule 105.13 itself, he fails to state a claim under the First Amendment.

### ii. First Amendment Retaliation Claims

Insofar as Plaintiff challenges whether Defendants faithfully enforced Prison Rule 105.13 by penalizing him for possessing the article which he claims was approved through the Media Review process, the Court is required to follow the findings of the state court during Plaintiff's Article 78 proceeding, where it affirmed that Plaintiff was guilty of violating Rule 105.13. *See Ortiz,* 935 N.Y.S.2d at 916. However, the Court also construes the Amended Complaint as alleging First Amendment retaliation claims

that were not previously raised against C.O.s Prindle and Gibb. [11] Am. Compl. ¶¶ 28, 54. Plaintiff alleges that C.O.s Gibb and Prindle "retaliated against him" by searching his cell and confiscating a news article containing gang-related material. Am. Compl. ¶ 54. C.O.s Prindle and Gibb were instructed by Sgt. Parkhurst to perform the cell search. *Id.* at ¶ 25.

[11]    Plaintiff also alleges retaliation claims against Sgt. Parkhurst. Am. Compl. ¶ 54. For the reasons set forth in Section III.B, Plaintiff's claim of retaliation against Sgt. Parkhurst must be dismissed because it was adjudicated by the State Supreme Court in its Article 78 proceeding. Even if the Court were to consider it on the merits, however, it would still fail due to the lack of temporal proximity between the dismissal of the 2007 misbehavior report and the conduct at issue here.

"[I]t is well settled that a 'prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Williams v. Dubray,* 557 F. App'x 84, 87 (2d Cir.2014) (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). Rather, "the inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." *Id.* (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). A First Amendment retaliation claim under § 1983 requires that a prisoner establish three elements; "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Acknowledging "the ease with which claims of retaliation may be fabricated," courts "examine prisoners' claims of retaliation with skepticism and particular care." *Johnson v. Eggersdorf,* 8 F. App'x 140, 144 (2d Cir.2001) (quoting *Colon,* 58 F.3d at 872); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (retaliation claims by prisoners are "prone to abuse"). Recognizing the possibilities for abuse in retaliation claims, "we have insisted on a higher

level of detail in pleading them[.]" *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Thus, a complaint "which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* (citing *Flaherty,* 713 F.2d at 13).

**\*11** At the outset, Plaintiff fails to specifically identify the speech or conduct at issue which he purports to be protected. Plaintiff argues that Sgt. Parkhurst and C.O.s Prindle and Gibb retaliated against him because an earlier misbehavior report, issued against him by Sgt. Parkhurst in 2007, was overturned. Am. Compl. ¶¶ 20–21. In the prison context, free and inhibited access to seek redress of grievances against state officers is a protected right. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Plaintiff has not stated whether he took any constitutionally protected action against Sgt. Parkhurst regarding the 2007 report. Presumably, however, the 2007 report was dismissed after Plaintiff filed a grievance or complaint. Even if the Court accepts this as true, his retaliation claims still fails for the reasons stated below.

Plaintiff does not allege facts which establish that C.O.s Gibb and Prindle took an adverse action against him. Although the Second Circuit has not specifically addressed whether a cell search constitutes "adverse action" as required for a retaliation claim, many district courts in this circuit have held that it does not. *See Williams v. King,* No. 11–CV–1863 (SAS), 2014 WL 3925230, at \*10 (S.D.N.Y. Aug.11, 2014) (collecting cases). Additionally, Plaintiff fails to allege any facts that would support a finding that C.O.s Prindle and Gibb were personally motivated by the dismissal of an earlier grievance they have no apparent connection with. Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim. *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing a *pro se* prisoner's claim that he was assaulted by the defendant in retaliation for an earlier letter he wrote which did not name or address defendant); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (the plaintiff "failed to provide any basis to believe that [the defendant] retaliated for a grievance that she was not personally named in"); *Hare v. Hayden,* No. 09 CIV. 3135 RWS, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."); *Bryant v. Goord,* No. 99 CIV. 9442, 2002 WL 553556, at

\*2 (S.D.N.Y. Apr.12, 2002) ("The grievances that Plaintiff filed prior to the disciplinary proceedings at issue here did not involve any of these Defendants, therefore, there is no basis to assume that these Defendants ... retaliate[d] for his filing grievances against other corrections officers.").

Finally, Plaintiff's retaliation claims lack the necessary causal connection. In evaluating whether a causal connection exists, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a [Tier III] hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Jones v. Marshall,* No. 08 CIV. 0562, 2010 WL 234990, at \*4 (S.D.N.Y. Jan.19, 2010) (quoting *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002)) (internal quotation marks omitted).

**\*12** Here, Plaintiff argues Defendants retaliated against him in 2010 for an overturned misbehavior report issued more than three years earlier. Am. Compl. ¶ 28. Citing an incident which occurred three years prior is generally insufficient to satisfy the causal connection requirement for a retaliation claim. *Spavone v. Fischer,* No. 10 CIV. 9427(RJH)(THK), 2012 WL 360289, at \*5 (S.D.N.Y. Feb. 3, 2012) (finding fifteen months inadequate to establish a causal connection through temporal proximity); *Crawford v. Braun,* No. 99 CIV 5851(RMB)(JCF), 2001 WL 127306, at \*6 (S.D.N.Y. Feb. 9, 2001) (describing a lapse of seven months as too "attenuated" for purposes of temporal proximity). Plaintiff also asserts that he "can, without a doubt, demonstrate proof of good behavior." Doc. 39 at 19. However, the attachments to Plaintiff's complaint reveal his disciplinary record is not as pristine as he represents.[12] As to the third factor, he admits that the Misbehavior Report was upheld by a Tier III hearing officer, Dir. Venettozzi, and a New York Supreme Court. *See* Am. Compl. ¶¶ 39, 40; *see also Ortiz,* 935 N.Y.S.2d at 914.

12      Plaintiff states that, with the exception of this Misbehavior Report, he has "never been charged with egregious [sic] misconduct to warrant a superintendent's hearing." Doc. 39 at 19. He goes on to state that a "superintendent's hearing" or, Tier III hearing, "is reserved for the most serious alleged disciplinary infractions." *Id.* at n. 9. However, Plaintiff's original complaint attached

two misbehavior reports, one from 2010 and another dated 2011, charging Plaintiff with multiple infractions including smuggling and the unauthorized exchange of personal items. Doc. 2–2 at 76, 79.

Plaintiff's claims against C.O.s Prindle and Gibb also allege retaliation in "wholly conclusory" terms. *Flaherty,* 713 F.2d at 13. Thus, the First Amendment retaliation claims against them must be dismissed.

### iii. Harassment Claims

Although Plaintiff did not address any harassment claims in his papers opposing Defendants' motion to dismiss, his Amended Complaint alleges that the Defendants "retaliated against him by harassing him." Am. Compl. ¶ 54.

"Prisoners have no constitutional right to be free from harassment." *Greene v. Mazzuca,* 485 F.Supp.2d 447, 451 (S.D.N.Y.2007) (citing *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). In order to qualify for constitutional protection, the alleged harassment "may be so drastic as to violate the Eighth Amendment's right to be free from cruel and usual punishment, but only in the harshest of circumstances." *Id.* It "must be objectively and sufficiently serious," and deny the inmate "the minimal civilized measure of life's necessities." *Id.*

Plaintiff states that, after learning that his 2007 misbehavior report had been dismissed, Sgt. Parkhurst "threatened plaintiff that he would get him at some later point." Doc. 39 at 17. In extremely broad terms, Plaintiff claims that Sgt. Parkhurst "used the disbursement forms and the newspapers articles for his purposes of harassing Plaintiff[.]" Am. Compl. ¶ 33. He also asserts that Sgt. Parkhurst conducted a 72–hour investigation, which Plaintiff alleges is "another form of harassment[,]"during which Plaintiff was "in confinement without charge." *Id.* at ¶ 34. Plaintiff claims that Sgt. Parkhurst, along with C.O.s Prindle and Gibb, used this 72–hour investigation to "finalize their set up [on sic] him." *Id.* at ¶¶ 34–35. Based on these allegations, the Court is unable to conclude that Defendants harassed Plaintiff to a level which amounts to an Eighth Amendment violation.

**\*13** Unless accompanied by a physical injury, verbal harassment alone "does not constitute the violation of *any* federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp.

at 474 (emphasis added). Threats, verbal harassment, and similar behavior are not sufficient for a claim under 42 U.S.C. § 1983. *See Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) ("Insulting or disrespectful comments directed at an inmate generally do not rise to this level [of a constitutional violation]."); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (holding "name calling" by a prison official was not a constitutional violation); *Greene v. Mazzuca,* 485 F.Supp.2d 447, 451 (S.D.N.Y.2007) (being yelled at, spit at, and threatened with time in the SHU did not rise to the level of a § 1983 claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 376 (S.D.N.Y.2001) ("Verbal threats or harassment, unless accompanied by physical force or the present ability to effectuate the threat, are not actionable under § 1983."). Thus, Sgt. Parkhurst's threat to "get him at some later point" does not constitute a constitutional violation.

### D. Failure to Allege Personal Involvement of Dir. Venettozzi

It is the well settled law of this Circuit that a claim brought under § 1983 must allege the personal involvement of each defendant. *See, e.g., Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir.2013) (listing Second Circuit cases). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient ... and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Kee v. Hasty,* No. 01 Civ. 2123(KMW) (DF), 2004 WL 807071, at *12 (S.D.N.Y. Apr. 14, 2004) (internal citations omitted).

Plaintiff alleges that Dir. Venettozzi deprived him of his Fourteenth Amendment rights when he wrongly affirmed the disposition of the hearing, thus penalizing and confining Plaintiff for exercising his First Amendment Rights. Am. Compl. ¶ 43. Courts within this Circuit are split as to whether a prison official who simply denies an inmate's administrative appeal from a disciplinary hearing can be held liable under § 1983. *Compare Jamison v. Fischer,* No. 11 CIV. 4697(RJS), 2012 WL 4767173, at *4 (S.D.N.Y. Sept.27, 2012) (holding that the administrative official who affirmed the results of the plaintiff's disciplinary hearing was not personally involved because the alleged constitutional violation had ceased by the time that he was called upon to review the appeal), *with Thomas v. Calero,* 824 F.Supp.2d 488, 509 (S.D.N.Y.2011) (denying motion to dismiss because, by affirming the results of the plaintiff's disciplinary hearing,

the defendant's actions were "sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability"). This Court agrees with the line of decisions that hold that "an official reviewing an appeal of a prison disciplinary hearing can be held liable under § 1983 only if the constitutional violation complained of ... is itself ongoing." *Jamison*, WL 4767173, at *5 (citing *Odom v. Calero,* No. 06 CIV 15527(LAK)(GWG), 2008 WL 2735868, at *7 (S.D.N .Y. July 10, 2008)). As one court has noted, "allowing suits to proceed against all of the officers who reviewed an inmate's appeal in such a situation would improperly impose supervisory liability, conflicting with the clear mandate of *Iqbal* and many years of Second Circuit case law." *Id.*

 **\*14** Since Dir. Venettozzi's involvement was distinct from the constitutional violations Plaintiff has alleged against the other Defendants, he cannot be held liable under § 1983 for violations that occurred prior to his review and were not ongoing. *See id.* Therefore, Plaintiff cannot sustain a claim against Dir. Venettozzi under § 1983.

### E. Habeas Corpus

In the alternative, Plaintiff asks this Court to "convert this action" to a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 39 at 11. However, a complaint alleging 42 U.S.C. § 1983 claims is not interchangeable with an application for a writ of habeas corpus. *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 202 n. 5 (S.D.N.Y.2004) (refusing to *sua sponte* convert a § 1983 action into a petition to habeas corpus because doing so "may result in a disastrous deprivation of a future opportunity to have a well-justified grievance adjudicated.") (quoting *Adams v. United States,* 155 F.3d 582, 583 (2d Cir.1998)); *Garcia v. Aquavuva,* No. 13–CV–4360 SLT JMA, 2013 WL 6248524, at n. 2 (E.D.N.Y. Dec.3, 2013) (denying plaintiff's motion to convert his § 1983 action to a habeas petition). This Court will not transform Plaintiff's complaint into a petition for habeas corpus.

### F. *Heck v. Humphrey*

Defendants argue that many of Plaintiff's claims are barred by *Heck v. Humphrey.* Doc. 33 at 12. In *Heck v. Humphrey,* the Supreme Court held that if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[,]" the court must dismiss his complaint "unless the plaintiff can demonstrate that the

conviction or sentence has already been invalidated." 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

The Second Circuit clarified the application of the *Heck* rule to "mixed sanction" cases, where a prisoner is subject to a single disciplinary proceeding that results in sanctions that affect both the duration of his imprisonment and the conditions of his confinement. In "mixed sanction" cases, a prisoner

> can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but that he can only do so if he is willing to forgo once and for all any challenge to any* sanctions that affect the duration of his confinement. In other words, the prisoner must abandon, not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding he is attacking in his current § 1983 suit.

*Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006) (emphasis in original).

Here, Plaintiff was sanctioned with ninety days in the SHU and six months loss of good time credits. Am. Compl. ¶ 39. If Plaintiff indeed lost good time credits, the rule from *Heck* bars Plaintiff from challenging the loss because he has not shown that it was invalidated. [13] *Peralta,* 467 F.3d at 100; *Paulino v. Fischer,* No. 9:12–CV– 00076 (TJM), 2013 WL 5230264, at *6 (N.D.N.Y. Sept.16, 2013) ("The rule announced in *Heck* applies whenever a prisoner challenges the fact or length of his conviction or sentence, including being deprived of 'good time' credits in a prison disciplinary proceeding, where the deprivation impacts the duration his confinement."). To the extent Plaintiff challenges his confinement in the SHU as a result of the Misbehavior Report, his claims are barred by *Heck* because he has not indicated that he is willing to forgo any and all challenges to his loss of good time credits. *See Peralta,* 467 F.3d at 104.

2015 WL 1427247

13    In his papers, Plaintiff claims that he could not lose good time credits because he was ineligible to receive them by virtue of the fact that he is serving an "indeterminate sentence of 25 years to life." Doc. 39 at 9.

**\*15**  "In mixed sanction actions, a *pro se* plaintiff should be given the option of waiving any challenge to conditions affecting the duration of his confinement so that he can proceed with his claims with respect to the conditions of his confinement." *Paulino,* 2013 WL 5230264, at *7. However, because all of Plaintiff's claims are dismissible on separate grounds, presenting Plaintiff with this option is unnecessary.

### G. Qualified Immunity

Finally, Defendants contend that Plaintiff's claims should be dismissed under the doctrine of qualified immunity. Doc. 33 at 21. A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where the conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. *Manganiello v. City of New York,* 612 F.3d 149, 164 (2d Cir.2010) (internal citations omitted).

At the very least, Defendants' qualified immunity argument succeeds on the third prong of the test, because the Defendants' actions were objectively reasonable in light of clearly established legal rules regarding

circumstances present here. The substantial deference due to prison officials allows them to use their professional judgment to reach an experience-based conclusion that prison policies, such as Rule 105.13, work to further prison objectives. *Beard,* 548 U.S. at 533. Moreover, there is no authority establishing a First Amendment right to possess gang-related newspaper articles or publications. Taking into account both the objective reasonableness of the Defendants' actions and the absence of a clearly established right, Defendants are entitled to qualified immunity with respect to Plaintiff's First Amendment claims.

### IV. Conclusion

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 31, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

It is SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1427247

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of the New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

1    This is the fourth civil rights action filed by Plaintiff
     in this District. Generally, two of these actions arose
     out of Plaintiff's refusal to consent to a strip search
     and the subsequent actions taken against Plaintiff
     as a result of his refusal. *See Groves v. New York,*
     09–CV–0406, Decision and Order (N.D.N.Y. filed
     May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
     complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
     *Groves v. The State of New York,* 9:09–CV–0412,
     Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
     (Sharpe, J.) (granting defendants' motion to dismiss
     the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
     The third action alleged numerous violations of
     Plaintiff's constitutional rights during the period July
     23, 2009, and August 26, 2009, and was dismissed
     without prejudice upon Plaintiff's request in October,
     2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
     Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
     (Suddaby, J.). As a result, it does not appear that
     the current action is barred because of res judicata,
     collateral estoppel, and/or the rule against duplicative
     litigation.

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See*

*generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

[2]  At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]  The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by

2012 WL 651919

the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

[4]    *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

[7]   *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them

that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

## 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*4**  Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to intercede [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an

Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp.

35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment

2012 WL 651919

when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[10] Rather, this claim is hereby dismissed with prejudice.

[10] The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[11]

[11] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not

Groves v. Davis, Not Reported in F.Supp.2d (2012)

2012 WL 651919

establish supervisory liability." *Watson v. McGinnis, 964 F.Supp. 127, 130 (S.D.N.Y.1997).* [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12]  See also *Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]  See also *Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force

on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted

unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill,

Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

# V. MOTION FOR APPOINTMENT OF COUNSEL

2012 WL 651919

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]   For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[15] and it is further

[15]   Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte DISMISSED* **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2754859

2012 WL 2754859
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,
v.
Kurt ELLIS, Cleric, Mid–State Correctional
Facility; Kyle Ready, Correctional Officer, Mid–
State Correctional Facility; Theda Kupiec, Senior
Mail Room Supervisor, Mid–State Correctional
Facility; Sheila Marlenga, Facility Steward, Mid–
State Correctional Facility; Maureen Boll, Deputy
Commissioner, Department of Corrections and
Community Supervision; and Brian Fischer,
Commissioner, Department of Corrections
and Community Supervision, Defendants.

No. 9:11–CV–600 MAD/ATB.
|
July 9, 2012.

**Attorneys and Law Firms**

Patrick Guillory, 09–B–0714, Gouverneur Correctional
Facility, Scotch Settlement Road, Gouverneur, New
York, Plaintiff pro se.

Office of The New York State Attorney General, The
Capitol, Albany, New York, for Defendants.

William J. McCarthy, Jr., AAG, of Counsel.


MEMORANDUM–DECISION AND ORDER

DAGOSTINO, J.


I. INTRODUCTION

**\*1** On November 4, 2011, Plaintiff *pro se* filed a motion
for a Temporary Restraining Order ("TRO"), and on
December 29, 2011, Plaintiff filed a motion for summary
judgment relating to his civil rights complaint. In his
civil rights complaint, Plaintiff alleges that Defendants
subjected him to religious discrimination, denied him
access to courts, and retaliated against him for exercising

his First Amendment Rights. *See* Dkt. No. 48–1; Dkt. No.
54 at 1.

Magistrate Judge Baxter issued a Report–
Recommendation dated March 22, 2012, recommending
that the Court deny both motions. *See* Dkt. No. 54 at
2. Currently before the Court are Plaintiff's objections
to Magistrate Judge Baxter's March 22, 2012 Report–
Recommendation. [1]

[1]   Plaintiff's objections to Magistrate Judge Baxter's
     Report–Recommendation were filed with the Court
     on March 27, 2012, as well as supplemental objections
     to the same, filed with the Court on April 3, 2012 and
     May 21, 2012. *See* Dkt. Nos. 56, 58 & 70.


II. BACKGROUND

A. Factual Background
In a September 27, 2011 Decision and Order, the Court
dismissed some of Plaintiff s claims "with prejudice"
and some "without prejudice with leave to replead,"
and allowed the following claims to proceed without
amendment to the complaint:

(1) Plaintiff's First Amendment Free Exercise Clause
    and Religious Land Use and Institutionalized
    Persons Act ("RLUIPA") [2] claim against Defendant
    Ready regarding the events of December 7, 2010;

[2]   42 U.S.C. § 2000cc (2006).

(2) Plaintiff's First Amendment Free Exercise Clause
    and RLUIPA claims against Defendant Ellis
    regarding the events of March 20, 2011;

    (3) Plaintiff's claim that Defendant Ready denied
        Plaintiff the right to attend a religious service
        on December 7, 2010 in retaliation for filing a
        grievance;

    (4) Plaintiff's Equal Protection claim against
        Defendant Ready;

    (5) Plaintiff's claim that Defendants Kupiec and
        Marlenga lost or destroyed Plaintiff's property
        in retaliation for filing grievances;

(6) Plaintiff's claim that Defendants Kupiec and Marlenga interfered with Plaintiff's right to send and receive mail;

(7) Plaintiff's claim that Defendants Kupiec and Marlenga denied Plaintiff access to the courts, and

(8) Plaintiff's claims against defendants Fischer and Boll (except those claims relating to the allegedly inadequate grievance system).

*See id.* at 41 n. 11. For a more complete discussion of the underlying claims, the Court directs the parties to the Court's September 27, 2011 Decision and Order.

B. Magistrate Judge Baxter's Report–Recommendation
In his Report–Recommendation date March 22, 2012, Magistrate Judge Baxter recommended that the Court deny Plaintiff's motions for summary judgement and for a TRO. *See* Dkt. No. 54 at 2.

Regarding the current motion for a TRO, this is the third of its kind that Plaintiff has filed. *See* Dkt. 35; Dkt. No. 54 at 3 n.3. Magistrate Judge Baxter noted that the Court previously denied Plaintiff's other two motions for injunctive relief based on Plaintiff's transfer from Mid–State Correctional Facility to Gouverneur Correctional Facility. *See* Dkt. No. 54 at 5. Ching to *Day v. Chaplin,* 354 Fed. Appx. 472, 473 (2d Cir.2009), the Court held that an inmate's request for injunctive relief against a particular correctional facility becomes moot upon transfer or discharge to a different correctional facility. As with his previous motions, Magistrate Judge Baxter equally found that Plaintiff's third motion for a TRO is moot. *See* Dkt. No. 54 at 5.

**\*2** Magistrate Judge Baxter based his decision on several factors, including that the motion for injunctive relief was not directed at the original defendants because Plaintiff had been transferred to a new correctional facility, and the " 'new' alleged deprivations" that had occurred after the issuance of the Court's previous order "were over." *See id.* at 5–6. Magistrate Judge Baxter also found that Plaintiff's concerns of possible future retaliation are "too speculative to warrant injunctive relief." *See id.* at 6 (citing *Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, \*2 (W.D.N.Y. Dec. 5, 2011) (other citations omitted)).

As to the motion for summary judgment, Magistrate Judge Baxter's Report–Recommendation recommends that the Court find that there are questions of fact remaining with regards to certain claims, and that Plaintiff has not met his burden entitling him to summary judgment with respect to other claims. *See id.* at 10, 11, 12, 16.

Regarding the claims involving an alleged violation of Plaintiff's First Amendment Free Exercise rights under RLUIPA, Magistrate Judge Baxter recommended, with respect to the December 7, 2010 incident involving Defendant Ready, [3] that "[P]laintiff's own exhibits show that there is a question of fact regarding these issues." *See id.* at 9–10. With respect to the March 20, 2011 incident involving Defendant Ellis, [4] Magistrate Judge Baxter examined Plaintiff's grievance, and the investigation report of that grievance, which indicated that the Rabbis arrived late for the Purim celebration. [5] *See* Dkt. No. 48–2, Ex. B. Magistrate Judge Baxter concluded that it is clear a question of fact remains regarding Defendant Ellis' conduct, and thus Plaintiff's motion should be denied. *See* Dkt. No. 54 at 11.

[3]    On December 7, 2010, Plaintiff was denied attendance to religious services by Defendant Ready despite his name appearing on a call-out list for such services. *See* Dkt. No. 54 at 9–10 (citing Compl. at ¶¶ 37–47).

[4]    On March 20, 2011 Plaintiff was permitted a scheduled visit with a Rabbi for a Purim celebration, but the service was cut short by Defendant Ellis. *See* Dkt. No. 54 at 10 (citing Compl. ¶ 65). Plaintiff filed a grievance with Mid–State's Superintendent regarding Defendant Ellis' action. *See* Dkt. 48–1 at ¶¶ 19, 20.

[5]    The Purim celebration commenced upon the arrival of the Rabbis. *See* Dkt. No. 48–2, Ex. B.

Regarding the claims involving retaliation, Magistrate Judge Baxter stated that the "fact that corrective action was taken after a grievance by plaintiff, without more, does not prove that a constitutional or statutory violation occurred." *See id.* Additionally, although an "alleged adverse action occurred in close proximity to the protected conduct," this does not "necessarily prove plaintiff's claim by a preponderance of the evidence." *See id.* at 12 (citing *Davis v. Goord,* 320 F.3d 346, 352–54 (2d Cir.2003); *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, \*17 (W.D.N.Y. Oct. 12, 2011); *Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*16–20 (N.D.N.Y.

Mar. 30, 2010)). Accordingly, Magistrate Judge Baxter recommended that the Court find Plaintiff is not entitled to summary judgment on his retaliation claims. *See id .*

Addressing the access to courts/mail claims, Magistrate Judge Baxter noted that a constitutional violation of denying access to the courts requires that Plaintiff show Defendants' conduct was deliberate and malicious, and resulted in injury to Plaintiff. *See id.* at 13–14 (citing *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008)). Magistrate Judge Baxter recommended that the Court find that a question of fact still exists, noting that just because Plaintiff received a reimbursement for the certified mail from Defendant Kupiec does not mean she was responsible for the error. *See id.* at 14.[6] As such, Magistrate Judge Baxter determined that a question of fact exists regarding causation in Plaintiff's access to the courts claim. *See id.* at 15. Magistrate Judge Baxter also came to the same conclusion regarding Plaintiff's claim that Defendant Kupiec destroyed his mail in retaliation for his complaints. *See id.*

[6]     Magistrate Judge Baxter also noted that Plaintiff filed a motion to dismiss his own complaint with prejudice in his case before the Court of Claims. *See id.* at 14. Magistrate Judge Baxter stated that "Plaintiff cannot ask the Court of Claims to dismiss his action and then blame the defendant for the 'injury' " if such injury does in fact exist. *See id.* at 15.

**\*3** With respect to the claims made against the supervisory officials, Magistrate Judge Baxter noted that "[p]ersonal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability." *See id.* at 16 (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)) (other citations omitted). Magistrate Judge Baxter recommended the Court find that, "[b]ecause questions of fact remain regarding the individuals who allegedly committed the violations, and [D]efendants' Boll and Fischer's liability depends on the liability of their subordinates, [P]laintiff has not shown that he is entitled to summary judgment against these two [D]efendants." *See id.* at 17.

C. Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation

Plaintiff filed objections to Magistrate Judge Baxter's March 22, 2012 Report–Recommendation on March 27, 2012, and supplemental objections on April 3, 2012. *See* Dkt. No. 56; Dkt. No. 58. Plaintiff's sixteen objections are as follows: 1) his request for injunctive relief was, in fact, directed at the original Defendants in the complaint; 2) his motion for a TRO is seeking to maintain the status quo regardless of whether the alleged deprivations are new, old, or pending; 3) he was not merely speculating about retaliation after the Court issued its September 27, 2011 Order, after which he was allegedly denied food for 104 hours; 4) he has met his burden for the Court to issue a TRO; 5) Defendants' failure to submit an affidavit in opposition to summary judgment and Defendants' had an adequate opportunity to conduct discovery; 6) the Court is promoting discovery abuse by issuing the Report–Recommendation since Defendants' request for an extension of time was not granted, nor has the pretrial discovery and scheduling order been amended for a continuance; 7) the Report–Recommendation prejudicially advocates for Defendants to be given an extension of time to respond to discovery, to be given an extension of time to respond to the application for summary judgment, and to be given the chance to affix an affidavit to support such extension; 8) summary judgment regarding the retaliation claims against Defendant Ready should be because on the Department of Corrections and Community Supervision ("DOCCS") Office of Counsel's response indicating that corrective action was taken in response to Plaintiff's grievance and this is an admission to malfeasance on Defendant Ready's part; 9) summary judgment should be granted in Plaintiffs favor against Defendant Ellis because the law sets forth that where a non-moving party willfully fails to respond adequately to a properly filed motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute; 10) the Report–Recommendation violates Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation, and the Report–Recommendation fails to support its denial of Plaintiff's motion as to the retaliation claims with any relevant facts; 11) the grievance response received containing an apology from Defendant Kupiec regarding her action of not mailing Plaintiff's Notice of Intention to File a Claim as instructed and the letter from Defendant Kupiec apologizing for destroying Plaintiff's test scores are admissions to his mail claims against Defendant Kupiec; 12) the Report–Recommendation sends the message that Defendants have special privileges

2012 WL 2754859

with respect to discovery, and Magistrate Judge Baxter will go against his own prior text orders to support such abuse; 13) specifically detailed Defendants Boll and Fischer's personal involvement regarding the liability of their subordinates, and thus there is no question of material fact regarding this issue; 14) granting Defendants' second letter motion for an extension, without an accompanying affidavit, is a double standard and is not in compliance with this Court's rules; and 15) the Report–Recommendation should be reversed in the interest of justice because the Federal Rules of Civil Procedure and the Northern District Local Rules should apply equally to both *pro se* litigants and prisoners, as well as state defendants. *See* Dkt. No. 56 at 3–34; Dkt. No. 58 at 3–7.

**\*4** In his supplemental objections filed on March 21, 2012, Plaintiff claims that he "received some documents from Defendants' Counsel ... which proves that more Jews are being starved throughout the Department of Correction and Community Supervision (DOCCS) when the said individuals file grievances." *See* Dkt. No. 70 at 2. Plaintiff claims that the two emails from DOCCS employees discussing two complaints filed by other inmates at Mid–State regarding issues similar to those in the present matter. *See id.* at Exhibit "A."

### III. DISCUSSION

A. Review of a Magistrate Judge's Decision
When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objection in made." 28 U.S.C. § 636(b)(1) (2006). However, when a party files "[g]eneral or conclusory objection or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court review those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B. Injunctive Relief
1. Standard of Review

A party seeking injunctive relief must demonstrate 1) irreparable harm; and 2) either a) a likelihood of success on the merits of the claims, or b) existence of serious questions going to the merits of the claims, and a balance of hardships tipping decidedly in moving party's favor. *See D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits." ' *Candelaria v. Baker,* No. 00–CV–012E, 2006 WL 618576, \*3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)).

A higher standard than ordinarily required must be met "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act ." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (citation omitted). To meet such a higher standard, the moving party must "show[ ] 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from a denial of the injunction." *Id.* at 133 (other citations omitted). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167 (W.D.N.Y.1997) (citing *Farmer v.. Brennan,* 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994)) (other citations omitted).

2. Application
**\*5** Regarding Plaintiff's current motion, this Court agrees with Magistrate Judge Baxter's finding that Plaintiff has not met his burden showing that he is entitled to injunctive relief. The Second Circuit has repeatedly held that "a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *see, e.g., Day v. Chaplin,* 354 Fed. Appx. 472, 473–74 (2d Cir.2009) (other citations omitted). Since the alleged unconstitutional and retaliatory acts occurred while Plaintiff was incarcerated at Mid–State, his transfer to Gouverneur renders his application for a TRO moot.

Moreover, Plaintiff has directed his motion for a TRO to individuals not included in the original complaint, with the exception of Defendants Boll and Fischer. [7] *See* Dkt. No.

2012 WL 2754859

35–1 at ¶¶ 4–7. As such, this Court agrees with Magistrate Judge Baxter's finding that "[i]f additional individuals denied [P]laintiff his constitutional right to practice his religion, he may move to supplement his complaint or bring a separate action against individuals at Gouverneur." *See* Dkt. No. 54 at 7. Even if Plaintiffs motion for a TRO was directed at Defendants in this action, Plaintiff has failed to establish an imminent threat of irreparable harm or that other serious injury that would result if injunctive relief is not granted because the alleged new deprivations have already occurred.

7     Magistrate Judge Baxter's Report–Recommendation noted that original Defendants Boll and Fischer are employees of DOCCS, and are not located at any specific facility. *See* Dkt. No. 54 at 5 n.9 (citing Dkt. No. 45 at ¶¶ 40–48). Magistrate Judge Baxter further noted that Plaintiff's claim that Defendants Boll and Fischer approve all transfers—even if true— is not proof that they were responsible for subsequent denials of Plaintiff's religious rights by individuals at Gouverneur. *See* Dkt. No. 54 at 6 n.10.

Finally, Plaintiff's concerns of possible future retaliation are too speculative to warrant injunctive relief, since no imminent threat is posed. *See Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, *2 (W.D.N.Y. Dec. 5, 2011) (citations omitted).

For the foregoing reasons, Plaintiff's motion for preliminary injunctive relief is denied.

## C. Summary Judgment

### *1. Standard of Review*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n.5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*6** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers." ' *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 303 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." ' *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### *2. Application*

#### *a. Sufficiency of Defendants' response*

In his objection, Plaintiff argues that because Defendants failed to submit an affidavit in support of their response in opposition to summary judgment the Court must grant his motion. *See* Dkt. No. 56 at 12–15. While not issuing a formal response, Defendants submitted a letter to Magistrate Judge Baxter, stating that Plaintiffs motion

for summary judgment is premature and should be denied because they have not had the opportunity to conduct discovery. *See* Dkt. No. 49 at 1.

The Second Circuit has held that,

> a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing " '(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." '

*Gurary v. Winehouse,* 190 F.3d 37, 43–44 (2d Cir.1999) (quoting *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995)) (other citations omitted). Defendant's response to Plaintiff's motion for summary judgment only consisted of a letter to Magistrate Judge Baxter, citing to case law and Rule 56(f) of the Federal Rules of Civil Procedure, indicating that summary judgment should not be granted because they have not been afforded adequate opportunity to conduct discovery. Defendants failed to attach a Rule 56(f) affidavit to their response, and the letter did not address facts to be sought with additional discovery that would create a genuine issue of material fact. *See* Dkt. No. 49 at 1–2. [8]

[8]  Defendants referenced Rule 56(f) in the response letter to Magistrate Judge Baxter. However, "[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985)). As such, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985) (other citations omitted).

Although Plaintiff is correct that Defendants' response was deficient, Plaintiff is still not entitled to summary judgment. Four days before the response deadline, Magistrate Judge Baxter issued a text order providing that "[n]o further submissions are required or allowed...." Clearly, Magistrate Judge Baxter believed, as does the

Court, that Plaintiff's motion was premature and fell short of carrying his burden; and, therefore, did not require a formal response. Defendants' failure to comply with Rule 56(f) does not obviate Plaintiff's burden of proof, which he failed to meet. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (holding that "[a]n unopposed summary judgment motion may also fail where the undisputed facts fail " 'to show that the moving party is entitled to judgment as a matter of law' " ' (quotations omitted)); *see also Giannullo,* 322 F.3d at 140–41 (holding that the "non-movant is not required to rebut an insufficient showing").

*b. Religion*

**\*7**  Prisoners are certain constitutional protection with regards to the First Amendment Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (quoting 42 U.S.C. § 2000cc–1(a) (2006)); *see e.g., Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*15 (N.D.N.Y. Mar. 30, 2010) (citation omitted). Plaintiff claims that his First Amendment Free Exercise rights under RLUIPA were violated by Defendants Ready and Ellis.

With respect to the incident that occurred on December 7, 2010, involving Defendant Ready's refusal to allow Plaintiff to attend religious services, this Court agrees with Magistrate Judge Baxter's findings that a question of fact remains based on the exhibits Plaintiff submitted. Specifically, the investigation report issued in response to Plaintiffs grievance about the matter indicates that the call-out list for Jewish Services on December 2, 2010 was not distributed following normal procedure. *See* Dkt. No. 1, Ex. L. As a result of this error, the call-out list was hand delivered to housing units, but not the program areas, where Plaintiff was at the time of the incident. *See id.* The report also indicates that there was insufficient evidence "to substantiate any malfeasance by staff" and that there was "no malice intended." *See id.*

Plaintiff asserts that DOCCS Office of Counsel's response, indicating that corrective action was taken regarding this incident, is an admission to unconstitutional acts. *See* Dkt.

No. 56 at 17–18. A statement indicating that corrective action was taken is not necessarily the equivalent of an admission to unconstitutional conduct. Additionally, in his objection, Plaintiff claims that the DOCCS Office of Counsel overruled the superintendent's decision regarding the grievance. *See id.* at 18. This claim, however, is untrue. Plaintiff's own exhibit shows that the Central Office Review Committee ("CORC") upheld the decision of the superintendent regarding this grievance, and stated that it had "not been presented with sufficient evidence to substantiate that [Plaintiff] was purposefully denied attendance to the callout or discriminated against by staff." *See* Dkt. No. 1, Ex. S. Thus, there remains a question of material fact regarding the incidents of December 7, 2010, and Plaintiff's objection regarding the incident is unfounded.

Similarly, regarding the incident that occurred on March 20, 2011, it is clear from Plaintiff's own submissions that a question of fact still remains regarding Defendant Ellis' conduct. Plaintiff claims that the religious services scheduled for March 20, 2011 were intentionally cut short by Defendant Ellis in an expression of anti-Semitic behavior. *See* Dkt. No. 1 at ¶ 65. However, the investigation report in response to Plaintiff's grievance indicates that the Rabbis arrived late for the services, and inmates were sent back to their housing units until they arrived. *See* Dkt. No. 48–2, Ex. D. As such.

**\*8** Based on the foregoing, the Court finds that Plaintiff has failed to establish that there are no issues of material fact and is, therefore, not entitled to summary judgment on this claim.

*c. Retaliation*

The Second Circuit has held that retaliation against a prisoner for filing a grievance is a violation of that prisoner's First Amendment right to petition the government for redress. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)). To establish a claim of retaliation, the plaintiff must establish "(1) that the disciplined conduct was constitutionally protected, and (2) that his punishment was motivated, in whole or in part, by his conduct—in other words, that the prison officials' actions were substantially improper retaliation." *Id.* Additionally, there must be a causal connection between the protected activity and the adverse action. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239

F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Plaintiff claims he was subjected to several instances of retaliation, including the following: (1) the events of March 20, 2011, for filing an earlier grievance against Defendant Ellis, and CO. Johnston;[9] (2) improperly mailing out Plaintiff's Notice of Intent to File a Claim in retaliation for filing grievances; (3) Defendant Kupiec's destruction of two of Plaintiff's packages in retaliation for filing a Notice of Intent to File a Claim and grievances; and (4) the tearing of Plaintiff's mail in retaliation for filing grievances. *See* Dkt. No. 48–1 at ¶¶ 20, 22, 23, 97.

[9]    Plaintiffs grievance number MS–20189–10 was filed in response to Defendant Ellis' and CO. Johnston's refusal to permit Plaintiff to remain in the law library when he was excused from work and/or programs in accordance with the Jewish Holiday. *See* Dkt. No. 1, Ex. F.

Again, Plaintiff has failed to establish that there are no issues of material fact regarding the above mentioned events. Plaintiff has failed to put forth evidence indicating that these events "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In fact, evidence of the exact opposite exists in that Plaintiff continually filed grievances for acts he thought were in violation of his rights. Plaintiff is merely relying on the fact that these events occurred in close proximity to protected conduct, and such reliance "does not strongly establish [a] causal nexus." *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, \*17 (W.D.N.Y. Oct. 12, 2011).

*d. Access to Courts/Mail Claims*

"Under the First Amendment, prisoners have a right to 'the free flow of incoming and outgoing mail.' " *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (quoting *Davis v. Goord,* 320 F.3d at 351). A prisoner's right to send and receive mail can be regulated, if such regulation "is reasonably related to legitimate penological interests." *Id.* (quoting *Rodriguez v. James,* 83 F.2d 8, 12 (2d Cir.1987) (other quotation omitted)). To establish such a claim, it must be shown that "the defendant's conduct was deliberate and malicious, and that the defendant's

actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (citing *Davis v. Goord,* 320 F.3d at 351). Actual injury is established by demonstrating that the plaintiff's efforts in pursuing a nonfrivolous claim were frustrated as a result of the defendant's actions. *See id.* (citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996)).

**\*9** With respect to non-legal mail, a "prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, \*5 (S.D.N.Y. Mar. 29, 2001) (quoting *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993)). "In order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Id.* (citing *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999)).

In the present matter, Magistrate Judge Baxter correctly held that Plaintiff has failed to show that no question of fact exists regarding the issue of his legal mail not being sent out as instructed. Plaintiff has not produced any evidence showing that Defendant Kupiec's conduct was deliberate and malicious. Plaintiff states that the apology letter received from Defendant Kupiec was an admission to the error in mailing. *See* Dkt. No. 56 at 25. However, as Magistrate Judge Baxter noted, the fact that Defendant Kupiec responded to Plaintiff's complaint, apologized to Plaintiff for the error, and issued him a reimbursement does not establish that her conduct was deliberate and malicious. *See* Dkt. No. 54 at 14.

Plaintiff also refers to his claim that Defendant Kupiec lost or destroyed his mail, specifically his test scores, in retaliation for grievances filed. *See* Dkt. No. 54 at 15; Dkt. No. 56 at 25. Although Plaintiff may be able to succeed on a claim for interference with incoming non-legal mail by showing that a pattern and practice of interference exists between the two packages that were allegedly destroyed or missing, and the destruction of his test scores, that was not justified by any legitimate penological interest, questions of fact remain as to who committed the violations with respect to the two packages, and with regard to Defendant Kupiec's motive in ripping Plaintiff's mail, as noted by Magistrate Judge Baxter. *See* Dkt. No. 54 at 15. [10]

| 10 | In a letter from Defendant Kupiec to Plaintiff, Defendant Kupiec apologizes for tearing the test scores because she mistook them for advertisements that could not be forwarded. *See* Dkt. No. 48–2, Ex. S. |

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly held that questions of fact exist which preclude summary judgment at this time.

*e. Supervisory Officials*

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.)). There is a sufficient showing of personal responsibility of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

**\*10** It is well-settled that receipt of letters or grievances, by itself, does not amount to personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009). Further, "[p]rison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint" *Id.* at 199 n.13 (citations omitted); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997).

Magistrate Judge Baxter correctly held that, because there are remaining questions of fact as to whether any unlawful violations actually occurred, Plaintiff's motion for summary judgment as to Defendants Boll and Fischer must be denied. Moreover, contrary to Plaintiff's

assertion, Magistrate Judge Baxter did, in fact, address his claims against Defendants Fischer and Boll and correctly found that summary judgment as to those Defendants was inappropriate at this time. *See* Dkt. No. 54 at 6 n.10, 16–17.

Based on the foregoing, the Court finds that Plaintiff has failed to establish that he is entitled to summary judgment as to Defendants Boll and Fischer.

*f. Other Objections*

In his tenth objection, Plaintiff states that the Report–Recommendation is in violation of Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation. *See* Dkt. No. 56 at 21–22. By the very language of Local Rule 7.1(a)(1), however, this Local Rule is only applicable to parties, not the court. *See* LOCAL RULES N.D.N.Y. 7.1(a)(1). [11]

[11]    * * *

With regards to his twelfth objection, Plaintiff is not being "condimed [sic] for taking appropriate action" with respect to dismissing his own Court of Claims action. Magistrate Judge Baxter noted with respect to this claim, that "[i]f an injury exists, there is at least a question of fact regarding the causation of the injury to plaintiff's legal claim." *See* Dkt. No. 54 at 16; Dkt. No. 56 at 29. Plaintiff still has the opportunity to prove this claim at trial.

Plaintiff also objects to Magistrate Judge Baxter "granting" Defendants' second letter motion for an

extension. Plaintiff's objection is without merit because, quite simply, Defendant's second letter motion to stay discovery was denied by Magistrate Judge Baxter in a text order dated May 15, 2012.

The Court has reviewed Plaintiff's remaining objections and finds that they are meritless and often quite difficult to comprehend.

IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Baxter's March 22, 2012 Report–Recommendation is ADOPTED in its entirety for the reasons stated therein; and the Court further

**\*11** ORDERS that Plaintiff's motions for preliminary injunctive relief (Dkt. No. 35) and for summary judgment (Dkt. No. 48) are DENIED; and the Court further

ORDERS that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2754859

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Morehouse v. York, N.D.N.Y., January 7, 2016

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,
v.
N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/ATB).
|
Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

## ORDER

Hon. BRENDA K. SANNES, District Judge.

**\*1** Plaintiff Edgardo L. Lopez, a former New York State inmate, commenced this civil rights action under 42 U.S.C. § 1983 raising federal and state claims against New York State Department of Correction officials arising out of plaintiff's confinement at Marcy Correctional Facility. Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a motion for summary judgment which was referred to United States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69, 83. On May 20, 2015, Judge Baxter issued a Report–Recommendation, recommending that defendants' motion for summary judgment be granted, and that plaintiff's First Amendment and Eighth Amendment claims be dismissed without prejudice to refiling and that plaintiff's due process and state law claims be dismissed with prejudice. Dkt. No. 83, p. 24. Judge Baxter advised the parties that:

> Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within

which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation was mailed to Lopez's last known address via certified mail. Dkt. No. 83. Lopez's copy of the Report–Recommendation was returned to the Court marked "Return to sender, unable to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and a request for an extension of time to respond to the Report–Recommendation. Dkt. Nos. 86–87. Lopez noted that he received the Report–Recommendation that day at the public counter in the courthouse. Dkt. No. 87. The Court granted Lopez's request for an extension of time and, in a text order dated June 8, 2015, extended the due date for filing objections to June 22, 2015. The text order was mailed to Lopez's last known address. Lopez's copy of the text order was returned to the Court marked "Return to sender, not deliverable as addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded Lopez of his obligation to notify the Court of any change in address, see Local Rule 10.1(c)(2), and provided Lopez an additional fourteen days to file his current address and any objections to the Report and Recommendation. Dkt. No. 90, pp. 2–4. The Court advised Lopez that if he failed to comply with the Decision and Order, the Court would "consider the Report and Recommendation as unopposed and review for clear error only." Dkt. No. 90, p. 4. The Decision and Order was served on Lopez via certified mail at his last known address. Dkt. No. 90. On July 8, 2015, the Court received an executed return receipt of delivery. Dkt. 91. Lopez has not, to date, filed any objections to the Report–Recommendation.

**\*2** Accordingly, as no objections to the Report–Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report–Recommendation for clear error. *See Glaspie v. N.Y.C. Dep't of Corr.,* No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at \*1, 2010 U.S. Dist. LEXIS 131629, at \*2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections to report and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.' ") (quoting *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005)). Having reviewed the Report and Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions. (Amended Compl ., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state law tort claims in connection with the alleged assault. (*Id.* ¶¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1] . Defendants did not submit a reply.

[1]    Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process that he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

### *DISCUSSION*

#### I. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for

summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).*

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord, 467 F.3d at 273.* In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. ., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Salahuddin, 467 F.3d at 272.*

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York, 426 F.3d 549, 554–55 (2d Cir.2005)* ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

**II. Exhaustion of Administrative Remedies**

**\*4** Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions [2]. (*Id.* ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff had completed the administrative grievance process for these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

[2]     Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

**A. Legal Standards**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord, 380 F.3d 670, 675–76 (2d Cir.2004)* (citing *Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)* (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g,* *Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*5** At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops

them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some discussion.[4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

3      See *Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

4      See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

## B. Application

Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt. No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B)). On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt. No. 69–3, Ex. 3; Dkt 73–2, Pl's Ex. 3(C)). On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D)).

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.) Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating to his assault and retaliation claims prior to commencing this federal litigation [5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8.)

[5]   Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter, 534 U.S. at 532.* Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8.) If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as

required by the PLRA." *Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.). [6]

[6]   The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at \*19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, \*2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP") and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B.).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at \*8–9 (S.D.N.Y. Mar. 28, 2013) (the plaintiff's claim that he was deterred from pursuing grievances by threats from

2015 WL 4394604

a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

 *7 During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies *before* filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." *Id.,* 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.*

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff had exhausted his administrative remedies as to the due process issue. *See Chavis v. Goord,* No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. *See* Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *see also Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due

process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. *See, e.g., Murray v. Fischer,* No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at \*2–3) (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); *Emory v. New York,* No. 11–CV–1774, 2013 WL 1881009, at \*3 (E.D.N.Y. May 6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their "voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at \*4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

**B. Legal Standards**

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ....,

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*9** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

**C. Application**

Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

### 1. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee assistant, who is not named as a defendant, refused to help plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance

when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

### 2. Use of OMH Information

**\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-

clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

### 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When the witness testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition, defendant Cavaleri noted the consistent testimony of seven witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at \*1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7].

[7]  The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at \*11–18 (S .D.N.Y. Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at \*4–7 (N.D.N.Y. Jan.25, 2011) (Rep't–Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

### III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt No. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in

any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/RFT), 2014 WL 1292281, \*16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at \*4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct by a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–

CV–595, 2014 WL 3809129, \*5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at \*3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of instructions.' " *Id.,* 2014 WL 3809129, \*6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

2015 WL 4394604

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4394604

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 2760339
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Marcel C. Bristol, Plaintiff,
v.
Nassau County, Nassau County Police
Department, A.D.A. Lauren Doddato,
A.D.A. Jane Doe, Sgt. William Gunter,
and Det. Ronald S. Schepis, Defendants.

08 Civ. 3480 (AMD) (SIL)
|
Signed 05/12/2016

## MEMORANDUM DECISION AND ORDER

ANN DONNELLY, District Judge.

 **\*1** The *pro se* plaintiff brings this Section 1983 *in forma pauperis* lawsuit alleging false arrest, malicious prosecution, and excessive bail in connection with his allegedly unlawful arrest and prosecution for grand larceny, criminal possession of a forged instrument, identity theft, and a scheme to defraud. The defendants Nassau County, Nassau County Police Department, Assistant District Attorney ("ADA") Lauren Doddato, ADA "Jane Doe," Sergeant William Gunter, and Detective Ronald Schepis move for judgment on the pleadings pursuant to Rule 12(c).

In his opposition to the defendants' motion, the plaintiff agrees to dismiss his claims against the defendants in their official capacity, the claims against the Nassau County District Attorney's Office, and the claims against Nassau County Police Department. [1] (Pl.'s Opp. to Mot. to Dismiss at 28 (ECF No. 108).) The plaintiff's motion to withdraw those claims is granted. The plaintiff also requests an amendment to his complaint and argues that "[t]his motion should rather be decided under Rule 56 for summary judgment in favor of plaintiff." (Pl.'s Opp. to Mot. to Dismiss at 10 (ECF No. 108).)

[1]   The plaintiff did not plead claims against the Nassau County District Attorney's Office in this action.

For the reasons discussed below, I deny the plaintiff's request to substitute Detective John Harvey for named-defendant Sergeant William Gunther, deny the plaintiff's motion for summary judgment, and grant the defendants' motion to dismiss. Further, pursuant to 28 U.S.C. § 1915(e)(2)(B), I *sua sponte* dismiss the excessive bail claim. The plaintiff's complaint is dismissed in its entirety. Because any amendment would be futile, the plaintiff is not granted leave to amend his complaint.

## BACKGROUND

The plaintiff alleges that on January 4, 2008, Sergeant William Gunter and Detective Ronald Schepis stopped the car in which the plaintiff was a passenger without justification, and arrested him without a warrant. (Compl. ¶¶ 1, 8.) [2]

[2]   The plaintiff complains that the driver's car was impounded, and that the driver "underwent a grilling interrogation by the defendants." (Compl. ¶¶ 8, 10.) The plaintiff does not have standing to assert claims on the driver's behalf.

In a search incident to the plaintiff's arrest, the officers recovered money and the plaintiff's Pepcid medication, which he says he takes twice a day to manage gastroesophageal reflux disease. (Compl. ¶ 10.) The plaintiff claims that the police officers withheld his medication until he agreed to speak to them without his lawyer. (Compl. ¶ 11.)

During an interview at the precinct stationhouse, the officers advised the plaintiff that they investigate "forgery, counterfeit, and identify theft," and they believed the plaintiff had taken "unauthorized loans" from credit unions. (Compl. ¶ 10.) The plaintiff complains that the officers repeatedly interrupted the interview to consult with the District Attorney's Office and others in the police precinct. (Compl. ¶ 12.) Further, the plaintiff says that Assistant District Attorney ("ADA") Lauren Doddato provided the officers with legal advice as law enforcement prepared the "seven felony complaints" upon which the plaintiff was later arraigned. (Compl. ¶ 12.) The plaintiff alleges that the felony complaints were "fabricated and fraught with perjury." (Compl. ¶ 13.) Moreover, he says that the preparation of seven "unwarranted felony complaints" operated to "guarantee plaintiff's detention on excessive bail." (Compl. ¶ 15.) In his

Case 9:16-cv-01157-EJS-TWD   Document 57   Filed 08/31/18   Page 308 of 314

amended complaint, the plaintiff accuses ADA Doddato of "willfully concoct[ing] an accusatory instrument, purported to be an indictment [w]hen she knew it was invalid." (Am. Compl. ¶ 9.) [3]

[3]    The plaintiff's amended complaint does not stand on its own; rather, the plaintiff's submission purports to amend the initial August 21, 2008 complaint by denoting revisions to the initial complaint. *Cf. Davidson v. Canfield*, No. 07-CV-599S SR, 2012 WL 6087486, at *3 (W.D.N.Y. Dec. 6, 2012) (amended complaint should be "intended to completely replace the prior complaint in the action.") (emphasis in original). Because district courts are to treat the pleadings of *pro se* plaintiffs liberally, I read the complaint, as supplemented by the amended complaint.

**\*2** On August 21, 2008, the plaintiff filed his complaint in this action ("*Bristol I*"), and amended his complaint on December 1, 2008. (ECF No. 13.) The defendants answered. (ECF Nos. 15, 17.) [4] The Court granted the defendants' request to stay discovery pending conclusion of the plaintiff's state court criminal action. (ECF Nos. 27, 29.) [5]

[4]    This case was previously before Judge Joseph Bianco, and was reassigned to me in November of 2015.

[5]    Over the plaintiff's objection, the stay was extended during the plaintiff's appeal of his criminal conviction. (ECF Nos. 33-38,44.)

At the June 3, 2009 pretrial suppression hearing, the plaintiff's attorney argued that the plaintiff was arrested without probable cause and that physical evidence obtained during a search incident to the arrest should be suppressed. (Tr. of Pretrial Hearing at 107 (ECF No. 117).) The plaintiff's lawyer also argued that the plaintiff's statements to detectives should be suppressed because he was allegedly denied the right to speak to an attorney. (Tr. of Pretrial Hearing at 110 (ECF No. 117).) The plaintiff's lawyer did not argue, and the evidence presented at the hearing does not suggest, that the defendants withheld medication from the plaintiff at the stationhouse or otherwise coerced him into making any statements.

The Honorable James McCormack found that the arresting officer, Detective Schepis, had probable cause to arrest the plaintiff. (Tr. of Pretrial Hearing at 124 (ECF No. 117).) Further, the court found that the plaintiff was

advised of his *Miranda* rights in the early afternoon of January 4, 2008, that he made a knowing, voluntary, and intelligent waiver of those rights, and that the statement that the police obtained at the precinct was voluntarily obtained—"not the product of any force[ +], ... coercion, or promises of leniency." [6] (*Id.* at 125-126.)

[6]    The plaintiff refused to be present in court for the hearing. (Tr. of Pretrial Hearing at 7 (ECF No. 117).)

Following a jury trial in which he represented himself, the plaintiff was convicted on September 17, 2009 in the Supreme Court, Nassau County, of three counts of grand larceny, two counts of criminal possession of a forged instrument, four counts of identity theft and a scheme to defraud. *People v. Bristol*, 102 A.D.3d 881, 882 (App. Div. 2d Dep't 2013). He was sentenced as a predicate felony offender to an indeterminate prison term of from five to ten years.

While he was still incarcerated, the plaintiff brought a second lawsuit in the Eastern District against many of the same defendants. *Bristol v. Queens Cty., et al.*, No. 09-cv-5544 ("*Bristol II*"). [7] "In that complaint, he alleges that the Nassau County defendants arrested him on January 4, 2008, "referred the same charges" to the Queens County Defendants, and the Queens County defendants "re-arrested" the plaintiff in the Nassau County jail, without probable cause." (*Bristol II* Compl. ¶ 11, 17.) The Nassau County defendants moved to dismiss on June 7, 2010. (*Bristol II*, No. 09-cv-5544 (ECF Nos. 42-44).) The plaintiff opposed and moved for summary judgment. (*Bristol II*, No. 09-cv-5544 (ECF No. 50).)

[7]    *Bristol II* was reassigned from Judge Joseph Bianco to Judge Joan Azrack in January of 2015.

In a Report and Recommendation on the Nassau County defendants' motion to dismiss, Magistrate Judge A. Kathleen Tomlinson observed that "the specific allegations facing the Nassau County Defendants in this action all appear to arise out of Plaintiff's initial arrest in January 2008, which is the basis of *Bristol I*." *Bristol II*, 2011 WL 6937468, at *6 (E.D.N.Y. Feb. 28, 2011), *report and recommendation adopted sub nom. Bristol v. Cty. of Nassau*, No. 09-cv-5544-JFB-AKT, 2012 WL 10484 (E.D.N.Y. Jan. 3, 2012). [8] Consequently, in construing the plaintiff's *Bristol II* complaint liberally, Judge Tomlinson "[l]ook[ed] back to *Bristol I*" because there, the

Case 9:16-cv-01157-EJS-TWD    Document 57    Filed 08/31/18    Page 309 of 314
Bristol v. Nassau County, Not Reported in F.Supp.3d (2016)
2016 WL 2760339

allegations were directed solely to employees of Nassau County. *Id.*, at *10. "Judge Tomlinson found that the plaintiff's "own words demonstrate that ADA Doddato and ADA 'Jane Doe' took no part with the arresting officers in the actual arrest" of the plaintiff." *Id.* Because the acts alleged included only the "professional evaluation of evidence assembled by the police ... along with ADA Doddato's determination of which offenses would be charged in the seven felony complaints" Judge Tomlinson concluded that absolute immunity can be "gleaned from the complaint." *Id.* (citations omitted). Judge Joseph Bianco adopted Judge Tomlinson's recommendation to dismiss all claims asserted against the District Attorney defendants on the basis of absolute immunity. *Bristol v. Cty. of Nassau*, No. 09-CV-5544-JFB-AKT, 2012 WL 10484, at *1 (E.D.N.Y. Jan. 3, 2012) (adopting report and recommendation in its entirety). [9]

<hr/>

[8]    However, Judge Tomlinson declined to recommend dismissal pursuant to the doctrine of duplicative litigation on the grounds that the pleadings in *Bristol II* primarily address the circumstances and events surrounding the plaintiff's prosecution in Queens County. *Bristol II*, 2011 WL 6937468, at *5.

[9]    *Bristol II* is ongoing.

**\*3** In February of 2012, the plaintiff appealed his criminal conviction and his sentence on the grounds, among others, that his arrest was not supported by probable cause and there was insufficient evidence to convict him. (Appellant's Pro Se Brief at 21, 50 (ECF No. 115-14).) The plaintiff did not argue that his medication was withheld from him at the precinct stationhouse, or that his statements to the police were coerced.

On January 23, 2013, the Appellate Division Second Department reversed the plaintiff's conviction. While the court rejected his claims about the sufficiency of the evidence and the lawfulness of his arrest, the court faulted the trial judge's decision to allow the plaintiff to represent himself. For that reason, the court ordered a new trial. *People v. Bristol*, 102 A.D.3d at 882.

Following the reversal, the plaintiff's attorney moved to dismiss the criminal case in the interests of justice. (Aug. 13, 2013 Short Form Order at 2, *People v. Bristol*, Ex. E to Pl.'s Mot. to Dismiss (ECF No. 104).) In support of this application, defense counsel argued the following factors: the plaintiff's age, the fact that he had already served the

minimum term of his sentence, and that he was going to be deported to Haiti regardless of the outcome of his criminal case. *Id.* at 2-3. The People opposed, citing the plaintiff's record, the seriousness of the crime, and the strong proof of Mr. Bristol's guilt. *Id.* at 3. The Honorable Christopher Quinn denied the application. *Id.* at 5.

In February of 2014, the plaintiff was released from custody on his own recognizance. (Defs.' Status Report, Mar. 24, 2015 (ECF No. 84).) He was then apprehended by U.S. Customs and Immigration officials and deported to Haiti, where he now resides. *Id.* On February 27, 2014, a Nassau County Court judge issued a bench warrant because the plaintiff did not appear on his criminal case. According to the Office of the Nassau County Attorney, the Nassau County District Attorney did not plan to extradite the plaintiff; should the plaintiff ever return to the jurisdiction, he would face arrest on the warrant. *Id.*

On August 22, 2014, the instant civil case was dismissed for failure to prosecute. (ECF No. 81.) [10] Following the plaintiff's motion to set aside the dismissal (ECF No. 82), Judge Bianco ordered that the case be reopened, lifted the stay of discovery, and referred the action to the Magistrate Judge to oversee discovery. (ECF Nos. 83, 85.) On December 30, 2015, the defendants moved for judgment on the pleadings as to the entirety of Mr. Bristol's amended complaint. The plaintiff opposed, and included a request to substitute "Harvey John" for the defendant William Grunter. The plaintiff also argued that I should decide this case his favor pursuant to Rule 56. For the reasons set out below, the plaintiff's complaint is dismissed without leave to amend.

<hr/>

[10]    In the meantime, the plaintiff filed yet another lawsuit against Nassau County and individual defendants. *Bristol v. Schenk*, No. 14-cv-6647-JFB-AKT. In that lawsuit, the plaintiff alleges that that the defendants deprived him of his rights not to be punished twice for the same offense, not to be seized without due process, not to have his property seized without due process, and his right to be free from cruel and unusual treatment. *Bristol v. Prob. Dep't of Nassau Cty.*, No. 14-cv-6647-JFB-AKT, 2016 WL 873336 (E.D.N.Y. Mar. 8, 2016). That case is pending in front of Judge Bianco.

## DISCUSSION

### I. Motion to Dismiss Pursuant to Rule 12(c)

**\*4** The defendants move for judgment on the pleadings pursuant to Rule 12(c). The standard applicable to a motion to dismiss under Rule 12(b)(6) applies to a Rule 12(c) motion for judgment on the pleadings. *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). In deciding the motion for judgment on the pleadings, the court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiffs'] favor." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (alteration in original). Submissions filed by a *pro se* litigant are to be "liberally construed," and a *pro se* plaintiff's complaint "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). However, even a *pro se* complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Mcmcuso v. Hynes*, 379 Fed.Appx. 60, 61 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (applying *Iqbal* and *Twombly* to a *pro se* complaint). The court will dismiss the complaint if the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

On a motion to dismiss, consideration is "limited to the factual allegations in plaintiff[']s amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff[']s possession or of which plaintiff[ +] had knowledge and relied on in bringing suit." *Faconti v. Potter*, 242 Fed.Appx. 775, 777 (2d Cir. 2007) (alterations in original); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993) (On a Rule 12(b)(6) motion, "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken are considered."). Dismissal is appropriate when the defendants raise "collateral estoppel, or issue preclusion, as an affirmative defense and it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law." *Wachtmeister v. Swiesz*, 59 Fed.Appx. 428, 429 (2d Cir. 2003) (citing *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

The defendants request that I take judicial notice of the Appellate Division, Second Department's decision, remitting Mr. Bristol's criminal action for a new trial, *People v. Bristol*, 102 A.D.3d 881 (App. Div. 2d Dep't 2013), and the August 15, 2013 order declining to dismiss Mr. Bristol's criminal case. (Ex. E to Pl.'s Mot. to Dismiss (ECF No. 104).) Matters of which judicial notice may be taken under Rule 201 of the Federal Rules of Evidence include public records. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also Awan v. Ashcroft*, No. 09-cv-1653-JS-AKT, 2010 WL 3924849, at \*2 (E.D.N.Y. Sept. 28, 2010). Moreover, courts "routinely take judicial notice of documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer*, 937 F.2d at 774; *see also Elliott v. Nestle Waters N. Am. Inc.*, No. 13-cv-6331-RA, 2014 WL 1795297, at \*8 (S.D.N.Y. May 6, 2014) ("the Court may properly take judicial notice of the decisions to the extent that they establish that such decisions were rendered, though not to establish the truth of any matter asserted in the decisions."). I therefore take judicial notice of the Appellate Division, Second Department's decision and Judge Quinn's order denying the plaintiff's application to dismiss.

The plaintiff appends exhibits to his submission that I exclude from consideration. [11] I do not take judicial notice of these materials—and the plaintiff has not requested that I do—because they are not facts of which judicial notice may properly be taken. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Petschauer v. United States*, No. 13-cv-6335-NGG-VMS, 2016 WL 1271035, at \*4 (E.D.N.Y. Mar. 29, 2016) ("courts regularly refuse to take judicial notice of incident reports, arrest reports, and police reports."). Nor were these documents attached to the complaint or incorporated by reference. Moreover, there is no basis to treat the defendant's motion as one for summary judgment. [12]

---

[11]   The exhibits appear to be a copy of the of his criminal case file, excerpts from depositions, a Nassau County Sheriffs Department Inmate History for the plaintiff, Certification of a Grand Jury indictment, a Felony

Case 9:16-cv-01157-EJS-TWD Document 57 Filed 08/31/18 Page 311 of 314
**Bristol v. Nassau County, Not Reported in F.Supp.3d (2016)**
2016 WL 2760339

Property Seizure Report, a News Day article, and a partial transcript from his criminal proceeding.

12    The plaintiff seems to be asking that I treat the defendant's motion as one for summary judgment under Rule 56 and rule in his favor. Pursuant to Rule 12(d), the court must treat a motion under Rule 12(c) as one for summary judgment if matters outside the pleadings are presented and not excluded by the court. Fed. R. Civ. P. 12(d). However Rule 12(d) also provides that "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion" before treating a motion under Rule 12(c) as one for summary judgment under Rule 56. This requirement has not been met. As the plaintiff repeatedly asserts, discovery has been stayed for much of this litigation, and thus, the defendants have not had a reasonable opportunity to confirm or challenge the reliability of the information contained in the plaintiff's exhibits. *See McKenzie v. Grand Cent. P'ship*, No. 14-cv-6549-KAM-LB, 2016 WL 1180191, at *3 (E.D.N.Y. Mar. 25, 2016) (denying request to convert 12(b)(6) motion as one for summary judgment on the basis that the plaintiff had outstanding discovery requests). Accordingly, I exclude the matters outside of the pleadings of which I have not taken judicial notice, and I do not convert this motion, pursuant to Rule 12(d), to a motion for summary judgment. I will instead consider this motion as a motion to dismiss.

### A. Probable Cause to Arrest

 *5    The plaintiff complains that the defendants are liable under Section 1983 for false arrest and malicious prosecution. [13] In their motion to dismiss, the defendants argue that the false arrest and malicious prosecution claims cannot survive because the arresting officers had probable cause to arrest the plaintiff. Probable cause to arrest is a "complete defense" to claims of false arrest and malicious prosecution. *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013); *Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (Because lack of probable cause is an element of a malicious prosecution claim, "the existence of probable cause is a complete defense to a claim of malicious prosecution.").

13    The plaintiff alleges both "unlawful arrest and false imprisonment" (Compl. at 1), but I treat these as one cause of action for false arrest. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("[F]alse

arrest is a species of false imprisonment ...."). The plaintiff also claims that ADA Doddato "willfully concocted an accusatory instrument, purported to be an indictment." (Am. Compl.) I construe this as a component of the plaintiff's malicious prosecution claim. *See Pinero v. Casey*, No. 10-cv-4803-JSR-JCF, 2012 WL 832509, at *8 (S.D.N.Y. Mar. 13, 2012) (treating allegation that the indictment was "fabricated" and "bogus" as a malicious prosecution claim).

The defendants assert that the court should give preclusive effect to the Second Department's decision that Mr. Bristol's "arrest was supported by probable cause," and the "verdict of guilt was not against the weight of the evidence." (Defs'. Mot. to Dismiss at 8, *Bristol I* (ECF No. 105) (citing *People v. Bristol*, 102 A.D.3d at 882).) Federal courts "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). Under New York law, issue preclusion, also known as collateral estoppel, has two elements: "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Jenkins*, 478 F.3d at 85 (quoting *Juan C. v. Cortines*, 89 N.Y.2d 659, 667 (N.Y. 1997)). Put another way, the doctrine of issue preclusion "precludes a party from relitigating ... an issue clearly raised in a prior action ... and decided against that party ... whether or not the tribunals or causes of action are the same." *Tsirelman v. Daines*, 19 F. Supp. 3d 438, 449 (E.D.N.Y. 2014) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500 (1984)); *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 108 (2d Cir. 2015) (issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."). It is "well-settled" that issue preclusion may bar a plaintiff from bringing a Section 1983 action in federal court. *Barnes v. Cty. of Monroe*, 85 F. Supp. 3d 696, 723 (W.D.N.Y. 2015) (citations omitted); *see also Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996) (in actions brought under Section 1983, collateral estoppel "serves the important purpose of promoting comity between State and federal courts.").

The party seeking to invoke issue preclusion bears the "burden of showing that the issues are identical and were necessarily decided in the prior action," and the party opposing its application bears the "burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues." *Proctor v. LeClaire*, 715 F. 3d 402, 414 (2d Cir. 2013) (citation omitted).

**\*6** In order for the "identity" and "actually litigated" requirements to be satisfied, the issue "must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Evans v. Ottimo*, 469 F.3d 278, 282 (2d Cir. 2006) (citing *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N. Y.2d 659, 667 (N.Y. 1990)). At the plaintiff's suppression hearing, his lawyer argued that the police did not have probable cause to arrest him, and that the physical evidence recovered during the arrest should be suppressed. He also argued that the plaintiff's statements were coerced, and should be suppressed. The hearing court rejected both arguments and found that the plaintiff's arrest was supported by probable cause, and that his statements were knowing and voluntary.

The Second Department affirmed the hearing court's ruling. [14] *People v. Bristol*, 102 A.D.3d at 882. The questions in New York state court—whether the police officers had probable cause to arrest the plaintiff and whether the plaintiff's statements to law enforcement were voluntary—were identical to the issues here, and were resolved against the plaintiff. *See Thomas v. Venditto*, 925 F. Supp. 2d 352, 360-61 (E.D.N.Y. 2013) (there was identity of issues because the plaintiff's claim of selective prosecution, which he asserted in a Section 1983 civil rights suit, had been raised, litigated, and actually decided in his motion to dismiss the prosecution before the New York state criminal court).

[14]    On appeal, the plaintiff did not challenge the voluntariness of his statements to law enforcement.

Moreover, the plaintiff clearly had a "full and fair opportunity to litigate" the legality of his arrest and the voluntariness of his statements. *See Fequiere v. Tribeca Lending*, No. 14-cv-812-RRM-LB, 2016 WL 1057000, at \*9 (E.D.N.Y. Mar. 11, 2016) (In order to meet the "full and fair opportunity to litigate" requirement, the "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's

Due Process Clause."). Though the plaintiff's criminal prosecution is still pending, the Second Department heard and rejected his appeal of the hearing court's decision that his arrest was not supported by probable cause. *See Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996) ("Under New York law, appellate review plays a critical role in safeguarding the correctness of judgments ... and collateral estoppel cannot be applied without first considering the availability of such review."); *cf. Venditto*, 925 F. Supp. 2d at 362 (staying Section 1983 proceeding pending resolution of plaintiff's criminal court prosecution because the plaintiff had not had a "full and fair opportunity to litigate," in light of the fact that there had been not yet been an appeal of the trial court's decision not to dismiss).

Because I find that the doctrine of issue preclusion applies to the state court's determination that the Nassau County police officers had probable cause to arrest the plaintiff on January 4, 2008 and that his statements to law enforcement were not coerced, his claims of false arrest and malicious prosecution are dismissed as a matter of law. [15] Moreover, I deny the plaintiff's request to substitute Detective Harvey for the defendant William Grunter because the identity of the arresting police officers would not alter the outcome of my decision dismissing the claims for false arrest and malicious prosecution. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("a futile request to replead should be denied.").

[15]    Even if I concluded that the doctrine of issue preclusion did not apply, the plaintiff's claim for malicious prosecution would be dismissed. To state a cause of action for malicious prosecution, the prior criminal proceeding must have terminated in the plaintiff's favor. *Smalls v. Doe*, No. 06-CV-302-ARR, 2006 WL 270253, at \*1 (E.D.N. Y. Feb. 1, 2006) (citing *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)); *see also Poventud v. City of New York*, 750 F.3d 121, 127 (2d Cir. 2014) (malicious prosecution claim requires that plaintiff claim a favorable termination of any charge arising from the criminal transaction). While the plaintiff's conviction was reversed, the criminal case has not terminated in his favor. The plaintiff does not allege, and the documents of which I take judicial notice do not support, that the plaintiff's charges were dismissed. *See Smalls*, 2006 WL 270253, at \*2 (dismissing Section 1983 malicious prosecution claim because "plaintiff does not allege whether he was convicted of

the charges or whether the charges were dismissed."). Consequently, the plaintiff cannot state a claim for malicious prosecution upon which relief may be granted.

### B. Claims Against the Assistant District Attorneys

**\*7** An assistant district attorney who acted within the scope of her duties in "initiating and pursuing a criminal prosecution ... is immune from a civil suit for damages" under Section 1983. *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (citations omitted). For the reasons set out in Magistrate Judge Tomlinson's well-reasoned Report and Recommendation on the Nassau County defendants' motion to dismiss in *Bristol II*, I hold that the prosecutors' entitlement to absolutely immunity can be ascertained from the complaint. *Bristol II*, 2011 WL 6937468, at \*6.

### C. Monell Claims

The defendants assert that the plaintiff cannot establish municipal liability. (Defs.' Mot. to Dismiss at 14-15 (ECF no. 105).) The plaintiff appears to argue that the violation of his civil rights was a result of Nassau County's failure to train its law enforcement officers and prosecutors, and that this failure to train is an independent constructional violation.[16] Because the plaintiff has not stated a claim for an underlying constitutional violation upon which relief can be granted, the plaintiff's claims against the municipal defendant, Nassau County, are dismissed. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

[16]   The *Monell* allegations present in the *Bristol I* complaint are akin to those identified in Judge Tomlinson's decision recommending dismissal of the *Monell* claims. *Bristol II*, 2011 WL 6937468, at \* 11.

### D. Conspiracy Claims

The plaintiff alleges that the defendants "acting in concert, engaged in a well orchestrated scheme to deceive the county courts to injure plaintiff and to prosecute him without due process of law." (Compl. at 1.) The defendants move to dismiss that claim. (Defs.' Mot. to Dismiss at 13-14 (ECF No. 105).) Because, the plaintiff's claim that the individual defendants violated his constitutional rights is dismissed as a matter of law, his Section 1983 conspiracy claim also fails as a matter of law. *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009), *as amended* (Oct. 7, 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails."). Accordingly, because there is no underlying constitutional violation, the defendants' motion to dismiss the plaintiff's claim for conspiracy is granted.

### II. Sua Sponte Dismissal

The plaintiff also claims that he was subject to excessive bail in violation of the Eighth Amendment. Although the defendants have not moved to dismiss this claim, I dismiss it *sua sponte*.

While, as discussed above, I assume the truth of all well-pleaded, non-conclusory factual allegations in the complaint, under 28 U.S.C. § 1915(e)(2)(B), a district court must dismiss an *in forma pauperis* action "at any time" where it is satisfied that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." The plaintiff's allegation related to excessive bail does not state a claim on which relief may be granted.

The plaintiff complains that the fact that there were seven felony complaints induced the court to set bail so excessive, it "amount[ed] to no bail for plaintiff." However, the individual defendants named in the plaintiff's complaint—prosecutors and police officers—did not set Mr. Bristol's bail. The state court judge set the bail.[17] This judicial act breaks the chain of causation, such that neither the arresting officers nor the prosecutor can be liable on a theory that Mr. Bristol was denied his constitutional right to be free from excessive bail. *See Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (chain of causation broken by intervening exercise of independent judgment). Accordingly, to the extent that the plaintiff claims that he was denied his Eighth

2016 WL 2760339

Amendment right to be free from excessive bail, that claim is dismissed.

17    Amendment to name the state court judge would be futile, as the judge enjoys absolute judicial immunity for setting bail. *Root v. Liston*, 444 F.3d 127, 132 (2d Cir. 2006) ("Ordinarily, it is judges who set bail ... and judges enjoy absolute immunity when they do so.").

### III. Leave to Amend
**\*8**  Ordinarily, a *pro se* plaintiff is given an opportunity to amend his complaint if "a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco*, 222 F.3d at 112 (internal citations omitted). However, where, as here, it is clear from the complaint that he cannot state a claim for relief, the court need not grant an opportunity to amend. *See, e.g., Ashmore v. Prus*, 510 Fed. Appx. 47, 49 (2d Cir. 2013)

*cert. denied*, 133 S.Ct. 2038, 185 L.Ed.2d 887 (2013). The problems with the plaintiff's causes of action are substantive; "better pleading will not cure [them]." *Cuoco*, 222 F.3d at 112. Accordingly, I do not grant the plaintiff leave to amend his complaint.

### CONCLUSION

For the foregoing reasons, the complaint is dismissed in its entirety, and I deny the plaintiff leave to amend his complaint.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 2760339

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.